USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/25/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To All Actions*
------------------------------------------------------------------------------x

14-MD-2543 (JMF)
14-MC-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

This multi-district litigation proceeding ("MDL"), familiarity with which is presumed, relates to highly publicized defects in certain General Motors branded vehicles and associated vehicle recalls. Before the Court is Plaintiffs' motion to compel the production of documents from General Motors LLC ("New GM") and King & Spalding LLP ("K&S"), a law firm that has represented New GM. In brief, Plaintiffs argue that the documents, which are protected by either or both the attorney-client privilege and the work product doctrine, should be disclosed pursuant to the crime-fraud exception. In light of the fact that New GM was recently charged with violating federal criminal law by scheming to conceal material facts from a government regulator and committing wire fraud, the Court finds that there is probable cause to believe that New GM committed a "crime" or "fraud." But Plaintiffs fail to show that the documents at issue, most of which relate to counsel's evaluation of and advice to settle three discrete cases involving crashes, were made with the intent to further that — or any other — "crime" or "fraud." Accordingly, and for the reasons explained below, the motion is DENIED.

## BACKGROUND

The central defect alleged in this MDL is a faulty ignition switch in certain General Motors branded cars — most relevant for purposes of this motion, 2005-2007 model Chevrolet Cobalts — that could turn from the "run" position to the "accessory" position without warning,

thereby causing the car to stall (and, it later became clear, preventing the airbags from deploying in the event of a crash).  (*See, e.g.*, Pls.' Mem. Supp. Mot. To Compel Produc. Docs. New GM & King & Spalding LLC Based Crime-Fraud Exception (Docket No. 1136) ("Pls.' Mem.") 4). General Motors Corp. ("Old GM") — which filed for bankruptcy in 2009, a bankruptcy from which New GM emerged — became aware that there was a problem with the ignition switch (although not necessarily that there was a connection between that problem and airbag non-deployment) soon after production of the cars began.  (*See id.* at 4-5).  In response, Old GM issued a public bulletin — Information Service Bulletin 05-02-35-007 (the "ISB") — in December 2005.  (*See id.* at 5).  The ISB stated that the affected models had the potential to "inadvertently turn off the ignition due to low ignition key cylinder torque/effort."  (*Id.*).

In 2010 and 2011, K&S advised New GM in connection with potential lawsuits arising from two crashes — involving Hasaya Chansuthus and a 2006 Chevrolet Cobalt and Bridgette Sullivan and 2007 Chevrolet Cobalt, respectively — where, despite frontal collisions, the front airbags did not deploy.  (*See id.* at 6-7).  In each case, K&S attorneys prepared a case evaluation letter for New GM that described the crash and applicable law, and proffered a recommendation with respect to settlement.  (*See id.* at 7; King & Spalding LLP's Resp. Pls.' Mot. To Compel Produc. Docs. New GM & K&S Based Crime-Fraud Exception (Docket No. 1160) ("K&S's Mem.") 2).  Each evaluation followed a similar format: K&S relayed the specific facts of the case; notes on any of the victim's personal characteristics (for example, those that might make for a sympathetic plaintiff) and background on the potential claimant's counsel; a technical crash report, the engineers' findings, and information on relevant recalls; a summary of the applicable state's tort law; and an evaluation of the likely trial outcome and a recommendation for how to proceed.  (*See* Decl. Robert C. Hilliard Supp. Pls.' Mot. To Compel (Docket No. 1027) ("Hilliard

Decl."), Exs. 1, 13).  The evaluation in the Chansuthus case was sent on November 2, 2010, and the evaluation in the Sullivan case was sent on July 26, 2011.  (K&S's Mem. 7).

In its evaluation of the Chansuthus matter, K&S noted that New GM engineers had not settled on an explanation for the non-deployment of the airbags, but stated that engineers had noticed evidence of an electronic sensing "anomaly" and "hypothesized that a 'bounce' in the ignition switch could cause the [car's body control module] to sense that the vehicle was powered off while it was still running."  (*Id.* at 5).  K&S indicated that New GM engineers had been unable to replicate the phenomenon.  (*Id.*).  In part because of this "anomaly," K&S recommended that New GM try to settle the case.  (*Id.*).  K&S expressed concern that there was enough evidence of a potential defect under Tennessee law that, should the case go to trial, punitive damages were a real possibility.  (*Id.*).

K&S's letter in connection with the Sullivan case described the same "sensing anomaly," still believed to be caused by a "bounce" from rough road conditions, as a possible explanation for the airbag deployment failure.  (Pls.' Mem. 7).  The letter offered three possible technical explanations for the accident and airbag non-deployment.  (K&S's Mem. 6).  Once again, the inability to rule out the "anomaly" as a cause of the non-deployment, and the possibility that a large verdict would follow, led K&S to advise settlement.  (*Id.*).  In the wake of K&S's recommendations, both the Chansuthus and Sullivan matters were resolved, without litigation, through confidential settlements.  (*See* Pls.' Mem. 13 & n.55).  Those were not the only cases involving crashes relating to the accessory mode and airbag non-deployment; New GM identified twenty-two such incidents (including the Chansuthus and Sullivan matters that K&S handled) between July 2005 and September 2012.  (*See id.* at 9-10; Hilliard Decl., Ex. 26).

On February 24, 2012, K&S provided another case evaluation to New GM, for the crash of a 2005 Chevrolet Cobalt that had resulted in the death of Jennifer Brooke Melton.  (*See* Pls.' Mem. 8; K&S's Mem. 7-8).  This evaluation conveyed more information on the claimants' allegations and potential trial strategy (such as expert witnesses), as a lawsuit had already been filed, but was otherwise similar in form to the Chansuthus and Sullivan evaluations.  (*Compare* Hilliard Decl., Exs. 1, 13, *with id.*, Ex. 17).  The Melton crash did not involve frontal airbag non-deployment (because it was a side-impact crash), but it did appear to involve an ignition switch in the "accessory" position.  (K&S's Mem. 7).  Once again, K&S's letter about the Melton case cited the "bounce anomaly" as one of three possible explanations for the loss of power.  (*Id.* at 8).  K&S wrote that, regardless of the cause, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  (Hilliard Decl., Ex. 17, at 4).  Settlement was once again considered the most attractive option.  (K&S's Mem. 8).

In contrast to the Chansuthus and Sullivan matters, the Melton case did proceed to litigation, in Georgia state court.  As the case progressed, the Melton plaintiffs sought discovery relating to any crashes or complaints that were connected to the ISB.  (*See* Pls.' Mem. 16).  In its January 17, 2013 supplemental responses to the Melton plaintiffs' requests for production, New GM produced Field Performance Evaluation ("FPE") files and Problem Resolution Tracking System reports relating to the ignition switch and other features of the specified car models. (Hilliard Decl., Ex. 46, at 4).  Significantly, however, New GM stated that it had found no responsive documents relating to incidents with an identified connection to the ISB.  (*Id.* at 7).

New GM also stated that it had located no responsive documents regarding any lawsuits or "Not-In-Suit Matters" (that is, matters not involving filed lawsuits) alleging death, injury, or property damage resulting from the alleged ignition switch defect.  (Hilliard Decl., Ex. 47, at 3-5).

The Melton plaintiffs moved to compel the production of documents from New GM, contending that New GM was refusing to turn over responsive documents related to the ISB. (*See* Pls.' Mem. 17-18).  On February 7, 2013, the *Melton* Court held a hearing on the motion to compel, at which K&S stated that New GM's discovery responses were consistent with the electronic searches it had run.  (*See id.*).  The Court directed New GM to submit supplemental responses, with "information that's more definitive and specific."  (Hilliard Decl., Ex. 48, at 100; *see* K&S's Mem. 12).  On February 28, 2013, New GM submitted a set of second supplemental responses to the Melton plaintiffs' document requests, stating that it had run additional searches and was producing additional responsive documents.  (K&S's Mem. 12-13).  The Melton plaintiffs moved for discovery sanctions against New GM on June 18, 2013.  (*See* Hilliard Decl., Ex. 51, at 3).

At or about the same time, the Melton plaintiffs also sought to depose several New GM engineers with potential connections to the ignition switch defect.  At the April 29, 2013 deposition of one such engineer, Ray DeGiorgio, New GM and its counsel were surprised to learn that the Chevrolet Cobalt ignition switch had apparently been changed in the 2008 model Cobalts — terming the news a "bombshell."  (*See* Pls.' Mem. 22 & n.108).  New GM and K&S began to investigate the apparent part change, and hired Subbaiah Malladi as a consultant for that purpose, but they were unable to determine who at New GM had authorized the change.  (*See* K&S's Mem. 14-15).  They eventually concluded that the supplier of the ignition switches had instigated the change.  (*Id.* at 15).  In addition to DeGiorgio, the Melton plaintiffs sought to

depose an engineer named Jim Federico, but the case settled before his scheduled deposition took place.  (*See* Pls.' Mem. 24).

On July 22, 2013, a few months after the "bombshell" revelation that the ignition switch had been changed in later Cobalt models, K&S submitted a revised Melton case evaluation letter to New GM.  (*See* K&S's Mem. 8, 31).  K&S noted the Melton plaintiffs' new focus on the alleged ignition switch defect.  The letter described the history of the 2005 investigation of, and response, to the ignition switch defect, and then noted that ███████████████████████ ██████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████ ██████████████████████████ (Hilliard Decl., Ex. 3, at 2-3).  K&S recommended that the case be settled in light of the evidence surrounding the ignition switch defect.  (K&S's Mem. 8).  The parties did ultimately settle on September 9, 2013 — before the *Melton* Court had held a hearing or ruled on the plaintiffs' June 18, 2013 sanctions motion.  (*See* Pls.' Mem. 22).

Shortly thereafter, New GM's problems began to mount.  On February 7, 2014, New GM notified the National Highway Traffic Safety Commission ("NHTSA") about the ignition switch defect and airbag non-deployment.  (Pls.' Mem. 25).  Thereafter, New GM conceded that it had failed to fulfill its duty to notify NHTSA of the safety-related defect within five business days, as required by the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. § 30118(c)(1), and agreed to pay a civil penalty of $35 million.  New GM also issued recalls of

affected vehicles.  Finally, approximately two months ago, New GM consented, as part of a

deferred prosecution agreement ("DPA") with the United States Attorney's Office for the

Southern District of New York, to the filing of an information charging it with one count of

scheming to conceal material facts from a government regulator and one count of wire fraud.

*See United States v. $900,000,000 in U.S. Currency*, No. 15-CV-7342 (S.D.N.Y.), Docket No. 1

("DPA")).  As part of the DPA, New GM agreed to be bound by a detailed statement of facts

regarding its handling of the ignition switch defect.  (*Id.*).

## LEGAL STANDARD

The attorney-client privilege is "one of the oldest recognized privileges for confidential

communications," and "promote[s] broader public interests in the observance of law and the

administration of justice."  *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (internal

quotation marks omitted).  The privilege and its cousin, the work product doctrine, serve both to

protect the attorney-client relationship and to permit attorneys to carry out their duties fully.

They "promote unfettered communication between attorneys and their clients so that the attorney

may give fully informed legal advice" and "avoid chilling attorneys in developing materials to

aid them in giving legal advice in preparing a case for trial."  *In re Richard Roe, Inc.*, 68 F.3d 38,

40 (2d Cir. 1995) ("*Roe I*") (internal quotation marks omitted).  Rules that would pierce or waive

their protections must therefore be carefully formulated.  *See In re Cnty. of Erie*, 546 F.3d 222,

228 (2d Cir. 2008); *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997), *abrogated on other

grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014).  At the same time, the interests in

protecting the confidentiality of attorney-client communications and attorney work product are

minimal or non-existent when they are "made for the purpose of getting advice for the

commission of a fraud or crime."  *Roe I*, 68 F.3d at 40 (internal quotation marks omitted).  Thus,

the crime-fraud exception, which applies to both the attorney-client privilege and the work product doctrine.  *See United States v. Zolin*, 491 U.S. 554, 562-63 (1989); *Roe I*, 68 F.3d at 40 & n.2 (noting that the crime-fraud exception applies to both the attorney-client privilege and the work product doctrine).

Under federal law, which applies here, *see Von Bulow v. Von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987), a party seeking the production of otherwise privileged documents pursuant to the crime-fraud exception must make two showings.  First, the party "must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed"; and second, the party must show "that the communications were in furtherance thereof."  *Roe I*, 68 F.3d at 40; *accord In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) ("*Roe II*"); *Jacobs*, 117 F.3d at 87.  Where the moving party seeks *in camera* review of documents to which the crime-fraud exception would potentially apply, the court "should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies. Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court."  *Zolin*, 491 U.S. at 572 (internal citation and quotation marks omitted); *see In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994).  The threshold showing is intended to protect the policy of "open and legitimate disclosure between attorneys and clients," to prevent "groundless fishing expeditions," and to recognize "the burdens *in camera* review places upon the district courts, which may well be required to evaluate large evidentiary records without open adversarial guidance by the parties."  *Zolin*, 491 U.S. at 571.

With respect to the first prong of the test — whether there is probable cause to believe that a crime or fraud has been attempted or committed — the Second Circuit has not addressed

what kinds of "crime" or "fraud" are sufficient to trigger the exception or the level of detail with which the crime or fraud must be alleged. *See Chevron Corp. v. Salazar*, 275 F.R.D. 437, 452 (S.D.N.Y. 2011) ("Case law on the crime-fraud exception does not make perfectly clear what wrongdoing must be alleged, and with what specificity, in order for the privilege [not] to apply."). District courts within the Circuit, however, have applied the exception beyond patently criminal or fraudulent activity to non-fraud intentional torts. *See id.* at 452-53 ("[T]here is a large body of caselaw that recognizes its applicability even to non-fraud intentional torts." (internal quotation marks omitted)); *Madanes v. Madanes*, 199 F.R.D. 135, 148-49 (S.D.N.Y. 2001) (collecting crime-fraud cases from the Southern District of New York involving intentional torts). Additionally, some courts have held that "misconduct fundamentally inconsistent with the basic premises of the adversary system," such as "bad faith litigation conduct," falls within the scope of the exception. *Madanes*, 199 F.R.D. at 149 (internal quotation marks omitted); *Zimmerman v. Poly Prep Country Day School*, No. 09-CV-4586 (FB) (CLP), 2012 WL 2049493, at *17 (E.D.N.Y. June 6, 2012).

With respect to the second prong of the test, the Second Circuit has stressed that "the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud" and "where there is probable cause to believe that the *particular* communication with counsel or attorney work product was *intended* in some way to facilitate or to conceal the criminal activity." *Roe I*, 68 F.3d at 40 (initial emphasis in original); *see also Jacobs*, 117 F.3d at 88 ("*With strong emphasis on intent*, the crime-fraud exception applies only when there is probable cause to believe that the [documents in question] were intended in some way to facilitate or to conceal the criminal [or fraudulent] activity." (internal quotation marks omitted) (emphasis added)). That is, to subject

privileged communications or attorney work product to disclosure, a party must show a

"purposeful nexus," *Roe I*, 68 F.3d at 40 (internal quotation marks omitted), that the

communications were "*made with an intent to further*" the crime or fraud, *Jacobs*, 117 F.3d at 88

(emphasis in original) (internal quotation marks omitted); *see also, e.g.*, *In re 650 Fifth Ave.*, No.

08-CV-10934 (KBF), 2013 WL 3863866, at *2 (S.D.N.Y. July 25, 2013) ("[T]he Government

must provide particularized evidence that *each* challenged communication was made *in*

*furtherance of* the crime or fraud.") (emphasis in original).  Mere relevance or temporal

proximity does not suffice.  *See Roe I*, 68 F.3d at 40; *see also, e.g.*, *Roe II*, 168 F.3d at 71; *In re*

*Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986).

## DISCUSSION

In this motion, Plaintiffs seek to compel production — or, at a minimum, *in camera*

review — of several categories of presumptively privileged documents:

- All communications between New GM and K&S and attorney work product relating to
  the Chansuthus, Sullivan, and Melton matters concerning (1) claims evaluation;
  (2) settlement; (3) the ignition switch defect or "anomaly"; and (4) whether New GM was
  or might be obligated to report a safety defect to NHTSA and/or consumers;

- All communications between New GM and K&S and attorney work product relating to
  (1) the Melton document discovery requests; (2) part change documents; (3) the expert
  Subbaiah Malladi; and (4) the potential deposition of Jim Federico; and

- All K&S documents relating to whether rules of professional responsibility applicable to
  lawyers permitted or required K&S to reveal information concerning its representation of
  New GM in connection with the ignition switch defect (or to withdraw from such
  representation).

(Pls.' Mem. 32-33).[1]  Significantly, Plaintiffs already have a lot of those materials.  That is

because, pursuant to a Rule 502(d) order, New GM voluntarily agreed to produce most of the

---

[1]      Plaintiffs initially sought review of additional categories of documents, but have since
narrowed their request.  (*See* Pls.' Reply 22 nn.100, 102).

documents they had previously withheld as privileged, including communications related to the

Sullivan, Chansuthus, and Melton matters; discovery materials from *Melton*; and documents

produced to internal investigators and the Government.  (*See* Order No. 23 (Docket No. 404)

¶¶ 4-5; General Motors LLC's Am. Opp'n Pls.' Mot. To Compel Produc. Docs. New GM &

King & Spalding Based Crime-Fraud Exception (Docket No. 1556) ("New GM's Am. Opp'n")

9).  Plaintiffs nowhere argue that those disclosures were selective or incomplete.  Nevertheless,

even with those disclosures, the universe of documents at issue in this motion — largely internal

K&S work product (*see* New GM's Am. Opp'n 9) — is substantial.  According to New GM, it

totals at least ten thousand documents; according to K&S (which has never shared much of the

work product at issue, even with New GM), it totals more than 91,000 pages.  (New GM's Am.

Opp'n 2; K&S's Mem. 18).

Plaintiffs advance three theories for application of the crime-fraud exception to the

requested documents.  First, Plaintiffs contend that New GM engaged in a "systematic effort to

continue to conceal the deadly ignition switch defect, through the settlement of litigation, from

vehicle owners entitled to notice of the defect" and regulators such as NHTSA.  (Reply Mem

Law Supp. Pls.' Mot. To Compel Produc. Docs. New GM & King & Spalding Based Crime-

Fraud Exception (Docket No. 1256) ("Pls.' Reply") 12; *see also* Pls.' Mem. 30).  The settlement

of the Chansuthus, Sullivan, and Melton matters, Plaintiffs argue, involved the use of attorney

communications and work product "to prevent the disclosure" of the defect in furtherance of this

wrongdoing.  (Pls.' Mem. 32).  Second, Plaintiffs argue that New GM and K&S committed

"litigation misconduct" in the *Melton* proceeding, principally by failing to produce relevant and

responsive evidence of the ignition switch defect, and that "New GM used K&S's services in

furtherance of its discovery fraud."  (*Id.* at 36).  And third, Plaintiffs allege that by failing to

withdraw their representation when they learned New GM was concealing a safety defect, K&S lawyers violated rules of professional conduct and that this violation "provides an alternative basis to pierce the work product privilege." (*Id.* at 39). The Court will address each theory in turn.

## A. Concealment of the Defect

Plaintiffs' first theory — that New GM's communications with K&S were intended to (and did) conceal the existence of the ignition switch defect from the public and regulators — gained some traction when New GM entered the DPA because it is now indisputable that there is probable cause to believe that New GM engaged in a scheme to conceal a deadly safety defect from its regulator, NHTSA, and committed wire fraud in doing so. (*See* DPA at 1; Pls.' Ltr. (Docket No. 1598) 1-2).[2] Plaintiffs' bid falls short, however, with respect to the second prong of the crime-fraud test. Put simply, Plaintiffs do not provide a factual basis for a good faith belief that the communications and work product they seek — let alone any *particular* communications or work product they seek — were made with the intent to further a crime or fraud. *See Zolin*, 491 U.S. at 572; *Roe I*, 68 F.3d at 40. Instead, the materials upon which they rely — including, most notably, the Chansuthus, Sullivan, and Melton case evaluations — appear to be nothing more than good-faith attorney evaluations of whether to settle individual cases in light of the risks of adverse verdicts and large damage awards against New GM. They are, like the

---

[2]     Indeed, in light of the DPA, New GM filed amended versions of its opposition memorandum and sur-reply and appears no longer to argue that there is insufficient evidence to meet the first crime-fraud prong. (*See* New GM's Am. Opp'n; Gen. Motors LLC's Am. Surreply Opp'n Pls.' Mot. To Compel Produc. Docs. New GM & King & Spalding Based Crime-Fraud Exception (Docket No. 1557) ("New GM's Am. Sur-Reply")). Plaintiffs and K&S each filed letters regarding the effect of the DPA on the present motion. (*See* Pls.' Ltr.; K&S's Ltr. (Docket No. 1649)).

documents at issue in *Roe I* and *Roe II*, "only the kind of documents that one would typically expect to find generated in the course of a legitimate defense of this particular kind of litigation." *Roe II*, 168 F.3d at 72.  "No document suggests a belief that the defense of the litigation had no legal or factual support or that the act of litigating" — or, in this instance, settling — "was for an improper purpose. . . .  [And] no document indicates an intent to create or present misleading or false evidence."  *Id.*

To be sure, the confidential settlements in the Chansuthus, Sullivan, and Melton matters may, in some respects, have contributed to the delay in notifying the public and New GM's regulators about the ignition switch defect.  But there is an important distinction between effect and intent.  *See, e.g.*, *Jacobs*, 117 F.3d at 88 (noting that because of the crime fraud inquiry's "strong emphasis on intent . . . [it is] relevant to show that the wrong-doer had set upon a criminal course *before* consulting counsel") (emphasis in original); *cf. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (distinguishing between intent and effects in equal protection jurisprudence); Olatunde Johnson, *Disparity Rules*, 107 Colum. L. Rev. 374, 387-90 (2007) (discussing differences in intent and effects inquiries).  And the record before the Court — which includes most, if not all, of the relevant communications between New GM and K&S, which their authors never had reason to believe would see the light of day (*see* Order No. 23) — does not reveal any evidence that New GM's *intent* in seeking to settle the matters was to conceal the defect from the public and its regulators.

For example, there appear to be no references in the communications between New GM and K&S to the Safety Act or NHTSA, as one might expect if anyone involved had intended to violate the Safety Act by settling the cases confidentially.  Nor does there appear to be any mention of the risk that adverse jury verdicts would bring regulatory scrutiny or lead to vehicle

recalls.  That is, there is no mention of any consequences other than the risk of adverse jury verdicts and large punitive damages awards.  Moreover, the recommendations to settle the cases came from the K&S lawyers; there is no indication that anyone at New GM itself was desperate to settle or directed the K&S lawyers to settle the cases at all costs, as one might expect if the communications were in furtherance of an effort to conceal the defect from the public and NHTSA.  To the contrary, and this is the point, the case evaluations have all the hallmarks of dispassionate, sober evaluations (perhaps, in hindsight, too dispassionate and sober for their own good) by counsel of the costs and benefits of litigating the cases to their conclusion — just what one would might expect in a defense file and in the absence of a crime or fraud.  "The documents do reflect varying degrees of optimism or pessimism over particular issues and the ultimate outcome of the case[s].  The opinions offered, however, are garden variety remarks that one would find in any defense file."  *Roe II*, 168 F.3d at 72.

By contrast, in the cases upon which Plaintiffs rely (*see* Pls.' Reply 21-22), there was unmistakable evidence that the communications and materials at issue were made with an intent to further the relevant crime or fraud.  In *United States v. Ceglia*, No. 12-CR-876 (VSB), 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015), for example, the defendant was charged with doctoring a contract and fabricating emails in order to defraud Facebook and its founder, Mark Zuckerberg, by filing a fraudulent lawsuit.  *Id.* at *1.  In other words, the very purpose of the underlying civil litigation was to perpetrate a fraud, so the communications with counsel prosecuting the litigation and their work product were plainly in furtherance of the overall fraud.  *See id.* at *4-9.  Similarly, in *Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn. 2007), the Court allowed depositions of two attorneys pursuant to the crime-fraud exception where the plaintiff had submitted evidence that the defendant created trusts and other entities in order to shield his assets

from creditors, and had "used the legal services of [the] two attorneys to form and/or operate [those entities as] vehicles for carrying out the fraud." *Id.* at 406. And in *In re A.H. Robins Co., Inc., "Dalkon Shield" IUD Prods. Liab. Litig.*, 107 F.R.D. 2 (D. Kan. 1985) — where the plaintiffs argued, as Plaintiffs do here, that the defendant had "a pattern of settling cases to avoid production of documents," *id.* at 14 — the Court (applying Kansas law) found evidence of "a massive fraudulent scheme perpetrated on the public with the knowing assistance of members of the professional bar," including evidence that a defense "expert witness/consultant [had] committed perjury, with complicity of counsel" and evidence that "documents related to the litigation were destroyed or withheld, apparently with the knowledge of [defense] counsel." *Id.* at 11; *see also Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 439-40 (S.D.N.Y. Feb. 11, 2013) (applying the crime-fraud exception to attorney communications that allowed the defendant to fraudulently obtain financing from different financial institutions); *Zimmerman*, 2012 WL 2049493, at *20-22 (finding that certain attorney communications and work product were potentially intended to control a sham investigation that allegedly covered up a school sexual abuse scandal); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97-CV-4978 (LMM) (HBP), 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999) (holding that communications were in furtherance of crime or fraud when a party was seeking information from attorneys to be used in an extortion scheme).[3]

---

[3]     Many of these cases are distinguishable for another reason. Some of the courts held that, to satisfy the second prong of the crime-fraud test, a "communication or document need only *reasonably relate* to the subject matter of the purported fraud." *Ceglia*, 2015 WL 1499194, at *3 (emphasis added) (internal quotation marks omitted); *see Zimmerman*, 2012 WL 2049493, at *7; *Amusement Indus.*, 293 F.R.D. at 427. In the Court's judgment, the "reasonably related" test is in some tension, if not conflict, with the Second Circuit's analysis in *Roe I* and *Roe II*. In the former, the Court rejected a crime-fraud test that looked to whether documents were "relevant evidence of activity in furtherance of a crime," and held instead that "the exception applies only

In each of these cases, the attorney-client communications and work product at issue were plainly in furtherance of a criminal or fraudulent scheme: to recover under a forged contract, to establish a fraudulent trust or engage in fraudulent transactions, to make an extortionate request more convincing, or to conduct a sham investigation.  By contrast, there is no evidence of such intent here; instead, Plaintiffs have shown only that New GM solicited candid legal advice regarding the company's potential liability on individual claims and then settled those claims pursuant to its counsel's advice.  (Notably, the result, confidential settlements, are accepted — even encouraged — by the law as a way of promoting settlement. *See, e.g.*, *In re Teligent, Inc.*, 640 F.3d 53, 57-58 (2d Cir. 2011); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143-44 & n.9 (2d Cir. 2004).)  New GM's and K&S's conduct may well have contributed to the delay in public disclosure of the ignition switch defect.  And it may well be that Plaintiffs can ultimately prove (as the criminal charges against New GM certainly suggest) that there was an intentional scheme on the part of some at New GM to conceal the ignition switch defect from the public and NHTSA (and that the confidential settlements served to facilitate that scheme).  But the Second Circuit has "strong[ly] emphasi[zed]" that evidence of a crime or fraud alone is not enough to vitiate the attorney-client privilege and work product doctrine, *Jacobs*, 117 F.3d at 88, and that the moving party must *also* show "that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity," *Roe I*, 68 F.3d at 40.  Here, even though Plaintiffs are already

---

when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud."  68 F.3d at 40.  The Court reiterated its rejection of the "relevant evidence" test in *Roe II.  See* 168 F.3d at 71.  In this Court's view, "reasonably relate[d] to" feels perilously close to the rejected "relevant evidence of" standard.  (*See* New GM's Am. Opp'n 12-14; New GM's Am. Sur-Reply 2 n.4).

privy to most of the communications between New GM and K&S, they have failed to make that showing with respect to their first theory, of concealment.

## B. Litigation Misconduct in *Melton*

Plaintiffs' second crime-fraud theory — based on the alleged "litigation misconduct" and "discovery fraud" in the *Melton* litigation — fails as well.  Plaintiffs contend primarily that New GM and K&S lied about the existence of relevant documents and concealed evidence from the Meltons and the *Melton* Court and that this misconduct was "designed to further conceal the fact that New GM had known about, but concealed, the defect for years."  (Pls.' Ltr. 4; *see also* Pls.' Mem. 34; Pls.' Reply 23-27).[4]  But Plaintiffs exaggerate or mischaracterize much of the evidence.  To be sure, New GM's initial responses to the Meltons' requests for documents related to similar accidents and incidents do appear to have been less than forthcoming.  (*See* Pls.' Mem. 18).  After the motion to compel hearing, however, New GM supplemented its responses and production with thousands of pages of documents — including documents identifying the Chansuthus and Sullivan crashes and other similar incidents — and Plaintiffs do not suggest that that production was fraudulent or incomplete.  (*See* K&S's Mem. 13, 31-32; *see also* New GM's Am. Mem. 23).  More significantly, Plaintiffs provide no evidence to suggest that the initial shortcomings were a result of intentional misconduct.  If anything, the record

---

[4]    New GM contends that Plaintiffs lack "standing" to make this argument because the only parties injured by any litigation misconduct in *Melton* were the Meltons themselves, who released any and all claims against New GM in settling.  (New GM's Am. Opp'n 4).  That contention borders on frivolous.  Plaintiffs do not argue that they were injured by the litigation misconduct in *Melton*; they argue that New GM and K&S may not withhold communications and work product relating to *Melton* because they were in furtherance of a crime or fraud.  They have "standing" to make that argument — if that is even the right word — by virtue of the fact that they requested the documents at issue in this MDL and either New GM or K&S has objected to producing them.

suggests a good faith (though perhaps mistaken) belief that K&S and New GM had complied with their discovery obligations.  For example, Plaintiffs cite a December 2012 e-mail from Harold Franklin (a K&S attorney) to Ronald Porter (a New GM in-house attorney) as evidence that New GM chose to withhold responsive documents, but that e-mail states merely that "[*i*]f the airbag investigation was separate and distinct," then counsel was "comfortable with excluding it" from discovery in the Melton case (where, as noted above, airbag nondeployment was not an issue), indicating that those documents were presumptively nonresponsive from counsel's perspective.  (Pls.' Mem. 21 n.98; *see* Pls.' Mem. 36).

Plaintiffs also argue that New GM and K&S concealed "crucial part change documents" (namely, documentary confirmation from New GM's supplier of the ignition switch change that was implemented in the 2008 Chevrolet Cobalt) and "the role of a key engineer and prospective deponent, Jim Federico, in order to prevent his deposition."  (Pls.' Mem. 34).  Again, Plaintiffs exaggerate and mischaracterize the record, and ultimately fail to point to critical evidence of intent.  With respect to evidence that the ignition switch had been changed, for example, there is no evidence — as Plaintiffs assert — that, after learning the "bombshell" news during DeGiorgio's deposition that the ignition switch had been changed, New GM purposefully waited to "obtain part change documents until after" the case settled.  (Pls.' Reply 26).  To the contrary, the evidence reveals that, not long after the deposition, K&S and New GM sought further information about the apparent part change from New GM's supplier — a move they would not likely have taken if they were seeking to suppress evidence of the change — and that New GM did not receive the relevant documentation until October 2013, after the case had settled.  (*See* DPA ¶ 93; Pls.' Ltr. 4).  (Moreover, the very fact that K&S, in its privileged communications with New GM, characterized evidence of the part change as a revelation — specifically, as a

"bombshell" — belies any claim that the lawyers were part of an intentional scheme to conceal.)[5]

With respect to the deposition of Federico, the record makes plain that New GM was ready to

present him for the noticed deposition and certainly did nothing to "prevent" him from being

deposed.  (*See* K&S's Mem. 34).  The deposition did not go forward only because the case

settled shortly before the scheduled date (K&S's Mem. 35), and Plaintiffs point to no evidence

suggesting that New GM settled the case to avoid the deposition.

At bottom, the record may well support a conclusion that New GM and K&S played it

too close to the vest in the *Melton* case — by, for example, construing the concept of relevance

too narrowly and thus withholding documents and materials that should have been turned over

(or turned over earlier) to the Meltons.  But that is the stuff that ordinary (albeit perhaps overly

aggressive) litigation is made of, which can and should be addressed by sanctions in the same

case, not the stuff that crimes and frauds are made of, which can and should result in the

wholesale disclosure later of all attorney-client communications and attorney work product.  *See*

*Magnetar Techn. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 487-88 (D. Del.

2012) (rejecting the crime-fraud exception despite "a serious concern" about document

destruction and general uncooperativeness with discovery because there was an insufficient

---

[5]     Plaintiffs accuse DeGiorgio of giving "false testimony" that New GM did not authorize
the part change.  (*See* Pls.' Mem. 23; Pl.'s Reply 26-27).  There is no dispute that DeGiorgio's
testimony was inaccurate — his signature appears on the documents authorizing the part change
(*see* K&S's Mem. 13) — but Plaintiffs present no evidence that it was knowingly false when
made, let alone that the K&S lawyers involved in Melton were aware that it was false.  (When
deposed as part of the MDL, DeGiorgio testified that he did not realize or remember that New
GM had authorized a change to the ignition switch until he saw the change order in early 2014,
after *Melton* had settled.  (*See* K&S's Mem. 14 n.58; *id.* at 15).)  Plaintiffs cite no authority for
the proposition that the inaccurate (or even perjurious) testimony of a single witness is sufficient
to vitiate a company's attorney-client privilege or work product protections, let alone in a
wholesale manner.

showing of a crime or fraud); *Jinks-Umstead v. England*, 232 F.R.D. 142, 145-46 (D.D.C. 2005) (similar); *RCA Corp. v. Data General Corp.*, No. 84-CV-270 (JJF), 1986 WL 15684, at *2 (D. Del. Oct. 27, 1986) ("[T]he crime-fraud exception is not triggered by the mere showing that an attorney has failed to produce certain documents in the course of extensive discovery."); *cf. Roe II*, 168 F.3d at 71 ("Where the very act of litigating is alleged as being in furtherance of a fraud, the party seeking disclosure under the crime-fraud exception must show probable cause that the litigation or an aspect thereof had little or no legal or factual basis and was carried on substantially for the purpose of furthering the crime or fraud.").  Not surprisingly, therefore, it falls far short of the sort of calculated and purposeful litigation misconduct that has led courts in other cases to apply the crime-fraud exception.  *See, e.g.*, *1100 West, LLC v. Red Spot Paint & Varnish Co., Inc.*, No. 05-CV-1670 (LJM) (JMS), 2009 WL 232060, at *4-6 (S.D. Ind. Jan. 30, 2009) (applying the crime-fraud exception where the defendant and its attorneys had reviewed and then initially refused to turn over numerous documents that evidenced the use of a harmful chemical that the defendants' representatives had categorically and repeatedly denied was present on contested property); *Gutter v. E.I. Dupont de Nemours*, 124 F. Supp. 2d 1291, 1300 (S.D. Fla. 2000) (affirming a special master's report and recommendation applying the crime-fraud exception where counsel had repeatedly violated court orders and testified falsely).

## C.  Professional Ethics Violations

Finally, Plaintiffs ask for *in camera* review of otherwise protected attorney work product on the ground that K&S — not New GM — committed various ethical violations in its representation of New GM.  (*See* Pls.' Mem. 39; *see also* Decl. Robert C. Hilliard Supp. Pls.' Mot. To Compel (Docket No. 1257) ("Hilliard Reply Decl."), Exs. 20, 21).  As Plaintiffs note (Pls.' Mem. 39-40), some courts have indeed held that the attorney work product doctrine can be

vitiated by counsel's violation of professional rules of conduct.  *See, e.g.*, *Parrot v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983) (affirming a trial court's order requiring the production of interview tapes that had been secretly recorded by an attorney); *Anderson v. Hale*, 202 F.R.D. 548, 558 (N.D. Ill. 2001) (ordering production of same); *New York v. Solvent Chem. Co., Inc.*, 166 F.R.D. 284, 289-90 (W.D.N.Y. 1996) (ordering production of consulting agreements that secured the cooperation of a previously hostile witness); *Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1358-59 (E.D. Va. 1987) (ordering production of secret recordings); *see also Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) (holding that "a lawyer's unprofessional behavior may vitiate the work product privilege").  Every one of those cases, however, involved materials that were themselves "the fruit of impermissible legal conduct" — that is, evidence that was directly generated by the attorney's misconduct.  *Moody*, 654 F.2d at 800.  As the D.C. Circuit wisely explained, "[i]t would indeed be perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by those very activities the privilege was meant to prevent.  Non-disclosure would then provide an incentive for, rather than against, the disfavored practices." *Id.* (footnotes omitted); *see also Parrott*, 707 F.2d at 1271 n.20 ("Disclosure is clearly an appropriate remedy when the evidence sought was *generated* directly by the attorney's misconduct." (emphasis in original)).

This case is easily distinguished.  Here, Plaintiffs allege that K&S violated Model Rule of Professional Conduct 1.2(d), which "prohibits a lawyer from engaging in conduct the lawyer knows to be criminal or fraudulent," and Model Rule 1.16(a), which "mandates that an attorney withdraw from (or decline) representation if the representation will result in a violation of the rules of professional conduct or other law."  (Pls.' Mem. 39; *see also* Hilliard Reply Decl., Ex.

20, at 2-4).[6]  Whether or not Plaintiffs are correct — a question the Court need not and does not

address — the materials at issue are not the direct "fruits" of K&S's alleged misconduct.  Indeed,

at bottom, Plaintiffs' ethics violation argument is little more than a reframed version of their

concealment and litigation  misconduct arguments, as the gravamen of the argument is that K&S

attorneys acted improperly by pursuing confidential settlements and withholding discovery on

behalf of New GM.  Those arguments are no more persuasive when reframed than they were

when made directly.  Indeed, if anything, the reframed arguments are weaker, as it is well

established that, generally, "[t]he pertinent intent is that of the client, not the attorney."  *In re*

*Omnicom Grp. Inc. Sec. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006).  Relatedly, to the extent

that lawyers violate their professional responsibilities, it is generally better to sanction the

lawyers themselves, either in the same case or through disciplinary proceedings, than to punish

their client, who may or may not have been complicit in the violation.  *See Moody*, 654 F.2d at

801 n.23 ("Lawyers, of course, are always subject to disciplinary proceedings, if not criminal or

civil malpractice sanctions, for malfeasance in the conduct of their legal affairs.  Thus, disclosure

is not the sole available remedy for a breach of a professional duty, and may in fact bear so little

relationship to the underlying breach as to be inappropriate as a remedy.").  *But cf. id.* at 801

n.24 (noting that a "client's interest in non-disclosure would be illegitimate, of course, if he

knowingly instigated or participated in the conduct which constituted the breach of duty" and

---

[6]      Plaintiffs' experts cite a host of other rules (for example, Rule 1.4(a)(3), which provides
that lawyers must keep their clients informed about case matters) that potentially apply to the
situation.  (*See* Hilliard Reply Decl., Ex. 20, at 3-4; *id.*, Ex. 21, at 4; Pls.' Reply 29-30).  Because
Plaintiffs raised these for the first time in their reply — and because they cite no authority
holding that any of them could be the basis for the crime-fraud exception — the Court finds them
to be no more persuasive.  *See, e.g., Tutor Time Learning Ctrs., LLC v. GKO Grp., Inc.*, No. 13-
CV-2980 (JMF), 2013 WL 5637676, at *1 (S.D.N.Y. Oct. 15, 2013) ("[A]rguments raised for the
first time in a reply memorandum are waived and need not be considered." (citing cases)).

that, "[i]n some cases, the extent to which a client should be allowed to benefit from unprofessionally obtained information may also be questioned").  Accordingly, the Court rejects Plaintiffs' final argument for disclosure of the materials at issue.

## CONCLUSION

The issue presented by this motion is not whether there is probable cause to believe that New GM committed a crime or fraud by concealing the ignition switch defect from its regulators and the general public.  The recent criminal charges filed against New GM indicate there is probable cause to so believe, and Plaintiffs in this MDL may ultimately be able to prove that New GM committed egregious acts for which it should be held to account (and that settling the Chansuthus, Sullivan, and Melton matters facilitated them).  Instead, the issue presented by this motion is whether, under the well-established principles that govern application of the crime-fraud exception to the attorney-client privilege and attorney work product doctrine, Plaintiffs have shown that the communications and materials they seek were made with the intent to further a crime or fraud, thereby warranting their disclosure.  For the reasons stated above, the Court concludes that, however troubling some of New GM's conduct may have been, Plaintiffs have failed to make that showing.  Further, mindful of the fact that Plaintiffs were already provided access to a substantial cache of documents that would otherwise have been subject to the attorney-client privilege, the Court concludes that there is no basis even to review the materials at issue (or a subset of those materials) *in camera*.  Put simply, if there were "a factual basis" to conclude that New GM and K&S were communicating or working in furtherance of a crime or fraud, one would expect to see *some* evidence in those communications — which K&S and New GM had no reason to believe would see the light of day when they were made — that

they were made with such an intent.  *Zolin*, 491 U.S. at 572.  Because Plaintiffs point to no such

evidence, the Court concludes that Plaintiffs' motion to compel must be DENIED.

 The parties submitted portions of their briefs in redacted form (some of which has since

been unredacted) and certain exhibits under seal because New GM had designated the

information as "highly confidential."  (*See, e.g.*, Docket Nos. 1156, 1255; *see also* Docket Nos.

1101, 1116).  In this Opinion and Order, the Court has quoted from those materials; out of an

abundance of caution, the Court has redacted those portions from the version filed publicly.  As

the Court has repeatedly noted, however, the mere fact that information is subject to a

confidentiality agreement between litigants is not a valid basis to overcome the presumption in

favor of public access to judicial documents.  *See, e.g.*, *Dandong v. Pinnacle Performance Ltd.*,

No. 10-CV-8086 (JMF), 2012 WL 6217646, at *2 (S.D.N.Y. Dec. 3, 2012) ("The consent of the

parties is not a valid basis to justify sealing, as the rights involved are the rights of the public."

(internal quotation marks omitted)); *Vasquez v. City of N. Y.*, No. 10-CV-6277 (LBS), 2012 WL

4377774, at *3 (S.D.N.Y. Sept. 24, 2012) (similar).  Accordingly, and in accordance with the

procedures set out in Section X of MDL Order No. 77 (Docket No. 1349), any party who

believes the materials should remain under seal or in redacted form (including, but not limited to,

the portions of this Opinion and Order than have been redacted) shall file a letter brief **within**

**seven days** regarding the propriety of doing so.  *See, e.g.*, *Lugosch v. Pyramid Co. of Onondaga*,

435 F.3d 110, 119-20 (2d Cir. 2006) (discussing the presumption in favor of public access).

 The Clerk of Court is directed to terminate Docket Nos. 1031 and 1135.

 SO ORDERED.

Dated: November 25, 2015
   New York, New York

_____
JESSE M. FURMAN
United States District Judge