USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/15/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To All Actions*
-------------------------------------------------------------------------x

14-MD-2543 (JMF)
14-MC-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

**[Regarding New GM's Partial Motion To Dismiss the
Third Amended Consolidated Class Action Complaint]**

INTRODUCTION ...................................................................................................................3

BACKGROUND .....................................................................................................................6

PROCEDURAL HISTORY.....................................................................................................10

LEGAL STANDARDS ...........................................................................................................13

DISCUSSION ........................................................................................................................14

    A.    Plaintiffs' Theories of Injury ........................................................................15

    B.    Federal Claims ..............................................................................................24

        1.    RICO .................................................................................................25

            a.    RICO Enterprise.....................................................................27

            b.    RICO Injury ...........................................................................36

        2.    The Magnuson-Moss Warranty Act.................................................42

    C.    State Claims ..................................................................................................42

        1.    California .........................................................................................43

            a.    UCL........................................................................................44

            b.    CLRA......................................................................................51

            c.    Fraudulent Concealment .......................................................53

            d.    Unjust Enrichment ................................................................55

            e.    SBA........................................................................................56

            f.    Negligent Failure To Recall...................................................57

        2.    District of Columbia .......................................................................59

|  |  | a. | DCCPPA | 59 |
|  |  | b. | Fraudulent Concealment | 61 |
|  |  | c. | Unjust Enrichment | 61 |
|  | 3. | Florida |  | 62 |
|  |  | a. | FDUTPA | 63 |
|  |  | b. | Fraudulent Concealment | 67 |
|  |  | c. | Unjust Enrichment | 69 |
|  | 4. | Louisiana |  | 70 |
|  | 5. | Maryland |  | 72 |
|  |  | a. | MCPA | 73 |
|  |  | b. | Fraudulent Concealment | 76 |
|  |  | c. | Breach of Warranty | 77 |
|  |  | d. | Unjust Enrichment | 77 |
|  |  | e. | Negligence | 78 |
|  | 6. | Missouri |  | 78 |
|  |  | a. | MMPA | 79 |
|  |  | b. | Fraudulent Concealment | 82 |
|  |  | c. | Breach of Warranty | 84 |
|  |  | d. | Unjust Enrichment | 85 |
|  | 7. | Oklahoma |  | 86 |
|  |  | a. | OCPA | 87 |
|  |  | b. | Breach of Warranty | 90 |
|  |  | c. | Fraudulent Concealment | 91 |
|  |  | d. | Unjust Enrichment | 93 |
|  | 8. | Virginia |  | 94 |
|  |  | a. | VCPA and Fraudulent Concealment | 94 |
|  |  | b. | Unjust Enrichment | 97 |
| D. | Class Standing and Prudential Mootness |  |  | 97 |
| CONCLUSION |  |  |  | 101 |

# INTRODUCTION

All defect-free cars are alike; each defective car is defective in its own way.  This multidistrict litigation ("MDL"), familiarity with which is assumed, arose from the recall in February 2014 by General Motors LLC ("New GM") of General Motors ("GM") vehicles that had been manufactured with a defective ignition switch — a switch that could too easily move from the "run" position to the "accessory" and "off" positions, causing moving stalls and disabling critical safety systems (such as the airbag).  Following that recall, New GM recalled millions of other vehicles, some for ignition switch-related defects and some for other defects.  Thousands of MDL Plaintiffs have filed claims alleging that they or their loved ones were injured or killed as a result of accidents caused by one or the other of these defects.  Those cases are proceeding on one track, with "bellwether" trials in individual cases having commenced earlier this year.  On a separate track, Plaintiffs pursue claims for "economic losses."  Specifically, Plaintiffs pursue recovery on behalf of a broad putative class of GM car owners and lessors, arguing that they and others have been harmed by a drop in their cars' value due to the revelations of GM's years-long cover-up of the ignition switch and other potentially fatal defects.  Their operative complaint — the Third Amended Consolidated Complaint or "TACC" — runs to over a thousand pages and 4500 paragraphs, and includes claims under federal and state law brought by named Plaintiffs in all fifty states and the District of Columbia.

On February 24, 2016, New GM moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to partially dismiss the TACC.  New GM's motion was limited, not because it conceded that the TACC's other claims were valid, but because the scope of Plaintiffs' claims was likely to be affected by several appeals from rulings of the United States Bankruptcy Court

for the Southern District of New York to the United States Court of Appeals for the Second

Circuit — appeals that were decided just days ago.  *See In re Motors Liquidation Co.*, No. 15-

2844-bk(L) (2d Cir. July 13, 2016).[1]  Prompted by the Court, the parties agreed that New GM's

initial motion would focus on the claims of Plaintiffs from eight jurisdictions who purchased or

leased New GM cars (and who were outside the scope of the Second Circuit appeal).  This

Opinion and Order is similarly limited to those claims.  Thus, while it is a significant step in the

MDL, much remains to be done — including, presumably, more Rule 12(b)(6) motion practice.

By their own admission, Plaintiffs pursue an unprecedented theory of damages, one that

turns not on whether the vehicles at issue were sold with known, latent defects (many of the class

members' cars were concededly not defective when sold), but rather on the alleged reduction in

resale value of the vehicles due to damage to New GM's reputation and brand.  For the reasons

discussed below, the Court finds that that novel theory of damages is unsound in light of

persuasive precedent interpreting consumer protection law and general principles of tort

recovery.  Put simply, the law does not treat as cognizable a consumer's interest in the

continuing good reputation of a manufacturer that sells him or her a defect-free product that

performs as warranted.  That holding significantly curtails the scope of Plaintiffs' potential

recovery under the TACC.  So too does the Court's finding, discussed below, that Plaintiffs —

---

[1]      The Second Circuit affirmed the Bankruptcy Court to the extent it held that the July 2009
Sale Order pursuant to which New GM acquired certain assets and liabilities from General
Motors Corporation ("Old GM") does not apply to so-called "independent claims" brought
against New GM; it reversed the Bankruptcy Court's rulings that the Sale Order barred claims
brought by pre-closing accident and economic loss ignition switch plaintiffs and purchasers of
used Old GM cars; and vacated the Bankruptcy Court's rulings that the Sale Order barred claims
by purchasers of non-ignition switch Old GM vehicles and that the doctrine of equitable
mootness precluded claims against the General Motors Liquidation Trust (or "GUC Trust").  *See*
*In re Motors Liquidation Co.*, slip op. at 74.

regardless of whether their cars were sold with a defect — fail to plead a viable claim under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.*, both because they fail to allege the existence of an "enterprise" within the meaning of RICO and because RICO does not recognize the injury alleged by most of the Plaintiffs in the TACC. Finally, recovery is further limited by the Court's conclusion below that named Plaintiffs may bring class claims only on behalf of plaintiffs whose cars were sold with sufficiently similar defects (for example, the same type of ignition switch defect).

That said, the Court concludes that New GM goes too far in contending that the claims of Plaintiffs who purchased or leased allegedly defective cars should largely be treated alike. Plaintiffs' state law claims (brought in addition to the federal RICO claim and federal warranty claims) sound in consumer fraud, common law fraudulent concealment, unjust enrichment, breach of warranty, and negligence.  New GM's arguments against them are generally of three varieties: (1) that state law does not allow Plaintiffs to bring claims because their cars did not manifest the alleged defects; (2) that New GM (which did not manufacture the defective ignition switches) had no duty to disclose the alleged defects; and (3) that Plaintiffs have no viable unjust enrichment claims because their cars were purchased used or with express warranties.  The first two arguments depend on the particulars of each jurisdiction's law.  Accordingly, while it entails a significant amount of repetition, this Opinion and Order analyzes each claim in conjunction with precedent from the relevant jurisdiction.  New GM relies heavily on some opinions rejecting claims such as those pressed here, but many jurisdictions do in fact recognize claims brought by purchasers of products that were allegedly sold with known defects — regardless of how the product later performed — and so a number of the individual Plaintiffs' consumer

protection, fraud, and warranty claims survive. By contrast, the unjust enrichment claims must largely be dismissed.

In short, as discussed in detail below, New GM's motion to dismiss is GRANTED in part and DENIED in part. More specifically, it is granted with respect to Plaintiffs' RICO claim and claims brought by any Plaintiff whose car was not allegedly defective when sold. New GM's motion to dismiss is also GRANTED with respect to some of Plaintiffs' state law claims, but DENIED with respect to others. Finally, the named Plaintiffs who survive cannot bring claims on behalf of putative class members whose defects are not sufficiently similar to theirs. After setting out the relevant background, the Court will address Plaintiffs' theories of injury and then turn to Plaintiffs' claims, beginning with their claims under federal law.

## BACKGROUND

The following facts — which are taken from the TACC, documents it incorporates, and matters of which the Court may take judicial notice — are construed in the light most favorable to Plaintiffs. *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). On July 11, 2009, New GM emerged from the bankruptcy of Old GM as the operative General Motors business entity and the largest car manufacturer in the world. (*See* Third Am. Consolidated Compl. (Docket No. 1915) ("TACC") ¶¶ 168, 993, 996). New GM portrayed the new company as one devoted to safety, innovation, and vehicle quality. (*See id.* ¶¶ 171-188). For example, in the company's 2010 Annual Report, it touted that "[t]he new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity

and streamlined, more efficient inventory processes." (*Id.* ¶ 176). And advertisements proclaimed: "The New GM. Something to Believe In," while asserting that "[a]dvanced safety and security features will confirm GM's role as an innovation leader." (*Id.* ¶ 196).

Under the surface, however, things were not so rosy. Prior to the bankruptcy, Old GM engineers learned of a problem with the ignition switch in certain car models. (*See id.* ¶¶ 284-296). Specifically, the affected cars had an ignition switch that could inadvertently move from the "run" to the "accessory" or "off" position during driving, causing a car to lose power and the functionality of several critical safety features, including power brakes and airbags (although engineers did not appreciate the relationship between the ignition switch and airbag nondeployment until later). (*Id.* ¶¶ 258-260). Old GM issued a "Technical Service Bulletin" (that is, a notice to dealers about issues in GM vehicles (*see id.* ¶ 582)) to its dealers (but not the public) on February 28, 2005, advising them that there was a "potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort" and that the problem could be exacerbated if the driver was short or had a large key chain. (*Id.* ¶ 298). The bulletin advised dealers to find out if customers were likely to be affected and to tell customers to remove excess items from their key chains. (*Id.* ¶ 298). Old GM issued another Technical Service Bulletin related to the issue in December 2005. (*See id.* ¶ 306).

During the same period, Old GM began receiving reports of fatal crashes involving cars that had been in the "accessory" or "off" position or cars with airbags that did not deploy as expected. (*See id.* ¶¶ 305, 307-309, 314, 317-327). Those reports continued after the bankruptcy. (*See id.* ¶¶ 339-344). Despite opening investigations into such incidents, New GM did not issue a recall of potentially affected vehicles, an approach that was consistent with New GM's emphasis on avoiding recalls. (*See id.* ¶¶ 336-337, 343, 345-348). Most of the claims

arising out of the accidents were resolved through settlements, although one claim — relating to the death on March 10, 2010, of Brooke Melton — did proceed to litigation.  (*See id.* ¶¶ 339, 342, 352).  In addition to the reports of severe crashes, New GM received many customer complaints related to ignition switch problems.  (*See id.* ¶¶ 353, 375-379).  In a Statement of Facts ("SOF") to which New GM later stipulated as a part of a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Office for the Southern District of New York, New GM admitted that it knew of the ignition switch defect and its relationship to airbag nondeployment by Spring 2012.  (*See id.* ¶ 1057).

New GM ultimately recalled 2.1 million vehicles due to the ignition switch defect in February and March 2014 (the "Delta Ignition Switch Vehicles"); in June and July 2014, New GM recalled an additional eleven million vehicles for similar ignition switch defects.  (*See id.* ¶¶ 257, 380-384, 388-391).[2]  The recalls sparked public outcry and a congressional investigation, and led New GM to conduct its own internal investigation led by Anton R. Valukas, the chairperson of Jenner & Block LLP.  (*See id.* ¶¶ 384-385).  Valukas and his team reviewed a vast number of documents and interviewed hundreds of people, including over 200 New GM employees and former employees.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 524 (S.D.N.Y. 2015).  The result was a written report (the "Valukas Report") that New GM submitted to Congress, the Department of Justice, and the National Highway Traffic Safety Administration ("NHTSA"), among others.  *See id.* at 524-25.  The Valukas Report concluded, *inter alia*, that New GM had fostered a culture of cost-cutting and reluctance to take

---

[2]     The degree of similarity between these vehicles and the Delta Ignition Switch Vehicles is a point of dispute.

responsibility for safety that delayed the discovery of, and response to, the ignition switch defect. (*See* TACC ¶¶ 556-564, 571-597).  New GM also set up a claims resolution facility run by Kenneth Feinberg to resolve the claims of those who alleged personal injuries or wrongful deaths as a result of the ignition switch defects.  (*See id.* ¶ 386).  All told, at least 124 deaths and hundreds of injuries have been attributed to the ignition switch defects.  (*See id.* ¶¶ 20, 261).

New GM continued to recall vehicles for ignition-switch-related and other defects.  (*See id.* ¶¶ 505-507, 616).  Overall, between 2014 and 2015, New GM issued more than eighty-four recalls relating to more than seventy defects and affecting over twenty-seven million GM cars. (*See id.* ¶ 616).  On May 16, 2014, New GM entered into a Consent Agreement with NHTSA, admitting that it had violated the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. §§ 30101, *et seq.* by failing to timely disclose the ignition switch defect and issue recalls.  (*See* TACC ¶ 23).  As a result, New GM paid a $35 million fine, the maximum provided for under the statute.  New GM also entered into the DPA on September 16, 2015, pursuant to which it consented to the filing of an Information charging it with a scheme to conceal a deadly defect from a federal regulator and committing wire fraud, in violation of Title 18, United States Code, Sections 1001 and 1343.  (*See id.* ¶¶ 1055-1057).  The DPA also required New GM to stipulate to the truth of certain facts, memorialized in the SOF, regarding the history of the ignition switch defect and GM's conduct surrounding it; to forfeit $900 million dollars, representing proceeds from the conduct charged in the Information; to cooperate with various government agencies and investigations; and to submit to the oversight of an independent monitor tasked with reviewing and assessing New GM's policies and procedures for identifying product defects, issuing recalls, and generally ensuring vehicle safety.  *See* Compl., *United States v. $900,000,000 in U.S. Currency*, No. 15-CV-7342 (S.D.N.Y. Sept. 17, 2015),

Docket No. 1, Ex. A (DPA); *see also id.*, Ex. C (SOF).  New GM explicitly agreed not to "make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in" the DPA.  (DPA ¶ 13).

## PROCEDURAL HISTORY

On June 12, 2014, the Judicial Panel on Multidistrict Litigation (the "JPML") issued an order transferring fifteen actions to this Court for "coordinated or consolidated pretrial proceedings" pursuant to Title 28, United States Code, Section 1407.  (Docket No. 1).  All actions pending before the JPML at the time of its initial Order asserted economic loss claims against New GM based on the ignition switch defect.  Since then, the JPML has expanded the scope of actions transferred to this MDL to encompass personal injury and wrongful death claims (*see* Transfer Order (Docket No. 505) 1 n.1), as well as economic loss claims based on both ignition switch defects and other alleged defects, on the theory that "there will be discovery that is common to the MDL and to" such actions (Transfer Order (Docket No. 519) 1).  To date, the JPML has issued eighty-six transfer orders; the total number of cases in the MDL, including cases directly filed in this Court, is approximately three hundred, brought by several thousand plaintiffs.  New cases continue to be transferred to, or filed in, the MDL every week.

On August 7, 2014, the Court issued Order No. 7, directing Lead Counsel to "review all existing complaints . . . and file a consolidated or master complaint with claims on behalf of the class or classes [of economic loss Plaintiffs], as appropriate."  (Docket No. 215, at 2-3).[3]  The

---

[3]      In Order No. 7, the Court expressed its view that consolidated or master complaints would be helpful only with respect to economic loss claims and complaints, and would not be "necessary or prudent with respect to personal injury and wrongful death claims" given, among other things, the likelihood of case-specific factual and legal issues.  (Docket No. 215, at 2).

Court explained that "having a consolidated or master complaint sooner rather than later would streamline and clarify the claims and help eliminate those that are duplicative, obsolete, or unreflective of developing facts or current law." (*Id.* at 3). In addition, the Court reasoned that having a consolidated or master complaint would not only facilitate litigation in this Court, but would also help in the management and adjudication of parallel litigation proceeding in the Bankruptcy Court. (*Id.*). Lead Counsel filed two Consolidated Complaints on October 14, 2014, the first of which was limited to claims involving cars purchased or leased before July 11, 2009, the date on which New GM purchased the assets of Old GM, and the second of which was limited to post-July 11, 2009 claims. (Docket Nos. 345, 347).

The Consolidated Complaints did not name as plaintiffs every single plaintiff who had filed an economic loss claim in the MDL. Instead, each Complaint named only a subset of the economic loss plaintiffs in the MDL as proposed class representatives. The Complaints also included language providing that the Complaints did not waive or dismiss claims not included in the pleadings that were asserted by other plaintiffs, unless and until class certification came into the picture. (*See* Docket No. 345, at 1; Docket No. 347, at 2). New GM took issue with this language, and a series of orders and conferences addressed the appropriate balance between the need for one or two master complaints to organize and streamline the litigation and the rights of individual plaintiffs not named in the Consolidated Complaints. *See generally In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 3619584, at *3-6 (S.D.N.Y. June 10, 2015). The result was Order No. 50 (Docket No. 875), entered on April 24, 2015. Order No. 50 makes clear that the Consolidated Complaints superseded individual economic loss complaints, but provides a mechanism whereby individual plaintiffs have an opportunity to be heard before their individual claims are dismissed without prejudice and makes clear that

individual plaintiffs retain rights to recover or pursue their claims depending on the outcome of class certification.  (*See* Docket No. 875 ¶¶ 3, 6).  *See generally In re Gen. Motors*, 2015 WL 3619584, at *10.  As particularly relevant here, Order No. 50 clarifies that the Consolidated Complaints did supersede individual complaints for purposes of pretrial proceedings, including motion practice.

Pursuant to Order No. 50, Plaintiffs submitted a single Amended Consolidated Complaint on June 12, 2015, which incorporated developments from the first phase of discovery and certain of the Bankruptcy Court's rulings (rulings that were largely reversed or vacated by the Second Circuit in its recent decision).  (*See* Docket No. 875 ¶ 4; Docket No. 1038).  Plaintiffs filed their Second Amended Consolidated Complaint on July 9, 2015, and the TACC on December 17, 2015.  (Docket Nos. 1139, 1915).  Plaintiffs allege in the TACC that they were injured by New GM's disclosure of the many defects and related recalls based on a diminution in the value of their GM-brand cars.  (*See* TACC ¶¶ 1006-1017).  Plaintiffs are defined as "[a]ll persons in the United States who purchased or leased an Affected Vehicle prior to July 3, 2014 and who (i) still own or lease an Affected Vehicle, and/or (ii) sold an Affected Vehicle on or after February 14, 2014, and/or (iii) purchased or leased an Affected Vehicle that was declared a total loss after an accident on or after February 14, 2014."  (*Id.* ¶ 1027).[4]  The "Affected Vehicles" are defined as "(A) all New GM vehicles sold or leased on or after July 11, 2009; (B) all New GM vehicles and Old GM vehicles sold or leased as a 'Certified Pre-Owned' vehicle on or after July 11, 2009; and

---

[4]     The Court is not certain of the significance the dates in the proposed class definition. February 14, 2014, is around the time New GM began recalling cars for the Delta ignition switch defect, and July 3, 2014, is the date New GM recalled another 5.9 million vehicles for ignition switch defects.  (*See* TACC ¶¶ 380-384, 454).

(C) all vehicles subject to the Delta Ignition Switch recall in February and March of 2014 (the 'Delta Ignition Switch Vehicles')."  (*Id.*).  This "Nationwide Class" is further split into fifty-one subclasses for each state and the District of Columbia, and two ignition switch subclasses — the "Post-Sale Ignition Switch Defect Subclass" and the "Delta Ignition Switch Statewide Subclass" — defined based on ownership of certain vehicles.  (*See id.* ¶¶ 1036-1040).[5]

Plaintiffs bring a variety of federal and state law claims.  Because of the appeals of the Bankruptcy Court's rulings to the Second Circuit, the recent resolution of which affects claims brought on behalf of the purchasers of Old GM vehicles, the Court limited the current motion to certain purchasers or lessors of New GM cars.  (*See* Docket No. 2156).  More specifically, by agreement between the parties, the motion is limited to the claims of named Plaintiffs who reside in California, the District of Columbia, Florida, Louisiana, Maryland, Missouri, Oklahoma, and Virginia.  (*See id.* at 1; Def. General Motors LLC's Mem. Supp. Mot. To Dismiss (Docket No. 2357) ("New GM's Mem.") 5-6).

## LEGAL STANDARDS

In evaluating a motion to dismiss, a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A claim will survive a

---

[5]  "Post-Sale" refers to the covered vehicles sold or leased on or after July 11, 2009, when Old GM's sale of assets to New GM became effective.  (*See* TACC ¶¶ 424, 1032).  The parties only specify in passing which Plaintiffs in this motion are members of the Post-Sale Ignition Switch Defect Subclass, which is relevant to whether a plaintiff brings certain state law claims, such as claims for breach of warranty or negligence.  (*See* Pls.' Mem. 21).  The Court has attempted to identify the Subclass members by cross-referencing the vehicles owned by each Plaintiff with the list of car models comprising the Subclass provided in the TACC.  (*See* TACC ¶¶ 1033, 1038).

Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570. Finally, to the extent that a plaintiff alleges fraud, Rule 9(b) requires a plaintiff to plead claims "with particularity," specifying "the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In particular, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted). Failure to satisfy the Rule 9(b) standard, if applicable, is grounds for dismissal. *See, e.g.*, *id.* at 293; *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

## DISCUSSION

Plaintiffs bring claims under both federal and state law.[6] Under the former, Plaintiffs allege claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.*, on behalf of the Nationwide Class and claims under the Magnuson-Moss

---

[6] The TACC includes third-party beneficiary claims brought on behalf of members of the Delta Ignition Switch Subclass, but the parties agree that such claims are limited to purchasers of Old GM vehicles and thus outside the scope of this motion. (*See* Pls.' Mem. 1 n.1).

Warranty Act ("MMWA"), 15 U.S.C. § 2310, *et seq.*, on behalf of the nationwide Post-Sale Ignition Switch Defect Subclass.  Under the latter, Plaintiffs bring claims on behalf of fifty-one subclasses comprised of purchasers or lessors of New GM vehicles — one for each of the fifty states and the District of Columbia.  (As noted, however, this Opinion addresses only eight of those jurisdictional subclasses.)  The state law claims sound in consumer fraud, common law fraud, implied warranty, unjust enrichment and, for some jurisdictions, negligence.

The Court will begin with the federal claims, then turn to the state law claims, and end with discussion of two broader New GM arguments — namely, that Plaintiffs lack standing to assert claims on behalf of the proposed class and that Plaintiffs' claims are prudentially moot. Before turning to Plaintiffs' federal claims, however, the Court addresses Plaintiffs' theories of injury, as that discussion has a significant bearing on the rest of the Court's analysis.

## A.    Plaintiffs' Theories of Injury

The TACC's named Plaintiffs include residents of all fifty states and the District of Columbia, purchasers of Old GM and New GM vehicles, as well as consumers who still hold their GM-brand cars and consumers who have sold them.  Additionally, and significantly, the putative class Plaintiffs seek to represent includes purchasers or lessors of cars with dozens of different alleged defects, not to mention consumers who purchased or leased GM cars that are not alleged to have been sold with any defect or been subjected to any recall.  (*See* TACC ¶ 51 (including Plaintiff Anna Andrews, whose car did not contain any alleged defect); *id.* ¶¶ 1027-1029 (defining the Nationwide Class to include *all* New GM vehicles sold or leased on or after July 11, 2009)).  Plaintiffs argue that these consumers are united by a common theory of injury, what can be described as the "brand devaluation" theory: They thought they were buying cars made by "a brand that had a reputation for producing safe and reliable cars," that brand turned

out not to be what consumers thought it was (because of the company's emphasis on cost-cutting and disregard for safety), and when the revelations about defects and corporate culture became public the brand was tarnished, resulting in lower resale values across the board for the brand's products.  (June 17, 2016 Oral Argument Tr. ("Tr.") 69).  That theory of damages can be contrasted with another theory underlying the TACC, which can be described as the "benefit-of-the-bargain defect theory."  The gravamen of the benefit-of-the-bargain defect theory is that Plaintiffs who purchased defective cars were injured when they purchased for $x$ dollars a New GM car that contained a latent defect; had they known about the defect, they would have paid fewer than $x$ dollars for the car (or not bought the car at all), because a car with a safety defect is worth less than a car without a safety defect.

At times, Plaintiffs appear to argue that the two theories are one and the same — that the "latent defect" in the brand devaluation theory was GM's "true" corporate culture, which was focused on cost-cutting and unconcerned with safety and which was concealed by New GM's misrepresentations about its brand and culture.  (*See* Tr. 68-71).  Relatedly, Plaintiffs' claims appear in some instances to rest at least in part on the benefit-of-the-bargain defect theory.  (*See, e.g.*, TACC ¶ 57 (Plaintiff David Padilla "believes the value of his vehicle was diminished as a result of the defects"); *id.* ¶ 66 ("Had [Plaintiff Pajja Jackson] known about the safety defects and risks posed by his car . . . he would not have purchased this car."); *id.* ¶ 67 (Plaintiff Joni Ferden-Precht "would not have purchased this vehicle had she known about the safety defects in her vehicle"); Pls.' Opp'n Gen. Motors LLC's Mot. To Dismiss (Docket No. 2761) ("Pls.' Mem.") 16 ("Plaintiffs claim that, as a result of New GM's conduct, they have suffered economic loss because they *overpaid for their vehicles* . . . .") (emphasis added); *see also* Tr. 68-69 ("The injury here was at the point of sale, everyone was told that they had a car that was safe

and reliable, and they didn't have a car that was safe or reliable, *or* they thought they were buying a brand that had a reputation for producing safe and reliable cars." (emphasis added)).  At other times, however, Plaintiffs appear to distinguish the two theories and to largely disavow the benefit-of-the-bargain defect theory.  (*See, e.g.*, Pls.' Mem. 17 ("New GM relies on cases in which plaintiffs claimed that the product they purchased was defective, and sought to recover 'benefit of the bargain' damages based on the difference between the purchase price and what the product would have been worth had the defect been known.  But that claim is not the primary claim at issue on this motion. . . .  Plaintiffs allege that they did not receive the benefit of the bargain, and that the value of their vehicles diminished, because of New GM's concealment of a host of brand-wide defects and that New GM valued cost-cutting over safety." (citations and emphases omitted)); *see also* Tr. 69-70 ("[O]ur theory of the case is when you bought your car in 2007 or 2009, *the brand* was not what we thought it was. . . .  You got a car made by a company that wasn't capable of making safe and reliable cars, whether or not you had a defect or no defect." (emphasis added))).

In the Court's view, however, there is an important distinction between the two theories of damages.  The brand devaluation theory assumes that when a consumer purchases a car, the purchase comes not only with a promise — shared by the benefit-of-the-bargain defect theory — that the car does not contain any safety defects, but also with the promise that the manufacturer of the car has, and will maintain, a particular reputation for making safe and reliable cars separate and apart from the car purchased by the consumer at issue.  Measuring damages for a breach of the former promise is hard enough given how many variables (such as age, mileage, technical features, consumer preference, and even paint color) affect the value and price of cars; measuring damages for a breach of the latter promise is an even more fraught exercise, since the

17

value of a "brand" can be affected by many forces and can fluctuate and change swiftly. And there is, most obviously, a fundamental distinction between the two theories when it comes to the scope of the affected, and proposed, class: Whereas any purchaser of any GM vehicle could sue and recover under the brand devaluation theory, only a purchaser of a GM vehicle sold with a latent defect (and, as discussed below, perhaps only a purchaser of a GM vehicle sold with a latent defect that later manifests itself) could proceed under the benefit-of-the-bargain defect theory. In other words, to accept the brand devaluation theory is to accept that every time a manufacturer sells a product, it vouches not just for the value and functionality of that product, but also the product's resale value *and* the brand's continuing good name. In its most expansive formulation, there would be no expiration on this guarantee.

As Plaintiffs concede, no court has ever recognized such a broad theory of damages. (*See* Tr. 71-72). *Cf. Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989) (noting that the theory of "plaintiffs who alleged damages based solely on the 'diminished resale value'" of their cars was "a novel one," and the plaintiffs "cite no case in which a court has specifically held that the implied warranty of merchantability protects against unanticipated losses in resale value"). Instead, courts have consistently limited consumer protection claims to those consumers who have themselves purchased a product that is alleged to be defective. *See, e.g.*, *Carlson*, 883 F.3d at 298 (holding that plaintiffs who alleged only a diminution in value and no defect could not proceed with their claims, but plaintiffs who had alleged that their products were defective could go forward); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 987-88 (S.D. Cal. 2014) (holding that consumers who purchased gaming services with allegedly insufficient security protections stated cognizable injuries under California consumer protection statutes); *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 927 (N.D. Cal. 2012) (holding

that a purchaser of one allegedly defective iPhone model could not bring claims related to other allegedly defective iPhone models); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897, 912 (W.D. Mo. 2009) (holding that plaintiffs who purchased baby products containing an allegedly harmful chemical pleaded a claim for benefit of the bargain damages); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 281 (Md. 2007) (holding that plaintiffs who had alleged that they purchased cars with defective seatbacks were entitled to benefit of the bargain damages).

Notably, the closest Plaintiffs come to identifying a case that supports their position is *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152 (C.D. Cal. 2011) ("*Toyota II*"), where the Court made the observation that "'labels' and 'brands' have independent economic value." *Toyota II*, 790 F. Supp. 2d at 1166 n. 11. That is certainly true, *see, e.g.*, *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 432 (2003) (noting that a famous brand's "mark is unquestionably valuable"), yet it does not follow that a consumer can recover if he or she buys a defect-free and functional product that performs as expected, but the company's actions somehow affect the value of the company's brand. Moreover, the *Toyota* Court's unremarkable observation — relegated to a footnote — was irrelevant to the Court's holding that the plaintiffs there had adequately pleaded an injury. That is, the *Toyota* plaintiffs had not only alleged that they were injured by a general devaluation in the Toyota brand (although there is no doubt that the Toyota brand took a hit from the negative publicity surrounding its recalls in that case). Instead, as the Court explained it, "[b]ecause every lead Plaintiff alleges a safety defect, and defective cars are not worth as much as defect-free cars, Plaintiffs plausibly establish an economic loss." *Toyota II*, 790 F. Supp. 2d at

1165.  In other words, the *Toyota* Court recognized the plaintiffs to have a claim under a benefit-of-the-bargain defect theory.[7]

Plaintiffs suggest that this case is unprecedented and merits an expansion of the traditional limits on damages in consumer protection cases.  (*See* Tr. 68, 72).  But that suggestion is overblown.  The number of defects, the extent of New GM's concealment of those defects, and the scope of the recalls involved in this case may well exceed the allegations in any prior consumer protection case.  But the difference is one of degree rather than of kind.  Indeed, one need not look beyond the world of automobiles to find many cases in which alleged defects and the concealment thereof did damage to a manufacturer's reputation for quality and/or safety — at least temporarily.  Consider, for example, the Ford Pinto, the Ford/Firestone rollover problems, Toyota unintended acceleration, Takata airbags, and Volkswagen diesel emissions.  *See generally* James Derek Sapienza, *10 of History's Most Infamous Automotive Scandals*, Autos Cheat Sheet (July 3, 2016), http://www.cheatsheet.com/automobiles/10-of-historys-most-

---

[7]     In a supplemental letter, Plaintiffs also rely on language in the Second Circuit's July 13, 2016 opinion, where the Court observed that "[t]he business of cars is unique, dependent largely on the goodwill of consumers." (*See* July 13, 2016, Ltr. (Docket No. 3114) 1 (quoting *In re Motors Liquidation Co.*, slip op. at 60)).  But the language upon which Plaintiffs rely does little more than recognize the unremarkable fact that the GM brand has value (and that New GM's interest in preserving its brand might have led the company to assume liability for claims arising from the ignition switch defect had they been disclosed during Old GM's bankruptcy).  The language cannot be read to recognize the novel brand devaluation theory of damages.  If anything, language elsewhere in the Second Circuit's opinion suggests that the Court understood Plaintiffs' economic loss claims to sound in the benefit-of-the-bargain defect theory.  *See In re Motors Liquidation Co.*, slip op. at 41 ("The economic losses claimed by these individuals were 'contingent' claims.  That is, the ignition switch defect was there, but was not yet so patent that an individual could, as a practical matter, bring a case in court.  The contingency standing in the way was Old GM telling plaintiffs that the ignition switch defect existed.  In other words, Old GM's creation of the ignition switch defect fairly gave rise to these claims, even if the claimants did not yet know." (citation omitted)).

infamous-automotive-scandals.html/?a=viewall.  That is, there are many cases (some of which are admittedly still pending) in which courts could have recognized the brand devaluation theory. The silence is therefore telling.  Additionally, even if Plaintiffs were right that this case were unprecedented, recognizing the brand devaluation theory would open the door to a vast array of claims by consumers of otherwise merchantable products seeking damages any time the manufacturer of those products was beset by scandal or was revealed to have manufactured *any* defective product.[8]  If such a sea change in consumer protection policy and law is warranted, it should emerge from the legislative, not the judicial, realm.

That conclusion is bolstered by several other tort law doctrines and policies.  First, to the extent that consumer protection law is concerned with deterring manufacturers' practices that might harm consumers, *see, e.g.*, *Miller v. Long-Airdox Co.*, 914 F.2d 976, 979 (7th Cir. 1990) ("When a state formulates its tort law, it must (at least implicitly) balance several different policies including deterring wrongdoers, compensating injured parties, spreading the risk of loss from certain activities, and trying to accomplish these goals without overly discouraging productive activity."); *Hughes v. Abell*, 867 F. Supp. 2d 76, 88-89 (D.D.C. 2012) (noting that among the purposes of D.C.'s consumer protection law are deterring unfair business conduct and

---

[8]     In fact, taking the brand devaluation theory to its logical conclusion, it is not clear why it would even be limited to instances in which a company manufactured a defective product, as the value of a brand can suffer from all sorts of actions.  Assume, for example, that Apple were to launch several new products that were viewed as busts and that its reputation suffered as a result, causing Apple products to be viewed as less "cool" and their resale value to decline.  If a consumer could recover for brand devaluation, anyone owning an Apple product could conceivably bring a claim against Apple on the ground that its actions — producing "less cool" products — reduced the value of his or her product, even though the product was exactly as advertised at the point of sale.  To state the point is to make clear what the consequences of recognizing the brand devaluation theory would be.

"promot[ing] fair business practices in the community at large"); *Blue Cross & Blue Shield of N.J, Inc. v. Philip Morris, Inc.*, 133 F. Supp. 2d 162, 177 (E.D.N.Y. 2001) (noting that "one of the primary goals of tort law [is] effective and administratively efficient deterrence and compensation"), recognizing a brand devaluation theory may well *over*-deter.  That is, manufacturers whose brand names suffer because of defective products or fraudulent practices will face lawsuits brought by consumers who are directly injured.  Separate and apart from that, such manufacturers will also take a hit in the market (likely triggering shareholder suits as well).  These effects will often be significant (as they have been for New GM here), and thus the costs of allowing an even greater group of plaintiffs to recover are likely to exceed any marginal gain.  Additionally, where there is a limited pool from which potential plaintiffs can recover (which will be true in most cases, although it has not been suggested here), awarding damages to the larger set of brand devaluation plaintiffs would almost certainly diminish the resources available to plaintiffs who have been more directly injured by the manufacturer's products.  *Cf. BCS Servs. Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 755 (7th Cir. 2011) (noting, with respect to a discussion of proximate cause in tort, that "[t]he more plaintiffs there are clamoring for relief, the less in damages each one may be able to recover").

Rejection of the brand devaluation theory is also consistent with the well-established proposition that a plaintiff cannot base a fraudulent misrepresentation claim on mere puffery.  That is, courts have repeatedly held that general statements about a brand's quality, or a product's safety, are too vague or lacking in factual content to be actionable.  *See, e.g.*, *Zaccagnino v. Nissan N. Am., Inc.*, No. 14-CV-3690 (LLS), 2015 WL 3929620, at *4 (S.D.N.Y. June 17, 2015) ("[P]romoting a car as generally safe and reliable is too general a representation to be proven true or false."); *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection*

22

*HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1089 (S.D. Cal. 2010) (holding that statements that products "were of 'high' or 'superior' quality" were not actionable); *Davis v. Allstate Ins. Co.*, No. CIV.A. 07-4572, 2009 WL 122761, at *6 (E.D. La. Jan. 15, 2009) (holding "'You're in good hands with Allstate'" to be inactionable puffery).  If a fatal flaw in the brand devaluation theory is that consumers lack an enforceable interest in a brand's good name, the puffery doctrine is the other side of the same coin — holding that generic quality statements about a brand or a product do not create an enforceable promise if the consumer turns out to have been misled.[9]

In short, the Court declines Plaintiffs' invitation to recognize the expansive brand devaluation theory of damages.  At the same time, New GM goes too far when it argues that the benefit-of-the-bargain defect theory fails across the board or always requires a plaintiff to prove manifestation of the alleged defect.  (*See* Tr. 85, 121; New GM's Mem. 8-13; Def. Gen. Motors LLC's Reply Supp. Mot. To Dismiss (Docket No. 2828) ("New GM's Reply") 3-9).  The Court is bound to apply the states' law to Plaintiffs' state-law claims.  *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016-17 (7th Cir. 2002) ("*Bridgestone/Firestone II*") (holding that the law of individual states applied to consumers' economic loss claims for allegedly defective tires); *Szymczak v. Nissan N. Am., Inc.*, No. 10-CV-7493 (VB), 2011 WL

---

[9]     In observing that there is an analytical similarity between rejection of the brand devaluation theory and the puffery doctrine, the Court intimates no view on whether the misrepresentations alleged in this case qualify as inactionable puffery — a subject upon which the parties spill considerable ink.  (*See* New GM's Mem. 48-49, 52-53; Pls.' Mem. 47-49; New GM's Reply 27-28).  The Court need not and does not decide the issue because none of the Plaintiffs involved in this motion has a claim whose viability would turn on a finding that an affirmative statement was actionable.  As discussed below, Plaintiffs here either succeed in pressing fraud claims on a theory of concealment or omission or their claims fail for other, unrelated reasons.

7095432, at *12 (S.D.N.Y. Dec. 16, 2011) ("In a multi-state consumer class action, based on choice of law considerations, courts have applied the law of the buyer's domicile.").  And as discussed in more detail below, different jurisdictions have reached different conclusions with respect to whether a plaintiff can proceed under a benefit-of-the-bargain defect theory and whether doing so depends on a showing that the plaintiff experienced the defect when using the product.  Additionally, New GM is wrong in arguing that the benefit-of-the-bargain defect theory must fail because New GM did not warrant that its cars would have a particular resale value in the future.  (*See* New GM's Reply 2).  The benefit-of-the-bargain defect theory does not compensate a plaintiff for a decrease in resale value — the brand devaluation theory does.  The benefit-of-the-bargain defect theory compensates a plaintiff for the fact that he or she overpaid, at the time of sale, for a defective vehicle.  That form of injury has been recognized by many jurisdictions.  Accordingly, while the Court rejects Plaintiffs' reliance on the brand devaluation theory at the outset, the viability of the benefit-of-the-bargain defect theory must be analyzed with respect to each Plaintiff's claims under the relevant jurisdiction's law.

## B.    Federal Claims

The Court turns, then, to Plaintiffs' claims, beginning with their claims under federal law. As both sides agree (*see* Tr. 88, 95), to the extent there are differences in federal law among the Circuits, the Court is bound by Second Circuit law.  *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (R.B. Ginsburg, J.) (holding that the Circuit precedent of the transferee court, not the transferor court, is applicable to questions of federal law in cases transferred pursuant to 28 U.S.C. § 1407), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989); *see also In re Pan Am. Corp.*, 950 F.2d 839, 847 (2d Cir. 1991) (agreeing with *In re Korean Air Lines*); *In re MTBE Prods. Liab. Litig.*, No. 00-MD-1358 (SAS),

2005 WL 106936, at *5 (S.D.N.Y. Jan. 18, 2005) (concluding that *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), undercuts the reasoning but does not alter the conclusion of *In re Korean Air Lines*).  Applying that law, the Court concludes that Plaintiffs' RICO claim fails for two reasons: because Plaintiffs do not plead the existence of an enterprise with a common purpose independent from New GM's ordinary business activities and because even the benefit-of-the-bargain defect theory of injury is not cognizable under RICO.  The Court defers discussion of Plaintiffs' MMWA claims because, although brought pursuant to federal law, those claims incorporate and turn on state law.

### 1.      RICO

Plaintiffs' first federal claim, brought on behalf of the Nationwide Class, is for violation of the RICO Act.  (TACC ¶¶ 1051-1141).  To prevail on a civil RICO claim, for which treble damages would be available, a plaintiff "must show (1) a substantive RICO violation under [18 U.S.C.] § 1962; (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (internal quotation marks omitted).  To satisfy the first prong where, as here, the plaintiff brings a claim under Title 18, United States Code, Section 1962(c), "a plaintiff must show that the defendant conducted, or participated in the conduct, of a RICO enterprise's affairs through a pattern of racketeering activity," *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014), with a "pattern of racketeering activity" defined as at least two predicate acts of racketeering within ten years, 18 U.S.C. § 1961(5).

As defined in RICO, "racketeering activity" encompasses various substantive criminal offenses, including mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343.  *See id.* § 1961(1).

25

"[B]ecause the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants and because the allure of treble damages, attorney's fees, and federal jurisdiction presents a powerful incentive for plaintiffs to attempt to fit garden variety fraud claims within the standard of civil RICO, courts have noted that they have an obligation to scrutinize civil RICO claims early in the litigation to separate the rare complaint that actually states a claim for civil RICO from that more obviously alleging common law fraud." *Holmes v. Parade Place, LLC*, No. 12-CV-6299 (GBD) (DF), 2013 WL 5405541, at *14 (S.D.N.Y. Sept. 26, 2013) (alterations and internal quotation marks omitted); *see also Patrizzi v. Bourne in Time, Inc.*, No. 11-CV-2386 (PAE), 2012 WL 4833344, at *3 (S.D.N.Y. Oct. 11, 2012).  In fact, because "virtually every ordinary fraud is carried out in some form by means of mail or wire communication . . . RICO claims premised on mail or wire fraud" — like those here — "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Gross v. Waywell*, 628 F. Supp. 2d 475, 493 (S.D.N.Y. 2009) (internal quotation marks omitted).

In this case, Plaintiffs allege the existence of a RICO associated-in-fact enterprise (the "Enterprise") consisting of at least New GM, its outside counsel King and Spalding LLP ("K&S"), and its claims administrator ESIS, Inc. ("ESIS").  (*See* TACC ¶ 1062).  The alleged purpose of the Enterprise was to conceal the existence of the ignition switch defect and other defects from regulators and the public and, more generally, to misrepresent the safety of GM vehicles.  (*See id.* ¶¶ 1058, 1063, 1073).  Plaintiffs contend that K&S and ESIS participated in the scheme by knowingly or unknowingly collaborating with New GM to "fraudulently conceal information about the defects," and benefited from that purpose by "secur[ing] ongoing business and income from New GM as a result of achieving settlements for New GM that avoided public

disclosure of the Delta Ignition Switch Defect." (*Id.* ¶¶ 1063, 1070).  Plaintiffs allege that, in furtherance of this scheme, each member of the Enterprise committed mail and wire fraud, specifically by transmitting communications that fraudulently concealed the existence of the defects in GM cars.  (*See id.* ¶ 1073).  In particular, Plaintiffs allege that the Enterprise knew that the ignition switch defect was responsible for a number of fatal car crashes and entered into settlements with the parties in order to avoid disclosing the defect.  (*See id.* ¶¶ 1074-1101).  They further allege that New GM and K&S fraudulently concealed the defect during litigation surrounding the Melton crash.  (*See id.* ¶¶ 1101-1121).  The RICO Enterprise allegedly caused damage to Plaintiffs in several ways: (1) by causing them to pay more than they otherwise would have for New GM cars; (2) by causing them to continue to drive vehicles they otherwise would not; (3) by causing their vehicles to diminish in value; and (4) by causing some Plaintiffs to incur expenses "in connection with their efforts to implement the 2014 recall."  (*Id.* ¶ 1139).

New GM argues that Plaintiff's RICO claim fails for a number of reasons (*see* New GM's Mem. 26-42), but the Court will address only two here: the failure to allege the existence of an "enterprise" and, at least for most Plaintiffs, the failure to allege a cognizable injury.

### a.   RICO Enterprise

RICO liability is predicated on the existence of an "enterprise."  It is well-established that "[t]he enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (citations omitted).  That is, "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  A corporation carrying out its own activities (even fraudulent ones) only through its agents and employees does not

constitute an enterprise.  *See, e.g.*, *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) (noting that in order to prevent RICO from "encompass[ing] every fraud case against a corporation," courts have held "that an employer and its employees cannot constitute a RICO enterprise"); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[T]he person and the enterprise referred to must be distinct . . . .  [B]y alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented.").  Moreover, individuals or entities whose activities sometimes intersect do not form an enterprise.  Instead, the existence of an enterprise depends on a showing "of an ongoing organization, formal or informal"; "evidence that the various associates function as a continuing unit"; and "a common purpose of engaging in a course of conduct."  *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (internal quotation marks omitted).

Judge Posner's decision in *Fitzgerald* is instructive.  In that case, the plaintiffs alleged that Chrysler had engaged in warranty fraud through a RICO enterprise "consisting of subsidiaries of the Chrysler Corporation . . . plus Chrysler's dealers, plus trusts controlled by Chrysler" — all "affiliates and agents [that] participate[d] directly or indirectly in the retail sale of Chrysler automobiles."  116 F.3d at 226.  Cautioning that, "[r]ead literally, RICO would encompass every fraud case against a corporation, provided only that a pattern of fraud and some use of the mails or of telecommunications to further the fraud were shown," the Court observed that courts — including the Second Circuit — had held "that an employer and its employees cannot constitute a RICO enterprise."  *Id.* (citing, *inter alia*, *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996), and *Riverwoods Chappaqua Corp.*, 30 F.3d at 343-44).  Judge

28

Posner concluded that the result should be no different merely because a corporation "does

business through agents, as virtually every manufacturer does."  *Id.* at 227.  As he explained:

> If Chrysler were even larger than it is and as a result had no agents, but only
> employees (it might own all its dealerships), it could not be made liable for
> warranty fraud under RICO.  What possible difference, from the standpoint of
> preventing the type of abuse for which RICO was designed, can it make that
> Chrysler sells its products to the consumer through franchised dealers rather than
> through dealerships that it owns, or finances the purchases of its motor vehicles
> through trusts, or sells abroad through subsidiaries?  We have never heard it
> suggested that RICO was intended to encourage vertical integration, yet that is the
> only effect that we can imagine flowing from [holding that Chrysler, its
> subsidiaries, its trusts, and its dealers could constitute a RICO enterprise].

*Id.*  The Court did not rule out the possibility of a manufacturer "us[ing] its dealers or other

agents or affiliates in such a way as to bring about the sort of abuse at which RICO is aimed, in

which event it might be possible to characterize the assemblage as a RICO enterprise."  *Id.* at

228.  But, the Court concluded, "where a large, reputable manufacturer deals with its dealers and

other agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely

incidental, differing not at all from what it would be if these agents were the employees of a

totally integrated enterprise, the manufacturer plus its dealers and other agents . . . do not

constitute an enterprise within the meaning of the statute."  *Id.*; *see also, e.g.*, *In re Toyota Motor*

*Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 826 F. Supp. 2d

1180, 1202-03 (C.D. Cal. 2011) (dismissing RICO claims because the "Plaintiffs merely allege

that the Defendants are associated in a manner directly related to their own primary business

activities, which is insufficient to state a claim . . . .  Indeed, the [operative complaint] alleges no

more than that Defendants' primary business activity — the design, manufacture, and sale or

lease of Toyota vehicles — was conducted fraudulently.").

29

Significantly, Judge Posner's conclusions are consistent with Second Circuit law, which holds that a corporation acting in concert and in the ordinary course of business with its agents and employees is not a RICO enterprise, whether or not the agents are external or internal to the corporation. *See, e.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (holding that the defendant corporation, its chief operating officer, and its corporate counsel could not form an enterprise because the complaint merely alleged that the COO and counsel carried out "the regular affairs of [the defendant], such as day-to-day financial operations, including the implementation and supervision of deceptive trading practices" (internal quotation marks omitted)); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) (holding that legally separate entities that nonetheless act within the scope of a single corporate structure cannot form a RICO enterprise, because "[i]t would be inconsistent for a RICO person, acting within the scope of its authority, to be subject to liability simply because it is separately incorporated, whereas otherwise it would not be held liable"), *vacated on other grounds*, 525 U.S. 128 (1998); *Daigneault v. Eaton Corp.*, Civ. No. 3-06-cv-1690 (JCH), 2008 WL 2604929, at *3 (D. Conn. June 16, 2008) (holding that the plaintiff had failed to plead a RICO enterprise consisting of the defendant's employees and its legal defense team because "all of the employees and attorneys alleged to constitute the RICO enterprise were acting as employees or agents of [the defendant] when they allegedly committed mail or wire fraud"); *Kaczmarek v. Int'l Bus. Machs. Corp.*, 30 F. Supp. 2d 626, 630 (S.D.N.Y. 1998) ("To the extent plaintiffs allege that the enterprise also included third party manufacturers, dealers, and resellers, plaintiffs have failed to distinguish this association of entities from the typical and ordinary participants who act separately for the purpose of distributing any product."); *R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, No. 93-CV-8571 (JGK), 1997 WL 27059, at *8 (S.D.N. Jan. 23, 1997) (rejecting the plaintiffs'

argument that the defendant partnership and its outside counsel formed an enterprise because the allegations showed only that the attorney represented the partnership with respect to its interests in the ordinary course of business).

Applying that law here, Plaintiffs' RICO claim fails because they do not allege a common purpose or organized conduct separate and apart from New GM's ordinary affairs.  In the TACC, Plaintiffs allege that New GM, K&S, and ESIS formed an enterprise united by the "common purpose" of "knowingly or unknowingly facilitating New GM's scheme" to conceal the ignition switch defect and maintain a profitable business.  (*See* TACC ¶¶ 1070, 1073).  In more recent submissions, however, Plaintiffs appear to have withdrawn or abandoned the "unknowing" facilitation theory.  (*See* Pls.' June 24, 2016 Ltr. (Docket No. 3051) ("Pls.' Supp. Ltr.") 6 ("Plaintiffs do not agree that K&S and ESIS (or others) were unaware or that they did not share a purpose with New GM: the TACC alleges the opposite." (citing TACC ¶¶ 1058-1070)).  In any event, to proceed on that theory Plaintiffs would have to plead and prove that New GM, K&S, and ESIS "were sufficiently organized and devoted to the alleged illicit purposes that the resulting whole functioned as a continuing unit" and that their "common purpose was dictated" by a "person" — here, New GM —  "who controlled the corporate . . . entities' activities and manipulated them to the desired illicit ends."  *United States v. Cianci*, 378 F.3d 71, 83 (1st Cir. 2004); *see, e.g.*, *Cruz*, 720 F.3d at 121 (noting that entities who were generally unaware of the defendant's allegedly deceptive practices could not be plausibly alleged to share a common purpose and therefore be part of a RICO enterprise); *see also, e.g.*, *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 134-35 (E.D.N.Y. 2010) (dismissing a RICO claim where the plaintiff alleged that the defendant, "its employees, and various independent contractors engaged in a series of independent frauds that somehow benefited" the defendant, without

31

providing evidence "that the various defendants were associated with one another for a common purpose"); *Structural Maint. & Contracting Co. v. Jayce Enters., Inc.*, No. 09-CV-8087 (BSJ) (MHD), 2010 WL 4159517, at *9 (S.D.N.Y. Oct. 12, 2010) ("Here, the amended complaint repeatedly alleges that Defendants acted for their 'own benefit.' As a result, Plaintiffs fail to allege that Defendants acted 'for a common purpose.'" (citation omitted)). Plaintiffs make no such allegations.

To the extent Plaintiffs allege that New GM, K&S, and ESIS shared a common purpose because K&S and ESIS "knowingly facilitated" New GM's scheme, their allegations also fall short. Notably, Plaintiffs made a nearly identical argument earlier in the litigation when they moved to compel production of documents from K&S on the basis of the crime-fraud exception to the attorney-client privilege. (*See* Docket No. 1136). Specifically, Plaintiffs asserted, as they do in the TACC, that K&S worked with New GM to settle cases involving the ignition switch defect in order to prevent the defect from coming to light. (*Compare* Pls.' Mem Supp. Mot. To Compel Produc. Docs. New GM & King & Spalding LLC Based Crime-Fraud Exception (Docket No. 1136), *with* TACC ¶¶ 1079, 1090, 1109-1118). The Court denied Plaintiffs' motion, holding that there was *no* evidence of any intent on the part of K&S to perpetuate a scheme to conceal the ignition switch defect. *See In re Gen. Motors LLC*, 14-MD-2543 (JMF), 2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015). With respect to the settlement of cases, the Court concluded that the communications between K&S and New GM "appear to be nothing more than good-faith attorney evaluations of whether to settle individual cases in light of the risks of adverse verdicts and large damage awards against New GM." *Id.* at *6. Similarly, with respect to alleged litigation misconduct in the *Melton* case, Plaintiffs "ultimately fail[ed] to point to critical evidence of intent." *Id.* at *8. As the Court concluded, Plaintiffs' allegations consist of

"the stuff that ordinary (albeit perhaps overly aggressive) litigation is made of, which can and should be addressed by sanctions in the same case, not the stuff that crimes and frauds are made of." *Id.* at *8-9.

Significantly, as Lead Counsel conceded at oral argument (*see* Tr. 101-102), the Court may consider the documents presented in connection with the crime-fraud motion here, as Plaintiffs relied on them in drafting the TACC. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). In light of that, the Court's denial of the crime-fraud motion compels the conclusion that Plaintiffs do not (and cannot) plausibly allege that K&S and ESIS "knowingly facilitated" New GM's scheme in a way that could satisfy the enterprise requirement for purposes of RICO. (Admittedly, ESIS was not implicated in the crime-fraud motion. But the TACC's allegations with respect to ESIS's knowledge and intent are even more threadbare than the allegations with respect to the knowledge and intent of K&S.) On the settlement point, the Court's admonition in the crime-fraud context that "there is an important distinction between effect and intent" applies with equal force here. *In re Gen. Motors LLC*, 2015 WL 7574460, at *6. That is, although the settlements facilitated by K&S and ESIS may have enabled New GM to continue its concealment of the ignition switch defect, there is no factual basis to infer that K&S and ESIS knowingly acted with that purpose — as opposed to the purpose of carrying out their respective professional obligations to a client — in mind. And with respect to *Melton*, Plaintiffs' allegations that K&S "hid" documents and "lied" during the Melton litigation are once again both conclusory and contradicted by Plaintiffs' own allegations that K&S was told that the airbag nondeployment investigation was not relevant to the Melton crash, because there was no allegation that her airbags should have deployed. (*See* TACC ¶¶ 1116-1118.)

33

At oral argument, Plaintiffs contended that a shared *lawful* purpose could suffice to create a RICO enterprise.  (*See* Tr. 102-103).  That may or may not be true as a general matter. *Compare, e.g.*, *Cruz*, 720 F.3d at 120 ("[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." (internal quotation marks omitted)), *with Cianci*, 378 F.3d at 88 n.9 (noting that while "one might often expect [an association-in-fact enterprise's] purpose to be of a criminal nature . . . it is not required that each participant have a separate mens rea so long as each can reasonably be said to share in the common purpose").  But even if true, then the only "common purpose" plausibly alleged here is the processing and settlement of New GM claims in the ordinary course of business.  And as discussed above, "where a large, reputable manufacturer deals with its . . . agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise, the manufacturer plus its . . . agents . . . do not constitute an enterprise within the meaning of the statute."  *Fitzgerald*, 116 F.3d at 228; *see also Cruz*, 720 F.3d at 121 ("We have long since rejected the idea that a RICO enterprise may consist 'merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant . . . .'" (quoting *Riverwoods Chappaqua Corp.*, 30 F.3d at 344)).

Contrary to Plaintiffs' contentions (Pls.' Mem. 33; Pls.' Supp. Ltr. 5-6), *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005), and *Mayfield v. Asta Funding*, 95 F. Supp. 3d 685 (S.D.N.Y. 2015) — which involved enterprises comprised, in part, of companies and their outside lawyers — do not call for a different result.  For one thing, the two cases are distinguishable on their facts.  In *Living Designs*, for example, the attorneys had

allegedly helped their client, DuPont, cover up and falsify relevant information, and courts had already found that the attorneys had acted improperly.  *See* 431 F.3d at 358.  (*See* New GM's June 24, 2016 Ltr. (Docket No. 3048) ("New GM's Supp. Ltr.") 5-6).  Here, by contrast, there is no allegation that New GM's settlements were fraudulently obtained, and the Court has already ruled that K&S did not act fraudulently with respect to the *Melton* litigation, the only case in which Plaintiffs allege specific wrongdoing.  *See In re Gen. Motors LLC*, 2015 WL 7574460, at *8-9; *cf. Morin v. Trupin*, 711 F. Supp. 97, 105 (S.D.N.Y. 1989) ("[A]lthough attorneys are not immune from liability simply because they represent a client, legitimate acts of attorneys on behalf of clients cannot form the basis of a RICO claim." (citations omitted)).  Similarly, in *Mayfield*, the law firm defendants were involved in obtaining fraudulent default judgments and prepared fraudulent affidavits and pleadings; the lawyer defendants shared in the fraudulent common purpose of the enterprise, and were not merely engaged in aiding their clients through litigation in the ordinary course.  *See* 95 F. Supp. 3d at 697-98.

To be sure, there is language in *Living Design* that could be read broadly to suggest that a corporation and its outside counsel are *always* sufficiently distinct to establish a RICO enterprise. For example, in holding that the enterprise formed by the defendant company and its outside lawyers was "separate and distinct" from the company, the Ninth Circuit reasoned that "law firms are required to conform to ethical rules and thus are not merely at the beck and call of their clients. . . .  Indeed, the rules of professional conduct require law firms to be distinct entities and to maintain their professional independence.  In addition, even in the context of the attorney-client relationship, attorneys retain control over important functions; for example, in litigation, the attorney retains control over tactical and strategic decisions."  431 F.3d at 361-62 (citation omitted).  "Thus," the Court concluded, "the litigation 'enterprise' necessarily must be distinct

from the client retaining legal assistance." *Id.* Read that broadly, however, the Ninth Circuit's decision conflicts with Second Circuit precedent holding that attorneys and their clients are not necessarily distinct for RICO enterprise purposes. *See, e.g.*, *Cruz*, 720 F.3d at 121 (holding that the defendant's corporate counsel was merely carrying out ordinary business activities and therefore not distinct); *Discon*, 93 F.3d at 1064 (noting that if "'*attorneys*, accountants and other agents'" were acting within the scope of their authority and on behalf of the corporation, they would not create an enterprise (emphasis added)); *Daigneault*, 2008 WL 2604929, at *3 (holding that the distinctiveness requirement was not met because the attorneys were acting as employees or agents); *R.C.M.*, 1997 WL 27059, at *8 (same).[10]

In short, because K&S and ESIS acted in concert with New GM to carry out its business, and had no common purpose beyond helping New GM carry on its ordinary affairs, Plaintiffs do not meet the pleading requirements for a RICO enterprise.

### b.  RICO Injury

The lack of an "enterprise" is sufficient reason in itself to dismiss Plaintiff's RICO claim, but the claim largely fails for an additional reason as well.  By its terms, "RICO compensates only for injury to 'business or property.'"  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) (quoting 18 U.S.C. § 1964(c)).  In light of that limitation, the Second Circuit held in *McLaughlin* that "loss of value" or "benefit of the bargain" damages "are generally unavailable in RICO suits" and "plainly" unavailable where (similar to the case here) a RICO

---

[10]     Indeed, taken to its logical conclusion, the Ninth Circuit's reasoning would apply equally to in-house attorneys — even though they are indisputably employees of a corporation and thus generally could not form an enterprise with it — since they are subject to the same rules of professional responsibility as outside lawyers.

claim "sound[s] in fraud in the inducement." *Id.* at 228-29.  There, the plaintiffs alleged that they had been deceived by the defendant tobacco companies into purchasing "light" cigarettes, believing them to be healthier than full-flavored cigarettes. *Id.* at 220.  As a result of the alleged fraud, the plaintiffs purchased light cigarettes "in greater quantity than they otherwise would have and at an artificially high price, resulting in plaintiffs' overpayment for cigarettes." *Id.* One of the plaintiffs' theories of injury "purport[ed] to measure the difference between the price plaintiffs paid for light cigarettes as represented by defendants and the (presumably lower) price they would have paid (but for defendants' misrepresentation) had they known the truth." *Id.* at 228.  The Second Circuit rejected that theory on the ground that "the loss of value model is designed to award plaintiffs damages based on the benefit of their bargain[, and s]uch damages are generally unavailable in RICO suits." *Id.* at 228.  The Court understood this to follow directly from the "business or property" requirement, because it had not been shown that "a party's 'expectation' can constitute 'business or property.'" *Id.*  RICO, as the Court interpreted it, "'requires proof of *concrete financial loss*, and not mere injury to a valuable intangible property interest.'" *Id.* (quoting *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)).[11]

That conclusion is consistent with courts that have found speculative, expectation-based, benefit-of-the-bargain damages to be incompatible with RICO.  *See, e.g.*, *In re Taxable Mun.*

---

[11]      As Plaintiffs here note (*see* Pls.' Mem. 28), the *McLaughlin* Court faulted the plaintiffs' loss of value theory of damages on the ground that, "even if benefit of the bargain damages could be awarded, there is no reasonable means of calculating them in this case."  522 F.3d at 229.  But the difficulty in calculating damages — a consideration that may or may apply here — was merely an additional reason to reject the plaintiffs' argument above and beyond the Court's conclusion that expectation damages are not cognizable for purposes of RICO.  *See id.* at 228-29.

*Bond Sec. Litig.*, 51 F.3d 518, 522-23 (5th Cir. 1995) (holding that the plaintiff's alleged injury that he lost the opportunity to obtain a lower-interest loan was too speculative for purposes of RICO); *Roberts v. The Scott Fetzer Co.*, No. 4:07-CV-80 (CDL), 2010 WL 3937312, at *10 (M.D. Ga. Sept. 30, 2010) ("Moreover, the intangible, expectancy-type, benefit of the bargain damages that Plaintiff seeks are not what are contemplated as being recoverable as RICO damages."); *Impress Commc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1065 (C.D. Cal. 2003); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1091 (S.D. Ind. 2001) (rejecting the plaintiffs' diminution-in-value theory because, "[a]s numerous appellate and district courts have held . . . RICO affords a monetary remedy only to plaintiffs who have actually realized the diminished value or experienced product failure, and not to those who allege a risk (or even a probability) of such loss"). Judge Barker's opinion in *In re Bridgestone/Firestone* is particularly salient. There, one class of plaintiffs alleged that they had been injured because they had bought defective tires that they either would not have bought or would have paid less for, had they known about the safety defects. 335 F. Supp. 2d at 1090. Another class alleged that its members had been harmed by purchasing cars whose value decreased when the concealed tire defects came to light. *Id.* Noting that "[f]ederal courts have consistently and repeatedly held that to satisfy the injury requirement of section 1964, a plaintiff must prove an actual, concrete monetary loss," Judge Barker rejected both classes' RICO claims because they had alleged only "financial loss . . . grounded in the possibility of future events." *Id.* at 1090-91.

Where courts have recognized expectation damages under RICO, it has been where an agreement between the parties provided for a certain performance guarantee that the defendant had no intention of keeping. *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108,

122-23 (2d Cir. 2013) (holding that plaintiffs who had entered into contracts that purportedly entitled them to pricing discounts but were in fact fraudulently overcharged by the defendants had stated RICO injury in the form of the overpayment); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) (holding that plaintiffs who had invested in a real estate partnership with guaranteed yields which the defendants knew could not be achieved had stated a RICO injury for the amount of return that they had been guaranteed); *Roberts*, 2010 WL 3937312, at *8 (recognizing a viable theory of RICO damages only for each specific good which was sold as new, turned out to be used, and was shown to have been worth less as a result). Plaintiffs contend that their situation is like the ones in *Merrill Lynch* and *U.S. Foodservice*, because "New GM never gave [Plaintiffs] what it promised" — namely, a car made by a manufacturer that would continue to enjoy a good reputation — and RICO functions to "restore Plaintiffs to the same position they would have been in but for the illegal conduct."  (Pls.' Mem. 27-28) (internal quotation marks omitted).  The contracts in *Merrill Lynch* and *U.S. Foodservice*, however, contained explicit promises, whereas here the continuing resale value of GM-brand vehicles is at best implied.  Plaintiffs also attempt to distinguish *McLaughlin* by arguing that a secondary market exists for cars, unlike cigarettes, similarly implying that a certain resale value is implicit in the ownership of a car.  (*See* Pls.' Mem. 28; Tr. 96-97).  But, as discussed above, no court has recognized brand devaluation (on which the implied-resale theory turns) as a cognizable injury, and the Court declines to do so here.  Indeed, there is even less basis to recognize that form of injury in the RICO context, where conceptions of injury have been more cabined than in the consumer protection realm.

At oral argument, Plaintiffs suggested that improvements in the ability to calculate damages and expert testimony militate in their favor, relying on Judge Posner's opinions in *BCS*

*Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011), and *BCS Services, Inc. v. BG Investments, Inc.*, 728 F.3d 633 (7th Cir. 2013).  (*See* Tr. 98-101).  There, the plaintiffs were businesses that had participated in tax lien auctions through a county organization, the rules of which permitted only one agent of a potential buyer or group of buyers to attend each auction. *BG Invs.*, 728 F.3d at 637.  The logistics of the auction meant that a buyer with multiple agents who could raise their arms and indicate bids would have a greater chance of winning a desired lien.  *Id.*  The plaintiffs proved that the defendants had fraudulently packed the auction rooms with multiple agents and were able to show a high statistical probability that they had won fewer liens than they otherwise would have won absent the fraud.  *Heartwood 88*, 637 F.3d at 759-60.

On those facts, the Seventh Circuit held that the plaintiffs had proved injury to their "business" within the meaning of RICO — namely, that the fraud had deprived them of a business opportunity to which they were otherwise entitled.  *See BG Invs.*, 728 F.3d at 638 (concluding that, while the plaintiffs might not have a "property" interest in the tax liens, they had a "business" interest in "the profit they would have made had the fraud not prevented" it); *Heartwood 88*, 637 F.3d at 756-57 ("The defendants stole a business opportunity from the plaintiffs by flooding the auction room with raised hands that shouldn't have been there."); *cf. Living Designs*, 431 F. 3d at 364 (holding that the plaintiffs' allegation that they had suffered financial losses, namely "that they settled their claims for a smaller percentage of their alleged damages than they could have," would not itself be sufficient to confer RICO standing, but that their additional allegation that the fraudulent inducement harmed their property and business interests in their businesses by accepting the lower settlements did suffice to show RICO injury). Additionally, the Court relied on the principle that, where plaintiffs can prove injury, but the "defendants' misconduct prevent[s] the plaintiffs from calculating damages accurately, . . .

damages can be estimated by methods that would be deemed impermissibly speculative in other contexts." *BG Invs.*, 728 F.3d at 639-40. That principle has no application here. Thus, for purposes of this case, Judge Posner's opinions can, at most, be read to stand for the proposition that a RICO plaintiff can pursue a claim based on statistical harm to "business" expectations. As applied here, that proposition might provide support for a RICO claim against New GM by dealers in GM-branded vehicles who expected to be able to sell their stock at a certain price and received lower prices when New GM's concealment was revealed. (*See* Tr. 100 (counsel for Plaintiffs noting that the *BCS Services* plaintiffs "were injured in their business . . . because of that loss of opportunity"). It does not, however, support holding — in the face of *McLaughlin* — that consumers could bring a RICO claim for harm to "property" based on the benefit-of-the-bargain defect theory pressed here.[12]

In short, although New GM itself may well have committed fraud — as described below and as New GM itself more or less conceded in entering the DPA and agreeing to the SOF — not every fraud can form the basis of a RICO claim. Here, because Plaintiffs fail to allege a RICO enterprise and largely fail to allege injury to "business or property" within the meaning of RICO, New GM's motion to dismiss Plaintiffs' RICO claim is GRANTED.[13]

---

[12]     Strictly speaking, some Plaintiffs may well allege cognizable injuries. Out-of-pocket losses are plainly recoverable under RICO, *see, e.g.*, *McLaughlin*, 523 F.3d at 227-28, and the TACC alleges that some Plaintiffs incurred out-of-pocket losses as a result of the ignition switch recalls (for example, by paying for repairs or obtaining alternative transportation while their cars were in the shop) and that some Plaintiffs sold or traded their cars for a lower-than-expected resale value. (*See* Pls.' Mem. 28; TACC ¶¶ 54, 56, 72, 91, 92). None of the Plaintiffs included in this motion, however, alleges those kinds of injury. Moreover, the failure to allege an enterprise is fatal to all Plaintiffs' RICO claims, even those that allege cognizable losses.

[13]     In supplemental briefing, Plaintiffs brought to the Court's attention an opinion in the Takata Airbag MDL denying a motion to dismiss RICO claims very similar to the one pressed here. (*See* Pls.' June 28, 2016 Ltr. (Docket No. 3054) 3 n.3 (citing *In re Takata Airbag Prods.*

### 2.  The Magnuson-Moss Warranty Act

Plaintiffs' second federal claim, brought on behalf of certain members of the Post-Sale Ignition Switch Defect Subclass, is for violation of the MMWA, 15 U.S.C. § 2310, *et seq.*  (*See* TACC ¶¶ 1142-1158).  The MMWA provides a remedy for "a consumer who is damaged by the failure of a warrantor to comply with any obligation under a written [or implied] warranty." *Wilbur v. Toyota Motor Sales, U.S.A., Inc.*, 86 F.3d 23, 26 (2d Cir. 1996) (internal quotation marks and alterations omitted); *see* 15 U.S.C. § 2310(d)(1).  The MMWA, however, does not create an independent basis for liability.  Instead, liability under the federal law turns on questions of state warranty law.  *See, e.g.*, *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 n.2 (9th Cir. 2009); *Carlson*, 883 F.2d at 291; *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C. Cir. 1986); *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 540 (E.D.N.Y. 2006).  Accordingly, Plaintiffs who have viable state law warranty claims, as discussed below, also have viable claims under the MMWA; if a Plaintiff's state law warranty claim is dismissed, so is his or her MMWA claim.

### C.  State Claims

The Court turns, then, to Plaintiffs' state claims, which sound in consumer fraud, common law fraud, warranty law, unjust enrichment, and negligence.  As noted, Plaintiffs bring

---

*Liab. Litig.*, No. 15-MD-2599 (FAM), 2015 WL 9987659 (S.D. Fla. Dec. 2, 2015)).  The *Takata* Court held that the Takata plaintiffs had adequately alleged an associated-in-fact enterprise consisting of Takata, other vehicle manufacturers, and dealerships and that the plaintiffs had adequately alleged injury by pleading that "they overpaid for vehicles based on misinformation regarding vehicle safety; they overpaid for airbags within the vehicles; and the vehicles they purchased diminished in value after the public learned about the airbag defect."  2015 WL 9987659, at *1-2.  This Court respectfully disagrees with the *Takata* Court's conclusion, which does not appear to rely on or cite any of the precedent discussed above (and is, to put it mildly, in tension with much of it).

claims under the laws of all fifty states and the District of Columbia, but this motion deals with claims under the laws of only eight jurisdictions: California, the District of Columbia, Florida, Louisiana, Maryland, Missouri, Oklahoma, and Virginia.  In their briefs, the parties largely addressed these claims together on an issue-by-issue basis.  By contrast — and despite the repetition it entails — the Court will separately address each claim with respect to each jurisdiction, as subtle differences in state law can dictate different results for plaintiffs in different jurisdictions.  By and large, however, Plaintiffs' consumer fraud, common law fraud, and implied warranty claims survive, but their unjust enrichment and negligence claims fail.

###   1.   California

The California Plaintiffs for purposes of this motion are Anna Andrews, Marc and Madeline Koppelman, David Padilla, and Randall Pina.  (*See* New GM's Mem. 6).  Andrews owns a 2010 Buick LaCrosse, which she purchased used on August 25, 2011, and which was not subject to any recall.  (*See* TACC ¶ 51; New GM's Mem. 6).  The Koppelmans own a 2010 Chevrolet HHR, which they purchased Certified Pre-Owned in 2012 and which was subject to the ignition switch, ignition cylinder, and power steering recalls.  (*See* TACC ¶ 55; New GM's Mem. 6).  Padilla owned a 2010 Chevrolet Cobalt, which he purchased new in April 2010 and sold in spring 2014, and which was subject to the ignition switch, ignition cylinder, and power steering loss recalls.  (*See* TACC ¶ 57; New GM's Mem. 6).  Pina owns a 2011 Chevrolet HHR, which he purchased new on or about April 25, 2011, and which was subject to the ignition switch and ignition cylinder recalls.  (*See* TACC ¶ 58; New GM's Mem. 6).  Andrews' car has never exhibited any defect.  (*See* TACC ¶ 51).  The Koppelmans' car suffered a loss of power on the road in June 2012; following the 2014 recall, the car was repaired.  (*See id.* ¶ 55).  Padilla's car shut off once while he was driving; before he sold it, the car's ignition switch was replaced

43

pursuant to the 2014 recall.  (*See id.* ¶ 57).  Pina does not allege that his car manifested any

defect; he had his ignition parts replaced pursuant to the 2014 recall.  (*See id.* ¶ 58).  The

California Plaintiffs bring claims under the California Unfair Competition Law ("UCL"), Cal.

Bus. & Prof. Code § 17200, *et seq.* (TACC ¶¶ 1445-1467); the Consumers Legal Remedies Act

("CLRA"), Cal. Civ. Code § 1750, *et seq.* (TACC ¶¶ 1418-1444); for fraudulent concealment

(*id.* ¶¶ 1468-1481); and for unjust enrichment (*id.* ¶¶ 1516-1525).  The California Plaintiffs who

are also members of the Post-Sale Ignition Switch Defect Subclass (that is, everyone other than

Andrews — together, the "California Ignition Plaintiffs") also bring a claim for violation of the

Song-Beverly Consumer Warranty Act ("SBA"), Cal. Civ. Code §§ 1791.1, 1792 (TACC

¶¶ 1482-1496), and for negligent failure to recall (*id.* ¶¶ 1497-1505).  The Court will address

each of those claims in turn.

### a.  UCL

California's UCL proscribes "unlawful, unfair or fraudulent business acts or practices and

unfair, deceptive, untrue or misleading advertising."  *Berger v. Home Depot USA, Inc.*, 741 F.3d

1061, 1068 (9th Cir. 2014) (internal quotation marks omitted); *see* Cal. Bus. & Prof. Code §

17200.  "A plaintiff may pursue a UCL claim under any or all of three theories: the

'unlawfulness,' 'fraudulent,' or 'unfairness' prongs."  *In re Toyota Motor Corp. Unintended*

*Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1175 (C.D.

Cal. 2010) ("*Toyota I*").  The "unlawful" prong "borrows violations of other laws and treats them

as actionable."  *Toyota I*, 754 F. Supp. 2d at 1175 (internal quotation marks omitted).  The

"fraudulent" prong looks to whether a business practice "is one that is likely to deceive the

public and may be based on representations that are untrue."  *Id.* at 1175.  As for the "unfair"

prong, courts have yet to reach a consensus on what the statutory term means, but have variously

44

considered whether the defendant's activities create "some actual or threatened impact on competition" or whether "the impact of the challenged practice on its alleged victim [outweighs] the reasons, justifications, and motives of the alleged wrongdoer." *Taragan v. Nissan N. Am., Inc.*, No. 09-CV-3660 (SBA), 2013 WL 3157918, at *8 (N.D. Cal. June 20, 2013). Here, the California Plaintiffs contend that New GM is liable under all three prongs. (*See* TACC ¶¶ 1448-1450).

To prevail on a UCL claim, a plaintiff must plead and prove that the defendant engaged in a business practice proscribed under one of the statute's three prongs and that the plaintiff was injured "as a result of" the business practice. *See, e.g.*, *Berger*, 741 F.3d at 1068; *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013); *Toyota I*, 754 F. Supp. 2d at 1168. Further, UCL allegations that sound in fraud must meet the heightened pleading requirements of Rule 9(b). *See, e.g.*, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). In *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877 (Cal. 2011), the California Supreme Court considered the requirements for standing under the UCL in light of an amendment that required a plaintiff to have "lost money or property" to bring a claim. The plaintiffs in the case had purchased locks that were sold with a "Made in U.S.A." label, but in fact had been manufactured abroad; the plaintiffs alleged that they had suffered injury because they had been induced to purchase products they did not want and would not have bought but for the misrepresentation. *See Kwikset*, 246 P.3d at 883. The *Kwikset* Court held: "To satisfy the narrower standing requirements imposed by [the amended UCL], a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Id.* at 885. Interpreting what could

45

constitute economic injury, the Court described the following as two representative, non-exclusive options: "A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; [or] (2) have a present or future property interest diminished." *Id.* at 885-86.

Applying those standards, the *Kwikset* Court held that the plaintiffs had stated a viable injury under the UCL because "[a] consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section 17204 by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation." *Id.* at 890.  The economic harm came from the fact that "the consumer ha[d] purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay . . . whether or not a court might objectively view the products as functionally equivalent." *Id.* at 890; *see also, e.g.*, *McMahon v. Take-Two Interactive Software, Inc.*, No. 14-55296, 2016 WL 684963, at *1 (9th Cir. Feb. 19, 2016) (citing *Kwikset* to find that the plaintiffs had standing under the UCL because they alleged they would not have paid a "premium price" if the defendants had not misrepresented the online availability of a video game); *Johnson v. Wal-Mart Stores, Inc.*, 544 F. App'x 696, 697 (9th Cir. 2013) (reversing the district court's holding that the plaintiff had not alleged sufficient injury where the plaintiff asserted that she had "paid more than she otherwise would have if Wal-Mart had not engaged in the alleged misrepresentation" (citing *Kwikset*) (internal quotation marks omitted)).  Courts have since extended *Kwikset*'s holding to cases of fraudulent concealment or omission, in addition to affirmative misrepresentation.  *See, e.g.*, *In re Sony Gaming Networks*, 996 F. Supp. 2d at 988; *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 921 (N.D. Cal. 2012).

Here, each of the California Plaintiffs alleges that he or she would not have purchased his or her New GM vehicle, or would have paid less than he or she did, had he or she known about New GM's corporate culture and the undisclosed defects in GM vehicles.  (*See* TACC ¶¶ 51, 55, 57, 58).  This alleged injury is directly in line with *Kwikset*.  Furthermore, contrary to New GM's argument (*see* New GM's Mem. 9-10), nothing in *Kwikset* suggests that a product must actually manifest a defect to give rise to a claim.  Instead, the *Kwikset* Court indicated that what matters is whether, given a consumer's subjective expectations, a product is what it was advertised to be — even if there is no objective difference between the product as advertised and the product as manufactured.  *See* 246 P.3d at 890 ("For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm . . . — the loss of real dollars from a consumer's pocket — is the same whether or not a court might objectively view the products as functionally equivalent.").  Further, the post-*Kwikset* cases to which New GM cites do not address *Kwikset* or standing under the UCL, much less hold that a manifested defect is required to bring a claim under the UCL.  (*See* New GM's Reply 9-10).  *See Czuchaj v. Conair Corp.*, No. 13-CV-1901 (RBB), 2016 WL 1240391, at *3 (S.D. Cal. Mar. 30, 2016) (noting that the defendant argued that California requires a manifested defect for a breach of implied warranty claim, but not addressing the issue); *Galitski v. Samsung Telecomm. Am., LLC*, No. 12-CV-472-D, 2015 WL 5319802, at *10 (N.D. Tex. Sept. 11, 2015) (noting that, for a breach of implied warranty claim under California law, a manifestation of a defect does not necessarily mean that a product is not merchantable); *see also id.* at *13-15 (denying class certification for UCL and CLRA claims because the plaintiffs would have to present individualized proof to show that each phone was defective when sold).  Accordingly, the California Plaintiffs each allege sufficient injury to bring a claim under the UCL.  That leaves the

questions of whether New GM engaged in a prohibited practice and, if so, whether that practice

caused each Plaintiff's injury.

The answer to those questions is plainly yes for the California Ignition Plaintiffs.

California law provides that a duty to disclose arises "(1) when the defendant is in a fiduciary

relationship with the plaintiff; (2) when the defendant ha[s] exclusive knowledge of material

facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the

plaintiff; or (4) when the defendant makes partial representations but also suppresses some

material fact." *Donohue*, 871 F. Supp. 2d at 925; *see Herron v. Best Buy Co.*, 924 F. Supp. 2d

1161, 1174 (E.D. Cal. 2013). A fact is material "'if a reasonable man would attach importance

to its existence or nonexistence in determining his choice of action.'" *Herron*, 924 F. Supp. 2d at

1174 (quoting *Kwikset*, 246 P.3d at 877); *see also Wilson v. Hewlett-Packard Co.*, 668 F.3d

1136, 1141 (9th Cir. 2012) (noting that California courts have generally found that a

manufacturer's UCL duty to disclose extends only to safety issues). Here, the TACC includes a

litany of allegations suggesting that New GM may have known, via knowledge imputed from

Old GM employees and documents, about the ignition defects by at least spring 2010, when the

first California Plaintiff purchased his car. (*See, e.g.*, TACC ¶¶ 298-339).[14] For example: In

---

[14] The question of whether and under what circumstances knowledge of Old GM employees
can be imputed to New GM has been the focus of prior litigation, before both this Court and the
Bankruptcy Court. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF),
2015 WL 9582714, at *2 (S.D.N.Y. Dec. 30, 2015); *In re Motors Liquidation Co.*, 541 B.R. 104
(Bankr. S.D.N.Y. 2015). The Bankruptcy Court ruled that, as a matter of bankruptcy law, Old
GM personnel's knowledge or knowledge of information contained in Old GM files could be
imputed to New GM only to the extent that it could be shown, as a matter of *non*-bankruptcy
law, that New GM actually had that knowledge (for example, through an Old GM employee who
later became an employee of New GM). *See In re Motors Liquidation Co.*, 541 B.R. at 108.
Plaintiffs make clear in the TACC that they include allegations with respect to Old GM's
knowledge only to the extent that it can be imputed to New GM, and highlight the significant
number of Old GM employees who went to work for New GM after the bankruptcy. (*See* TACC

February 2005 Old GM notified dealers, but not the public, about the ignition switch's ability to inadvertently rotate (*id.* ¶ 298); there were multiple "reports of power failure and/or engine shutdown in Delta Ignition Switch Vehicles" that resulted in inquiries in 2005 by Old GM, including one reported by an Old GM engineer (*id.* ¶¶ 302-304); Old GM was notified of media reports investigating fatal crashes involving the ignition switch defect in 2006 and 2007 (*id.* ¶¶ 315-316); Old GM was repeatedly notified by one of its engineers who experienced a stall while driving a 2006 Chevrolet Impala in August 2005 (*id.* ¶ 424); Old GM and New GM received notice of fatal incidents where the car was in the accessory or off position (including instances where the frontal airbags should have deployed, but did not) from 2007 to 2010 (*id.* ¶¶ 317-329); and New GM received customer complaints specifically identifying vehicle stalls and other ignition issues between 2009 and 2014 (*id.* ¶¶ 375-379, 428-443, 490-500). And the concealed defect unquestionably implicated a safety issue and would have affected a reasonable person's decision to purchase a car — making the omission material. Taken together, these allegations are sufficient to satisfy the heightened pleading requirements of Rule 9(b) and to state a claim under the UCL. *See In re Sony Gaming Networks*, 996 F. Supp. 2d at 988 (finding that a plaintiff had alleged injury and causation under the UCL by alleging "that Sony omitted material information regarding the security of [its products] and that this information should have been disclosed to consumers and the time consumers purchased their [products]").[15]

---

¶¶ 265-271). New GM does not challenge the inclusion of these allegations here to the extent they bear on New GM, and drawing all inferences in Plaintiffs' favor, it is plausible that much of the knowledge attributed to Old GM employees and documents came over to New GM.

[15]     To be clear, the California Ignition Plaintiffs purchased car models that were not manufactured with the faulty ignition switch, but which could have been repaired at some point using the faulty ignition switch. (*See* New GM's Mem. 3 n.3). Accordingly, if they are ultimately to succeed on their claims with respect to the ignition switch, they will have to show

Andrews, whose car was not subject to any recall and who does not claim to have experienced any defect, presents a different question.  (*See* TACC ¶ 51).  New GM would not have had a duty to disclose to Andrews that other New GM cars were potentially defective.  *See Donohue*, 871 F. Supp. 2d at 927 (dismissing the plaintiff's claim with respect to his iPhone because the only alleged omissions were made regarding a different model).  And she does not have a claim under the benefit-of-the-bargain defect theory, as she does not allege that her car was defective when sold.  She proceeds, therefore, only under the brand devaluation theory, which the Court has already rejected.  Notably, that theory fails even under *Kwikset*'s expansive conception of injury.  The *Kwikset* Court acknowledged that "labels matter," but it also grounded its holding on the fact that accurate representations about geographic origin are material and something to which consumers are legally entitled.  *See Kwikset*, 246 P.3d at 890 (noting that the California legislature had enacted legislation prohibiting deceptive representations of geographic origin).  By contrast, the continuing good reputation of a manufacturer is not an element of a consumer purchase to which a consumer is entitled.  Nor did New GM represent that its reputation for safety and quality would remain unchanged.  Andrews therefore does not state a claim under the UCL, because she does not allege injury within the meaning of the statute.  New GM's motion to dismiss the California Plaintiffs' UCL claim is accordingly GRANTED with respect to Andrews, but DENIED with respect to the Koppelmans, Padilla, and Pina.

---

that their cars in fact contained that defect.  New GM does not raise this challenge here and, in any event, drawing all reasonable inferences in favor of Plaintiffs, the Court can plausibly infer that their cars may have contained the ignition switch defect.

### b.     CLRA

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal Civ. Code § 1770(a).  The California Plaintiffs contend that New GM violated the CLRA by, among other things, (1) representing that its vehicles "have characteristics, uses, benefits, and qualities which they do not"; and (2) representing that its vehicles "are of a particular standard, quality, and grade when they are not." (TACC ¶ 1422).  *See* Cal. Civ. Code § 1770(a)(5), (7).  They rely largely on allegations that New GM actively concealed and failed to disclose safety defects in GM cars.  (*See* TACC ¶¶ 1427-1428, 1433-1434).  Concealment or a failure to disclose are actionable under the CLRA, as under the UCL, "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007); *see Toyota I*, 754 F. Supp. 2d at 1172-73.  California courts have held that in order for an undisclosed fact to count as "material," it must go to the safety of a product. *See In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1095 (S.D. Cal. 2010); *Toyota I*, 754 F. Supp. 2d at 1173-74.  CLRA claims that sound in fraud, as the claims do here, are subject to the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *Kearns*, 567 F.3d at 1126.

As for injury, although the *Kwikset* ruling addressed only the UCL and relied on language specific to the UCL, courts have since read *Kwikset* to apply equally to injury under the CLRA. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107-1108 (9th Cir. 2013); *Musgrave v. ICC/Marie*

*Callender's Gourmet Prods. Div.*, No. 14-CV-2006 (JST), 2015 WL 510919, at *9 (N.D. Cal. Feb. 5, 2015).  This Court agrees.  Notably, the language of the CLRA is even broader than that of the UCL: It provides a remedy to "[a]ny consumer who suffers *any damage* as a result" of an unfair trade practice, Cal. Civ. Code § 1780(a) (emphasis added), whereas the UCL applies only to "a person who has suffered injury in fact and has *lost money or property* as a result of the unfair competition," Cal. Bus. & Prof. Code § 17204 (emphasis added).  On its own terms, therefore, the statute would appear to reach at least as broadly as the UCL reaches.  *Cf. Kwikset*, 246 P.3d at 886-87 (observing that the UCL's "economic injury requirement is qualitatively more restrictive than" the requirement of "injury in fact" required to establish Article III standing, "embracing as it does fewer kinds of injuries").  That conclusion is particularly appropriate in light of the CLRA's exhortation that the statute "shall be liberally construed and applied to promote its underlying purposes."  Cal. Civ. Code § 1760.

It follows that the California Ignition Plaintiffs sufficiently allege injury for purposes of the CLRA, as they state that they purchased products that they otherwise would not have, or paid more than they otherwise would have paid, due to New GM's failure to disclose the ignition defects in their cars.  Additionally, they plausibly allege that New GM had a duty to disclose those defects, either because New GM had exclusive knowledge of material facts or because New GM actively concealed material facts.  For example, the TACC alleges that Old GM and New GM had notice of dozens of ignition-switch related accidents long before the spring of 2012, when New GM concededly knew of the defect.  And a defect that can cause a car to suddenly switch off plainly implicates safety, and thus constitutes a "material" fact that would cause a consumer to behave differently if she knew of it.  *See Falk*, 496 F. Supp. 2d at 1095; *see also Toyota I*, 754 F. Supp. 2d at 1173 ("The Court is convinced that a safety consideration as

fundamental as whether a car is able to stop when the brakes are applied is material to

consumers.").  The California Ignition Plaintiffs accordingly state a claim under the CLRA.  *See*

*Toyota I*, 754 F. Supp. 2d at 1174 (holding that the plaintiffs had stated a claim under the CLRA

when they alleged that Toyota had exclusive knowledge about the sudden acceleration defect and

did not disclose that defect to consumers).  By contrast, Andrews's CLRA claim must be

rejected; although the CLRA's injury language is broader than that of the UCL, Plaintiffs do not

cite, and the Court is not aware of, any authority extending its reach to claims under a brand

devaluation theory.  Thus, New GM's motion to dismiss the CLRA claim is GRANTED with

respect to Andrews, but DENIED with respect to Padilla, Pina, and the Koppelmans.

### c.      Fraudulent Concealment

In addition to their consumer fraud claims, the California Plaintiffs bring a common law

fraudulent concealment claim.  (*See* TACC ¶¶ 1468-1481).  Under California law, a plaintiff

bringing a claim for fraudulent concealment must allege: "(1) a misrepresentation (false

representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent

to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Toyota I*,

754 F. Supp. 2d at 1189 (internal quotation marks omitted).  For concealment to be actionable,

the defendant must have had a duty to disclose, which arises under the same circumstances as in

the UCL and CLRA contexts — namely, (1) if the defendant is in a fiduciary relationship with

the plaintiff; (2) if the defendant had exclusive knowledge of material facts not known to the

plaintiff; (3) if the defendant actively conceals a material fact from the plaintiff; or (4) if the

defendant makes partial representations but suppresses some material fact. *See id.* at 1190.

Given the Court's analysis and conclusions with respect to the California Plaintiffs' claims of

fraudulent concealment under the UCL and CLRA, it is plain that Andrews's fraud claims must

be dismissed.  It is equally plain that the California Ignition Plaintiffs plausibly allege a duty to disclose and satisfy at least the first four elements of a fraud claim.  Among other things, they plausibly allege that New GM knew — in part through knowledge acquired from Old GM — of dozens of accidents involving the ignition switch defects by the time they purchased their cars. (*See* TACC ¶¶ 298-339).

Whether the California Ignition Plaintiffs plausibly allege damages for purposes of their common law fraud claims, however, requires closer examination.  The UCL and CLRA are consumer-protection statutes, which by their terms extend broadly and have been interpreted by courts to reach "benefit of the bargain" or "diminution in value" damages such as those alleged here.  By contrast, California law provides that "[o]ne defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction."  Cal. Civ. Code § 3343(a); *see Toyota I*, 754 F. Supp. 2d at 1193.  In other words, "[i]n fraud cases involving the 'purchase, sale or exchange of property,' the Legislature has expressly provided that the 'out of pocket' rather than the 'benefit of the bargain' measure of damages should apply" and, thus, "a defrauded party is ordinarily limited to recovering his 'out of pocket' loss."  *Strebel v. Brenlar Invs., Inc.*, 135 Cal. App. 4th 740, 747 (Cal. Ct. App. 2006) (internal quotation marks omitted)).  That said, the California Supreme Court has held that that limitation applies only to the calculation of damages, not the ability to plead an injury.  *See Kwikset*, 246 P.3d at 893-94 ("In the context of a common law deceit action, the [Section 3343] rule's only purpose is to provide the measure of damages; it limits neither standing nor the availability of equitable remedies.").  Accordingly, New GM's

motion to dismiss the California Plaintiffs' fraudulent concealment claims is GRANTED with respect to Andrews, and DENIED with respect to the California Ignition Plaintiffs.

### d. Unjust Enrichment

Next, the California Plaintiffs bring claims for unjust enrichment. (*See* TACC ¶¶ 1516-1525). New GM argues that California does not recognize unjust enrichment as a cause of action. (*See* New GM's Mem. 46). Although there is precedent supporting that assertion, at least some courts have held that "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (internal quotation marks omitted); *see Berger* 741 F.3d at 1070 (recognizing unjust enrichment as a cause of action). A plaintiff may not recover for unjust enrichment or restitution, however, when there is a valid, express contract between the parties, and the majority approach appears to be that such claims can be pleaded in the alternative only if the plaintiff also alleges that the contract may have been invalid or procured by fraud. *Compare, e.g.*, *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011) (denying a motion to dismiss an unjust enrichment claim because the plaintiff "properly alleged a claim for fraud in the procuring of the alleged contract"), *with Progeny Ventures, Inc. v. W. Union Fin. Servs., Inc.*, 752 F. Supp. 2d 1127, 1135 (C.D. Cal. 2010) (dismissing an unjust enrichment claim in light of an enforceable express contract between the parties), *and Boon Rawd Trading Int'l Co. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 956 (N.D. Cal. 2010) (dismissing an unjust enrichment claim because the plaintiff did not "either allege that the parties' rights were not squarely set out in a binding agreement, or allege that any express contract was procured by fraud or was ineffective for some reason"). Here, Padilla and Pina both allege that their cars were covered by warranties at the time of purchase. (*See* TACC ¶¶ 57-58).

By contrast, the TACC is silent with respect to whether Andrews and the Koppelmans were parties to express warranties (although it is hard to imagine they were not).  New GM's motion to dismiss the California unjust enrichment claim is accordingly GRANTED with respect to Padilla and Pina, and DENIED with respect to Andrews and the Koppelmans.[16]

### e.   SBA

The TACC's last two claims under California law are brought solely on behalf of the California Ignition Plaintiffs (that is, all California Plaintiffs other than Andrews).  First, they bring a claim for breach of the implied warranty of merchantability under the SBA.  The SBA provides that "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable."  Cal. Civ. Code § 1792.  "Merchantable" goods are defined, in turn, as those that: "(1) [p]ass without objection in the trade under the contract description; (2) [a]re fit for the ordinary purposes for which such goods are used; (3) [a]re adequately contained, packaged, and labeled; and (4) [c]onform to the promises or affirmations of fact made on the container or label."  Cal. Civ. Code § 1791.1(a).  Significantly, the relevant inquiry focuses on whether the product was defective at the time it was sold.  *See Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1243 (C.D. Cal. 2011) ("[T]he implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale, so in the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the

---

[16]     Andrews's unjust enrichment claim may fail for other reasons — namely, failure to show that New GM "unjustly" retained any benefit, because New GM did not act improperly with respect to Andrews and her car.  New GM does not press this argument, however, and the Court declines to dismiss the claim *sua sponte* on that ground.  (*See* New GM's Mem., Ex. 1, at 1).

existence of the unseen defect, *not by its subsequent discovery*." (emphasis added) (internal quotation marks omitted)); *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 924 (C.D. Cal. 2010) (similar).  Further, the SBA applies only to sales "of consumer goods that are sold at retail in [California]."  Cal. Civ. Code § 1792.

At the outset, the Koppelmans' claim under the SBA must be dismissed because, as alleged in the TACC (*see* TACC ¶ 55), they bought their car in Maryland, not in California.  *See In re Sony Grand Wega*, 758 F. Supp. 2d at 1097.  By contrast, Padilla and Pina both state claims under the SBA.  They allege that their cars were sold with, among other things, the ignition-switch defect.  (*See* TACC ¶¶ 57-58).  That defect resulted in a risk that their cars could suddenly stall while driving, and "[v]ehicles subject to engine failure cannot be said to be merchantable." *Cholakyan*, 796 F. Supp. 2d at 1244.  To be sure, the parties do not cite, and the Court has not found, any precedent addressing whether the *Kwikset* theory of damages applies to claims under the SBA.  But the fact that Padilla's and Pina's vehicles were defective at the time of sale suggests that California law permits their warranty claims to proceed.  *Cf. Toyota I*, 754 F. Supp. 2d at 1186 (rejecting the argument that breach of warranty claims require a manifest defect). New GM's motion to dismiss the California Plaintiffs' claims under the SBA and the MMWA (which, as discussed above, depends on state warranty law) is therefore GRANTED with respect to the Koppelmans, and DENIED with respect to Padilla and Pina.

### f.    Negligent Failure To Recall

Finally, the California Ignition Plaintiffs bring claims for negligent failure to recall.  (*See* TACC ¶¶ 1497-1505).  The Court agrees with New GM that those claims are barred by California's economic loss rule.  (*See* New GM's Mem. 55-56).  That rule precludes a plaintiff from recovering in negligence for a product defect that causes only economic loss, which

"consists of damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits — without any claim of personal injury or damages to other property." *Sharma v. BMW of N. Am., LLC*, No. 13-CV-2274 (MMC), 2014 WL 2795512, at *6 (N.D. Cal. June 19, 2014) (quoting *Robinson Helicopter Corp. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2005)). Such is the case here: The California Plaintiffs allege no personal injury or damage to property other than the alleged economic impact on their cars. (*See* TACC ¶¶ 55, 57, 58). Plaintiffs argue that the economic loss rule does not apply because damage was caused to "property" — namely, their cars — "other than the product itself" — namely, the ignition switches in their cars — and because of a special "relationship between the parties created here by" the Safety Act. (Pls.' Mem. 59). But if a plaintiff could do an end run around the economic loss rule by drawing a distinction between property and its component parts the rule would be rendered almost meaningless. Additionally, drawing a distinction between the ignition switch and the overall car is unpersuasive in light of the fact that the contractual relationship between a consumer and New GM is created with respect to the whole car, not each component part. *Cf. NuCal Foods v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1028-29 (E.D. Cal. 2013) (holding that the economic loss rule did not bar a negligence claim against a supplier of contaminated eggs when the supplier's eggs caused damage to other eggs held by the plaintiff). Finally, New GM did not have a relationship with the California Ignition Plaintiffs, as distinct from its relationship with all purchasers of its cars, that would give rise to an exception to the economic loss rule. *See Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1054 (N.D. Cal. 2004) (noting that the special-relationship exception requires the manufacturer's specific knowledge of sales to a particular party); *Greystone Homes, Inc. v. Midtec, Inc.*, 86 Cal. Rptr. 3d 196, 222-24 (4th Dist.

2008) (same).  Accordingly, New GM's motion is GRANTED with respect to the California

Ignition Plaintiffs' claim for negligent failure to recall.

### 2. District of Columbia

The sole D.C. Plaintiff for purposes of this motion is Pajja Jackson, who took title to his

grandmother's 2011 Buick Regal, which had been purchased new on August 23, 2010.  (*See*

New GM's Mem. 6; TACC ¶ 66).  Jackson's Buick was subject to the seat-belt and front turn

signal recalls.  (*See* New GM's Mem. 6).  Jackson experienced brake locking while driving the

car on multiple occasions, and the car's battery also exploded, after which the battery was

repaired.  (*See* TACC ¶ 66).  Jackson is not a member of the Post-Sale Ignition Switch Defect

Subclass.  (*See id.* ¶ 1033).  Jackson brings claims under the D.C. Consumer Protection

Procedures Act ("DCCPPA"), D.C. Code § 28-3901, *et seq.* (TACC ¶¶ 1713-1737); for fraud by

concealment (*id.* ¶¶ 1738-51); and for unjust enrichment (*id.* ¶¶ 1769-1778).  The Court will

address each claim in turn.

### a. DCCPPA

The DCCPPA prohibits "misleading or deceiving a consumer by representing that goods

or services have a sponsorship, approval, [or] certification that they do not have; representing

that goods or services are of a particular standard or quality if in fact they are of another; and

misrepresenting a material fact which has a tendency to mislead."  *Search v. Uber Techs., Inc.*,

128 F. Supp. 3d 222, 236 (D.D.C. 2015) (internal quotation marks omitted); *see* D.C. Code § 28-

3904(a)-(e).  To recover under the DCCPPA, a plaintiff must show (1) the existence of a material

fact that (2) the defendant failed to state, (3) that such omission had a tendency to mislead, (4)

that the plaintiff relied on the misrepresentation, and (5) that the plaintiff suffered damages as a

result.  *See, e.g.*, *Simon v. Hofgard*, — F. Supp. 3d —, 2016 WL 1226269, at *5 (D.D.C. Mar.

28, 2016) (internal quotation marks and alterations omitted); *see also* D.C. Code § 28-3904; *Search*, 128 F. Supp. 3d at 236.  Here, Jackson contends that New GM violated the DCCPPA by, among other things, concealing a host of safety defects, making incomplete representations about the safety of GM cars, and hiding the fact that the company valued cost-cutting over safety.  (*See* TACC ¶¶ 1721, 1723-1726, 1729, 1731).

Jackson's DCCPPA claim fails as a matter of law for several reasons.  First, the DCCPPA only "establishes an enforceable right to truthful information . . . about consumer goods and services that are or would be purchased, leased, or received *in the District of Columbia*."  D.C. Code § 28-3901(c).  Jackson's car, however, was not purchased, leased, or received in the District of Columbia; it was purchased in Mississippi, and there is no allegation that it was otherwise "received" in D.C.  (*See* TACC ¶ 66).  Second, Jackson does not allege that he or his grandmother, who purchased the car, relied on any representation by New GM.  (*See* TACC ¶ 66).  *See, e.g.*, *Search*, 128 F. Supp. 3d at 236 (noting that a plaintiff must have relied on a misrepresentation to bring a claim under the DCCPPA); *Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 141-42 (D.D.C. 2011) (dismissing a claim under the DCCPPA because the plaintiffs had not alleged that the defendants had made a specific misrepresentation on which the plaintiffs had relied).  And third, Jackson does not allege that New GM made any misrepresentations or omitted material facts with respect to the 2011 Buick Regal.  The only alleged defects in the 2011 Buick Regal are the seat-bolt and front turn signal.  (*See* New GM's Mem. 6).[17]  But Plaintiffs allege that New GM knew about the seat-bolt defect no earlier than July 10, 2013, long

---

[17]     Although Jackson alleges that his battery exploded, he does not allege that that was due to a defect in the car or one about which New GM should have known.  (*See* TACC ¶ 66).

after the 2011 Buick Regal was purchased.  (*See* TACC ¶¶ 714-717).  Similarly, New GM did

not know about the defect in the front turn signal until September 6, 2012, at the earliest.  (*See*

*id.* ¶¶ 873-876).  For all of these reasons, New GM's motion is GRANTED with respect to the

D.C. Plaintiff's DCCPPA claim.

### b.    Fraudulent Concealment

For some of the same reasons, Jackson's fraudulent concealment claim must be

dismissed.  To state a claim for fraudulent concealment under D.C. law, a plaintiff must show

"(1) a duty on behalf of the defendant to disclose to the plaintiff a material fact; (2) the failure to

disclose the fact; (3) an intention to defraud or deceive the plaintiff; (4) action taken by the

plaintiff in justifiable reliance on the concealment; and (5) damages as a result of the defendant's

concealment."  *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 75 (D.D.C. 2012); *see Sundberg v.*

*TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) ("[M]ere silence does not constitute fraud

unless there is a duty to speak." (internal quotation marks omitted)).  Further, a fraudulent

concealment claim must, pursuant to Rule 9(b), be pleaded with particularity.  *See Firestone v.*

*Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996); *Howard Univ.*, 857 F. Supp. 2d at 75.  For the

reasons stated above with respect to the DCCPPA — namely, Jackson's failure to allege reliance,

misrepresentation, or knowing failure to disclose a material fact, let alone with the particularity

required by Rule 9(b) — Jackson fails to state a claim for fraudulent concealment.  New GM's

motion to dismiss the D.C. Plaintiff's fraud claim is accordingly GRANTED.

### c.    Unjust Enrichment

Finally, Jackson brings a claim for unjust enrichment.  (*See* TACC ¶¶ 1769-1778).  New

GM argues that this claim must fail because the 2011 Buick Regal was covered by an express

warranty.  (*See* New GM's Mem. 42-43; TACC ¶ 66).  D.C. law is clear that an element of an

unjust enrichment claim is the absence of an express contract. *See, e.g.*, *Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004); *Harrington v. Trotman*, 983 A.2d 342, 346-47 (D.C. 2009) (collecting cases); *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 n.2 (D.C. 1997).  And although some courts applying D.C. law have permitted unjust enrichment claims to be pleaded in the alternative, the majority approach is not to permit alternative pleading where, as here, there is no contention that the contract is invalid. *See, e.g.*, *Jacobson v. Hofgard*, — F. Supp. 3d —, 2016 WL 837923, at *15 (D.D.C. 2016); *United States v. First Choice Armor & Equip., Inc.*, 808 F. Supp. 2d 68, 77-78 (D.D.C. 2011); *Plesha v. Ferguson*, 725 F. Supp. 2d 106, 112 (D.D.C. 2010).  (*Cf.* Pls.' Mem. 39-40 (arguing that Plaintiffs may plead in the alternative under Rule 8)).  Accordingly, New GM's motion to dismiss the D.C. Plaintiff's unjust enrichment claim is GRANTED.

### 3.  Florida

There is only one Florida Plaintiff named in the TACC: Joni Ferden-Precht.  (*See* TACC ¶ 67; New GM's Mem. 6).  Ferden-Precht purchased a new 2011 Chevrolet Traverse on May 27, 2011; the Traverse was subject to the wiring harness and seat belt connector defects.  (*See* TACC ¶ 67; New GM's Mem. 6).  Neither defect manifested itself in the car, but Ferden-Precht did experience an airbag service light that illuminated intermittently.  (*See* TACC ¶ 67).  Ferden-Precht is not a member of the Post-Sale Ignition Switch Defect Subclass.  (*See id.* ¶ 1033).  She brings claims under the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* (TACC ¶¶ 1779-1802); for fraud by concealment (*id.* ¶¶ 1803-1816); and for unjust enrichment (*id.* ¶¶ 1827-1836).  The Court will address each in turn.

a.    **FDUTPA**

The elements of a claim under the FDUTPA are "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."  *Carriuolo v. Gen. Motors Corp.*, — F.3d —, 2016 WL 2870025, at *3 (11th Cir. 2016); *see Blair v. Wachovia Mortg. Corp.*, No. 11-CV-566 (TBS), 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012); *Kia Motors Am. Corp. v. Butler*, 985 So.2d 1133, 1140 (Fla. Dist. Ct. App. 2008).  "A deceptive act or unfair practice may be found when there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  *Blair*, 2012 WL 868876, at *3 (internal quotation marks omitted); *see Carriuolo*, 2016 WL 2870025, at *3.  As Ferden-Precht's FDUTPA claim sounds in fraud (*see* TACC ¶¶ 1784, 1794-1795), she must meet the heightened pleading standards of Rule 9(b).  *See, e.g.*, *Blair*, 2012 WL 868878, at *3 ("While federal district courts have split as to whether FDUTPA claims are subject to Rule 9(b), this Court concludes that where the gravamen of the claim sounds in fraud, as here, the heightened pleading standard of Rule 9(b) would apply." (internal citations omitted)).

Whether Ferden-Precht sufficiently alleges an unfair or deceptive practice with respect to her purchase of the 2011 Chevrolet Traverse is a close call.  She does not allege any specific misrepresentations New GM made about the car, other than general statements regarding quality and safety that, as noted above, *see supra* at pages 22-23, are generally held to constitute inactionable puffery.  *See, e.g.*, *Zaccagnino v. Nissan N. Am., Inc.*, No. 14-CV-3690 (LLS), 2015 WL 3929620, at *4 (S.D.N.Y. June 17, 2015) ("[P]romoting a car as generally safe and reliable is too general a representation to be proven true or false."); *In re Sony Grand Wega*, 758 F. Supp. 2d at 1089 (holding that statements that products "were of 'high' or 'superior' quality" were not actionable.  Nor does she allege that New GM knew about the seat belt connector defect at the

time she purchased her car in 2011.  (*See* TACC ¶¶ 694-701).  She does, however, allege that New GM may have known about the wiring harness defect, at least as present in other vehicle models, as early as November 2009.  (*See id.* ¶¶ 645-648).  Although that barely alleges knowledge of a potential defect that was not disclosed to consumers, the Court finds that it is just enough to cross the Rule 9(b) line.

The parties focus more on the question of whether Ferden-Precht alleges a plausible theory of injury under FDUTPA and whether she can pursue a FDUTPA claim without a manifested defect.  (*See* New GM's Mem., Ex. 1, at 2; Pls.' May 18, 2016 Ltr. ("Pls.' Fla. Ltr.") (Docket No. 2871); New GM's May 23, 2016 Ltr. ("New GM's Fla. Ltr.") (Docket No. 2885)).  Significantly, about two months ago, the Eleventh Circuit decided *Carriuolo v. General Motors*, in which it affirmed the certification of a class of plaintiffs who alleged damages under FDUTPA based on a benefit-of-the-bargain defect theory.  *See* 2016 WL 2870025, at *9.  The plaintiffs there brought claims for safety ratings stickers on GM cars, which said that the cars had been given five-star safety ratings in three categories — when, in fact, the cars had not been rated. Notably, the Eleventh Circuit stated that, under FDUTPA, the plaintiffs' "damages should reflect the difference between the market value of a 2014 Cadillac CTS with perfect safety ratings for three standardized categories and the market value of a 2014 Cadillac CTS with no safety ratings."  2016 WL 2870025, at *5.  That is because, the Court explained, "FDUTPA damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."  *Id.*  The Court also rejected the argument that differences in whether class members saw and relied upon the deceptive stickers had a bearing on the merits of their claims, noting that "the FDUTPA 'benefit of the bargain'

model provides a standardized class-wide damages figure because the plaintiff's out-of-pocket

payment is immaterial."  *Id.*  Put simply, the FDUTPA injury inquiry — as interpreted by the

*Carriuolo* Court — focuses on what the defendant did, not what harm the individual plaintiff

suffered.  That is directly in line with the benefit-of-the-bargain defect theory.

New GM argues that the *Carriuolo* Court's holding does not govern here — relying on

*Kia*, in which the Florida District Court of Appeals held that plaintiffs must present evidence of a

manifest defect, and on cases holding that individualized damages must be shown for FDUTPA

claims.  (*See* New GM's Fla Ltr. 1-2).  Admittedly, there is some tension — if not conflict — in

the cases interpreting Florida law, but the Court concludes that Plaintiffs (and the *Carriuolo*

Court) have the better of the argument.  In the first place, *Kia* is not as persuasive as New GM

contends.  The *Kia* Court stated that Florida "firmly aligned [itself] with" the jurisdictions

holding that defect manifestation is required in *Ortiz v. Ford Motor Co.*, 909 So.2d 479 (Fla.

Dist. Ct. App. 2005).  *See Kia*, 985 So.2d at 1139.  But *Ortiz* did not clearly so hold.  Instead, the

Court there simply found that that the differences in brake models would make it difficult to

prove a defect for all models on a class-wide basis; it also found that class treatment was not a

superior method of adjudication because the plaintiff had "failed to present proof demonstrating

the manageability of the putative class which is based on an economic recovery of a product that

is merely failure-prone."  909 So.2d at 481.  That does not amount to holding that manifestation

of a defect is required for an individual FDUTPA claim.

In the second place, the other authority upon which New GM relies is no more

convincing.  (*See* New GM's Fla. Ltr. 2).  *Brisson v. Ford Motor Co.*, 349 F. App'x 433 (11th

Cir. 2009) (per curiam), addressed a breach of warranty claim, not a FDUTPA claim, and

*Breakstone v. Caterpillar, Inc.*, No. 09-CV-23324, 2010 WL 2164440, at *6 (S.D. Fla. May 26,

2010), held only that "it is inappropriate to certify a class containing both individuals [whose product has] 'manifested a deficiency' and those whose product has 'performed satisfactorily'" because the plaintiffs with no manifest injury would have only speculative damages (citing *Kia*). Plaintiffs here emphasize that they can show the relevant market data that would allow a fact-finder to measure the difference between a defective car and a defect-free car.  (*See* Tr. 97).  If so, then damages can be calculated on both an individualized and a class-wide level.  *See Carriuolo*, 2016 WL 2870025, at *5.  (*See* New GM's Fla. Ltr. 2).  Finally, some deference is due the Eleventh Circuit's interpretation of the state law of a state within its jurisdiction, given its familiarity with Florida law.  *See Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011) ("Where . . . a question of state law has not been conclusively resolved by [a state's courts], our general practice is to look next to the law of the circuit in which the state is located . . . ."); *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981) (holding that where a "court of appeals has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule").  In light of the foregoing, New GM's motion to dismiss Ferden-Precht's FDUTPA claim is DENIED.[18]

---

[18]     New GM submitted a supplemental letter calling to the Court's attention a recent opinion on a motion to dismiss in the Takata Airbag MDL.  (*See* New GM's June 24, 2016 Ltr. (Docket No. 3049); *see also* Pls.' June 28, 2016 Ltr. (Docket No. 3054) (responding to New GM's letter)).  *See In re Takata Airbag Prods. Liab. Litig.*, — F. Supp. 3d — , 2016 WL 3388713 (S.D. Fla. 2016).  The *Takata* Court held that Florida law did not require the named plaintiffs to have pleaded that their airbags manifested the alleged defect, limiting its analysis to the motion to dismiss stage and "taking as true Plaintiffs' allegations of a *uniform* defect."  *In re Takata*, 2016

### b. Fraudulent Concealment

In addition to her consumer fraud claim, Ferden-Precht brings a common law fraudulent concealment claim. New GM argues that that claim is barred by Florida's economic loss rule. (*See* New GM's Mem. 54-55; New GM's Reply 30). The Court agrees.

The economic loss rule applies in products liability cases to preclude "recovery of economic damages in tort where there is no property damage or personal injury." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So.3d 399, 404 (Fla. 2013); *see Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899, 902 (Fla. 1987); *Burns v. Winnebago Indus., Inc.*, No. 13-CV-1427, 2013 WL 4437246, at *2-3 (M.D. Fla. Aug. 16, 2013); *Aprigliano v. Am. Honda Motor Co.*, 979 F. Supp. 2d 1331, 1337 (S.D. Fla. 2013). "Economic loss" is defined to include "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits — without any claim of personal injury or damage to other property" and "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Tiara*, 110 So.3d at 401 (internal quotation marks omitted). In *Tiara*, the Florida Supreme Court held that "the economic loss rule is limited to products liability cases." *Id.* at 400. The Court also noted, and reaffirmed the viability of, exceptions to the rule, including fraudulent inducement, negligent misrepresentation, and "free-standing statutory causes of action." *Id.* at 406.

Plaintiffs do not dispute that Ferden-Precht is seeking only economic loss damages. Instead, they contend that the economic loss rule also includes an exception for fraudulent

---

WL 3388713, at *5. The *Takata* opinion thus supports the Court's conclusion, and New GM's renewed arguments to the contrary are unpersuasive.

concealment, and thus does not bar Ferden-Precht's claim.  (*See* Pls.' Mem. 57-58).  That

argument, however, elides the distinction between fraudulent *inducement* — which is by

definition independent of a contract claim — and fraudulent *concealment*, which may well

overlap with the subject matter of the contract and any contract claim.  The exceptions to the

economic loss rule are defined as those that are "based on torts independent of the contractual

breach even though there exists a breach of contract action."  *Tiara*, 110 So.3d at 402 (internal

quotation marks omitted).  When transferred into the products liability realm, that principle

suggests that tort claims that overlap with the subject matter of a breach of warranty claim are

barred by the economic loss rule because they do not arise independently from the sale of the

product itself.  *See Aprigliano*, 979 F. Supp. 2d at 1337-38 (dismissing a claim for negligent

misrepresentation because it was "dependent on the same fundamental allegations contained in

the breach of warranty claim — specifically, that Honda breached the terms of its Warranties by

providing Plaintiffs with defective motorcycles and failing to repair or replace those

motorcycles"); *Burns*, 2013 WL 4437246, at *3 (agreeing with the defendants' argument that the

economic loss rule applied to the plaintiff's claims because the plaintiff sought "relief due to the

inferior quality of the RV, which did not meet his expectations due to the corrosion"); *see also In

re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, No. 13-MD-2495 (TWT), 2015 WL

3796456, at *3 (N.D. Ga. June 18, 2015) (applying Florida law and dismissing a fraud claim that

alleged the defendant had sold a product with a known defect).

      The opinion in *In re MyFord Touch Consumer Litigation*, 46 F. Supp. 3d 936 (N.D. Cal.

2014), upon which Plaintiffs rely, also conflates fraudulent inducement and fraudulent

concealment, and does not explain why *Tiara*'s reasoning is consistent with permitting a fraud

claim for economic loss to proceed when it is based only on a concealed product defect.  *See* 46

F. Supp. 3d at 965-66 (applying Florida law). The other case Plaintiffs rely on, *Miller v. Samsung Electronics America Inc.*, No. 14-CV-4076, 2015 WL 3965608 (D.N.J. June 29, 2015), is similarly unpersuasive because it involved a defendant that had "specifically marketed, advertised and represented to consumers" that its product contained a feature that it did not contain, and the Court expressly distinguished cases involving the fraudulent concealment of product defects (where the economic loss rule would apply). 2015 WL 3965608, at *1, 10 (internal quotation marks omitted). Here, the only viable basis for Ferden-Precht's fraud claim is that New GM failed to disclose a known defect in her car at the time of purchase. That claim falls squarely within the domain of products liability, and is therefore barred by Florida's economic loss rule. New GM's motion to dismiss the Florida Plaintiff's fraudulent concealment claim is thus GRANTED.

### c.   Unjust Enrichment

Finally, New GM argues that Ferden-Precht's unjust enrichment claim should be dismissed because her car was covered by an express warranty when it was purchased. (*See* New GM's Mem. 42-43; TACC ¶ 67). The weight of authority among courts interpreting Florida law is that the absence of an express contract governing the parties' relationship is an element of unjust enrichment and that unjust enrichment may be pursued in the face of an express contract only when the validity of the contract is called into question. *See, e.g.*, *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1220 (S.D. Fla. 2015) ("Plaintiffs cannot maintain their unjust enrichment claim under the facts they allege here because their mortgage contracts, the authenticity of which Plaintiffs cannot contest, do in fact govern the subject of Plaintiffs' dispute."); *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1227 (S.D. Fla. 2013) ("[U]njust enrichment may only be pleaded in the alternative where one of the parties

asserts that the contract governing the dispute is invalid." (collecting cases)); *Manicini Enters., Inc. v. Am. Express Co.*, 236 F.R.D. 695, 699 (S.D. Fla. 2006) ("[T]he Court finds that Plaintiff should be permitted to plead alternative equitable claims for relief as the existence of express contracts between the Parties has yet to be proven."). There is no allegation or suggestion that Ferden-Precht's warranty is somehow invalid. New GM's motion to dismiss the Florida Plaintiff's unjust enrichment claim is therefore GRANTED.

### 4. Louisiana

The Louisiana Plaintiffs for purposes of this motion are Nathaniel and Frances Ann Fagans. (*See* New GM's Mem. 6). The Faganses own a 2013 Cadillac SRX, which they purchased on June 19, 2013, and previously owned a 2012 Cadillac CTS, which they purchased on July 2, 2012. (*See* TACC ¶ 87). The Cadillac CTS was subject to the unintended ignition key rotation recall, and the Cadillac SRX was subject to the acceleration-lag and rear suspension nut recalls. (*See* New GM's Mem. 6). The Cadillac CTS stalled while driving in the spring of 2013; the Cadillac SRX has not manifested a defect. (*See* TACC ¶ 87). The Louisiana Plaintiffs are not members of the Post-Sale Ignition Switch Defect Subclass. (*See id.* ¶ 1038).[19] They bring claims under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. Rev. Stat. § 51:1401, *et seq.* (TACC ¶¶ 2352-2375); for fraud by concealment (*id.* ¶¶ 2376-2389); and unjust enrichment (*id.* ¶¶ 2408-2417).

---

[19]   Plaintiffs suggest in their brief that the Faganses *are* members of the Post-Sale Ignition Switch Defect Subclass. (*See* Pls.' Mem. 21). Their cars are not included in the list of Post-Sale Ignition Switch Defect vehicles in the TACC, however. (*See* TACC ¶ 1038). In any event, even if they were members of the Post-Sale Ignition Switch Defect Subclass and thus brought a breach of warranty claim, it too would be barred by the LPLA.

New GM argues that all of the Louisiana Plaintiffs' claims are barred by the Louisiana

Products Liability Act ("LPLA").  (*See* New GM's Mem. 46-47, 51, 56; *id.*, Ex. 1, at 3).  The

Court agrees.  The LPLA "established the exclusive theories of liability for manufacturers for

damages caused by their products."  La. Rev. Stat. § 9:2800.52; *see, e.g.*, *Demahy v. Schwarz*

*Pharma, Inc.*, 702 F.3d 177, 183 (5th Cir. 2012); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254,

261 (5th Cir. 2002); *In re Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2016

WL 874778, at *4 (S.D.N.Y. Mar. 3, 2016); *Payne v. Gardner*, 56 So.3d 229, 231 (La. 2011);

*see also Grenier v. Med. Eng'g Corp.*, 243 F.3d 200, 203-04 (5th Cir. 2001) (noting that the

LPLA's only theories of liability are defective design, defective construction, failure to warn,

and breach of warranty).  "Based on [that] unequivocal statutory language, courts routinely

dismiss claims against manufacturers that do not arise under the LPLA."  *Cantu v. C.B. Fleet*

*Holding Co.*, No. 06-CV-2168, 2007 WL 689566, at *3 (W.D. La. Mar. 1, 2007) (collecting

cases dismissing negligence, fraud, and warranty claims on the basis of the LPLA).

Prudently, Plaintiffs do not argue that New GM is not the manufacturer of the vehicles at

issue here, and therefore not subject to the LPLA.  *Cf. In re Gen. Motors*, 2016 WL 874778, at

*4 (holding that because Old GM, not New GM, had manufactured the plaintiff's car in that

case, the LPLA's exclusivity provision did not apply).  Instead, they contend that because they

"do *not* sue for damages caused by *their* particular vehicles, and do not sue for losses arising

from a deficiency in or loss of use of their vehicles," the damage they assert does not fall under

the LPLA and its exclusivity provision.  (*See* Pls.' Mem. 52-53 (internal quotation marks

omitted)).  The LPLA is unequivocal, though, in defining damage as "*all* damage caused by a

product," La. Rev. Stat. Ann. § 2800.53(5), and stating that a plaintiff "may not recover from a

manufacturer for damage caused by a product on the basis of any theory of liability not set forth"

in the LPLA, La. Rev. Stat. Ann. § 2800.52.  Whatever Plaintiffs' theory of damages, their injury is tied to vehicles manufactured by New GM.  And the only case they cite in support of their position holds that where a contract "provided for certain engineer, repair, and training *services*" — in addition to the *products* that were found to be defective — the plaintiff could pursue a non-LPLA claim for those services that were not provided.  *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*, No. 09-CV-0750, 2010 WL 892869, at *7 (W.D. La. Mar. 11, 2010) (emphasis added).  The Louisiana Plaintiffs do not seek damages for services promised but not provided to them, but rather damages due to the fact that they "would not have purchased [their] vehicles, or they would have paid less for them, had they known about the defects . . . and New GM's true corporate culture."  (TACC ¶ 87).  Those damages are directly tied to products manufactured by New GM and, thus, the only method of recovery under Louisiana law is through the LPLA.  Accordingly, New GM's motion to dismiss the Louisiana Plaintiffs' LUTPA, fraud, and unjust enrichment claims is GRANTED.

### 5.    Maryland

The Maryland Plaintiff for purposes of this motion is Harry Albert.  (*See* TACC ¶ 90; New GM's Mem. 6).  Albert purchased a new 2012 Chevrolet Camaro in October 2012; he traded this car in for a used 2013 Chevrolet Impala in July 2014.  The 2012 Chevrolet Camaro was subject to the key fob ignition bump, driver-side airbag shorting bar, and seat bolt recalls; the 2013 Chevrolet Impala was subject to the ignition key slot recall.  (*See* New GM's Mem. 6).  Albert experienced stalls while driving the 2012 Chevrolet Camaro at least three times.  (*See* TACC ¶ 90).  He has not experienced a manifested defect with the 2013 Chevrolet Impala.  (*See id.*).  Albert is a member of the Post-Sale Ignition Switch Defect Subclass.  (*See id.* ¶ 1033).  He brings claims under the Maryland Consumer Protection Act ("MCPA"), Md. Code Com. Law

§ 13-101, *et seq.* (TACC ¶¶ 2483-2505); for fraud by concealment (*id.* ¶ 2506-2519); for a breach of the implied warranty of merchantability, Md. Code Com. Law § 2-314 and the Magnuson-Moss Warranty Act (TACC ¶¶ 2520-2526; 1142-1158); for unjust enrichment (*id.* ¶¶ 2537-2546); and for negligence (*id.* ¶¶ 1159-1167).  The Court will address each in turn.

      **a.**      **MCPA**

The MCPA prohibits unfair and deceptive trade practices.  Md. Code Com. Law § 13-303.  A plaintiff bringing a claim under the MCPA must allege (1) an unfair or deceptive practice or misrepresentation; (2) reliance; and (3) that the practice or misrepresentation caused the plaintiff injury.  *See Farasat v. Wells Fargo Bank, N.A.*, 913 F. Supp. 2d 197, 205 (D. Md. 2012); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 275 (Md. 2007).  The MCPA prohibits not only active misrepresentations, but also the failure to disclose, or omission of, a material fact.  *See* Md. Code Com. Law § 13-301(3), (9); *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 534 (D. Md. 2011); *Green v. H&R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999).  An omission is material "if a significant number of unsophisticated consumers would find [the] information important in determining a course of action," *Green*, 735 A.2d at 1059, and a consumer can be said to have "relied" on an omission "where it is substantially likely that the consumer would not have made the choice in question had the commercial entity disclosed the omitted information," *Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d at 535.

Here, Albert plausibly alleges that New GM engaged in an unfair or deceptive trade practice, at least with respect to the ignition-related defects in both of his cars.  The TACC alleges that New GM may well have known of the defects by 2009 or 2010, and New GM itself has admitted that it knew of the ignition switch defect by the spring of 2012 — before Albert

bought his car.  That is, the TACC plausibly alleges that New GM concealed the fact of the

ignition-related defects, a fact that could certainly be found to be "material," as consumers would

likely not have purchased cars if they had known that the cars could suddenly stall and lose

power.  *See id.* at 535; *Green*, 735 A.2d at 1059; *see also Lloyd* , 916 A.2d at 284 (holding that

the plaintiffs had pleaded misrepresentation or omission under the MCPA by alleging that the

defendants continued to manufacture cars while knowing that the cars were defective).  Thus, the

only question at this stage of the proceedings is whether the benefit-of-the-bargain defect theory

of injury is cognizable under the MCPA.

The Court concludes that it is.  In *Lloyd*, the Maryland Court of Appeals held that

consumers who had purchased cars with defective seats had suffered an "actual injury or loss" as

required for a claim under the MCPA because they "allege[d] that, as a result of the

[manufacturers'] misrepresentation or omission, they suffered a loss, measured by the amount it

will cost them to repair the defective seatbacks."  *Id.* at 281.  Notably, the Court held that that

was the case even though the plaintiffs had alleged neither physical injury to person or property,

nor actual product malfunction.  *See id.* at 275.  Further, in reaching its conclusion, the *Lloyd*

Court distinguished between two earlier cases.  *See id.* at 281.  In one, the Court had held that a

plaintiff stated a claim by alleging that he had incurred moving expenses and an increase in rent

when forced to leave an unlicensed, uninhabitable apartment.  *See id.* at 278-79 (discussing *Golt*

*v. Phillips*, 517 A.2d 328 (Md. 1986)).  In the other, the Court had held that a similar claim failed

because the plaintiffs had not alleged that the apartment, although unlicensed, was uninhabitable

and had not alleged either any incurred costs or that they had not received the full benefit of their

bargain.  *See id.* at 280-81 (discussing *Citaramanis v. Hallowell*, 613 A.2d 964 (Md. 1992)).

The critical question, the *Lloyd* Court explained, was whether a consumer had "suffered an

identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the seller's misrepresentation." *Lloyd*, 916 A.2d at 277.  That is consistent with the benefit-of-the-bargain defect theory, which measures the difference in value between the defective car the consumer received and the defect-free car the consumer thought she was getting (and for which she paid).

New GM argues that *Lloyd* does not apply to Albert's claim, because the *Lloyd* holding was limited to cases in which the loss alleged is the cost of repairing a defect.  (*See* New GM's Mem. 14; New GM's Reply 12).  Although there is some language in the *Lloyd* Court's opinion that supports that reading, the Court disagrees.  *Lloyd*'s expansive discussion of injury (both in the context of the MCPA and the other causes of action, as discussed below) suggests that it is not limited to cases alleging repair costs.  If anything, the *Lloyd* plaintiffs appear to have used the quantum of repair costs as the best proxy for fulfilling the benefit of their bargain, and making up the difference between the defect-free car they thought they were purchasing and the one they actually received.  *See Lloyd*, 916 A.2d at 264-65.  In particular, in distinguishing *Citaramanis*, the Court of Appeals emphasized that the plaintiffs in that case had "articulated *nothing* they had lost as a result of the alleged misrepresentation."  *Id.* at 281 (emphasis added).  Here, by contrast, Albert alleges a loss: that he purchased cars that he would otherwise not have had he known about the undisclosed defects and that he suffered an economic loss from the difference in value between a defective car and a defect-free car.  (*See* TACC ¶ 90).  In the Court's view, that meets the injury requirement of the MCPA.  Accordingly, Albert states a claim under the MCPA, and New GM's motion to dismiss that claim is DENIED.

### b.      Fraudulent Concealment

The elements of a claim for fraudulent concealment under Maryland law are: "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment." *Lloyd*, 916 A.2d at 274 (internal quotation marks omitted); *see Core Commc'ns, Inc. v. Verizon Md. LLC*, 744 F.3d 310, 324 (4th Cir. 2014). Maryland does not require a fiduciary relationship between the parties to impose a duty to disclose, but where no such relationship exists, a plaintiff must plead that the defendant engaged in "'suppression of the truth with the intent to deceive.'" *Rhee v. Highland Dev. Corp.*, 958 A.2d 385, 390 (Md. Ct. Special App. 2008) (quoting *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000)).  The *Lloyd* Court held that when plaintiffs allege a defect that creates a serious risk of bodily harm or death, they can assert "a claim for economic loss resulting from fraudulent concealment."  916 A.2d at 275.  For the reasons discussed above, the Court finds that Albert sufficiently pleads his claim for fraudulent concealment.  Specifically, the TACC alleges that New GM knew of the defects by the time Albert purchased his car and continued to sell cars without disclosing the defect — even arguably taking active steps to conceal the defect from regulators and consumers.  (*See, e.g.*, TACC ¶ 619 (alleging that New GM instructed its employees to avoid using terms that could notify NHTSA or the public as to the existence of a safety issue)).  *See Lloyd*, 916 A.2d at 284.  Additionally, the ignition-related defects create a serious risk of bodily harm or death, and New GM does not attempt to argue otherwise.  Finally, Albert alleges damages — namely, that he received less for his 2012 Chevrolet Camaro than he would have had it not been defective and that he would not have purchased either the Camaro or

his 2013 Chevrolet Impala if he had known about the defects.  New GM's motion to dismiss Albert's fraud claim is thus DENIED.

### c.       Breach of Warranty

New GM argues that Albert's implied warranty claims (under Maryland law and the MMWA) fail because he does not allege a cognizable injury and because his 2013 Chevy Impala did not manifest a defect.  (*See* New GM's Mem., Ex. 1, at 3).  Once again, *Lloyd* calls for a different conclusion.  The *Lloyd* Court held that plaintiffs

> are not required to plead that they have suffered a physical bodily injury in order to prove a breach of warranty.  Nor must a plaintiff prove that the product actually malfunctioned.  To the contrary, a plaintiff need only plead that the automobiles were sold with a defect and that the defect rendered the goods unfit for ordinary and safe use.  In other words, the injury arises, *ipso facto*, from the breach, creating a "gap" of sorts between what the consumer bargained for and what the consumer actually received . . . .  The objective determination of the cost of that injury will always, at the very least, be the measure of difference between value of the goods if the petitioner had received them as warranted and the value of the goods as received with the defect.

916 A.2d at 290-91.  That language squarely rebuts New GM's contentions.  Because Albert pleads that both cars were sold with at least one defect and that the defects rendered the goods unfit for ordinary and safe use (because of the possibility of a moving stall), he states a breach of implied warranty claim under state (and, by extension, federal) law.  Accordingly, New GM's motion to dismiss is DENIED with respect to Albert's warranty claims.

### d.       Unjust Enrichment

Next, New GM argues that Albert's unjust enrichment claim should be dismissed because it is precluded by an express warranty (in the case of the 2012 Chevrolet Camaro) and because no direct benefit was conferred on New GM (in the case of the 2013 Chevrolet Impala, because it was purchased used).  (*See* New GM's Mem. 46; New GM's Mem., Ex. 1, at 3).  As with the

cars purchased by Andrews and the Koppelmans, it is hard to imagine that the 2012 Camaro was sold without an express warranty. The TACC, however, is silent on the question, so that is not a basis to dismiss Albert's unjust enrichment claim at this time. Further, with respect to the used 2013 Chevrolet Impala, the Court is unwilling to rule, as a matter of law, that purchasing a used New GM car confers no benefit whatsoever on New GM. New GM could benefit from the sale of used cars through, for example, increased brand loyalty and publicity or the purchase of replacement parts. Accordingly, New GM's motion to dismiss Albert's unjust enrichment claim is DENIED.

### e.    Negligence

Finally, Albert brings a negligence claim, alleging that New GM negligently designed, manufactured, and failed to warn. (TACC ¶¶ 1159-1167). New GM argues that this claim should be dismissed because Albert does not allege a cognizable defect or theory of damages. (*See* New GM's Mem., Ex. 1, at 3). *Lloyd* squarely holds, however, that a negligence claim premised on an expansive theory of economic loss may proceed if the plaintiff "allege[s] facts that demonstrate that the product at issue creates a dangerous condition, one that gives rise to a clear danger of death or personal injury." 916 A.2d at 266 (emphasis omitted). As discussed above, Albert does so here, and so New GM's motion to dismiss his negligence claim is DENIED.

### 6.    Missouri

The Missouri Plaintiffs for the purposes of this motion are Cynthia Hawkins, Ronald Robinson, and Michelle Washington. (*See* New GM's Mem. 6; TACC ¶¶ 105-107). Hawkins purchased a used 2010 Chevrolet Cobalt on July 23, 2013; the Cobalt was subject to the ignition switch defect recall, but did not manifest a defect before it was repaired in August 2014. (*See*

TACC ¶ 105; New GM's Mem. 6).[20]  Robinson purchased a used 2010 Chevrolet Impala in June 2010; the Impala was subject to the ignition key slot recall, but did not manifest a defect before its parts were replaced in the summer of 2015.  (*See* TACC ¶ 106; New GM's Mem. 6).  Washington purchased a new 2014 Chevrolet Impala on May 9, 2014; the Impala was subject to a host of recalls, but did not manifest a defect.  (*See* TACC ¶ 107; New GM's Mem. 6).  All three Missouri Plaintiffs are members of the Post-Sale Ignition Switch Defect Subclass.  (*See* TACC ¶ 1033).  They bring claims for violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010, *et seq.* (TACC ¶¶ 2827-2851); for fraud by concealment (TACC ¶¶ 2852-2865); for breach of the implied warranty of merchantability, Mo. Rev. Stat. § 400.2-314 (TACC ¶¶ 2866-2872); for violation of the MMWA (TACC ¶¶ 1142-1158); and for unjust enrichment (*id.* ¶¶ 2883-2892).  The Court begins with the claims under the MMPA.

> ### a.        MMPA

To pursue a claim under the MMPA, a plaintiff must show: (1) purchase of personal merchandise; (2) an ascertainable loss of money or property; and (3) that the loss is a result of an unfair or fraudulent business practice.  *See Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008); *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 82 (Mo. Ct. App. 2011).  Omission of a material fact constitutes a prohibited business practice; where, as here, a plaintiff alleges such an omission, he or she must show that the defendant knew or reasonably should have known the material fact, and failed to disclose it to consumers.  *See Hope*, 353 S.W.3d at 84.

---

[20]        Hawkins's car, like those of the California Ignition Plaintiffs, would not have been manufactured with the ignition switch defect, but could have been repaired at a later date using a defective switch.  *See supra* note 15.

New GM implicitly concedes that Plaintiffs plead actionable omissions for the ignition switch and key rotation defects.  (*See* New GM's Mem. 49-50).  New GM argues, though, that the Missouri Plaintiffs' MMPA claims fail because none of their cars manifested a defect.  (*See* New GM's Mem., Ex. 1, at 3-4; New GM's Reply 10-11; *see also* June 24, 2016 Ltr. (Docket No. 3048) ("New GM's Supp. Ltr.") 1-3).  There is substantial case law applying Missouri law consistent with that argument.  *See, e.g.*, *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, No. 15-2145, 2016 WL 559216, at *3 (3d Cir. Feb. 12, 2016) (holding that the plaintiff had pleaded "no ascertainable loss" when she used a prescription drug and suffered no physical injuries); *Owen*, 533 F.3d at 922-23 ("Where, as here, the alleged unfair practice is the failure to disclose a product defect, there must be a showing that the [plaintiffs'] vehicle in fact suffered that defect, or evidence from which the defect reasonably could be inferred."); *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) ("Since the Plaintiffs have failed to allege any manifest defect and their vehicles performed in a satisfactory manner, the District Court was correct when it dismissed the Plaintiffs' Original Complaint."); *Mikhlin v. Johnson & Johnson*, No. 14-CV-881 (RLW), 2014 WL 6084004, at *3 (E.D. Mo. Nov. 13, 2014) (rejecting the plaintiffs' benefit of the bargain theory of damages where they had not suffered injury).

Confusing matters, however, many other cases have recognized MMPA claims even without a manifested defect, often on a "diminution-in-value" or "benefit-of-the-bargain" theory of the sort pressed here.  *See, e.g.*, *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 758-59 (W.D. Mo. 2015) ("[U]nder the benefit of the bargain rule as applied to MMPA claims, Plaintiff need only allege that the actual value of the product as purchased was less than the value of the product as represented to state a claim for an ascertainable loss."); *Polk v. KV Pharm. Co.*, No. 09-CV-0588 (SNLJ), 2011 WL 6257466, at *5 (E.D. Mo. Dec. 15, 2011)

("Missouri courts apply the 'benefit of the bargain' rule when determining if a plaintiff has suffered an ascertainable loss under the MMPA."); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 751 F. Supp. 2d 277, 295 (D. Mass. 2010) ("Injury under the Missouri CPA is sufficiently pled where the class members allege that the actual value of the item they purchased was less than the value of the item as it was represented to be at the time it was purchased."); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897, 912 (W.D. Mo. 2009) (holding that MMPA claims based on product misrepresentations "d[id] not depend on proving the products are defective"); *Hope*, 353 S.W.3d at 79 (affirming class certification where the class consisted of "owners of the FX Vehicles on the theory that each owner would have been or would be damaged by the 'stigma' and 'diminished resale value' . . . regardless of the manifestation of the defect"); *Plubell v. Merck & Co.*, 289 S.W.3d 707, 715 (Mo. Ct. App. 2009) (affirming certification of a class whose members "alleged an ascertainable loss under the benefit-of-the-bargain rule, which compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction" which "is part of our standard instructions for damages in misrepresentation cases").

Although the question is a close one, the Court concludes that the balance of authority weighs slightly in favor of Plaintiffs' view that Missouri law recognizes the benefit-of-the-bargain defect theory and does not require "manifestation" of a defect to bring a claim such as the one here. Among other things, many of the cases appearing to require a plaintiff to show a manifest defect seem to be driven by skepticism that the products at issue were even defective at all. In *Briehl*, for example, the Court noted that "[t]he Plaintiffs do not allege that the [brake system] is incapable of stopping the vehicles or that [the brake system] has violated any national safety standards." 172 F.3d at 626. Additionally, the plaintiffs there had failed to calculate any

damages due to lost resale value — causing the Court to label their damages theory too speculative.  *Id.* at 629.  Similarly, in *Mikhlin*, the Court noted that the plaintiffs had not pleaded any "quantifiable damages" or "ascertainable loss," but had argued merely that they would not have purchased Johnson's Baby Powder had they known of studies showing an increased risk of ovarian cancer associated with its use.  2014 WL 6084004, at *3; *see also Owens*, 533 F.3d at 923 (holding that the plaintiffs could not proceed on their proposed defect theory because there could have been any number of reasons for the windshield wiper failure, there was no evidence that their car had contained the alleged defect, and the plaintiffs' own expert had testified that 23% of cars whose windshield wipers failed as theirs did "failed for no ascertainable cause").  Notably, the *BPA* Court distinguished *Briehl* on precisely these grounds, stating that whereas in *Briehl* there had been "only a potential that a person's brakes would be misused" in the case before it, "there is not merely a potential for BPA being in the products — there is no doubt that BPA was present."  687 F. Supp. 2d at 911.  As in *BPA*, the TACC alleges that the defects here were present in the Missouri Plaintiffs' cars at the time of sale — they just did not cause any problems while the plaintiffs were driving the cars.  (*See* TACC ¶¶ 105-107).  Additionally, unlike in *Briehl* and *Mikhlin*, the TACC presents detailed calculations for the diminished resale value of Plaintiffs' vehicles.  (*See id.* ¶¶ 1013-1016).  New GM's motion to dismiss Plaintiffs' MMPA claims is thus DENIED.

### b.    Fraudulent Concealment

Under Missouri law, "[t]o recover for fraudulent concealment, plaintiffs must prove that defendants had a duty to disclose the concealed information."  *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997) (collecting cases).  Such a duty can arise from a confidential or fiduciary relationship, privity of contract, or "when

82

one party has superior knowledge of information not within the fair and reasonable reach of the other party." *Id.* (internal quotation marks omitted); *accord U.S. ex rel. Bussen Quarries, Inc. v. Thomas*, 938 F.2d 831, 833-34 (8th Cir. 1991).  In *Independent Business Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698 (8th Cir. 1997), the Eighth Circuit called a situation where the defendant had sold the plaintiff printing presses that the former knew were defective a "classic case" of the scenario "where one of the parties has superior knowledge which is not within the fair and reasonable reach of the other." *Id.* at 702.  Similarly, the Supreme Court of Missouri held that a bank had a duty to disclose an EPA investigation that implicated a parcel of land sold to the plaintiff at a foreclosure sale, and could be held liable for fraudulent concealment for failing to disclose it.  *See Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765-67 (Mo. 2007); *see also id.* at 765 ("[A] jury is empowered to find that the buyer has a right to rely on the seller to disclose where the undisclosed material information would not be discoverable through ordinary diligence.")  By contrast, in *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, the court dismissed the plaintiffs' fraudulent concealment claim because they had failed to allege that General Motors did anything to conceal the alleged defect or that the plaintiffs lacked an opportunity to discover the facts.  *See* 966 F. Supp. at 1535.

The allegations here are closer to those in *Independent Business Forms* and *Hess*.  As noted, Plaintiffs allege that New GM knew of the ignition-related defects by late 2009 or early 2010 and (at least arguably) took steps to conceal those defects — for example, instructing employees to avoid using words that might call attention to the existence of a safety issue.  (*See* TACC ¶ 619).  There is no argument that these facts are not material or that Plaintiffs would have been able to discover them through reasonable diligence.  And given that the MMPA and common law claims both sound in fraudulent concealment, Missouri law presumably recognizes

Plaintiff's benefit-of-the-bargain defect theory of damages as valid for the common law theory of

fraud as well.  *See, e.g.*, *Pollard v. Remington Arms Co.*, No. 13-CV-0086 (ODS), 2013 WL

3039797, at *3-5 (W.D. Mo. June 17, 2013) (discussing the elements of MMPA and common

law fraud claims together).  Accordingly, New GM's motion to dismiss the Missouri Plaintiffs'

fraudulent concealment claim is DENIED.

### c.      Breach of Warranty

A plaintiff bringing a breach of implied warranty claim in Missouri must show "(1) that a

merchant sold goods, (2) which were not 'merchantable' at the time of sale, (3) injury and

damages to the plaintiff or his property (4) which were caused proximately or in fact by the

defective nature of the goods, and (5) notice to the seller of the injury."  *Hope*, 353 S.W.3d at 90.

Notably, the Missouri Court of Appeals in *Hope*, which had affirmed the district court's class

certification for an MMPA claim, reversed the certification on the warranty claim, holding that

"a majority of the putative class members here have no breach of implied warranty claim"

because their cars had never exhibited the alleged defect.  *Id.* at 91.  The court noted that if the

cars never manifested a defect, they were "fit for their ordinary purpose, merchantable, and no

cause of action for breach of implied warranty can arise, as there must be some showing of

damage."  *Id.* at 91.  In so holding, the Court of Appeals relied on *O'Neil* and *Briehl*, the Eighth

Circuit cases upon which New GM relies here.  (*See* New GM's Mem. 8-11).[21]  That suggests

---

[21]      Plaintiffs argue that *Hope*'s holding is no longer good law in light of *In re Zurn Pex
Plumbing Prods. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011).  (*See* Pls.' Mem. 25 n.15; Pls.' June
24, 2016 Ltr. (Docket No. 3051) 3).  That opinion gives some support to Plaintiffs' argument, as
the Eighth Circuit concluded that a plaintiff who had a product that contained a defect, but which
had not yet exhibited damage from a defect, could bring a warranty claim consistent with its
prior case law.  *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d at 616-17.  But the
Court there was interpreting Minnesota, not Missouri, warranty law.  *See id.* at 617.

that, while manifestation of a defect may not be required to state a claim under the MMPA, manifestation *is* required to plead a viable breach of warranty claim under Missouri law.  *See, e.g.*, *Williams v. United Tech. Corp.*, 2015 WL 7738370, at *6-7 (W.D. Mo. Nov. 30, 2015) (dismissing a breach of implied warranty claim, even when the product had exhibited occasional defects, because the product's performance overall "satisfies a minimum level of quality such that Defendants did not breach the implied warranty of merchantability"); *Johnsen v. Honeywell Int'l, Inc.*, No. 14-CV-594 (RLW), 2015 WL 631361, at *6 (E.D. Mo. Feb. 12, 2015) (distinguishing *Hope* because "the individual plaintiff here has alleged an actual manifestation of the defect" and therefore stated a viable breach of implied warranty claim).  It follows that New GM's motion to dismiss the Missouri Plaintiffs' breach of warranty claims must be and is GRANTED.

### d.    Unjust Enrichment

Finally, with respect to the Missouri Plaintiffs' unjust enrichment claims, New GM argues, first, that Robinson's and Hawkins's claims fail, because they purchased used vehicles and therefore did not confer a direct benefit on New GM and, second, that Washington's claim fails because her vehicle came with an express warranty.  (*See* New GM's Mem. 42-46).[22]  The Court finds that Robinson's and Hawkins's claims may proceed, both because it may be proved at a later stage that purchasing a used New GM car conferred a sufficient benefit on New GM

---

[22]    New GM also contends that the unjust enrichment claims must be dismissed because the Missouri Plaintiffs have adequate remedies at law.  (*See* New GM's Mem. 43-44).  Missouri courts have held, however, that "[w]hen a court has concurrent jurisdiction to hear both legal and equitable claims, it may invoke equitable principles, despite the existence of an adequate remedy at law."  *Webcon Grp., Inc. v. S.M. Properties, L.P.*, 1 S.W.3d 538, 542-43 (Mo. Ct. App. 199) (internal quotation marks omitted) (collecting cases).

and because "courts have allowed unjust enrichment claims to go forward under Missouri law even without a showing that the plaintiff directly conferred a benefit upon the defendants." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827 (SI), 2011 WL 4345446, at *4 (N.D. Cal. Sept. 15, 2011).  The Court agrees, however, that Washington's claim must be dismissed because she alleges the existence of an express warranty (*see* TACC ¶ 107), and her unjust enrichment claims arise out of the same allegations.  *See, e.g.*, *Patterson Oil Co. v. Verifone, Inc.*, No. 15-CV-4089, 2015 WL 6149594, at *9 (W.D. Mo. Oct. 19, 2015) ("T]he unjust enrichment claim arises out of the express warranty contract and must be dismissed."); *Budach v. NIBCO, Inc.*, No. 14-CV-4324, 2015 WL 3853298, at *8-9 (W.D. Mo. June 22, 2015) (rejecting the plaintiff's argument that unjust enrichment may be pleaded in the alternative and dismiss the unjust enrichment claim on the basis of an express warranty).  New GM's motion to dismiss the Missouri Plaintiffs' unjust enrichment claim is therefore GRANTED with respect to Washington, and DENIED with respect to Robinson and Hawkins.

### 7.     Oklahoma

The Oklahoma Plaintiffs for purposes of this motion are Jennifer Reeder and Bruce and Denise Wright.  (*See* New GM's Mem. 6; TACC ¶¶ 137-140).  Reeder purchased a used 2012 Chevrolet Impala on August 30, 2013, which was subject to the unintended ignition key rotation recall and which exhibited a stuck ignition key while Reeder was driving the car in 2014.  (*See* TACC ¶ 137; New GM's Mem. 6).  Reeder also purchased a used 2010 Chevrolet Cobalt on February 5, 2014; that car was subject to the ignition switch recall, among others, and stalled while Reeder's son was driving the car, resulting in a severe accident.  (*See* TACC ¶ 138; New GM's Mem. 6).  The Wrights purchased a new 2011 Chevrolet Camaro on March 18, 2011, which was subject to the ignition switch recall but did not manifest a defect.  (*See* TACC ¶ 140;

New GM's Mem. 6).  Reeder and the Wrights are members of the Post-Sale Ignition Switch

Defect Subclass.  (*See* TACC ¶ 1033).  The Oklahoma Plaintiffs bring claims under the

Oklahoma Consumer Protection Act ("OCPA"), Okla. Stat. tit. 15 § 751, *et seq.* (TACC ¶¶ 3550-

3576); for breach of the implied warranty of merchantability, 12A Okla. Stat. Ann. § 2-314

(TACC ¶¶ 3591-3597); for violation of the MMWA (TACC ¶¶ 1142-1158); for fraud by

concealment (*id.* ¶¶ 3577-3590); and for unjust enrichment (*id.* ¶¶ 3608-3617).

     **a.**     **OCPA**

To state a claim under the OCPA, "a plaintiff must show (1) that the defendant engaged

in an 'unlawful practice' as that term is defined in section 753 of the Act; (2) that the challenged

practice occurred in the course of the defendant's business; (3) that the plaintiff, as a consumer,

suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury."

*Dinwiddie v. Suzuki Motor of Am., Inc.*, 111 F. Supp. 3d 1202, 1215 (W.D. Okla. 2015) (citing

*Patterson v. Beall*, 19 P.3d 839, 846 (Okla. 2000)) (internal quotation marks omitted).

"Unlawful practices" include "[m]ak[ing] a false representation, knowingly or with reason to

know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject

of a consumer transaction," "[r]epresent[ing], knowingly or with reason to know, that the subject

of a consumer transaction is of a particular standard, style or model, if it is of another," and

making "a misrepresentation, omission or other practice that has deceived or could reasonably be

expected to deceive or mislead a person to the detriment of that person."  Okla. Stat. Ann. tit. 15

§§ 752(13), 753(5), (7).  Here, the Oklahoma Plaintiffs sufficiently allege that New GM knew

about, but did not disclose, at least some of the defects in their cars before they were purchased.

More specifically, the TACC alleges — and New GM itself has admitted — that New GM knew

about the ignition switch defect well before Reeder bought her 2010 Chevrolet Cobalt on

February 5, 2014 (the car was not recalled until March 28, 2014) (*see* TACC ¶¶ 384, 1057(3));

that New GM knew about the unintended ignition key rotation before Reeder purchased her 2012

Chevrolet Impala in August 2013 (*see id.* ¶¶ 422-424, 428-436); and that New GM knew about

the key fob ignition bump defect in the 2011 Chevrolet Camaro before the Wrights purchased

their car on March 18, 2011 (*see id.* ¶¶ 392-400).

Once again, however, the parties strenuously dispute whether the law requires the

manifestation of a defect to bring an OCPA claim and whether the OCPA recognizes a benefit-

of-the-bargain defect theory.  (*See* New GM's Mem., Ex. 1, at 4; Pls.' Mem. 25; New GM's

Reply 11-12).[23]  The Court finds that, although Oklahoma law is not crystal clear on the issue,

courts interpreting the OCPA have read it more strictly than consumer protection statutes in other

states, and require either a manifested defect or damages beyond a failure to receive the benefit

of a bargain, if not both.  *See, e.g.*, *Harrison v. Leviton Mfg. Co.*, No. 05-CV-0491 (EFHM),

2006 WL 2990524, at *5 (N.D. Okla. Oct. 19, 2006) (holding that the plaintiff's allegations that

he would have to replace the defendant's allegedly defective products installed in his home did

not state an injury under the OCPA because it was "not the type of actual or threatened distinct

injury required to bring a claim under the OCPA, as plaintiff must allege actual damages to

qualify as an aggrieved consumer under the act" (internal quotation marks omitted); *In re Gen.*

*Motors Corp.*, No. 04-MD-1600, 2005 WL 1924335, at *2 (W.D. Okla. Aug. 8, 2005) (noting

that to prevail on his claim under the OCPA, the plaintiff would have to allege that the alleged

defect manifested itself, and distinguishing a case where the plaintiff sought "to recover for a

---

[23]     Plaintiffs rely in part on *Cuesta v. Ford Motor Co.*, 209 P.3d 278 (Okla. 2009).  (*See* Pls.'
Mem. 25).  But *Cuesta* has limited value as it involved Michigan law and only addressed a
breach of warranty claim.  *See Cuesta*, 209 P.3d at 285.

potentially life-threatening defect" and therefore could not recover (internal quotation marks

omitted)); *Tibbetts v. Sight 'n Sound Appliance Ctrs., Inc.*, 77 P.3d 1042, 1051 (Okla. 2003)

(noting that the OCPA "requires the consumer to show something more than a violation of the

Act; instead for a viable private claim under the OCPA the consumer *must* show actual damages

as a necessary element of a claim"); *Walls v. Am. Tobacco Co.*, 11 P.3d 626, 629 (Okla. 2000)

(rejecting the plaintiffs' argument that "being an aggrieved consumer merely requires proof that

a plaintiff was the consumer in an unlawful transaction" because "damages are a necessary

element of a claim").  In *Walls*, for example, the Oklahoma Supreme Court concluded that "a

person may not bring an action as an aggrieved consumer under [the OCPA] solely as a result of

his or her payment of the purchase price" for a product sold in violation of the OCPA —

suggesting that Oklahoma does not recognize the benefit-of-the-bargain defect theory for OCPA

claims.  11 P.3d at 630.  Plaintiffs do not cite, and the Court is not aware of, any authority

interpreting the OCPA that is to the contrary.

  In light of the foregoing, the OCPA claim of the Wrights — whose car never manifested

a defect, and who allege damage only from a diminution in the value of their car — must be and

is dismissed.  (*See* TACC ¶ 140).  Reeder, on the other hand, alleges that both of her cars

manifested the ignition-related defects.  (*See id.* ¶¶ 137-138).  To be fair, the only manifested

defect that she alleges with respect to the 2012 Chevrolet Impala is that her key got temporarily

stuck in the ignition (she was able to remove it the next day).  (*See id.* ¶ 137).  It may turn out that

that incident is unconnected to the unintended ignition key rotation defect; but, at this stage of

the proceedings, drawing all inferences in Reeder's favor (as the Court must), the Court cannot

say as a matter of law that the incident does not qualify as the manifestation of the alleged defect.

Furthermore, Reeder alleges more than just a diminution in the value of her cars as a result of the

defects.  For example, she contends that defects caused her to spend money as a result of the

Cobalt's crash; that she has had to use up her extended warranty on the Impala as a result of the

crash; and that she received less in her insurance settlement because of the recalls' effects on her

vehicle.  (*See id.*¶ 138).  Taken together, those allegations state a cognizable injury under the

OCPA, so New GM's motion to dismiss Reeder's OCPA claim is DENIED.

      **b.**      **Breach of Warranty**

     Courts interpreting Oklahoma warranty law have held that a manifested defect is also

required for a breach of warranty claim.  *See, e.g.*, *Dinwiddie*, 111 F. Supp. 3d at 1209 (noting

that a warranty claim typically requires manifestation of a defect during the warranty period);

*Harrison*, 2006 WL 2990524, at *6 (dismissing breach of warranty claims because the plaintiff

had not alleged that the products had manifested a defect); *see also O'Neil v. Simplicity, Inc.*, 553

F. Supp. 2d 1110, 1115 (D. Minn. 2008) (relying in part on *Harrison* to hold that manifestation

of a defect is required for a warranty claim).  In *Hess*, the court noted that Oklahoma (and

Michigan) had "not yet answered" the question of "whether a breach of warranty action can be

brought by a plaintiff for an allegedly defective product that has a 'potential' for damage, but

which has not yet 'manifested' damage."  221 P.3d 132, 139.  The Court went on to hold that —

at least for purposes of class certification — a plaintiff had to show either that a defect had

manifested itself or that such manifestation was "likely."  221 P.3d at 139-40.

     This case, of course, is at the motion-to-dismiss stage, and the balance of authority

suggests that Oklahoma warranty law requires a manifested defect for an individual breach of

warranty claim.  In any event, while the Wrights' car may have been defective at some point, that

defect never manifested and (at least for their purposes) never will as they have since disposed of

the car.  (*See* TACC ¶ 140).  Reeder's cars, on the other hand, did manifest defects, and so her

warranty claims are not precluded on that ground. New GM argues that the claim should alternatively be dismissed for failure to plead a cognizable theory of damages. (*See* New GM's Mem., Ex. 1, at 4). Oklahoma law suggests, however, that benefit-of-the bargain damages are cognizable. *See, e.g.*, *Harrison*, 2006 WL 2990524, at *6 ("A consumer may bring a claim for breach of warranty against the retailer and the manufacturer to recover the benefit of the bargain." (citing *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 652 (Okla. 1990)); *Cuesta*, 209 P.3d at 286 (while discussing class certification under Oklahoma law, noting different kinds of economic damages such as "replacement costs, diminution in value, or the cost of a loaner vehicle"). New GM's motion to dismiss the Oklahoma breach of warranty claims is therefore GRANTED with respect to the Wrights, and DENIED with respect to Reeder.

### c.     Fraudulent Concealment

By contrast, for *common law* fraud, Oklahoma does not appear to require that a plaintiff show either a manifested defect or some injury beyond a diminution in value or benefit of the bargain theory. In *Tibbetts*, the Oklahoma Supreme Court indicated that that requirement for purposes of the OCPA derived from the "aggrieved consumer" language in the statute. 77 P.3d at 1051. In *LeFlore v. Reflections of Tulsa, Inc.*, 708 P.2d 1068 (Okla. 1985), on the other hand, the Court stated that "Oklahoma, by decisional law, has adopted a form of the benefit of the bargain measure in fraud actions, allowing the plaintiff to recover the difference between the actual value received and the value the defrauded party would have had if it had been as represented." *Id.* at 1077 (collecting cases); *see also Parks v. AT&T Mobility, LLC*, No. 09-CV-212, 2012 WL 4382194, at *9 (W.D. Okla. Sept. 25, 2012). The plaintiff in *LeFlore* had entered a beauty contest that promised an all-expenses paid Caribbean cruise, but it turned out transportation was not provided to the point of embarkation; LeFlore sought to recover the total

91

cost of the cruise plus the transportation to which she would have been entitled pursuant to the terms of the contest advertisement (despite the fact that it appears she did not go on the trip). 708 P.2d at 1075.  The Supreme Court reversed the lower court's holding that LeFlore had not pleaded damages on the ground that she had failed to receive the fully paid trip that had been fraudulently promised.  *Id.* at 1077; *see also Bowman v. Presley*, 212 P.3d 1210, 1219 (Okla. 2009) (reversing a grant of summary judgment that had held the buyers of a home represented as larger than it was had not suffered any detriment, because a jury could find that the buyers would be entitled to the value of the home as represented).  Similarly, the Oklahoma Plaintiffs here allege that they did not receive the benefit of their bargain because they were sold defective cars.

New GM also argues that the Oklahoma Plaintiffs' fraudulent concealment claims fail because Oklahoma does not impose a duty to disclose unless "the parties have a fiduciary, confidential, or some other special relationship."  (New GM's Mem. 53-54).  But courts interpreting Oklahoma law have recognized that,

> [e]ven absent a fiduciary relationship, the relation of the parties, the nature of the subject matter of the contract or the peculiar circumstances of each particular case may be such as to impose a legal or equitable duty to disclose all material facts. For example, the duty to disclose may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth.

*Myklatun v. Flotek Indus., Inc.*, 734 F.3d 1230, 1234 (10th Cir. 2013) (applying Oklahoma law) (internal quotation marks and citation omitted); *see also Croslin v. Enerlex, Inc.*, 308 P.3d 1041, 1046 (Okla. 2013) ("Constructive fraud 1) may be based on a negligent misrepresentation or an innocent misrepresentation where there is an underlying right to be correctly informed of the facts, 2) may be based on the silence by one who has a duty to speak, or 3) may be invoked to prevent harm or to extend protection to recognized public interests."); *Silk v. Phillips Petroleum Co.*, 760 P.2d 174, 179 (Okla. 1988) ("If on account of peculiar circumstances there is a positive

duty on the part of one of the parties to a contract to speak, and he remains silent to his benefit and to the detriment of the other party, the failure to speak constitutes fraud."). In *Croslin*, for example, the Oklahoma Supreme Court found that the defendant had a duty to disclose $10,000 of mineral proceeds that had accrued on a mineral interest being deeded away from the plaintiff to the defendant. 308 P.3d at 1051. The language in the mineral deed assigning any royalties that might accrue imposed a duty on the defendant to disclose related, material facts of which it had particular knowledge. *Id.* Applying those standards, a car manufacturer's failure to disclose a potentially deadly safety defect of which it was aware — as New GM is alleged to have done here — would seem to qualify as a "peculiar circumstance" triggering a duty to disclose. *Myklatun*, 734 F.3d at 1234. (*See* Pls.' Mem. 57). Accordingly, New GM's motion to dismiss the Oklahoma Plaintiffs' fraudulent concealment claim is DENIED.

### d.    Unjust Enrichment

Finally, the Wrights and Reeder each plead the existence of an express warranty covering their cars. (*See* TACC ¶¶ 137-138, 140). Courts are split on whether to permit alternative pleading of unjust enrichment claims under Oklahoma law when an express contract exists or there is an adequate remedy at law. *Compare Morrison v. Stonebridge Life Ins. Co.*, No. 11-CV-1204, 2015 WL 137261, at *7 (W.D. Okla. Jan. 9, 2015) (rejecting the plaintiff's argument that she could plead alternative theories of recovery and collecting cases), *with Briggs v. Freeport-McMoran Copper & Gold, Inc.*, No. 13-CV-1157, 2015 WL 1461884, at *6 (W.D. Okla. Mar. 30, 2015) ("[T]he Court finds that, at this stage of the litigation, plaintiffs have the right to plead alternative theories of recovery and, therefore, plaintiffs' unjust enrichment claim should not be dismissed."). Consistent with the many other jurisdictions that prohibit the alternative pleading

of contract and unjust enrichment claims, the Court GRANTS New GM's motion to dismiss the Oklahoma Plaintiffs' unjust enrichment claims.

### 8.   Virginia

The final jurisdiction at issue in this motion is Virginia.  The sole Virginia Plaintiff for purposes of this motion is Ashlee Hall-Abbott.  (*See* TACC ¶ 157; New GM's Mem. 6).  Hall-Abbott purchased a new 2014 Chevrolet Silverado in March 2014; since then, the car has been the subject of a host of recalls.  (*See* TACC ¶ 157; New GM's Mem. 6).  Hall-Abbott is not a member of the Post-Sale Ignition Switch Defect Subclass.  She brings claims under the Virginia Consumer Protection Act ("VCPA"), Va. Code Ann. § 59.1-196, *et seq.* (TACC ¶¶ 4193-4216); for fraud by concealment (*id.* ¶¶ 4217-4230); and for unjust enrichment (*id.* ¶¶ 4247-4256).[24]

### a.   VCPA and Fraudulent Concealment

To bring a claim under the VCPA, a plaintiff must show that the defendant engaged in a prohibited practice under the act (namely, using a "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction") and that the plaintiff suffered a loss as a result of the prohibited practice.  *Bay Point Condo. Ass'n, Inc. v. RML Corp.*, 52 Va. Cir. 432, 2000 WL 33268342, at *10 (Va. Cir. Ct. 2000); *see Padin v. Oyster Point Dodge*, 397 F. Supp. 2d 712, 722 (E.D. Va. 2005); *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260-61 (Va. 2014).  A party may also plead constructive fraud, where the misrepresentation of a material fact is made innocently or negligently but results in damage to the party who relies on it.  *See Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 582 (Va.

---

[24]    The parties did not discuss Virginia law on consumer and common law fraud in their initial briefing on this motion, but submitted supplemental letters on the issue at the Court's request.  (*See* New GM's Supp. Ltr. 3-5; Pls.' Supp. Ltr. 3-5).

2003).  Similarly, for a common law fraud claim, a plaintiff must plead "(1) a false

representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to

mislead, (5) reliance thereon by the party misled, and (6) resulting damage to the party misled."

*Owens*, 764 S.E. 2d at 260.  A plaintiff may plead fraud by concealment, but that generally

requires a duty to disclose.  *See Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir.

1999); *Norris v. Mitchell*, 495 S.E.2d 809, 812-813 (Va. 1998).  "A duty may arise (1) if the fact

is material and the one concealing has superior knowledge and knows the other is acting upon

the assumption that the fact does not exist; or (2) if one party takes actions which divert the other

party from making prudent investigations (e.g., by making a partial disclosure)."  *Bank of

Montreal*, 193 F.3d at 829 (citations omitted).

New GM argues that Hall-Abbott lacks viable fraud claims because Virginia law would

not impose a duty to disclose on a remote manufacturer such as New GM.  (*See* New GM's

Supp. Ltr. 4-5).  The Court disagrees.  The case upon which New GM primarily relies, *McCabe

v. Daimler AG*, No. 12-CV-2494 (MHC), 2015 WL 10091635 (N.D. Ga. Aug. 20, 2015)

(applying Virginia law), was decided at the summary judgment stage based on the fact that no

evidence was presented suggesting that the plaintiff had had any communication or interaction

with the remote seller.  2015 WL 10091635, at *16; *see Murray v. Royal Constr. Co.*, 61 Va. Cir.

643, 2002 WL 32238304, at *2 (Va. Cir. Ct. 2002) (finding there was no duty to disclose

because there were no allegations of any communication between the parties or any information

the defendant may have misrepresented or concealed); *see also, e.g.*, *Alexander v. Se. Wholesale

Corp.*, 978 F. Supp. 2d 615, 623 (E.D. Va. 2013) ("In Virginia, a claim of fraud does not require

direct contact or privity between the defendant and the plaintiff.  A complaint must merely allege

that the defendant knew or had reason to know that the plaintiff would rely on the

misrepresentation." (citation omitted)).  Following discovery in this case, Hall-Abbott may well

be able to show a sufficient relationship between her and New GM — for example, through

marketing materials or the warranty that accompanied her vehicle.  The Court does note,

however, that Hall-Abbott purchased her car in March 2014, after the first round of New GM's

recalls; thus, at least to some extent, she may have been on notice of defects in the car at the time

of purchase.  (*See* TACC ¶ 517).  Plaintiffs sufficiently allege, however, that New GM knew

about at least some of the defects in the 2014 Chevrolet Silverado at the time of Hall-Abbot's

purchase, but delayed in issuing recalls for that vehicle.  For example, the TACC alleges that

New GM knew about problems in the transmission oil cooler line as early as September 2013,

but did not issue a recall until March 31, 2014.  (*See* TACC ¶¶ 813-827).  Given that that defect

could constitute a "material fact" that New GM concealed from Hall-Abbott and that New GM

was plainly in a position of superior knowledge with respect to that fact, the Court concludes that

Hall-Abbott adequately pleads that New GM had a duty to disclose that it violated.

New GM also contends that Virginia law requires the manifestation of a defect and does

not recognize the benefit-of-the-bargain defect theory.  (*See* New GM's Supp. Ltr. 3-4).  But

New GM does not cite, and the Court has not found, any Virginia authority that imposes a

manifest defect requirement or rejects benefit-of-the-bargain recovery for fraud claims.  (*See*

New GM's Supp. Ltr. 4).  *Cf. Polk v. Crown Auto, Inc.*, 228 F.3d 541, 543 (4th Cir. 2000)

(affirming the dismissal of a VCPA claim based on an excessive fee for late payments when the

plaintiff never made a late payment and thus was not subjected to the fee); *Alston v. Crown Auto,*

*Inc.*, 224 F.3d 332, 336 (4th Cir. 2000) (affirming the dismissal of a similar claim where the

plaintiff did pay the excessive fee, but was reimbursed for the full amount she paid above the

permissible limit).  Instead, a few opinions suggest that benefit-of-the-bargain damages are

96

available under Virginia law.  *See Buie v. Sys. Automation Corp.*, 918 F.2d 955 (Table), 1990

WL 180126, at *11 (4th Cir. 1990) (citing with approval the Maryland Court of Appeals'

flexible approach to determining when benefit-of-the-bargain damages should be available for

fraud claims); *Celeste v. Bayliss*, No. 4460, 1986 WL 401809, at *4 (Va. Cir. Ct. July 23, 1986)

(noting that the benefit-of-the-bargain theory is one theory of recovery available for fraud

claims).  In the absence of persuasive authority to the contrary, New GM's motion to dismiss the

Virginia Plaintiff's VCPA and fraudulent concealment claims is DENIED.

### b.       Unjust Enrichment

Hall-Abbott purchased her 2014 Chevrolet Silverado with an express warranty (*see*

TACC ¶ 157), and makes no argument that the warranty was invalid.  It follows that she may not

pursue a claim for unjust enrichment.  *See Myers v. Lee*, No. 1:10-CV-131 (AJT) (JFA), 2010

WL 2757115, at *6 (E.D. Va. July 12, 2010) (dismissing an unjust enrichment claim where there

was no allegation that the express contract was invalid); *Centex Constr. v. Acstar Ins. Co.*, 448 F.

Supp. 2d 697, 707 (E.D. Va. 2006) ("Virginia law provides no relief under a quantum meruit

theory where a valid, express contract exists between the parties."); *McDonald's Corp. v.

Turner-James*, No. 05-CV-804, 2005 WL 7873649, at *3 (E.D. Va. Nov. 29, 2005) ("[U]njust

enrichment claims arise only where there is no express contract." (internal quotation marks

omitted).  Accordingly, New GM's motion to dismiss Hall-Abbbott's unjust enrichment claim is

GRANTED.

## D.  Class Standing and Prudential Mootness

New GM's remaining arguments are (1) that Plaintiffs lack standing to pursue claims

pertaining to vehicles that they themselves do or did not own and (2) that the recalls render

Plaintiffs' claims prudentially moot.  (*See* New GM's Mem. 16-26; New GM's Reply 12-16).

As should be clear from the foregoing discussion, the Court does not find that the recalls moot Plaintiffs' claims.  New GM argues that the recalls provide Plaintiffs with full relief, but Plaintiffs are seeking benefit-of-the-bargain damages even for cars that have been fully repaired — cars that they allege were and are worth less than cars sold without the undisclosed defects.  Such claims are cognizable under at least some jurisdictions' laws, as discussed above, despite the Court's rejection of Plaintiffs' broader brand devaluation theory of damages.  (*Cf.* Tr. 112-13 (arguing that brand devaluation claims could not be mooted by the recalls)).  Furthermore, the cases upon which New GM relies involved plaintiffs seeking declaratory and injunctive relief for existing defects through a court-ordered recall.  (*See* New GM's Mem. 16-19; New GM's Reply 12-14).  *See Hadley v. Chrysler Grp., LLC*, 624 F. App'x 374, 379 (6th Cir. 2015) ("Because New Chrysler has already acknowledged the defect . . . and repaired the plaintiffs' vehicle, their claims for a declaratory judgment and injunctive relief are moot."); *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210-11 (10th Cir. 2012) (dismissing claims which sought an order notifying consumers of a defect and creation of a fund for repairs because, once a recall was implemented via NHTSA, "Congress and the Executive have committed to ensure [the plaintiff] precisely the relief she seeks"); *Cheng v. BMW of N. Am., LLC*, No. 12-CV-9262 (GAF) (SHX), 2013 WL 3940815, at *4 (C.D. Cal. July 26, 2013) (dismissing claims as prudentially moot because the defendant's subsequent recall provided the plaintiff the injunctive relief sought, and the plaintiff specifically disavowed any request for monetary damages).  Here, Plaintiffs seek to recover damages from New GM for fraud — not to obtain declaratory and injunctive relief for existing defects.  And finally, Plaintiffs allege that some of the ignition recalls have not been fully effective, leaving at least some Plaintiffs with defective cars and indisputably live claims.  (*See* TACC ¶¶ 1150, 1494, 2524).  Because the recalls, even those

sufficient to remedy the defects, do not compensate Plaintiffs fully for the damages sought here, the Court declines to exercise its discretion to dismiss the remaining claims as prudentially moot.

By contrast, with respect to standing, the Court agrees with New GM that Plaintiffs lack class standing to bring claims on behalf of consumers who purchased or leased different New GM vehicles.[25]  The Second Circuit has held that, "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to the other members of the putative class by the same defendants."  *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014) (internal quotation marks omitted); *see DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (summary order); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012).  In *NECA*, for example, the Second Circuit held that the plaintiffs had class standing to bring claims on behalf of purchasers of some trust certificates that they themselves did not own because they were backed by the same originators; the Court distinguished those from certificates backed by other originators, however, noting that "to the extent the representations in the Offering Documents were misleading with respect to one Certificate, they were not necessarily misleading with respect to others."  693 F.3d at 163-64.  In *Retirement Board*, the Court rejected the plaintiffs' assertions of class standing because the "alleged misconduct must be proved loan-by-loan and trust-by-trust.  For example, whether Countrywide breached its

---

[25]     Both sides agreed at oral argument that it would be appropriate for the Court to consider the issue of class standing at this stage.  (*See* Tr. 106, 112).

obligations under the governing agreements (thus triggering BNYM's duty to act) requires examining its conduct with respect to each trust."  775 F.3d at 162.  The *Retirement Board* Court specifically rejected the plaintiffs' argument that BNYM's general policy of inaction gave the named plaintiffs sufficient standing, because the plaintiffs would still have had to show which trusts actually should have triggered action on BNYM's part.  *Id.*  Finally, in *DiMuro*, the Court held that the plaintiffs could only assert claims with respect to the allegedly misadvertised products that they themselves had purchased and used (and not other similar products), because "[e]ntirely unique evidence will . . . be required to prove that the 35-some advertising statements for each of the seven different . . . products are false and misleading."  572 F. App'x at 29.

So too here.  As the analysis with respect to each plaintiff's claims makes clear, the viability of the claims in the TACC turns primarily on individualized factors — what car was purchased, when it was purchased, what kind of defect (or defects) it had, and what New GM may have known about such defects at a given time.  Plaintiffs argue that because they allege a diminution in value of their vehicles, the "claims are thus typical of *all* New GM vehicle purchasers, and they can serve as named Plaintiffs for the Nationwide RICO Class as well as their respective state-wide classes."  (Pls.' Mem. 26).  As Plaintiffs conceded at oral argument, however, rejection of the brand devaluation theory of damage means that Plaintiffs do not have a common basis for their claims across all defects and vehicle models.  (*See* Tr. 111).  As discussed above, the Court does reject that theory, so if a plaintiff does have a viable claim, it is based on a fraudulent omission or concealment of a particular defect.  That, in turn, depends on individualized facts about that particular plaintiff's vehicle type.  New GM's warranty or statements about a vehicle's safety may have been "misleading with respect to one [car] . . . [but] not necessarily misleading with respect to others," depending on what New GM knew and when.

*NECA*, 693 F.3d at 163.  Claims may therefore have to proceed individually or in subclasses of cars affected by a common defect.  For example, the Court is inclined to agree with Plaintiffs that a Delta Ignition Switch plaintiff has standing to bring claims on behalf of other Delta Ignition Switch car purchasers, and owners of cars with the other ignition-related defects could likely proceed on behalf of each other (perhaps with subclasses for cars bought before or after a certain date, when it is established when New GM knew of a particular defect).  (*See* Tr. 111-12).  By contrast, Plaintiffs alleging other defects — defects that have not been shown to have any connection with each other — would not have claims susceptible to the same kind of common proof (as Plaintiffs implicitly conceded in their argument with respect to the ignition defects).  Accordingly, the named Plaintiffs may assert claims only on behalf of owners of the same car models that they themselves purchased (or leased) or models with sufficiently similar defects, if applicable; the Court defers delineation of the specifics of the permissible class claims until the class-certification stage.[26]  But New GM's motion to dismiss is GRANTED with respect to any putative class members whose vehicles do not fall within those parameters.

## CONCLUSION

In short, many of the claims of the named Plaintiffs in this motion survive, but a large swath of the claims in the TACC — those brought under RICO, those brought on behalf of Plaintiffs whose cars were not allegedly defective when sold, and those brought on behalf of Plaintiffs whose cars are too dissimilar from the named Plaintiffs' cars — are foreclosed.  (For convenience, a chart indicating whether New GM's motion is granted or denied with respect to

---

[26]      By New GM's count, there are forty-four recalls referenced in the TACC concerning vehicles that are not owned by any named plaintiff.  (*See* New GM's Mem. 2).

each state law claim is attached as Exhibit A.)  Additionally, the Court rejects Plaintiffs' broadest theory of damages — the brand devaluation theory — as unprecedented and unsound.  Thus, to the extent that Plaintiffs are entitled to relief at all, they are entitled — at most — to benefit-of-the-bargain defect damages, out-of-pocket damages, and the like.

Although this ruling addresses only some of the claims in the TACC, it will undoubtedly inform the parties with respect to the viability of other claims and, more generally, bear upon the further progress of the MDL.  The July 13, 2016 ruling from the Second Circuit, which held that purchasers of Old GM cars with ignition switch defects can bring claims for Old GM's wrongdoing against New GM has, in all likelihood, also substantially redefined the scope of the claims that may proceed.  The parties should be prepared to discuss the implications of this Court's ruling and the Second Circuit's ruling at the July 28, 2016 status conference — including but not limited to implications for the next phase of discovery.  (*See* Docket Nos. 1569, 2156).  Additionally, within **thirty days** from the date of this Opinion and Order, Plaintiffs shall submit their proposed amendments to the TACC.  (*See* Docket No. 2323).

The Clerk of Court is directed to terminate Docket No. 2356.

SO ORDERED.

Dated: July 15, 2016
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

**EXHIBIT A**

**CHART OF RULINGS ON NEW GM'S MOTION TO DISMISS STATE LAW CLAIMS**

|  | Consumer Protection | Fraudulent Concealment | Warranty | Unjust Enrichment | Negligence |
|---|---|---|---|---|---|
| **Anna Andrews (CA)** | GRANTED | GRANTED | N/A | DENIED | N/A |
| **Marc & Madeline Koppelman (CA)** | DENIED | DENIED | GRANTED | DENIED | GRANTED |
| **David Padilla (CA)** | DENIED | DENIED | DENIED | GRANTED | GRANTED |
| **Randall Pina (CA)** | DENIED | DENIED | DENIED | GRANTED | GRANTED |
| **Pajja Jackson (DC)** | GRANTED | GRANTED | N/A | GRANTED | N/A |
| **Joni Ferden-Precht (FL)** | DENIED | GRANTED | N/A | GRANTED | N/A |
| **Nathaniel & Frances Ann Fagans (LA)** | GRANTED | GRANTED | N/A | GRANTED | N/A |
| **Harry Albert (MD)** | DENIED | DENIED | DENIED | DENIED | DENIED |
| **Ronald Robinson (MO)** | DENIED | DENIED | GRANTED | DENIED | N/A |
| **Michelle Washington (MO)** | DENIED | DENIED | GRANTED | GRANTED | N/A |
| **Cynthia Hawkins (MO)** | DENIED | DENIED | GRANTED | DENIED | N/A |
| **Bruce & Denise Wright (OK)** | GRANTED | DENIED | GRANTED | GRANTED | N/A |
| **Jennifer Reeder (OK)** | DENIED | DENIED | DENIED | GRANTED | N/A |
| **Ashlee Hall-Abbott (VA)** | DENIED | DENIED | N/A | GRANTED | N/A |