UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

This Document Relates To All Actions
-----------------------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/30/2017

14-MD-2543 (JMF)
14-MC-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

**[Regarding New GM's Partial Motion To Dismiss the
Fourth Amended Consolidated Class Action Complaint]**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

LEGAL STANDARDS ........................................................................................................5

DISCUSSION ......................................................................................................................7

    A.    Brand Devaluation Claims........................................................................7

    B.    Damages for Lost Time ...........................................................................12

    C.    The Relevant Time Period for New GM's Economic Loss Liability ...................17

    D.    State Law Claims ....................................................................................23

        1.    Alabama ...........................................................................................23

            a.    The ADTPA ..........................................................................24

            b.    Fraudulent Concealment ........................................................28

            c.    Unjust Enrichment ................................................................32

        2.    Illinois ............................................................................................33

            a.    The ICFA ..............................................................................34

            b.    Fraudulent Concealment ........................................................39

            c.    Unjust Enrichment ................................................................42

        3.    Massachusetts ..................................................................................46

            a.    The Massachusetts CPA ........................................................47

            b.    Unjust Enrichment ................................................................49

        4.    Michigan .........................................................................................51

            a.    The MCPA ............................................................................52

|       | b.  | Fraudulent Concealment ................................................................59 |
|       | c.  | Breach of Implied Warranty ........................................................62 |
|       | d.  | Unjust Enrichment ......................................................................63 |
| 5.    |     | New York ..............................................................................................66 |
|       | a.  | GBL Section 349 .........................................................................68 |
|       | b.  | Fraudulent Concealment ................................................................72 |
|       | c.  | Unjust Enrichment ......................................................................75 |
| 6.    |     | Pennsylvania .......................................................................................77 |
|       | a.  | Economic Loss Doctrine ..............................................................79 |
|       | b.  | Manifestation ...............................................................................80 |
|       | c.  | The UTPCPL ...............................................................................87 |
|       | d.  | Fraudulent Concealment ................................................................90 |
|       | e.  | Unjust Enrichment ......................................................................95 |
| 7.    |     | Texas ....................................................................................................98 |
|       | a.  | The Texas DPTA ........................................................................100 |
|       | b.  | Fraudulent Concealment ...............................................................110 |
|       | c.  | Unjust Enrichment .....................................................................113 |
| 8.    |     | Wisconsin ...........................................................................................115 |
|       | a.  | The WDTPA ...............................................................................116 |
|       | b.  | Fraudulent Concealment ...............................................................125 |
|       | c.  | Unjust Enrichment .....................................................................125 |
| **CONCLUSION** ................................................................................................127 |

# INTRODUCTION

This multidistrict litigation ("MDL"), familiarity with which is assumed, arose from the recall in February 2014 by General Motors LLC ("New GM") of General Motors ("GM") vehicles that had been manufactured with a defective ignition switch — a switch that could too easily move from the "run" position to the "accessory" and "off" positions, causing moving stalls and disabling critical safety systems (such as the airbag). Following that recall, New GM recalled millions of other vehicles, some for ignition switch-related defects and some for other defects. In this litigation, Plaintiffs seek recovery on behalf of a broad putative class of GM car owners and lessors whose vehicles were subject to those recalls, arguing that they have been harmed by, among other things, a drop in their vehicles' value due to the ignition switch defect and other defects. Their operative complaint — the Fourth Amended Consolidated Complaint or "FACC" — runs to over a 1700 pages and 7500 paragraphs, and includes claims under state law brought by named Plaintiffs in all fifty states and the District of Columbia.

In conjunction with the parties, the Court decided early on not to entertain a motion to dismiss all of the Plaintiffs' economic loss claims at once — given, among other things, the number and scope of those claims; the possibility that the litigation would be materially affected by parallel proceedings in (and arising out of) bankruptcy court; and the likelihood that the parties could ultimately agree upon how the Court's rulings as to some state law claims would apply to others, saving the need for the parties to brief and the Court to decide the same issues in fifty-one different jurisdictions. In an opinion filed almost exactly one year ago with respect to the then-operative Third Amended Consolidated Complaint ("TACC"), the Court ruled on the validity of, among other things, Plaintiffs' claims in eight jurisdictions. Since that time, Plaintiffs filed the FACC and New GM filed another partial motion to dismiss, pursuant to Rules

9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, focusing — by agreement — on the claims of Plaintiffs from eight jurisdictions that were not addressed in the Court's last Opinion. This Opinion and Order addresses those claims and a few issues that are not state-specific (that is, that apply to all Plaintiffs' claims) — namely, a revised version of Plaintiffs' "brand devaluation" theory of damages, which was pled in the TACC and dismissed in the Court's last Opinion; Plaintiffs' claims for damages in the form of "lost time" spent having their vehicles repaired; and the viability of economic loss claims brought by Plaintiffs who purchased their vehicles before New GM came into existence on July 10, 2009, or who disposed of their vehicles prior to GM's announcement of the recalls in 2014. .

For the reasons stated below, New GM's motion to dismiss is GRANTED in part and DENIED in part. More specifically, it is GRANTED with respect to Plaintiffs' repleaded "brand devaluation" claims, but DENIED with respect to Plaintiff's lost-time-to repair claims. Additionally, it is GRANTED with respect to Plaintiffs who purchased their vehicles prior to New GM's inception or disposed of their vehicles prior to the recall announcement. And finally, New GM's motion to dismiss Plaintiffs' claims in Alabama, Illinois, Massachusetts, Michigan, New York, Pennsylvania, Texas, and Wisconsin is GRANTED in part and DENIED in part, depending on, among other things, whether each state's law allows claims in the absence of a manifested defect, requires a special trust relationship between the parties for a duty to disclose to arise, and permits plaintiffs to plead both contract claims and unjust enrichment claims. Ultimately, for the reasons that follow, most of Plaintiffs' consumer fraud, fraudulent concealment, and breach of implied warranty claims survive, while the bulk of Plaintiffs' unjust enrichment claims must be and are dismissed.

**BACKGROUND**

The underlying facts giving rise to this MDL proceeding are set forth in this Court's prior opinions, familiarity with which is presumed. *See, e.g.*, *In re General Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016). To the extent relevant here, pursuant to a Sale Order entered on or about July 10, 2009, New GM emerged from the bankruptcy of General Motors Corporation ("Old GM") as the operative GM business entity and the largest car manufacturer in the world. (Docket No. 3356 ("FACC") ¶¶ 291, 336, 873). Prior to the bankruptcy, however, Old GM personnel learned of a defect with the ignition switches in certain car models that allowed them to move from the "run" to the "off" or "accessory" positions too easily. *See In re Gen. Motors*, 2016 WL 3920353, at *3. New GM opened several investigations into incidents — including fatal crashes — involving the defective ignition switch, but ultimately did not recall any vehicles until February 2014. *See id.* at *4. Thereafter, between 2014 and 2015, New GM issued more than eighty-four recalls relating to more than seventy defects and affecting over twenty-seven million GM cars. *Id.*

On June 12, 2014, the Judicial Panel on Multidistrict Litigation transferred to this Court fifteen actions relating to the alleged ignition switch defect for "coordinated or consolidated pretrial proceedings" pursuant to Title 28, United States Code, Section 1407. (Docket No. 1). The MDL has since grown to hundreds of cases (comprised of several thousand individual claims), with new cases transferred to, or filed directly with, the Court every month. Broadly speaking, the Court and the parties have divided the cases into two categories: personal injury and wrongful death claims, on the one hand, and economic loss claims, on the other. (*See* Docket No. 215). With respect to the latter, at issue here, the Court ordered Plaintiffs to proceed by submitting a "master" consolidated complaint that would supersede individual complaints, at

least for purposes of pretrial proceedings (including motion practice). *See In re Gen. Motors,* 2016 WL 3920353, at *5; *In re General Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 3619584, at *10 (S.D.N.Y. June 10, 2015).

Plaintiffs did so, and later amended the consolidated complaint twice. On February 24, 2016, New GM filed a partial motion to dismiss the then-operative TACC. (Docket No. 2356). In an opinion entered on July 15, 2016, the Court granted New GM's motion in part and denied it in part. *See In re Gen. Motors,* 2016 WL 3920353. In particular, the Court dismissed Plaintiffs' claims under the federal Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1961, *et seq.*, and rejected Plaintiff's broadest theory of damages, which it called the "brand devaluation theory." *See id.* at *7-18. The Court characterized the "brand devaluation theory" of damages as "unprecedented and unsound," after finding that "persuasive precedent interpreting consumer protection law and general principles of tort recovery" precluded it from being a basis for recovery. *Id.* at *2, 42. The Court also considered Plaintiffs' claims under the laws of eight different states, upholding the majority of Plaintiffs' consumer fraud, common law fraud, and implied warranty claims while dismissing the bulk of their unjust enrichment and negligence claims. *See id.* at *18-42.

On September 15, 2016, Plaintiffs filed the FACC at issue here. The FACC asserts claims on behalf of a class of millions of Old GM and New GM vehicle owners whose vehicles were affected by various alleged defects and recalls. (*See* FACC 2-4). The FACC defines the plaintiff class as "[a]ll persons who bought or leased (i) a Delta Ignition Switch Vehicle on or before February 14, 2014; (ii) a Low Torque Ignition Switch Vehicle prior to July 3, 2014; (iii) a Knee-to-Key Camaro Defect Vehicle prior to July 3, 2014; (iv) a Side Airbag Defect Vehicle prior to March 17, 2014; and/or (v) a Power Steering Defect Vehicle Prior to April 1, 2014." (*Id.*

¶ 34; *see also id.* at 2-3; Docket No. 3578 ("GM Mem."), at 2-7).  It does not seek damages for

physical injury or property damage; nor does it allege that Plaintiffs were promised defect-free

vehicles.  Instead, Plaintiffs allege that their vehicles diminished in value because of the recalls

and New GM's alleged conduct.  (FACC ¶¶ 32-33, 44, 1104).  They also allege that "all

Plaintiffs incurred damages in at least the form of lost time required to repair their vehicles."

(*E.g.*, FACC ¶ 1145).  Plaintiffs bring a variety of state law claims, sounding in consumer fraud,

common law fraud, implied warranty, and unjust enrichment.  By agreement between the parties,

the instant motion is largely limited to claims of the named Plaintiffs who reside in eight states

not addressed in New GM's motion to dismiss the TACC: Alabama, Illinois, Massachusetts,

Michigan, New York, Pennsylvania, Texas, and Wisconsin.  (Docket No. 3431).[1]

## LEGAL STANDARDS

In evaluating a motion to dismiss, a court must accept all facts set forth in the complaint

as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Burch v. Pioneer

Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A claim will survive a

Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to

relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A

claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A plaintiff must show "more

than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere

---

[1]     The FACC also includes successor liability claims brought on behalf of the Delta Ignition
Switch plaintiffs.  (FACC ¶¶ 896-957).  New GM has moved for summary judgment on those
claims.  (*See* Docket Nos. 3427, 3519).  The Court will address that motion in a separate opinion.

"labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

To the extent that a plaintiff alleges fraud, as Plaintiffs do here, Rule 9(b) requires a plaintiff to plead claims "with particularity," specifying "the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Rule 9(b) "provides that a party alleging fraud 'must state with particularity the circumstances constituting fraud or mistake," to ensure that the defendant has "fair notice of a plaintiff's claim and adequate information to frame a response." *United States v. Wells Fargo Bank*, 972 F. Supp. 2d 593, 615 (S.D.N.Y. 2013). Generally, to satisfy Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted). For fraud claims premised on concealment, a plaintiff must allege "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." *Schneider v. Pearson Educ., Inc.*, 12-CV-6392 (JPO), 2013 WL 1386968, at *4 (S.D.N.Y. Apr. 5, 2013). Notably, "where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *Wells Fargo Bank*, 972 F. Supp. 2d at 616 (internal quotation marks omitted). Failure to satisfy the Rule 9(b) standard, if applicable, is grounds for dismissal. *See, e.g.*, *Lerner*, 459 F.3d at 293; *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

**DISCUSSION**

As noted, New GM's present motion is largely limited to claims of the named Plaintiffs from eight new states: Alabama, Illinois, Massachusetts, Michigan, New York, Pennsylvania, Texas, and Wisconsin.  As in the earlier opinion concerning New GM's partial motion to dismiss the TACC, the Court will address each state separately because there are differences, small and large, in the relevant law from one state to the next.  Before doing so, however, the Court will address three broader (that is, non-state-specific) arguments made by New GM — namely, that the Court should dismiss (1) Plaintiffs' revised version of the "brand devaluation" theory; (2) Plaintiffs' claims for "lost time" (that is, time devoted to repairing vehicles as part of the recalls); and (3) benefit-of-the-bargain claims brought on behalf of (a) Plaintiffs who purchased their vehicles before July 2009, when New GM was created, and (b) Plaintiffs who disposed of their vehicles before New GM announced its recalls in 2014.[2]

**A.  Brand Devaluation Claims**

As an initial matter, New GM moves to dismiss the FACC to the extent that it repleads the brand devaluation claims that the Court dismissed in its prior Opinion.  (Docket No. 3547 ("GM Supp. Br."), at 1; *see also* Docket No. 3543; Nov. 10, 2016 Status Conf. Tr. 33-35).  In its prior Opinion, the Court dismissed that theory of damages "as unprecedented and unsound."  *In re Gen. Motors*, 2016 WL 3920353, at *42.  The Court reasoned that the theory was unprecedented in both its breadth and scope in at least two respects.  First, it was brought on

---

[2]    By separate Order entered on June 16, 2017, the Court dismissed the claims of thirteen Plaintiffs for failure to comply with their discovery obligations.  (*See* Docket No. 4093). Accordingly, the Court need not and does not address the claims of Melissa Cave, Mary Ann Cechini, Carolyn Coleman, Bruce Dunn, Mark Fellter, Karen Gooden, Wynonia Jackson, Pearl Jemison, Shawn Markin, Eric Rhine, William Shimak, and Bryon and Tonya Skinner.

behalf of anyone who owned a GM brand car — without regard for whether a car had a defect. *See id.* at *7. Second, if recognized, it would amount to an indefinite guarantee of both "the product's resale value *and* the brand's continuing good name." *Id.* The Court acknowledged that "labels and brands have independent economic value," yet stated that "it does not follow that a consumer can recover if he or she buys a defect-free and functional product that performs as expected, but the company's actions somehow affect the value of the company's brand." *Id.* at *8. Indeed, the Court noted that doing so might well have perverse effects: It might over-deter manufacturers and "diminish the resources available to plaintiffs who have been more directly injured by the manufacturer's products." *Id.* at *9. "If such a sea change in consumer protection policy and law [was] warranted," the Court ultimately concluded, "it should emerge from the legislative, not the judicial, realm." *Id.*

Plaintiffs replead the brand devaluation theory in the FACC, but contend that they do so in a "narrowed and revised" form that cures the defects identified by the Court in its last Opinion. (FACC ¶ 1086; Docket No. 3438 ("Pls.' Ltr."), at 1). Specifically, Plaintiffs identify two differences between the brand devaluation claims pleaded in the TACC and the brand devaluation claims pleaded in the FACC. First, Plaintiffs amended their brand devaluation claims to apply only to "Plaintiffs and putative class members who have (or had) defective cars." (Docket No. 3546 ("Pls.' Supp. Br"), at 2). Second, "the FACC incorporates the work of a brand expert and explains how the theory applies in this specific context to affected cars." (*Id.* (citing FACC ¶¶ 308-335). That is, "[t]he FACC makes allegations about how the repeated recalls had a negative impact on the brands and models that were recalled, about the relationship of New GM to its sub-brands, about New GM's brand architecture, and it identifies some of the primary variables that will inform the calculation of the spillover effect of the ignition switch recalls to

8

other recalled cars." (*Id.* (citing FACC ¶¶ 332-335). New GM counters that these changes are immaterial for either of two reasons: (1) because the Court dismissed the brand devaluation claims in the TACC with prejudice; and (2) because, in any event, the claims, as amended, still fall short. (GM Supp. Br. 2-8). The Court agrees with New GM on both scores.

First, New GM is correct that the Court dismissed Plaintiffs' brand devaluation claims with prejudice. In its motion to dismiss the TACC, New GM certainly asked that Plaintiffs' brand devaluation claims be dismissed with prejudice. (Docket No. 2357, at 1-3). And while the Court was silent on the issue in its Opinion, *see* 2016 WL 3920353 at *42, the law deems such silence to mean dismissal with prejudice, *see, e.g.*, *Lerma v. Falks*, 338 F. App'x 472, 474 (5th Cir. 2009) ("The district court's dismissal, though, will be construed as a dismissal with prejudice because it was silent on the issue."); *Stern v. Gen. Elec. Co.*, 924 F.2d 472, 477 n.7 (2d Cir. 1991) ("A district court's dismissal under rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice."); *Crawford v. W.V. Governor's Office*, 935 F.2d 1285 (4th Cir. 1991) (per curiam) (noting that final orders that were "silent" as to whether a dismissal is with or without prejudice "indicat[e] dismissal with prejudice"). Notably, Plaintiffs themselves come close to conceding as much. In a footnote in the FACC itself, for example, they state that their brand devaluation "allegations remain in the Complaint *to preserve these claims for appeal*." (FACC 1 n.1 (emphasis added)). And in their memorandum of law in opposition to New GM's motion to dismiss (which Plaintiffs filed *after* they had briefed the question of whether the Court's earlier dismissal was with or without prejudice), they note that

the FACC includes "enhanced brand diminution allegations *for appellate purposes*." (Docket No. 3661 ("Pls.' Opp'n"), at 4-5 (emphasis added)).[3]

Plaintiffs concede that "12(b)(6) dismissals unrelated to pleading infirmities . . . are generally with prejudice, even if silent as to the point." (Pls.' Ltr. 1-2). Nevertheless, they argue that the Court "made clear that further amendments — without limitation — were authorized" in the final paragraph of its earlier Opinion. (*Id.* at 2). That argument barely passes the laugh test. The final paragraph of the Court's earlier Opinion read in full:

> Although this ruling addresses only some of the claims in the TACC, it will undoubtedly inform the parties with respect to the viability of other claims and, more generally, bear upon the further progress of the MDL. The July 13, 2016 ruling from the Second Circuit, which held that purchasers of Old GM cars with ignition switch defects can bring claims for Old GM's wrongdoing against New GM has, in all likelihood, also substantially redefined the scope of the claims that may proceed. The parties should be prepared to discuss the implications of this Court's ruling and the Second Circuit's ruling at the July 28, 2016 status conference — including but not limited to implications for the next phase of discovery. (*See* Docket Nos. 1569, 2156). Additionally, within **thirty days** from the date of this Opinion and Order, Plaintiffs shall submit their proposed amendments to the TACC. (*See* Docket No. 2323).

*In re Gen. Motors*, 2016 WL 3920353, at *42. Nowhere in that paragraph (or elsewhere in the Opinion, for that matter) did the Court grant Plaintiffs *carte blanche* to re-plead the claims that had been found deficient. To be sure, the Court did invite Plaintiffs to submit "proposed amendments to the TACC" within thirty days, *id.*, but that invitation — as the citation to Docket No. 2323 made clear — was limited to Plaintiffs' agreement "to make certain amendments to the TACC" to comply with rulings of the Bankruptcy Court. (Docket No. 2323, at 2; *see also*

---

[3] Additionally, although Plaintiffs also replead their RICO claim in the FACC (*see* FACC ¶¶ 998-1088), they conceded at the status conference held on October 13, 2016, that they did so only for preservation purposes and agreed that there was no need for New GM to move for dismissal of the claim again. (Oct. 13, 2016 Status Conf. Tr. 9-10; *see also* FACC 1 n.1). Accordingly, Plaintiffs' RICO claim is (or remains) dismissed.

Docket No. 2389 (adopting the parties' proposal regarding the proposed amendments)). Accordingly, to the extent the Court dismissed Plaintiffs' claims — including their brand devaluation claims — that dismissal was plainly with, not without, prejudice.

Second, and in any event, Plaintiffs' revised brand devaluation claims still fail as a matter of law. *See, e.g.*, *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (noting that a court need not grant leave to amend when "where the proposed amendment would be futile" (internal quotation marks omitted)). The FACC's new paragraphs about the importance of labels and brands do little more than provide a factual basis for the proposition that "labels and brands have independent economic value" — a proposition explicitly accepted by the Court in its earlier Opinion. *See In re Gen. Motors*, 2016 WL 3920353, at *8. And while the revised claims are brought on behalf of a narrower universe of Plaintiffs — namely, "Plaintiffs and putative class members who have (or had) defective cars" (Pls.' Supp. Br. 2) — that does not make them any less "unprecedented and unsound." *In re Gen. Motors*, 2016 WL 3920353, at *42. For one thing, Plaintiffs provide no conceptual basis for narrowing the universe of plaintiffs who could recover under their theory; that is, *ipse dixit* aside, they identify no limiting principle that would justify applying the brand devaluation theory to only a subset of GM car owners generally, all of whom the theory would view as having suffered harm. Additionally, whether the claims are asserted on behalf of all GM car owners or some subset of that universe, the claims suffer from the more fundamental problems identified in the Court's earlier opinion — namely, that existing law does not provide a guarantee of both "the product's resale value *and* the brand's continuing good name." *Id.* at *7.

As they did in their briefing in opposition to New GM's motion to dismiss the TACC, Plaintiffs rely primarily (if not exclusively) on *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152

(C.D. Cal. 2011).  (*See* Pls.' Supp. Br. 5).  But that decision does not support Plaintiffs' argument, let alone bear the weight that Plaintiffs would put on it.  Far from acknowledging the brand devaluation theory, the *Toyota* Court merely recognized that the plaintiffs in that case had established injury-in-fact as a result of their defective cars under the benefit-of-the-bargain theory.  *See* 790 F. Supp. 2d at 1165 ("Because every lead Plaintiff alleges a safety defect, and defective cars are not worth as much as defect-free cars, Plaintiffs plausibly establish an economic loss."); *see also In re Gen. Motors*, 2016 WL 3920353, at *8 (noting that the *Toyota* Court recognized the plaintiffs to have a claim solely under the benefit-of-the-bargain defect theory).  More broadly, the portion of the Toyota opinion upon which Plaintiffs here rely concerns the question of standing, not the viability of any particular damages theory.  *See In re Toyota*, 790 F. Supp. 2d at 1166 (finding injury-in-fact for a plaintiff that "plausibly established an economic loss by alleging that he saw the trade-in value of his 2007 Toyota Sienna drop according to various sources 'once the recalls were made public'").  And as the *Toyota* Court itself observed, "[a]n injury-in-fact differs from a 'legal interest'; an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law."  *Id.* at 1160 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006).  Thus, *Toyota* provides no more support with respect to Plaintiffs' amended brand devaluation claims than it did with respect to their original claims, and those claims remain dismissed.

## B.  Damages for Lost Time

Next, New GM moves to dismiss Plaintiffs claims to the extent that they seek damages in the form of "lost time" — that is, the time they spent getting repairs done on their defective vehicles in connection with the recalls.  (*See* GM Mem. 24-25; Docket No. 3734 ("GM Reply"), at 13-14; *see also, e.g.*, FACC ¶¶ 1145, 2794, 3790, 3918, 5182, 5958, 6573, 7298; Pls.' Opp'n

28-29). New GM contends that time spent having a vehicle repaired for free as part of a recall does not constitute a legally cognizable or compensable injury. (*See* GM Mem. 24-25; GM Reply 13-14). Significantly, however, it frames that argument in categorical terms. That is, New GM does not move to dismiss Plaintiffs' claims under the law of any particular jurisdiction (either the eight states that are the focus of this round of motion practice or otherwise); instead, it argues that Plaintiffs' theory of damages for lost time — a theory alleged for the first time in the FACC — fails as a matter of law, without regard for the substantive law to be applied. In light of that, the question for present purposes is whether *any* jurisdiction would recognize Plaintiffs' theory of "lost time" damages. If so, then New GM's motion can be denied, and the question of whether any particular Plaintiff has a viable claim for "lost time" damages under his or her jurisdiction's law can be postponed to another day.

The Court concludes that some states do recognize "lost time" as a valid theory of consequential damages. Consequential damages are generally "defined as damages which arise from special circumstances that make them probable, although they would be unusual apart from such circumstances." *Nat'l Investor Servs. Corp. v. Integrated Fund Servs., Inc.*, 85 F. App'x 779, 781 (2d Cir. 2004) (summary order) (internal quotation marks omitted). By contrast, general damages are "the natural and probable consequence of the breach." *Id.* While all states permit the recovery of general damages in some form, states diverge with respect to the availability of consequential damages and, in particular, whether lost time can be recovered as a form of consequential damage. For example, courts in Illinois — one of the states at issue here — have recognized "lost time" as a viable theory of damages. *See, e.g.*, *Fed. Ins. Co. v. J.K. Mfg. Co.*, 933 F. Supp. 2d 1065, 1073 (N.D. Ill. 2013) ("Economic loss includes some incidental and consequential losses as lost profits, rental expenses *and lost time*." (emphasis added)

(quoting *Reed v. Central Soya Co.*, 621 N.E.2d 1069, 1074 (Ind. 1993))); *Dacor Corp. v. Sierra Precision*, 753 F. Supp. 731, 732-733 (N.D. Ill. 1991) (declining to dismiss the plaintiff's request for "incidental and consequential damages flowing from the recall of the defective products" as duplicative of the request for "damages in an amount equal to the difference between the value" of the product as sold versus the value of the product as warranted).

More broadly, as Plaintiffs note (Pls.' Opp'n 28-29), most state courts construe their consumer protection statutes to permit recovery beyond actual damages, including incidental and consequential damages. *See, e.g.*, *Jersild v. Aker*, 775 F. Supp. 1198, 1206 (E.D. Wis. 1991) (discussing the Wisconsin Supreme Court's acknowledgment that damage measures must be flexible depending "on the nature of the bargain and the circumstances of each case," such that parties can be entitled to "indirect or consequential damages" if not duplicative of direct damages); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) (requiring a plaintiff to prove only actual injury rather than "pecuniary harm" to recover under New York's consumer protection statute); *Hauf v. Life Extension Found.*, 547 F. Supp. 2d 771, 780 (W.D. Mich. 2008) (observing that the Michigan consumer protection statute is "remedial" and "must be liberally construed to achieve its intended goals," such that a plaintiff can recover for a broad array of damages, even for injuries such as mental distress (quoting *Forton v. Laszar*, 609 N.W.2d 850, 853 (Mich. Ct. App. 2000))); *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 492 (Mass. 2004) (observing that defendants "confused issues of whether the plaintiffs will be able to prove actual damages with whether they have been injured by the defendants' allegedly unlawful conduct," which would entitled them to damages regardless under the Massachusetts consumer protection statute). In light of these examples, New GM's categorical challenge to Plaintiffs' claims for "lost time" damages falls short.

In fact, despite New GM's claims to the contrary (GM Reply 13-14), some courts have even recognized "lost time" as a basis for recovery in cases involving vehicle recalls. *See, e.g.*, *Frederick v. DaimlerChrysler Corp.*, No. 05-CV-2085 (JWL), 2005 WL 1319135, at *2 (D. Kan. May 12, 2005) (remanding to state court a case in which the plaintiffs were seeking, *inter alia*, "[c]ompensation for loss of time, loss of vehicle use, rental car expenses, inconvenience, and consequential damages" incurred for having their Grand Cherokees serviced and repaired); *In re Myford Touch Consumer Litig.*, No. 13-CV-3072 (EMC), 2016 WL 7734558, at *15-17 (N.D. Cal. Sept. 14, 2016) (declining to certify a class where the plaintiffs "presented no methodology at all" relating to incidental and consequential damages, particularly because the plaintiffs did not even tell the court whether "they [sought] to recover for the loss of time in taking their vehicles to Ford to repair" and, if so, whether that would "include time driving their vehicles to and from Ford for repair" and "[l]ost wages as a result"); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 357 n.1 (3d Cir. 2015) (considering, for purposes of diversity jurisdiction, the scope of damages pleaded by the plaintiffs "including but not limited to costly repairs, loss of vehicle use, substantial loss in value and resale value of the vehicles, and other related damages"); *Ford Motor Co. v. Ocanas*, 138 S.W.3d 447, 449-50 (Tex. App. 2004) (considering the trial court's certification of a class where the damages sought included, among other things, "loss of use of the vehicle during the time of replacement").

*Hadley v. Chrysler Group LLC*, 624 F. App'x 374 (6th Cir. 2015), upon which New GM relies, does not call for a different conclusion. In *Hadley*, the plaintiffs alleged injuries "in the form of the diminished value and loss of enjoyment of their vehicle, the cost of having their airbag system diagnosed or repaired, and the expense incurred from having to obtain alternative means of transportation." *Id.* at 377. The Sixth Circuit dismissed the claims on standing

grounds because, in relevant part, the plaintiffs had failed to allege that they ever stopped using their vehicle as a result of the defect or repairs. *See id.* at 378-79. Thus, the *Hadley* Court did not reach the question of whether a party can recover damages for "lost time" (or, as framed in that case, "lost use"), particularly when a plaintiff *can* "establish a casual connection" between his or her injuries and the defendant's misconduct. *Id.* at 378. On top of that, this Court previously distinguished *Hadley* and the other cases relied on by New GM because the plaintiffs in those cases were "seeking declaratory and injunctive relief for existing defects through a court-ordered recall." *In re Gen. Motors*, 2016 WL 3920353, at *40. By contrast, Plaintiffs here "seek to recover damages from New GM for fraud — not to obtain declaratory and injunctive relief for existing defects." *Id.* Accordingly, the Court sees no reason why Plaintiffs (who plainly have standing to sue) should not be entitled to consequential damages if they are able to make out the necessary elements under the applicable state law.

None of this is to say that Plaintiffs in every jurisdiction will be able to recover for "lost time"; there may well be states that do (or would) not recognize "lost time" as a valid theory of damages. Additionally, with respect to jurisdictions that do recognize "lost time" as a valid theory, Plaintiffs may face obstacles to certification of a class. *Compare, e.g.*, *In re Myford Touch*, 2016 WL 7734558, at *17 ("Absent a clear model, the Court might be tasked with conducting individualized inquiries into *how* each class member was harmed, not just into the *extent* of the harm. [The p]laintiffs have therefore failed to satisfy Rule 23(b)(3) with respect to their requests for incidental and consequential damages."), *with Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429-430 (4th Cir. 2003) ("Plaintiffs' other damages claims — those relating to injury to credit, time lost, and loss of enjoyment of life — may require individualized inquiry. But even considering [p]laintiffs' claims against [the defendant] *as a whole*, we cannot conclude

that the district court abused its discretion in finding that at this juncture common issues predominate over the individual issues that may be involved in resolving these claims."). But those are questions for another day — either in connection with motions for class certification or dispositive motions examining the laws of each applicable state. For present purposes, it suffices to say that some states do recognize the "lost time" theory of damages alleged by Plaintiffs. It follows that New GM's motion to dismiss that theory on a categorical basis is denied.

## C. The Relevant Time Period for New GM's Economic Loss Liability

Before turning to New GM's state-specific arguments, the Court addresses two final issues that affect Plaintiffs in multiple jurisdictions (including jurisdictions beyond those specifically addressed in New GM's current motion). The first issue is whether Plaintiffs who purchased their vehicles prior to July 10, 2009 — the date on which New GM purchased most of the assets of Old GM as part of the bankruptcy proceedings — can pursue claims for economic loss.[4] New GM contends that they may not, on the ground that any economic injury occurred at the time of sale — prior to New GM's existence — while Plaintiffs argue that New GM's own misconduct caused a decrease in the value of their vehicles, independent from any damages caused by Old GM. (Pls.' Opp'n 23-24). The second issue is whether Plaintiffs who disposed of — that is, sold, traded in, or returned — their vehicles prior to New GM's announcement of the recalls beginning in 2014 can pursue such claims. New GM asserts these Plaintiffs could not have realized any "diminished value" damages because they did not own any affected GM vehicles at the time of the recall; Plaintiffs contend that New GM's argument cannot be squared

---

[4]     As Plaintiffs note, this argument could be mooted, at least in part, if the Court were to hold that Plaintiffs could pursue successor liability claims against New GM. (Pls.' Opp'n 23). As noted above, that issue is the subject of a separate motion to be addressed in due course. (*See* Docket Nos. 3519, 3520, 3617, 3656).

with its own assertion that the relevant point in time for assessment of benefit-of-the-bargain damages is the date of sale. (GM Mem. 22-24; Pls.' Opp'n 24 n.17).

The Court agrees with New GM on both issues. As discussed at length in the Court's prior Order (and reaffirmed above in the discussion of the reframed brand devaluation claims), Plaintiffs' injuries here are limited to the "benefit-of-the-bargain defect theory." *See In re Gen. Motors*, 2016 WL 3920353, at *7-10. That theory holds "that Plaintiffs who purchased defective cars were injured when they purchased for *x* dollars a New GM car that contained a latent defect; had they known about the defect, they would have paid fewer than *x* dollars for the car (or not bought the car at all), because a car with a safety defect is worth less than a car without a safety defect." *Id.* at *7. Most relevant here, the theory "does *not* compensate a plaintiff for a decrease in resale value." *Id.* at *10 (emphasis added). Instead, a plaintiff is compensated "for the fact that he or she overpaid, *at the time of the sale*, for a defective vehicle." *Id.* (emphasis added). It follows that Plaintiffs who purchased cars from Old GM suffered an injury before New GM even existed and cannot now recover from New GM for those injuries. Put differently, while New GM's alleged concealment of the ignition switch defect may have caused economic injury to Plaintiffs who purchased their vehicles after New GM came into existence, it did not cause economic injury to Plaintiffs who purchased their vehicles before; the latter Plaintiffs' injury, if any, was complete at the time of sale, and thus is not attributable to New GM's conduct.

That conclusion is consistent with the decisions of courts confronting similar facts. In *Hadley*, for example, the plaintiffs argued that they had been injured by the diminished value of their vehicles due to New Chrysler's delay in implementing repairs. *See* 624 F. App'x at 378. The *Hadley* Court rejected that argument as follows: "New Chrysler did not manufacture the plaintiffs' vehicle. Old Chrysler did. The plaintiffs have not shown how they suffered

diminished-value injuries based on solely on New Chrysler's delay in repairing the [defect]." *Id.*

Similarly, in *In re Old Carco LLC*, 492 B.R. 392 (Bankr. S.D.N.Y. 2013), the plaintiffs brought

claims against New Chrysler, as the purchaser of Carco LLC's assets, even though the plaintiffs

owned vehicles that had been manufactured and sold by the then-bankrupt Carco. *See id.* at 395-

97. With respect to the claims of the plaintiffs who had purchased vehicles before New Chrysler

acquired Carco, the Bankruptcy Court concluded: "Each purchased a defective vehicle

manufactured by Old Carco that requires more servicing and is worth less money. New

Chrysler's failure to warn them that they purchased a defective vehicle manufactured by Old

Carco did not *proximately cause* their economic injury . . . ." *Id.* at 405. The Bankruptcy Court

contrasted those plaintiffs' situations with the situation of a plaintiff who suffered a personal

injury as a result of a defect that could have warned about at an earlier date. *See id.* In such a

case, the Court reasoned, the failure to warn would have "*proximately cause[d]*" a plaintiff's

subsequent injuries. *Id.*; *see also Holland v. FCA US LLC*, 656 F. App'x 232, 240 (6th Cir.

2016) ("Even if FCA had warned the [p]laintiffs, nothing would have changed. The only injuries

the [p]laintiffs allege involve the costs of the repairs, but the [p]laintiffs would have needed these

repairs irrespective of any warning. The injuries were the result of the defect, not FCA's failure

to warn. Thus, the [p]laintiffs have failed to sufficiently allege that FCA's failure to warn *caused*

their injury to survive a motion for judgment on the pleadings.").

Plaintiffs' attempts to distinguish these cases are weak at best. With respect to *In re Old

Carco*, Plaintiffs make much of the fact that the purchasers in that case had knowledge of the

design defects, whereas the purchasers here did not. (*See* Pls.' Opp'n 27). But that is a

distinction without a difference. That is, whether or not Plaintiffs who purchased their vehicles

prior to July 10, 2009, knew at the time of their purchase that a defect existed, they still

purchased their vehicles prior to the creation of New GM.  Moreover, although Plaintiffs are correct that the defendant-manufacturer had issued several recalls relating to the defect at issue in that case (specifically, a fuel-spit back problem), the plaintiffs there were the owners of particular models and years that had not previously been recalled.  *See In re Old Carco*, 492 B.R. at 395-96, 399.  Plaintiffs seek to distinguish *Hadley* (and *Holland*), meanwhile, on the ground that it did "not involve a massive fraudulent cover-up, but a voluntary recall."  (*See* Pls.' Opp'n 27).  But again, Plaintiffs do not explain *why* — even taking that difference as true — a cover-up would render New GM liable for economic injuries to Plaintiffs who, by their own admission, were harmed by "depriv[ations] of the benefits of their bargains."  (*Id.*).  Those deprivations took place at the time of sale, and no amount of arm-waving or finger-pointing can change the basic fact that New GM did not exist at that time and thus could not have caused the harm.

Finally, Plaintiffs rely on state-law cases allowing recovery for "diminished value" (*see* Pls.' Opp'n 24-26), but those cases are immaterial.  The Court does not take New GM to be arguing that "diminished value" can *never* be a proper measure of damages.  Several of the states at issue here plainly permit recovery of that sort in some circumstances.  *See, e.g.*, *Miller v. William Chevrolet/Geo, Inc.*, 762 N.E.2d 1, 10 (Ill. App. Ct. 2001) ("Illinois courts have generally allowed damages claims based on diminished value of a product regardless of whether it has yet malfunctioned, provided the product contains a manifested defect or current condition affecting value."); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995) ("Diminution in value does not duplicate the cost of repairs if the diminution is calculated based on a comparison of the original value of the property and the value after repairs are made." (emphasis omitted)).  But none of the cases cited by Plaintiffs addresses the real issues here: whether "diminished value" damages occur at or after the time of sale and, relatedly, whether an entity that did not

exist when the product was sold can be held liable for such damages. *See, e.g.*, *Franklin Corp. v. Prahler*, 932 N.Y.S.2d 610, 616 (2011) (holding that a plaintiff should be able "to recover the cost of [] diminution in value" where that diminution was caused "by the negligence of *the defendant*" (emphasis added)). Thus, the Court relies on the reasoning in its prior Opinion and the authority of *Hadley, Holland*, and *In re Old Carco* to conclude that the claims of all Plaintiffs who bought their vehicles prior to entry of the Sale Order on must be dismissed.[5]

This brings the Court to the final non-state-specific issue: New GM's contention that economic loss claims brought by Plaintiffs who sold, traded-in, or returned their vehicles prior to the announcement of the recalls must also be dismissed. (GM Mem. 23-24). Plaintiffs' respond solely by saying "this argument flatly contradicts New GM's argument that only the point of sale is relevant." (Pls.' Opp'n 24 n.17). But the Court takes New GM to be arguing that, even under Plaintiffs' theory, those who disposed of their vehicles before the recall could not have realized any "diminished value" because they did not own the defective vehicles when the recalls were announced. If so, the Court agrees. Crucially, though, New GM's point is limited to economic loss damages. In all likelihood, a plaintiff who resold her car before the recall suffered no economic loss damages, as the then-unknown defect could not have affected the resale price. *See, e,g.*, *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 859-60 (Ill. 2005) (finding no

---

[5]     Specifically, with respect to the named Plaintiffs at issue in this motion, New GM's motion to dismiss is GRANTED with respect to Alabama Plaintiff Gerald Smith and Marion Smoke; Illinois Plaintiff Keith Nathan; Massachusetts Plaintiffs Colin Elliott and Susan Viens; Michigan Plaintiffs Diana Cnossen, David Price, Jacqueline Smith, and Bryan Wallace; New York Plaintiffs Sandra Levine, Michael Rooney, and William Ross; Pennsylvania Plaintiffs Shawn Doucette, Shirley Gilbert, and George Mathis; Texas Plaintiffs Shenyesa Henry, Lisa Simmons, and Malinda Stafford; and Wisconsin Plaintiff Les Rouse.

actual damages where the plaintiff sold his vehicle for fair market value prior to any public knowledge that certain parts were of inferior quality).

That said, for reasons not discussed by the parties, it does not necessarily follow that the claims of all such Plaintiffs must be dismissed in their entirety. In theory, a plaintiff who purchased her car after the Sale Order, but sold it before the recall was announced, could still plead and prove damages in the form of out-of-pocket expenses and lost time. For instance, Lisa McClellan, who purchased her car on November 22, 2010, but returned the car to the dealership prior to the announcement of the recalls, alleges that her car "shut off while she was driving at least fifty or sixty times" in the year and a half that she owned it, requiring her to take it to "the service repair shop often." (FACC ¶ 275). McClellan further alleges that "[s]he suffered economically because of the vehicle," presumably because of the need for frequent repairs. (*Id.*). By contrast, Greg Theobald — the only other Plaintiff who purchased a vehicle from New GM but traded in the car prior to the recalls — does not allege paying for any defect-related repairs or suggest that the defect, even if not announced, had any impact on the amount he received for the car. Accordingly, New GM's motion to dismiss is denied with respect to McClellan and granted with respect to Theobald. Plaintiffs, however, are granted leave to amend to the FACC to allege other damages incurred by Theobald, if any.[6]

---

[6]  The other two Plaintiffs who sold, traded in, or returned their cars prior to the announcement of the first recalls in February 2014 are Coleman and Viens. The claims of the former were dismissed by the Court's Order of June 16, 2016, *see supra* note 2, and the claims of the latter fail because she purchased her car prior to the Sale Order, *see supra* note 5. Accordingly, the Court need not address whether they allege any viable damages despite the date on which they disposed of their cars. (*See* GM Mem. 23).

**D.  State Law Claims**

The Court turns, then, to Plaintiffs' state claims, which sound in consumer fraud, common law fraud, warranty law, unjust enrichment, and negligence.  As noted, Plaintiffs bring claims under the laws of all fifty states and the District of Columbia, but this motion deals with claims under the laws of only eight jurisdictions: Alabama, Illinois, Massachusetts, Michigan, New York, Pennsylvania, Texas, and Wisconsin.  In their briefs, the parties largely addressed these claims together on an issue-by-issue basis.  By contrast — and despite the repetition it entails — the Court will address each claim with respect to each jurisdiction separately, as subtle differences in state law can compel different results for plaintiffs in different jurisdictions.  By and large, however, Plaintiffs' consumer fraud, common law fraud, and implied warranty claims survive, but their unjust enrichment claims fail.

**1.  Alabama**

In light of the Court's rulings above and the Order of June 16, 2017, the only remaining Alabama Plaintiff for purposes of this motion is Valeria Glenn.  Glenn owns a 2006 Pontiac Solstice, which she purchased used on February 23, 2013, and which was subject to the Delta Ignition Switch recall.  (*Id.* ¶ 47).  Glenn's car experienced a shutdown event once while she was driving, and her steering wheel also locked up.  (*Id.*).  Glenn had her car's ignition switch replaced in April 2014 pursuant to the recall.  (*Id.*).  She brings claims under the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-1, *et seq.*  (FACC ¶¶ 1123-1148); for fraudulent concealment (*id.* ¶¶ 1149-1162); and for unjust enrichment (*id.* ¶¶ 1185- 1195).  The Court will address each of these claims in turn.[7]

---

[7]      The Court notes that it need not and does not decide in the discussion below whether Alabama law requires the manifestation of a defect to plead claims for consumer fraud, common

### a. The ADTPA

Glenn's first claim arises under the ADTPA (*see* FACC ¶¶ 1123-1148), which provides a remedy for certain "unlawful trade practices." Ala. Code § 8-19-5. Before addressing the substance of Glenn's claim under the statute, however, the Court must address a threshold issue raised by New GM — namely, that the "savings clause" of the ADTPA precludes Glenn's claim outright. (*See* GM Mem. 45-46). That provision provides:

> The civil remedies provided herein and the civil remedies available at common law, by statute or otherwise, for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment are mutually exclusive. An election to pursue the civil remedies prescribed in this chapter shall exclude and be a surrender of all other rights and remedies available at common law, by statute or otherwise. . . . An election to pursue any civil remedies available at common law . . . arising out of any act, occurrence or transaction actionable under this chapter shall exclude and be a surrender of all rights and remedies available under this chapter.

Ala. Code § 8-19-15(a)-(b). In light of that language, Glenn wisely concedes that she "cannot ultimately proceed under both the Alabama DTPA and the common law of fraud by concealment." (Pls.' Opp'n 44). But New GM goes one step further and argues that, by pleading a common law fraud claim, Glenn "procedurally waived" any claim under the ADTPA and that the statutory claim should therefore be dismissed. (GM Mem. 46).

There is a split of authority on the question of whether a plaintiff can plead claims under both the ADTPA and common law — that is, on whether a plaintiff must make her "election"

---

law fraudulent concealment, or unjust enrichment, as the claims of the one and only Alabama Plaintiff who does not allege the manifestation of a defect — Gerald Smith (*see* GM Mem. 16; Pls' Opp'n 15) — were dismissed on other grounds. *See supra* note 5. Notably, the Court's analyses of the claims in the other seven jurisdictions implicated in New GM's motion are unaffected by the rulings above and the June 16, 2017 Order, as the remaining Plaintiffs in each of those jurisdictions necessitate resolution of every issue raised in New GM's motion to dismiss.

under the savings clause at the pleading stage or may wait. *Compare Holmes v. Behr Process Corp.*, No. 15-CV-0454 (WMA), 2015 WL 7252662, at *2-3 (N.D. Ala. Nov. 17, 2015) (dismissing the plaintiff's ADPTA claim on the ground that she had "procedurally waived" it by pleading common law fraud claims), *with Barcal v. EMD Serono, Inc.*, No. 14-CV-1709 (MHH), 2016 WL 1086028, at *5 (N.D. Ala. Mar. 21, 2016) (denying a motion to dismiss an ADPTA claim on the ground that while the "ADPTA's savings clause would preclude [the plaintiff] from ultimately obtaining relief under both the ADPTA and her common law claims," she was permitted to plead both), *and Collins v. Davol, Inc.*, 56 F. Supp. 3d 1222, 1227 n.2 (N.D. Ala. 2014) (similar). In the Court's view, the courts permitting both claims at the pleading stage have the better of the argument. First, although the plain language of the savings clause requires a plaintiff to elect one or the other remedy, it does not specify *when* in the proceedings the plaintiff must do so.[8] Second, although the options are "mutually exclusive," the provision explicitly allows a plaintiff to elect either of the two kinds of remedy. *See, e.g.*, *Cheminova Am. Corp. v. Corker*, 779 So. 2d 1175, 1183 (Ala. 2000) (noting that "the Act specifically states that consumers are not prohibited from seeking redress under the common law or under other statutes for conduct that could be redressed under the Act"). Thus, it makes no more sense to say that a

---

[8]     Underscoring this point, the Alabama Supreme Court has considered without comment (albeit, regarding other issues) cases in which common law and ADPTA claims were pleaded together at the outset. *See, e.g.*, *Ex Parte Terminix Int'l Co. Ltd. P'ship, Inc.*, 14 So. 3d 849, 850 (Ala. 2009) (evaluating a motion for a protective order during discovery in a case where the plaintiffs asserted, "among other things, claims of fraud, breach of warranty, negligence, breach of contract, . . . and claims pursuant to the Alabama Deceptive Trade Practices Act"); *Birmingham News Co. v. Lynch*, 797 So. 2d 440, 444 (Ala. 2001) (evaluating the trial court's denial of a motion to compel arbitration where the plaintiffs alleged, *inter alia*, "fraud in the inducement" and "violations of the Deceptive Trade Practices Act").

plaintiff who pleads both kinds of claims has "procedurally waived" her claim under the ADPTA than to say that she has procedurally waived her claims under the common law.

Finally, Rule 8(d)(3) of the Federal Rules of Civil Procedure — which applies in this forum — "allows parties to plead alternative, even inconsistent, theories." *Barcal*, 2016 WL 1086028, at *5; *see* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Relying on *Holmes*, New GM contends that Rule 8(d)(3) does not apply because it would "improperly enlarge [Glenn's] substantive rights, violating the Rules Enabling Act" and the rule established in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) (GM Reply 22), but the Court is unpersuaded. Allowing Glenn to *recover* on her ADPTA claim and her common law fraud claim would obviously enlarge her substantive rights contrary to the language of the Act's savings clause. But the right to *plead* alternative, or even inconsistent, claims is not a matter of substance; it is a quintessential matter of procedure. In short, while Glenn will — at some point — need to make an "election" to pursue either her ADPTA claim or her common law fraud claims, the Court will not require her to do so now, let alone dismiss either kind of claim on the dubious ground that it was "procedurally waived."

Turning to the merits of Glenn's ADTPA claim, to the extent relevant here, the statute makes it unlawful to represent "that goods or services have . . . benefits[] or qualities that they do not have," Ala. Code § 8-19-5(5); to represent "that goods or services are of a particular standard, quality, or grade," *id.* § 8-19-5(7); or to engage "in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce," *id.* § 8-19-5(27). Alabama case law "interpreting the scope of the specific unlawful trade practices described in [the Act]" is scant, but the "entire statutory scheme" makes clear that the Act's provisions "are designed to have limited application, and are intended to replace the common law and statutory

actions for fraud only in specifically designated situations." *Sam v. Beaird*, 685 So. 2d 742, 744

(Ala. Civ. App. 1996). While the ADPTA does not "explicitly mak[e] the concealment or

omission of a material fact unlawful," the Act's "catch-all" provision makes it unlawful to

engage "in any other . . . deceptive act or practices." *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d

893, 915-16 (N.D. Ill. 2013) (quoting Ala. Code. § 8-19-5(27)). Thus, a plaintiff may base an

ADPTA claim on an "alleged concealment, suppression, or omission." *Id.* at 916. In doing so,

however, the plaintiff must show "some knowledge of false or deceptive conduct on the part of

the wrongdoer." *Beaird*, 685 So. 2d at 744; *see also, e.g.*, *Lynn v. Fort McClellan Credit Union*,

No. 11-CV-2904 (VEH), 2013 WL 5707372, at *7 (N.D. Ala. Oct. 21, 2013) (dismissing

ADPTA claim for failure to show "any intent by [the defendant] to deceive" the plaintiff).

Further, where, as here, an ADPTA claim sounds in fraud, the plaintiff must satisfy Rule 9(b).

*Reid*, 964 F. Supp. 2d at 916.

Glenn's ADPTA claim is sufficient to satisfy the heightened pleading requirements of

Rule 9(b). Glenn's car was subject to the Delta Ignition Switch recall (FACC ¶ 47), and New

GM tacitly concedes that the consumer protection claims of Delta Ignition Switch Plaintiffs in

every state (except Wisconsin, which the Court addresses below) are sufficiently pleaded to the

extent that they rest on alleged omissions as opposed to misrepresentations. (*See* GM Mem. 35-

38: Pls.' Opp'n 35 n.28). Glenn's claim easily survives on that basis alone, but it also passes the

Rule 9(b) test to the extent it rests on alleged misrepresentations. (*See* FACC ¶¶ 1135, 1137

(alleging affirmative misrepresentations)).[9] With respect to the Delta Ignition Switch defect in

---

[9]     New GM contends that Plaintiffs abandoned their misrepresentation claims under the law
of every jurisdiction at issue here other than Wisconsin by not responding to its arguments for
dismissal. (GM Reply 17-18). The Court disagrees, as Plaintiffs state as follows in their brief:

particular, Plaintiffs allege many misrepresentations made by New GM in nationwide advertisements and reports about the safety and reliability of their vehicles; Plaintiffs also offer a slew of evidence showing that New GM knew about (or should have known about) the Delta Ignition Switch defect from the time of its inception. (*See* FACC ¶¶ 336-472). The Court previously found allegations less robust than these to be "just enough to cross the Rule 9(b) line," even though the plaintiff had not alleged "any specific misrepresentations" that she relied on prior to purchasing her vehicle. *In re Gen. Motors*, 2016 WL 3920353, at *26. Other courts have done much the same. *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, No. 14-CV-24009 (FAM), 2016 WL 5844872, at *3 (S.D. Fla. June 20, 2016) (finding an ADPTA claim to be sufficient under Rule 9(b) where the plaintiffs had alleged that Subaru misrepresented in its brochures and on its website that its airbags were safe and reliable); *Glenn v. Hyundai Motor Am.*, No. SA 15-CV-2052 (DOC), 2016 WL 3621280, at *13 (C.D. Cal. June 24, 2016) (similar). It follows that New GM's motion to dismiss Glenn's ADPTA claim must be and is denied.

### b. Fraudulent Concealment

In addition to her consumer fraud claim, Glenn also brings claims for common law fraudulent concealment (sometimes referred to as "suppression" under Alabama law). (*See*

---

Plaintiffs dispute New GM's contention that their voluminous misrepresentation allegations fail to satisfy Rule 9(b). *See* [FACC] ¶¶ 336-422 (detailing broad sampling of false claims of safety and reliability). But, as New GM concedes, omissions and concealments, by themselves, are actionable under the consumer protection laws of each relevant jurisdiction apart from Wisconsin. Accordingly, for the purposes of this Section, Plaintiffs discuss their consumer protection claims based on misrepresentations claims only in the context of their claims under the Wisconsin DTPA.

(Pls Opp'n 35 n.28 (emphasis omitted)). Thus, this is not a situation where "an inference may be fairly drawn" that Plaintiffs have abandoned a whole host of claims. *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014).

FACC ¶¶ 1149-1162).  To prevail, Glenn must show: "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; [and] (4) action by the plaintiff to his or her injury." *Parsons & Whittemore Enters. Corp. v. Cello Energy, LLC*, 613 F. Supp. 2d 1271, 1288 (S.D. Ala. 2009) (quoting *Freightliner, LLC v. Whatley Contract Carriers, LLC*, 932 So. 2d 883, 891 (Ala. 2005)).  Here, whether Glenn pleads a plausible claim of fraudulent concealment turns on whether New GM owed her a duty.  (*See* FACC ¶¶ 1155-1159).  Under the statute, a duty to disclose arises if there is a confidential relationship between the parties or where the "particular circumstances" of the case mandate disclosure.  Ala. Code 1975 § 6-5-102; *see also Parsons*, 613 F. Supp. 2d at 1288; *Freightliner*, 932 So. 2d at 891.  Glenn does not allege, nor could she allege, any confidential relationship or fiduciary duty on the part of New GM.  Instead, the viability of her claim turns on whether the particular circumstances here required disclosure.

Courts look to several factors in determining whether the particular circumstances of a case required disclosure: "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Freightliner*, 932 So. 2d at 891 (internal quotation marks omitted).  Of particular relevance here, one of the "other relevant circumstances" is whether a defendant has made any "affirmatively false statements." *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1337 (S.D. Fla. 2016) (internal quotation marks omitted); *see also Freightliner*, 932 So. 2d. at 895 (holding that, where a defendant does not have a duty to speak but chooses to speak "either voluntarily or in response to inquiry, he is bound not only to state the truth but also not to suppress or conceal any facts within

his knowledge which will *materially qualify those statements*," that is, "if he speaks at all, he must make a full and fair disclosure" (internal quotation marks omitted)).

The decision in *In re Takata* is particularly illustrative here.  The plaintiffs there sought to recover economic losses from Mazda for having knowingly installed Takata-brand airbags filled with ammonium nitrate — a propellant highly prone to instability and explosions — in several models of Mazda cars.  *See* 193 F. Supp. 3d at 1335.  Mazda moved to dismiss the plaintiffs' Alabama fraudulent concealment claim, arguing it had no duty to disclose because the cars had been purchased from third parties.  *See id.* at 1336-37.  The *In re Takata* Court disagreed, finding that Mazda had a duty to disclose the alleged defect arising out of the company's decision to "[make] incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from [p]laintiffs that contradicted these representations." *Id.* at 1337-38 (internal quotation marks omitted).  The Court pointed in particular to information in brochures and on Mazda's website discussing its cars' superior performance and safety features.  *See id.*

Glenn's allegations are quite similar to the allegations made by the plaintiffs in *In re Takata*.  She plausibly alleges that New GM knew of ignition switch-related defects by late 2009 or early 2010 and (at least arguably) took steps to conceal those defects — for example, by instructing New GM employees not to use terms that could alert the National Highway Traffic Safety Administration ("NHTSA") or the public to the existence of a safety issue.  (FACC ¶¶ 42, 1024, 1156).[10]  Further, these facts were plainly of "high value," and there is no suggestion that

---

[10]     With respect to certain non-ignition switch defects, New GM contends that the FACC fails to allege that it had knowledge of the defect prior to certain plaintiffs' purchasing their vehicles.  (*See* GM Mem. 50 n.26).  That argument does not apply to Glenn, the only remaining Alabama Plaintiff, and thus is not addressed here.

Glenn had an opportunity to ascertain them on her own. (*See id.* ¶¶ 736-47, 752-54, 785, 1131).

Most relevant, Glenn alleges that New GM made repeated statements concerning the safety of its vehicles and the company's focus on safety standards. (*See id.* ¶¶ 336-424 (providing several specific examples)). A defendant that has chosen speak voluntarily cannot "suppress or conceal any facts within his knowledge which will materially qualify those stated." *Freightliner*, 932 So. 2d at 895 (emphasis omitted).

In arguing otherwise, New GM points to *Mason v. Chrysler Corp.*, 653 So. 2d 951 (Ala. 1995), in which the Alabama Supreme Court held that plaintiffs who purchased cars advertised to be "smooth-riding," which actually vibrated when driving at high speeds, could not make out a claim for fraudulent suppression because their "contacts with Chrysler Corporation consisted primarily of their viewing national advertisements before they purchased the vehicle and their presenting the vehicle for repair." *Id.* at 955; *see also McGowan v. Chrysler Corp.*, 631 So. 2d 842, 847 (Ala. 1993) (finding the plaintiff "failed to present substantial evidence that [Chrysler] had a duty to disclose to him the problems with the Fifth Avenue line of cars" for similar reasons); *DaimlerChrysler Corp. v. Morrow*, 895 So. 2d 861, 866 (Ala. 2004) (affirming dismissal on summary judgment where the plaintiff had alleged merely that Chrysler had a duty to disclose "certain similar problems that had occurred in other Dodge Ram trucks like his," without more specific allegations). Notably, however, the cases upon which New GM relies were all decided at the summary judgment stage rather than motion to dismiss stage, and none involved specific evidence that the defendant "knowingly or actively concealed from [the plaintiff] its knowledge of the" defects. *McGowan*, 631 So. 2d at 848. Accordingly, the Court concludes that Glenn, like the plaintiffs in *In re Takata*, plausibly alleges that New GM had a duty to disclose under the particular circumstances of this case. *See In re Takata*, 193 F. Supp.

3d at 1338 ("At the motion to dismiss stage, because Plaintiffs have alleged that Mazda made these incomplete statements, the Court finds Plaintiffs have sufficiently alleged Mazda had a duty to disclose additional facts about the safety of its vehicles.").  As that was the only disputed element of her fraudulent concealment claim, New GM's motion to dismiss that claim is denied.

### c. Unjust Enrichment

Finally, Glenn brings an unjust enrichment claim.  (*See* FACC ¶¶ 1185-1195).  To prevail on a claim for unjust enrichment under Alabama law, "the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to the defendant because of mistake or fraud." *Scrushy v. Tucker*, 955 So.2d 988, 1011 (Ala. 2006) (internal quotation marks and emphases omitted).  "A defendant cannot be unjustly enriched if it does not have in its possession any money belonging to the plaintiff." *RREF RB-AL SLDL, LLC v. Saxon Land Dev.*, 968 F. Supp. 2d 1133, 1141 (M.D. Ala. 2013).  That requirement is fatal to Glenn's claim, as she purchased her vehicle used from Southtown Motors, a non-GM dealership.  (FACC ¶ 47).  Accordingly, the Court "cannot reasonably infer from the facts alleged that [New GM] ever held any money belonging to [Glenn]." *In re Takata*, 193 F. Supp. 3d at 1342.  In any event, "unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law." *Unilavor Trust, SA v. Columbia Petroleum, LLC*, 315 F.R.D. 374, 382 (S.D. Ala. 2016); *see also N. Assur. Co. of Am. v. Bayside Marine Const., Inc*., No. 08-CV-222 (KD), 2009 WL 151023, at *4 (S.D. Ala. 2009) ("Alabama law makes clear that unjust enrichment is an equitable remedy only to be invoked where there is no available remedy at law."); *Pearson's Pharm., Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1278 (M.D. Ala. 2007) (dismissing an unjust enrichment claim with prejudice because a party had an adequate remedy at law for damages under a theory of breach

of contract). Here, Glenn has adequate remedies at law insofar as she purchased her car under warranty (FACC ¶ 47), and brings claims for the same damages under the ADPTA and for common law fraudulent concealment. Accordingly, New GM's motion to dismiss Glenn's unjust enrichment claims must be granted.

## 2. Illinois

The remaining Illinois Plaintiffs for purposes of this motion are Susan Benner, Debra Cole, Charlene Kapraun, Patrick Painter, and Cliff Redmon. Benner owned a 2007 Pontiac G5 that she bought as a certified pre-owned vehicle on August 22, 2011, which was subject to the Delta Ignition Switch recall. (FACC ¶ 115). Cole owned a 2004 Chevrolet Impala, which she purchased used in August 2009, and which was subject to the Low Torque Ignition Switch recall. (*Id.* ¶ 117). Kapraun owns a 2008 Chevrolet Impala, which she bought used from a private seller on May 27, 2011, and which was also subject to the Low Torque Ignition Switch recall. (*Id.* ¶ 119). Painter owns a 2010 Chevrolet Cobalt SS that he purchased new in April 2010, which was subject to the Delta Ignition Switch and Power Steering recalls. (*Id.* ¶ 122). Finally, Redmon owned a 2010 Chevrolet Camaro that he purchased new in the spring of 2010, which was subject to the Knee-to-Key Ignition Switch recall. (*Id.* ¶ 123).

Benner's car's ignition switch was difficult to turn on and, since it was repaired as part of the Delta Ignition Switch recall on August 6, 2014, the steering wheel of her car now vibrates — an issue that has yet to be fixed by the dealership. (*Id.* ¶ 115). Cole's car would sometimes not start, despite turning the ignition key; she ultimately received a recall notice for the Low Torque Ignition Switch recall in 2014. (*Id.* ¶ 117). In April 2014, however, she sold the vehicle due to ignition switch and other issues. (*Id.*). Kapraun's vehicle never manifested any defect, although it was subject to the Low Torque Ignition Switch recall, for which she received a recall notice on

July 6, 2015.  (*Id.* ¶ 119).  Painter's power steering failed in April 2011, but he had his car repaired under warranty.  (*Id.*¶ 122).  In October 2011, the ignition switch cylinder had to be replaced because the car would not turn off and the key could not be removed from the ignition. He did not learn about the recalls until 2014, however.  (*Id.*).  Finally, twice while Redmon was backing out of his driveway, his car shut down.  (*Id.*¶ 123).  Although he never received a recall notice, the dealership told him it needed to repair the ignition switch when he went in for an oil change.  After the repair, the car's remote fob no longer worked properly.  (*Id.*).  In January 2015, Redmon traded in his car.  (*Id.*).  The Illinois Plaintiffs bring claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* & 720 ILCS 295/1A (FACC ¶¶ 2772-2796); for fraudulent concealment (*id.* ¶¶ 2797-2810); and for unjust enrichment (*id.* ¶¶ 2833-2843).  The Court will address each of these claims in turn.[11]

### a.  The ICFA

The ICFA "provides a remedy for 'unfair methods of competition and unfair or deceptive acts or practices' in specific commercial transactions."  *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (quoting 815 Ill. Comp. Stat 505/2).  Specifically, the statute prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of any material fact."  815 Ill. Comp. Stat. 505/2.  To state a claim under the ICFA, a plaintiff must show: "(1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that

---

[11]  As was the case for Alabama, the Court need not and does not decide whether the law in Illinois or Massachusetts (the next state) requires the manifestation of a defect for any of the claims at issue.  That is because New GM does not argue the issue with respect to those states.

the deception occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (1996); *see also Reid*, 964 F. Supp. 2d at 912. Where an ICFA claim is based on concealment, a plaintiff must also "establish that the fact concealed was known to the seller at the time of concealment." *Chevrolet/GEO, Inc.*, 762 N.E.2d at 14. By contrast, "even innocent misrepresentations can support liability." *Id.* Finally, claims sounding in fraud under the ICFA are subject to the heightened pleading standards of Rule 9(b). *See, e.g.*, *Greenberger*, 631 F.3d at 399.

With those standards in mind, the Court will address each of the remaining Illinois Plaintiffs' claims. First, Benner's claim — based on the Delta Ignition Switch recall (FACC ¶ 115) — requires little discussion. New GM does not contest that Plaintiffs bringing claims relating to the Delta Ignition Switch recall on a concealment theory satisfy Rule 9(b). And Plaintiffs plainly allege a "deceptive act" (or, rather, acts) on the part of New GM that occurred in the course of commerce and that led them (including Benner) to either purchase a vehicle that they otherwise would not have or pay more for the vehicle. (*See id. ¶¶ 2772-2796*). Thus, for the reasons discussed above with respect to Glenn's claim, Benner's ICFA claim survives, in both its concealment and misrepresentation forms. *See, e.g.*, *Connick*, 675 N.E.2d at 594-95 (upholding an ICFA claim where the plaintiffs alleged that Suzuki represented "that the Samurai had special safety features to protect passengers in a rollover accident" when "this information was false since the Samurai had improper side-door strength and roof-crush resistance" and "Suzuki undoubtedly knew that many prospective purchasers would read the review").

The next two Plaintiffs, Cole and Kapraun, purchased vehicles subject to Low Torque Ignition Switch recalls. (*See* Pls.' Opp'n 4; GM Mem., Ex. 2 ("Recall Chart"), at 2). Specifically, Cole's car was subject to the June 2014 recall for an Inadvertent Key Rotation

Defect (Recall Chart 2), and Kapraun's car was subject to the July 2014 recall for a Slotted Key

Defect. (*Id.*). In simple terms, these defects both involved low torque ignition switches that

could inadvertently move out of the run position (due to road conditions or weighted key chains),

leading to a loss of power and loss of critical safety systems, including the airbags. (*See* FACC

¶¶ 562-655; GM Mem. 3-4, 5-6). As with the Delta Ignition Switch recall, New GM does not

contest that Plaintiffs bringing claims relating to the Low Torque Ignition Switch recalls on a

concealment theory generally satisfy Rule 9(b). Instead, New GM takes aim at Plaintiffs' claims

to the extent that they rest on the concealment of a "defective process" through which New GM

built vehicles. (GM Mem. 39; *see* FACC ¶ 2777 (alleging the unlawful concealment of defects

as well as a "defective process" that included "cost-cutting, minimizing the importance of safety

issues, siloing, the depletion of resources devoted to recognizing and studying safety issues,

etc.")). New GM claims that the FACC contains "no facts regarding a defective manufacturing

'process' aside from allegations relating to the Delta Ignition Switch vehicles." (GM Mem. 39

(citation omitted)). Relatedly, it contends that the "allegation — that Delta Ignition Switch

defects harmed owners of all recalled vehicles — attempts to resurrect the 'brand devaluation'

theory." (*Id.* (citation omitted)).

If Plaintiffs were bringing free-floating "defective process" claims — that is, untethered

to actual defects in particular vehicles — the Court would be inclined to agree with New GM

that the claims would amount to little more than rebranded brand devaluation claims. But the

Court does not understand that to be what Plaintiffs allege. Instead, the "defective process"

allegations are more accurately viewed as an extension of, or gloss on, Plaintiffs' concealment

claims as to particular defects. (*See* Pls.' Opp'n 39-40). And contrary to New GM's

contentions, the "defective process" allegations are not limited to Delta Ignition Switch vehicles.

Indeed, the FACC includes extensive allegations regarding New GM's prioritization of cost-cutting over safety, contributing to a culture that allowed for all of the alleged defects to occur and remain concealed.  (*See* FACC ¶¶ 772-821).  These allegations include references to company-wide practices that were applied to both the Delta Ignition Switch and non-Delta Ignition Switch defects.  For example, when evaluating whether to re-mail special bulletins regarding several known defects (including but not limited to the Delta Ignition Switch defect), a New GM director expressed concern that doing so would "drive a lot of cost and [would] create part issues."  (*Id.* ¶ 784).  Additionally, New GM instructed employees company-wide to refrain from using words such as "dangerous," "defect," and "safety-related" — instructions that plausibly (perhaps, likely) led to the concealment of defects beyond the Delta Ignition Switch. (*See, e.g.*, *id.* ¶¶ 803-810).  Finally, the FACC alleges that New GM was aware of the particular defects affecting Cole's and Kapraun's cars from its inception (*see id.* ¶¶ 522-597), but — as with the Delta Ignition Switch defect — failed to promptly address or recall those vehicles. Taken together, then, the Court concludes that Cole and Kapraun (and the other non-Delta Ignition Switch plaintiffs, including Redmon and Painter) sufficiently allege a "defective process" at New GM that would have been material to a reasonable consumer and could have contributed to concealment of all of the alleged defects, not just the Delta Ignition Switch.

Next, New GM argues that Redmon's ICFA claim must be dismissed in its entirety because he cannot show that New GM was aware of the Knee-to-Key Bump defect (also referred to as the "Camaro Ignition Key Bump" defect) prior to his purchase of a Chevrolet Camaro.  (*See* GM Mem. 41; FACC ¶ 123).  The Court agrees.  Plaintiffs allege that NHTSA received "numerous complaints of power failures in 2010-2014 Camaros," starting "as early as January 2010, months after New GM's formation."  (FACC ¶ 665; *id.* ¶¶ 669-783 (listing examples)).

The only specific examples Plaintiffs allege, however, are (1) an undated complaint involving a model year 2010 car (*see id.* ¶ 666); (2) two complaints in May 2010 (*see id.* ¶¶ 667, 669); and (3) complaints between October 2012 and May 2014. (*See id.* ¶ 670). The problem for Redmon is that the FACC is conspicuously vague about the specific date on which he purchased his car, describing it only as "in spring 2010" (*id.* ¶ 123) — a date that could be before or after the complaints in May 2010 and is obviously before the complaints in October 2010 and later. Thus, it is unclear whether *any* of the NHTSA complaints had been filed before Redmon's car purchase. As the NHTSA complaints are the sole basis upon which Plaintiffs allege New GM's knowledge of the Camaro Ignition Key Bump defect, it follows that Plaintiffs do not allege facts giving rise to a "strong inference" of New GM's "actual knowledge." *Lerner*, 459 F.3d at 290-93. Thus, Redmon's ICFA claim is dismissed, albeit with leave to amend in the event that he can cure the Rule 9(b) problem. *See Official Publ'ns, Inc. v. Kable News Co.*, 884 F.2d 664, 669 (2d Cir. 1989) ("[W]here [a] complaint is deficient under Rule 9(b), leave to amend is usually afforded.").

Finally, New GM challenges Painter's ICFA claim relating to the Power Steering defect on a similar ground — namely, that New GM did not know about the defect when Painter purchased his new 2010 Chevrolet Cobalt SS in April 2010. (GM Mem. 43-44; FACC ¶ 122). With respect to that defect, Plaintiffs allege that New GM knew "[f]rom the date of its inception" that "Old GM began receiving customer complaints regarding loss of power steering" in several car models as early as 2003. (*Id.* ¶ 753). Moreover, in 2010, "New GM first recalled MY 2005-2010 Chevy Cobalts" for these power steering issues. (*Id.* ¶ 755). Significantly, however,

Plaintiffs do not allege *when* in 2010 this recall occurred.[12]  If the recall occurred *before* Painter

purchased his car in April 2010, then his ICFA claim would necessarily fail because — at the

time of his alleged injury — he could not show that New GM was deceptively concealing the

defect or that his damages were "proximately caused" by any deception.  *Dubey v. Pub. Storage,*

*Inc.*, 918 N.E.2d 265, 277 (Ill. App. Ct. 2009).  By contrast, if the recall occurred relatively soon

*after* Painter's purchase, it would be reasonable to infer — on the basis of the complaints that

Old GM had received and the fact that there is inevitably a delay between discovery of a defect

and announcement of a recall relating to that defect, taken together — that New GM knew of the

alleged defect at the time of the purchase.

Accordingly, New GM's motion to dismiss Painter's ICFA claim is granted to the extent

that it pertains to the Power Steering defect.  Notably, though, Painter's car was also subject to

the Delta Ignition Switch recall (FACC ¶ 122) — as to which his claim survives for the reasons

stated above.  In any event, assuming the 2010 power steering recall of 2010 Chevy Cobalts was

initiated after Painter purchased his car in April 2010, he is granted leave to amend his ICFA

claim with respect to the Power Steering defect.  Additionally, for the reasons stated above, New

GM's motion is also granted with leave to amend as to Redmon.  With respect to the other

Illinois Plaintiffs' ICFA claims, New GM's motion is denied.

### b.  Fraudulent Concealment

The Illinois Plaintiffs also bring claims for common law fraudulent concealment.  (*See*

FACC ¶¶ 2797-2810).  To state a claim for fraudulent inducement under Illinois law, a plaintiff

---

[12]     Even more inexplicably, New GM does not indicate when the recall occurred in its
briefing, even though the Valukas Report (general familiarity with which is assumed) indicates
that it took place in March 2010, and it is plausible that the Court could have taken judicial
notice based on public documents or the like.

must "allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). In *Connick*, the Illinois Supreme Court held that "[a] duty to disclose a material fact may arise out of several situations." *Id.* The Court then described two:

> First, if plaintiff and defendant are in a fiduciary or confidential relationship, then defendant is under a duty to disclose all material facts. Second, a duty to disclose material facts may arise out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff. This position of superiority may arise by reason of friendship, agency, or experience.

Applying that standard, the *Connick* Court affirmed dismissal of claims much like those here — namely, claims for economic losses resulting from an alleged vehicle defect that had been concealed by the manufacturer. *See id.* As the Court explained, because "the complaint merely alleged that plaintiffs had purchased [their cars] from an authorized Suzuki dealer, and that Suzuki manufactured and distributed [those cars]," the plaintiffs had not "sufficiently allege[d] that they were in a confidential or fiduciary relationship with Suzuki, or that Suzuki was in a position of superiority over them." *Id*. at 593. "Without such allegations," the Court concluded, "plaintiffs' complaint did not allege a duty to disclose material facts which could give rise to a claim for common law fraudulent concealment." *Id.*; *see also Chevrolet/GEO, Inc.*, 762 N.E.2d at 13-14 (affirming dismissal of a fraudulent concealment claim brought by a consumer against a car dealer on the ground that, "[b]arring additional facts, the arms-length transaction that occurred between [the consumer] and [car dealer] did not give rise to a confidential relationship sufficient to impose a general duty of disclosure under the fairly rigorous principles of common law").

New GM argues that the Illinois Plaintiffs cannot meet the standard set forth in *Connick*. (GM Mem. 52-53). That may well be true, but other courts have held that, under Illinois law, there are "means of establishing a duty to speak" separate and apart from proving a "special or fiduciary relationship" of the sort discussed in *Connick*. *Allstate Ins. Co. v. Regions Bank*, No. 14-CV-067 (WS), 2015 WL 4073184, at *12 (S.D. Ala. July 2, 2015). Specifically, even without evidence of "direct contact," a plaintiff may *also* "establish a duty to speak for fraudulent concealment purposes in situations where (i) a defendant's acts contribute to plaintiff's misapprehension of a material fact and defendant fails to correct it or (ii) the defendant's silence is accompanied by deceptive conduct." *Id.*; *accord Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1375-77 (N.D. Ill. 2016); *PXRE Reins Co. v. Lumbermens Mut. Cas. Co.*, 342 F. Supp. 2d 752, 757 (N.D. Ill. 2004); *see also, e.g.*, *Miner v. Fashion Enters.*, 794 N.E.2d 902, 917 (Ill. App. Ct. 2003) ("Mere silence does not amount to fraud. However, silence accompanied by deceptive conduct or suppression of a material fact can give rise to concealment and the party which has concealed information is then under a duty to speak.").

Additionally, although not cited by Plaintiffs, at least two courts have held in circumstances similar to those presented here that a manufacturer of cars (or car parts) owed a duty to consumers under Illinois law to disclose "safety defects." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-CV-2765 (JLL), 2017 WL 1902160, at *20 (D.N.J. May 8, 2017) ("Plaintiffs here have specifically pled that the defect in the Timing Chain System created safety concerns, and, despite [d]efendant's knowledge of the defect and the safety concerns associated with the same, [d]efendant chose not to disclose the defect to [p]laintiffs. Hence, [d]efendant had a duty to disclose the defect under . . . Illinois . . . law . . . ." (citation omitted)); *see also In re Takata Airbag Prod. Liab. Litig.*, No. 14-CV-24009, 2017 WL 2406711, at *5

(S.D. Fla. June 1, 2017) ("In many states, a fraudulent concealment claim requires that the defendant have a duty to disclose facts. . . . [A] direct relationship is not required to create a duty to disclose — other special circumstances can suffice. . . . [B]ecause [the p]laintiffs allege that Takata made incomplete representations, the Court finds that [p]laintiffs sufficiently allege that Takata had a duty to disclose additional facts about the safety of its airbags.").  Here, Plaintiffs allege that New GM had a duty to disclose the defects "because it made many affirmative representations about the safety, quality, and lack of defects in New GM vehicles . . . , which were misleading, deceptive, and incomplete" absent disclosure of the whole truth.  (FACC ¶ 2804).  These allegations — along with the specific facts alleged in support of the claim throughout the FACC — are sufficient at this stage to sustain the Illinois Plaintiffs' claims for fraudulent concealment.  New GM's motion with respect to these claims is thus denied.

### c. Unjust Enrichment

Finally, the Illinois Plaintiffs bring claims for unjust enrichment against New GM. (FACC ¶¶ 2833-2843).  To prevail on a claim for unjust enrichment under Illinois law, a plaintiff must "allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 983, 922 (N.D. Ill. 2013) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E. 2d 672, 679 (Ill. 1989)).  "Because unjust enrichment is based on an implied contract, where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application."  *People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E. 2d 165, 177 (Ill. 1992) (internal quotation marks omitted); *see also Reid*, 964 F. Supp. 2d at 922 ("In general, the remedy of unjust enrichment is not available when a specific contract governs the parties'

relationship."); *Shaw v. Hyatt Intern. Corp.*, 461 F.3d 899, 902 (7th Cir. 2006) ("[The plaintiff]

fails to present a claim for unjust enrichment, because that is unavailable where the claim rests

on the breach of an express contract.").  Here, all but one of the Illinois Plaintiffs (namely,

Kapraun) purchased their New GM vehicles under warranty — that is, with a specific contract

governing the relationship of the parties.  But that does not end the Court's inquiry.

Under Illinois law, "a party may plead claims in the alternative, *i.e.*, she may plead a

claim for breach of contract as well as unjust enrichment," *Guinn v. Hoskins Chevrolet*, 836

N.E.2d 681, 704 (Ill. App. 2005), as long as the plaintiff does "not include allegations of an

express contract which governs the relationship of the parties[] in the counts for unjust

enrichment," *The Sharrow Group v. Zausa Dev. Corp.*, No. 04-CV-6379 (JBM), 2004 WL

2806193, *3 (N.D. Ill. 2004) (collecting cases).  The crucial question, then, is whether a

plaintiff's unjust enrichment claim actually rests on a breach of an underlying contract.  *See, e.g.*,

*id.* (dismissing the plaintiff's unjust enrichment claim because throughout the complaint it was

alleged that "valid and enforceable agreements" governed the parties' relationship and the

plaintiff had incorporated those allegations into its count for unjust enrichment); *see also, e.g.*,

*Cooper v. Durham School Services*, No. 03-CV2431 (JBM), 2003 WL 22232833, at *7 (N.D.Ill.

Sept. 22, 2003) (similar); *Team Impressions, Inc. v. Chromas Technologies Canada, Inc.*, No.

02-CV-5325 (AJS), 2003 WL 355647, at *4 (N.D. Ill. February 18, 2003) (similar).[13]

---

[13]        Significantly, the dispositive question is a substantive one — namely, what it takes, as a
matter of state law, to allege a plausible claim of unjust enrichment (or to negate an otherwise
valid claim thereof).  That is, if allegations in the FACC (or the lack of allegations in the FACC)
render a particular claim implausible, the claim is subject to dismissal, even though a plaintiff is
entitled under Rule 8(d)(3) of the Federal Rules of Civil Procedure to "state as many separate
claims . . . as it has, regardless of consistency."  It is for that reason that Plaintiffs' unjust
enrichment claims must be considered on a state-by-state basis — and that the Court's
conclusions as to those claims varies somewhat by state.  *See, e.g.*, *Schechner v. Whirlpool*

In this case, the Illinois Plaintiffs do not base their unjust enrichment claims on the breach of an existing contract. Nor do they incorporate any reference to a contract into that count — indeed, none of the remaining Illinois Plaintiffs is even seeking to recover under a theory of express or implied warranty. (*See, e.g.*, FACC ¶ 2835 ("This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.")). Thus, the case is easily distinguished from other Illinois precedents in which the viability of the unjust enrichment claim turned on an alleged contractual breach. *See, e.g.*, *Guinn*, 836 N.E.2d at 705 ("Although the contract is not specifically referenced in [plaintiff's] unjust enrichment count, she incorporates the allegations of each other count into the unjust enrichment count. Moreover, [the plaintiff] attached to her complaint the retail installment contract."); *Thorogood v. Sears, Roebuck & Co.*, No. 06-CV-1999, 2006 WL 3302640, at *5 (N.D. Ill. Nov 9, 2006) (dismissing an unjust enrichment claim where the plaintiff had "incorporated by reference the allegations of a contractual express warranty" and attached a report that "specifically mention[ed] that the dryer was subject to a one-year contractual warranty"); *Shaw v. Hyatt Int'l Corp.*, No. 05-CV-5022, 2005 WL 3088438, *3 (N.D. Ill. Nov. 15, 2005) (dismissing an unjust enrichment claim after reaching "the inescapable conclusion that the present dispute [arose] out of an express contract"). Accordingly, the Illinois Plaintiffs can proceed with their unjust enrichment claims, express warranties notwithstanding. *See Reid*, 964 F. Supp. 2d at 924; *Sirazi v. Gen. Mediterranean Holding, SA*, No. 12-CV-0653, 2013 WL 812271, at *9 (N.D. Ill. Mar. 5, 2013).

---

*Corp.*, — F. Supp. 3d —, 2017 WL 588460, at *11 (E.D. Mich. Feb. 14, 2017) ("Here, state law regarding the availability of an unjust enrichment claim is so intertwined with a substantive right under state law that Rule 8's alternative pleading provision may not be enforced. Therefore, the Court may not allow Plaintiffs to plead unjust enrichment if the state court would prohibit the same, despite the permissive nature of Rule 8.").

New GM alternatively contends that Illinois law precludes unjust enrichment where a plaintiff has an adequate remedy at law. (*See* GM Mem. 28). Although it is "well settled that a party cannot seek equitable relief when he has an adequate legal remedy," the precise nature of unjust enrichment under Illinois law has "led to numerous confusing statements in case law [implying] that it is equitable in nature," though "it is essentially an action at law." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05-CV-2623, 2007 WL 3754823, at *3 (N.D. Ill. Dec. 18, 2006); *see also In re Aqua Dots Prod. Liab. Litig.*, 270 F.R.D. 377, 386 (N.D. Ill. 2010) ("[T]here is considerable confusion about the law of unjust enrichment, including the no-adequate-remedy-at-law requirement in Illinois. While many intermediate courts in Illinois routinely say that, because it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law, the Illinois Supreme Court has said that restitution, *i.e.*, money damages under an unjust enrichment theory, *is* a legal remedy." (internal quotation marks and citation omitted)). "The correct Illinois rule appears to be a narrower one: unjust enrichment is unavailable where a specific contract governs the relationship of the parties." *In re Aqua Dots*, 270 F.R.D. at 386. Indeed, all of the cases New GM cites preclude unjust enrichment claims due to the existence of an express contract. *See Guinn*, 836 N.E.2d at 704 ("[W]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." (internal quotation marks alteration omitted); *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004) (same). For the reasons discussed above, the existence of an express contract does not pose an obstacle to the Illinois Plaintiffs' pursuing their unjust enrichment claims. *See, e.g.*, *Triumph Packaging Grp. v. Ward*, No. 11-CV-7927, 2012 WL 5342316, at *7 (N.D. Ill. Oct. 29, 2012) (allowing the plaintiffs' claims to proceed because no specific contract existed); *Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*, No. 05-CV-

3004, 2006 WL 952032, at *4 (N.D. Ill. Apr. 12, 2006) ("GSK is incorrect in stating that this unjust enrichment claim seeks equitable relief."). Accordingly, New GM's motion to dismiss the Illinois Plaintiffs' unjust enrichment claims is denied.

### 3. Massachusetts

The two remaining Massachusetts Plaintiffs for purposes of this motion are Debra Companion and Richard Leger. Companion owns a 2010 Chevrolet Cobalt that she purchased under warranty as a certified pre-owned vehicle from a Chevrolet dealer on December 31, 2011. (FACC ¶ 154). Her car was subject to the Delta Ignition Switch and Power Steering recalls. (*Id.*). Leger owned a 2007 Pontiac G5 that he purchased used under a ninety-day warranty from a Hyundai dealership in 2013. (*Id.* ¶ 156). His car was subject to the Delta Ignition Switch recall. (*Id.*). Companion's car experienced one shutdown event while she was driving on the highway, forcing her to pull over to restart the car. (*Id.* ¶ 154). She received an ignition switch recall notice but not a power steering recall notice, and her car was repaired in the summer of 2014 pursuant to the recall. (*Id.*). Leger's car began experiencing ignition switch issues in November 2013, including several instances when it shut down while he was driving. (*Id.* ¶ 156). He also experienced loss of power to the power steering and locking of the steering wheel. (*Id.*). After Leger learned about the recall in April 2014, he told the dealership that he would not pay for the car until the issues were fixed; his car was ultimately repossessed. (*Id.*).

Companion and Leger bring claims against New GM under the Massachusetts Consumer Protection Act ("Massachusetts CPA"), Mass. Gen. Laws ch. 93A, § 1 *et seq.* (FACC ¶¶ 3769-3793); for common law fraud by concealment (*id.* ¶¶ 3794-3807); for breach of the implied warranty of merchantability, ALM GL. CH. 106, § 2-314 (*id.* ¶¶ 3808-3817); and for unjust enrichment (*id.* ¶¶ 3840-3850). New GM moves to dismiss only two of these claims: the claim

under the Massachusetts CPA and the unjust enrichment claim. The Court will address each of these claims in turn.

### a. The Massachusetts CPA

The Massachusetts Plaintiffs' claims under the Massachusetts CPA (otherwise known as Chapter 93A) can be addressed briefly. The Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A § 2(a). To prevail on such a claim, the plaintiff "must show that the defendant engaged in trade or business and committed an unfair or deceptive act, causing economic injury to the plaintiff." *Brown v. Bank of Am., Nat. Ass'n*, 67 F. Supp. 3d 508, 514 (D. Mass. 2014); *see also Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009). "[I]t is neither necessary nor sufficient that a particular act or practice violate common or statutory law" to make out a claim under the statute. *Id.* Instead, conduct is "deceptive" when "it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 488 (2004). Massachusetts courts have not set out a precise test for determining when conduct becomes "unfair or deceptive," *see Kattar v. Demoulas*, 739 N.E.2d 246, 257 (2000) (explaining that such definition would be "impossible" because "there is no limit to human inventiveness in this field"), but rather look to the following factors: "(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Hanrahran v. Specialized Loan Serv., LLC*, 54 F. Supp. 3d 149, 154 (D. Mass. 2014). Finally, to the extent a Chapter 93A claim is premised on fraudulent conduct, it must satisfy the heightened pleading requirements of Rule 9(b). *See Ouch v. Fed. Nat. Mortg. Ass'n*, No. 11-CV-12090

(RWZ), 2013 WL 139765, at *2 (D. Mass. Jan. 10, 2013); *cf. Crisp Human Capital Ltd. v. Authoria Inc.*, 613 F. Supp. 2d 136, 139 (D. Mass. 2009) ("[T]o the extent it does not involve fraud, a Chapter 93A claim is not subject to a heightened pleading requirement.").

      Applying those standards here, the Massachusetts Plaintiffs' Chapter 93A claims survive for the reasons stated above in the discussion of the Alabama and Illinois Plaintiffs' consumer fraud claims. That is, both Companion and Leger purchased vehicles that suffered from the Delta Ignition Switch defect, and — as discussed above — Plaintiffs' allegations, both as to concealment and as to misrepresentation, satisfy Rule 9(b). (*See* FACC ¶¶ 154, 156). Additionally, New GM does not dispute (and nor could it) that the Massachusetts Plaintiffs sufficiently allege "deceptive" conduct to trigger Chapter 93A's protections. Finally, Companion and Leger also allege sufficient injury, as neither would have paid as much for, or potentially purchased, their vehicles had they known of the defects. *See, e.g.*, *Brown*, 67 F. Supp. 3d at 514 (noting that a "Chapter 93A claimant must also sufficiently plead economic injury," *i.e.*, "some kind of separate, identifiable harm arising from the violation itself"). Accordingly, Companion's and Leger's claims survive.[14]

---

[14]     Companion's 2010 Chevy Cobalt also suffered from the Power Steering defect. (*See* FACC ¶ 154). For reasons discussed above in connection with Painter's consumer fraud claim, there is a strong argument that Companion's claim on that score fails as a matter of law. That is because she did not purchase her car until December 2011 (*id.*), which is *after* New GM recalled certain car models (including hers) pursuant to a 2010 electric power steering defect recall, thus revealing the allegedly concealed facts. Strangely, though, New GM does not make the argument with respect to Companion's claim. Given the lack of a challenge from New GM, and the possibility that subtle (but material) differences may exist among the different recalls, the Court declines to dismiss Companion's claim on this ground.

### b. Unjust Enrichment

As noted, New GM also moves to dismiss the Massachusetts Plaintiffs' unjust

enrichment claims. To prevail on this claim under Massachusetts law, a plaintiff must show:

"(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by

the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under

the circumstances would be inequitable without payment of its value." *Blake v. Professional*

*Coin Grading Serv.*, 898 F. Supp. 2d 365, 390 (D. Mass. 2012); *see also Salamon v. Terra*, 477

N.E.2d 1029, 1031 (Mass. 1985). Significantly, however, unjust enrichment "can only be used if

the court does not find that a valid contract was formed." *Wong v. Nieboer*, No. 0233-CV-0207,

2006 WL 1172191, at *4 (Mass. App. Ct. Apr. 15, 2006) (per curiam); *see also Platten v. HG*

*Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006) ("Massachusetts law does not allow

litigants to override an express contract by arguing unjust enrichment."); *Boswell v. Zephyr*

*Lines, Inc.*, 606 N.E. 2d 1336 (Mass. 1993) (holding that a claim for unjust enrichment

"presupposes that no valid contract covers the subject matter of a dispute"); *Zarum v. Brass Mill*

*Mat. Corp.*, 134 N.E.2d 141, 143 (Mass. 1956) ("The law will not imply a contract where there is

an existing express contract covering the same subject matter."). Thus, where a plaintiff

"concedes the existence of a valid express contract between the parties," state substantive law

bars any claim of unjust enrichment. *See, e.g.*, *Okmyansky v. Herbalife Int'l of Am.*, *Inc.*, 415

F.3d 154, 162 (1st Cir. 2005).[15]

---

[15]     Plaintiffs point to one Massachusetts case allowing the pleading of alternative theories, *see Juergens v. Microgroup, Inc.*, No. 10-CV-237 (DJC), 2011 WL 1020856, at *2 (Mass. Super. Ct. Jan. 28, 2011) ("The plaintiff is permitted to proceed under alternative theories of contract and quasi-contract."), but the weight of Massachusetts authority is to the contrary, *see, e.g.*, *Rottner v. AVG Techs. USA, Inc.*, 943 F. Supp. 2d 222, 231 n.13 (D. Mass. 2013) ("In light of the viable contract claims at law, it is unnecessary for the court to consider his alternative equitable

Here, both Massachusetts Plaintiffs purchased their vehicles while under warranty (*see* FACC ¶¶ 154, 156), which forecloses their unjust enrichment claims.  Moreover, even if the express warranties were no bar, a plaintiff is prohibited under Massachusetts law from bringing a claim for unjust enrichment where an adequate remedy at law exists — regardless of the viability of that theory or whether it sounds in contract, fraud, or tort.  *See, e.g.*, *Scarpaci v. Lowe's Home Ctr., LLC*, 212 F. Supp. 3d 246, 253 n.7 (D. Mass. 2016) ("The term 'adequate remedy at law' refers to the existence of a legal (as opposed to equitable) theory by which the plaintiff make seek recovery; it does not, however, require the existence of a legal theory under which the plaintiff is ultimately successful on obtaining recovery."); *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) ("A claim of unjust enrichment, however, is not available to a party with an adequate remedy at law.  [The p]laintiff's negligence and chapter 93A claims thus preclude a claim for unjust enrichment.  The disposition of those claims is irrelevant.  Their mere availability is a bar to a claim of unjust enrichment." (internal quotation marks and citations omitted)); *Adrion v. Knight*, No. 07-CV-11277 (RGS), 2009 WL 3152885, at *1 n.1 (D. Mass. Sept. 28, 2009) ("[T]he availability of an adequate remedy at law (whether successful or not) precludes an equitable claim of unjust enrichment."); *Santagate v. Tower*, 833 N.E.2d 171, 176 (Mass. 2005) ("An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law.").  On that basis too, the Massachusetts Plaintiffs' unjust enrichment claims fail.  Accordingly, New GM's motion to dismiss those claims is granted.

---

claim for unjust enrichment."); *Santos v. SANYO Mfg. Corp.*, No. 12-CV-11452 (RGS), 2013 WL 1868268, at *7 (D. Mass. May 3, 2013) ("Because Santos had a valid contract with SANYO, he cannot maintain an equitable action for unjust enrichment.").

#### 4. Michigan

The remaining Michigan Plaintiffs for purposes of this motion are Sheree Anderson, Carter Bishop, Marquetta Chestnut, Rafael Lanis, Sophia Marks, Brian Semrau, and Franklin Wloch. Anderson owned a used 2008 Chevrolet HHR that she purchased under warranty from a dealership on November 15, 2011, which was subject to the Delta Ignition Switch defect. (FACC ¶ 158). Bishop owns a 2008 Chevrolet Impala that he purchased used and unwarranted from a dealership on August 7, 2012, which was subject to the Low Torque Ignition Switch recall. (*Id.* ¶ 159). Chestnut owns a 2005 Chevrolet Malibu that she purchased used and unwarranted from a dealership on February 17, 2011, which was subject to the Low Torque Ignition Switch and Power Steering recalls. (*Id.* ¶ 160). Lanis owns a 2006 Chevrolet Cobalt that he purchased used and unwarranted at auction in July 2011, which was subject to the Delta Ignition Switch recall. (*Id.* ¶ 162). Marks owns a 2009 Chevrolet Impala that she purchased used from a dealership along with an extended warranty on July 28, 2009, and which was subject to Low Torque Ignition Switch recall. (*Id.* ¶ 163). Semrau leased a new 2013 Cadillac CTS from a Cadillac dealership on August 19, 2013, while the vehicle was under the manufacturer's warranty, and it was later subject to the Low Torque Ignition Switch recall. (*Id.* ¶ 165). Finally, Wloch owns a 2011 Cadillac CTS that he purchased as a certified pre-owned vehicle from a Cadillac dealership along with an extended warranty on April 22, 2014, and which was subject to the Low Torque Ignition Switch recall. (*Id.* ¶ 169).

Anderson's car experienced issues with the ignition switch, including locking up such that she was unable to turn the key on several occasions. (FACC ¶ 158). Her car was repaired pursuant to the recall on June 10, 2014, after a several month delay waiting for the parts. (*Id.*). She finally sold the car for scrap on August 25, 2016, after additional mechanical issues rendered

it unusable. (*See id.*). Bishop's vehicle never manifested any defect, although it was repaired in June 2016 pursuant to the Low Torque Ignition Switch recall. (*Id.* ¶ 159). The power steering in Chestnut's car twice went out, once causing her to spin out on ice and almost collide with an oncoming ambulance, and once forcing her to coast across a highway to an exit in order to restart her car. (*Id.* ¶ 160). Lanis experienced his ignition switch shutting down approximately ten times after he started his car and removed his hand from the key, as well as one time while he was sitting idle at a traffic light. (*Id.* ¶ 162). On almost a daily basis, his key would stick in the ignition switch. (*Id.*). Lanis's car was repaired in April 2014 pursuant to the ignition switch recall; afterwards, he twice tried to sell the vehicle but was unsuccessful. (*See id.*). Mark's car shut off once while she was driving after hitting a bump in the road, requiring her to pull over and restart the car. (*Id.* ¶ 163). Her car was repaired in 2015 pursuant to the Low Torque Ignition Switch recall. (*Id.*). Like Bishop's car, Semrau's leased car never manifested any defect, although New GM sent him the parts to repair his ignition switch himself pursuant to the Low Torque Ignition Switch recall. (*Id.* ¶ 165). Semrau returned the vehicle on August 16, 2016, at the end of his lease. (*Id.*).

Together, the Michigan Plaintiffs bring claims against New GM under the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.903, *et seq.* (FACC ¶¶ 3896-3920); for common law fraud by concealment (*id.* ¶¶ 3921-3934); for breach of implied warranty of merchantability, *see* Mich. Comp. Laws § 440.2314 (*id.* ¶¶ 3935-3944); and for unjust enrichment (*id.* ¶¶ 3967-3977). The Court will address each of these claims in turn.

### a. The MCPA

The MCPA "prohibits the use of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 392

(Mich. App. Ct. 1999); *see also* Mich. Comp. Laws § 445.903(1). To the extent relevant here, the MCPA prohibits, *inter alia*, (1) representing that goods or services have characteristics that they do not have; (2) representing that goods or services are of a particular standard if they are of another; (3) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; (4) failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; (5) making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and (6) failing to reveal facts that are material in light representations of fact made in a positive manner. *See* Mich. Comp. Laws § 445.903(1). Michigan courts construe the provisions of the MPCA "with reference to the common-law tort of fraud." *Mayhall v. A.H. Pond Co., Inc.*, 341 N.W. 2d 268, 270 (Mich. 1983). For a misrepresented fact to be "material," therefore, it "need not relate to the sole or major reason for the transaction," but it must be "important to the transaction or affect[] the consumer's decision to enter into the transaction." *Zine*, 600 N.W.2d at 398 (internal quotation marks omitted). With respect to omissions, however, the inquiry "is not whether the omission is misleading to a reasonable consumer but whether the consumer could reasonably be expected to discover the omission at issue." *Id.* Moreover, for those subsections of the MCPA, plaintiffs "must establish reliance" to make out a viable claim. *In re OnStar Contract Litig.*, 278 F.R.D. 352, 378 (E.D. Mich. 2011). Finally, to the extent a plaintiff's MCPA claim is premised on fraud (as opposed to breach of an express or implied warranty), it must meet the heightened pleading standards of Rule 9(b). *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011).

Applying those standards here, the Michigan Plaintiffs' MCPA claims are sufficient to survive New GM's motion to dismiss. First, Plaintiffs allege "how [New GM] violated the MCPA," including "identify[ing] which MCPA sections" New GM purportedly violated. *Muneio v. Fed. Nat. Mortg. Assoc.*, 09-CV-12973 (AC), 2010 WL 5146328, at *4 (E.D. Mich. Dec. 13, 2010). (*See* FACC ¶¶ 3921-3934). Second, the purported misrepresentations were "material," as Plaintiffs allege that their decisions to purchase GM cars were impacted by the perception of safety. (*See, e.g.*, *id.* ¶ 159 (considering "advertisements touting high safety ratings from crash tests" when purchasing); *id.* ¶ 3907 ("New GM's [deceptive acts] were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.")). And with respect to New GM's alleged omissions, Plaintiffs sufficiently allege that the defects were not the sort that "consumer[s] could reasonably be expected to discover." *Zine*, 600 N.W.2d at 398. (*See* FACC ¶ 3911).

Finally, the Michigan Plaintiffs' MCPA claims satisfy the requirements of Rule 9(b). To the extent the Michigan Plaintiffs' claims relate to the Delta Ignition Switch recall (Anderson and Lanis) and the Low Torque Ignition Switch recalls (everyone *other than* Anderson and Lanis), that is true for the reasons discussed above in connection with Alabama and Illinois. That leaves only Chestnut's claim concerning the Power Steering recall. (FACC ¶ 160).[16] With respect to that claim, Plaintiffs allege, among other things, that New GM knew "[f]rom the date

---

[16] As discussed above in connection with Illinois Plaintiff Painter, New GM recalled some vehicles for electric power steering defects in 2010 — namely, model year 2005-2010 Chevrolet Cobalts and model year 2007-2010 Pontiac G5s. (FACC ¶ 755). Complicating matters, New GM issued another round of recalls for the Power Steering defect in 2014, including some of the models that had been recalled in 2010 (namely, the model year 2010 Chevrolet Cobalt) and additional models as well. (*Id.* ¶ 749). Unlike Painter, and potentially Companion, Chestnut's vehicle was not subject to the 2010 recall.

of its inception" that "Old GM began receiving customer complaints regarding loss of power steering" as early as 2003. (*Id.* ¶ 753). In particular, with respect to 2005 Chevy Malibus (Chestnut's car), "New GM knew that, in response to a NHTSA Preliminary Investigation into potential Power Steering Defect . . . [,] Old GM [had] extended warranty coverage . . . to replace the steering column assembly" even though "[n]o recall was done." (*Id.* ¶ 754). In June 2010, moreover, New GM initiated a special coverage program for that model. (*Id.* ¶ 756). Taken together, these allegations are sufficient to demonstrate that New GM knew about the Power Steering defect at the time of Chestnut's purchase in 2011.

That leaves one final issue to address: whether Bishop, Semrau, and Wloch can maintain their MPCA claims given that their vehicles never manifested the defects at issue here. (FACC ¶¶ 159, 165, 169).[17] Both parties agree that Michigan courts have not yet resolved whether a plaintiff can bring economic loss claims in the absence of a manifest defect. (*See* GM Mem. 18; Pls.' Opp'n 20). The Court is thus tasked with determining how "it believe[s] the [Michigan Supreme Court] would rule if the issue were before it." *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 47 (2d Cir. 1993). As far as this Court (and the parties) can tell, only one other federal court has confronted this same task. *See In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 155 F. Supp. 2d 1069, 1096-1099 (S.D. Ind. 2001), *overruled on other grounds by In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002). There, the Court concluded that

---

[17] New GM also contends that Anderson's car never manifested a defect. (GM Mem. 20 n.11). But Anderson is a Delta Ignition Switch Plaintiff (*see* FACC ¶ 158), and she alleges that, at least several times, the ignition switch on her vehicle "lock[ed] up on her and she [was] unable to turn the key." (*Id.*). New GM argues that this is not a "manifestation of the defect for which [she] is suing" (GM Reply 11 n.8), because she does not allege that her ignition switch "moved out of the 'run' position" (GM Mem. 20 n.11). That may turn out to be the case, but since Anderson alleges a defect in her ignition switch and that switch acted abnormally on at least several occasions, the Court declines to dismiss her claims on that basis without discovery.

the Michigan Supreme Court would *not* require the manifestation of a defect because, unlike in the realm of negligence (where a plaintiff must show injury), the MCPA requires a plaintiff to plead only "loss." *See id.* at 1097; *see also* Mich. Comp. Laws § 445.911(b)(2) ("A person who suffers *loss* as a result of this a violation of this act may bring an action to recover actual damages . . . ." (emphasis added)). As the *Bridgestone/Firestone* Court noted, other jurisdictions with consumer protection statutes that require only a showing of loss have allowed claims to proceed absent a manifested defect. *See, e.g.*, *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 819 (Conn. 1981) (allowing a plaintiff's statutory fraud action to proceed — absent any defect — because "[w]henever a consumer has received something other than what he bargained for, he has suffered a loss of money or property").

At least one Michigan appellate decision lends strong support to this position. *See Mayhall v. A.H. Pond Co., Inc.*, 341 N.W.2d 268 (Mich. Ct. App. 1983) (per curiam). In *Mayhall*, "the sole issue [was] whether the complaint alleged that plaintiff had suffered a 'loss' sufficient to withstand a motion for summary judgment" under the MCPA. *See id.* at 269. The plaintiff there had purchased a ring in reliance on "the defendants' knowing and false representation, made in their advertisement, that the ring was perfect," although the ring ultimately did not prove to be so. *See id.* at 272. The Michigan Court of Appeals instructed that the MCPA should be construed in accordance with common law fraud principles, and concluded that, in a fraud action, "injury may consist in the plaintiff's unfulfilled expectations." *Id.* at 270. Specifically, "the injury suffered by a victim of fraud" is that "the victim does not receive what he expected to receive," allowing him to "recover the difference between the actual value of the property when the contract was made and the value it would have possessed if the representation had been true." *Id.* at 271. Consistent with that principle, other courts have repeatedly held that,

"[u]nder Michigan law, a fraud plaintiff is entitled to the benefit of the bargain — in other words, what the purchaser would have gotten had the representations been true." *Thompson v. Paasche*, 950 F.2d 306, 314 (6th Cir. 1991) (emphasis omitted); *Hunter v. SMS, Inc.*, 843 F.2d 1391 (6th Cir. 1988) (noting that "benefit of the bargain damages resulting from [] fraudulent misrepresentations" are measured "by the difference between the actual value of the [item] received by the plaintiff and the value the [item] would have possessed had the representations been true"); *Dow Chem. Co. v. Gen. Elec. Co.*, No. 04-CV-10275 (BC), 2005 WL 2372838, at *4 (E.D. Mich. Sept. 27, 2005) ("Under Michigan law, recovery for damages caused by a failed, substandard, or defective product is limited . . . [to] the benefit of the bargain . . ." (internal quotation marks omitted)). This Court has previously found similar — if not less — support sufficient to conclude that a jurisdiction would allow a consumer fraud claim even without a manifest defect. *See In re Gen. Motors*, 2016 WL 3920353, at *40 (holding that Virginia would not require a manifest defect as "New GM does not cite, and the Court has not found, any Virginia authority that imposes a manifest defect requirement or rejects benefit-of-the-bargain recovery for fraud claims"). Thus, the Court will not impose a manifest defect requirement on the Michigan Plaintiffs here.

New GM's arguments to the contrary fall flat. For one, New GM contends that *Bridgestone/Firestone* is not persuasive authority because it was subsequently overruled by the Seventh Circuit. That is true, but the Seventh Circuit overruled the district court decision on other grounds (namely, choice of law). *See Bridgestone/Firestone*, 288 F.3d at 1018-20. Admittedly, the Seventh Circuit expressed some skepticism that economic loss claims could be maintained absent a manifested defect on the ground that "most states" had adopted the opposite rule, but the Circuit expressly declined to decide the issue because it found that Indiana law,

rather than Michigan or Tennessee law, controlled. *See id.* at 1016-17 (noting also that plaintiffs

must have believed Michigan and Tennessee to be "in the favorable minority" of jurisdictions

with respect to the manifestation requirement). New GM also cites to several non-Michigan

cases prohibiting recovery absent a manifest defect (*see* GM Mem. 18-20), but those precedents

are less persuasive than *Mayhall*, a Michigan decision. Moreover, some of the other jurisdictions

have walked back their stance on the issue more recently. *See, e.g.*, *In re Zurn Pex Plumbing*

*Prod. Liab. Litig.*, 644 F.3d 604, 608 (8th Cir. 2011) (rejecting an argument by the defendants,

which rested on a case New GM cites, that the plaintiffs could not show a "current harm" based

on brass piping that "contained a defect upon installation" because that defect had not yet

"caused external damage"). Indeed, in its ruling on the TACC, this Court found that California,

Florida, Maryland, Missouri, and Virginia do not (or would not) have a manifest defect

requirement for their consumer protection laws. *See In re Gen. Motors*, 2016 WL 3920353, at

*20, *26-27, *31, *33-34, *39-40.[18]

In the absence of persuasive authority to the contrary, the Court thus concludes that the

Michigan Plaintiffs "need only allege" that their vehicles are defective; "[t]hey are not required

to allege and prove . . . manifestation of [that] defect." *Bridgestone/Firestone*, 155 F. Supp. 2d at

1100; *cf In re Takata*, 193 F. Supp. 3d at 1335 ("If Takata had installed grenades in its airbags

that may or may not explode on impact, a court would not require an explosion to demonstrate

manifestation of a defect. Plaintiffs have alleged essentially this scenario, explaining that

---

[18]     That said, the Seventh Circuit and New GM appear to be right that the "majority view is
that there is no legally cognizable injury in a product defect case, regardless of whether the claim
is for fraud, violation of consumer protection statutes, breach of warranty, or any other theory,
unless the alleged defect has manifested itself in the product used by the claimant." 1
McLaughlin on Class Actions § 5:56 (13th ed.); *see also id.* § 5:56 n.15 (collecting cases).

occupants of vehicles equipped with the allegedly defective airbags cannot know whether their airbags will expel metal shrapnel that may kill or maim them." (footnote omitted)).  Accordingly, New GM's motion to dismiss the Michigan Plaintiffs' MCPA claims is denied.

### b. Fraudulent Concealment

The Michigan Plaintiffs next bring a common law claim for fraudulent concealment (also known in Michigan as "silent fraud").  (*See* FACC ¶¶ 3921-3934).  "Silent fraud is essentially the same [as traditional fraud] except that it is based on a defendant suppressing a material fact that he or she was legally obligated to disclose, rather than making an affirmative misrepresentation." *Barclae v. Zarb*, 834 N.W.2d 100, 115 (Mich. Ct. App. 2013).  To make out a claim, "the plaintiff must show that the defendant suppressed the truth with the intent to defraud the plaintiff *and* that the defendant had a legal or equitable duty of disclosure." *Id.* (emphasis added); *see also MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 665 (6th Cir. 2013) ("[T]o state a claim for the tort of silent fraud, a plaintiff must allege more than non-disclosure; a plaintiff must establish that the defendant had a legal duty to make a disclosure." (internal quotation marks omitted)).  A "legal or equitable duty" arises "most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Hord v. Envnmt'l Res. Inst. of Mich.*, 617 N.W.2d 543, 550-51 (Mich. 2000) (collecting cases).  In fact, Michigan courts effectively require proof of "statements by the vendor that were made in response to a *specific inquiry* by the purchaser, which statements were in some way incomplete or misleading." *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 39 (Mich. Ct. App. 1998) (emphasis added) (collecting cases).  That is, a plaintiff cannot prevail merely by showing "that the seller knew there was a hidden defect and that the purchaser had no knowledge of it." *Id.*

The Sixth Circuit's decision in *Cooley* is instructive. In that case, graduates of the Thomas M. Cooley Law School sued their alma mater alleging that the school's annual employment report and salary survey misrepresented the employment outcomes of its graduates — thereby inducing them to attend the school despite what were, in reality, bleak employment prospects upon graduation. *See* 724 F.3d at 657-60. The Sixth Circuit rejected the plaintiffs' silent fraud claim because they "did not allege in their amended complaint that they ever asked Cooley about the claims in its Employment Reports so as to create a duty for Cooley to disclose the truth." *Id.* at 666. "This failure to inquire," the Court concluded, "dooms the silent-fraud claim. Absent such an inquiry, Cooley had no duty to make any further disclosure concerning its Employment Reports." *Id.*; *see, e.g.*, *Hord*, 617 N.W.2d at 550 (holding that the plaintiff could not establish a silent fraud claim where "[t]here was no evidence that the plaintiff made any inquiry about the financial condition of the company in general or requested updated financial data in particular"); *McConkey*, 585 N.W.2d at 39-40 (dismissing a silent fraud claim in the absence of proof that "the buyer expressed some particularized concern or made a direct inquiry and the seller failed to fully disclose the material facts within the seller's knowledge"); *see also, e.g.*, *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5354 (KAM) (RLM), 2014 WL 1311979, at *11 (E.D.N.Y. Mar. 28, 2014) ("[U]nder Michigan law, *partial* disclosure can amount to fraud only if the partial disclosure is in response to a specific inquiry made by the injured party." (emphasis added)); *cf. Clement-Rowe v. Michigan Health Care Corp.*, 538 N.W.2d 20, 23-24 (upholding a silent fraud claim where the employer had "assert[ed] its economic health to attract qualified employees" even though it knew that the company was financially shaky *and* the employer "omit[ed] to disclose, *when asked*, known economic instability" that later led to layoffs (emphasis added)).

These decisions are fatal to the Michigan Plaintiffs' fraudulent concealment claims. The Michigan Plaintiffs do not allege that they made any inquiries directly to New GM regarding the safety of their vehicles or the existence of any potential defects. Such a "failure to inquire "dooms the silent-fraud claim." *Cooley*, 724 F.3d at 666. Contrary to Plaintiffs' argument, it is not enough that New GM made "many affirmative representations about the safety, quality, and lack of defects in New GM vehicles, which were misleading, deceptive, and incomplete without the disclosure of the defects." (FACC ¶ 3928). "Absent" an actual "inquiry," New GM "had no duty to make any further disclosure concerning" the safety (or lack thereof) of GM cars. *Cooley*, 724 F.3d at 666. Notably, the two cases cited by Plaintiffs do not hold otherwise. (*See* Pl's Opp'n 54). In the first — *United States Fidelity & Guar. Co. v. Black*, 313 N.W. 2d 77 (Mich. 1981) — the Michigan Supreme Court held that, as a "general rule," a party "to a business transaction is under an obligation to exercise reasonable care to disclose to the other party . . . any subsequently acquired information which he recognizes as rendering untrue, or misleading, previous representations." *Id.* at 89. But key to the Court's holding was the fact that the parties in the case had an ongoing relationship in which the appellants frequently discussed "their concern over their potential liability" and "openly attempt[ed] to limit this liability," with the result that the appellees "knew that [the appellants] were very concerned" about the issue and so "had a duty to clearly inform [them] of the new situation." *Id.* at 88-89. And in *Alfieri v. Bertorelli*, 813 N.W.2d 772 (Mich. Ct. App. 2012), the Michigan Court of Appeals found a duty to disclose because the plaintiffs had "made *direct inquiries* of defendants about the condition of the property" and the defendants were later advised that their "sales brochure contained inaccurate and misleading information." *Id.* at 776 (emphasis added). In short, these cases underscore that a direct inquiry (or the functional equivalent) is a *sine qua non* of a fraudulent

concealment claim under Michigan law.  As the Michigan Plaintiffs do not allege such inquiries, New GM's motion to dismiss their fraudulent concealment claims must be and is granted.[19]

### c. Breach of Implied Warranty

Next, New GM challenges the viability of implied warranty claims asserted by the Michigan Plaintiffs whose vehicles did not manifest any defect — namely, Bishop, Semrau, and Wloch.  The *Bridgestone/Firestone* Court considered and rejected the same argument on the ground that the Uniform Commercial Code ("UCC"), which has been adopted by Michigan, "expressly provides" that a claim for the breach of an implied warranty "'accrues when the breach occurs" and that "there is no requirement that [p]laintiffs demonstrate any injury to their person or property as a result of the breach, but only that they purchased an unmerchantable product."  155 F. Supp. 2d at 1099 (quoting UCC § 2-725(2)); *see also, e.g.*, *Koscielny v. Ford Motor Co.*, No. 05-CV-527127 (NZ), 2006 WL 1726486, at *4 (Mich. Cir. Ct. June 21, 2006) ("Breach of the warranty of merchantability means the vehicle was defective at the time when it left the possession of the manufacturer or seller" (internal quotation marks and alteration omitted)); *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 615 (Mich. 1992) ("Under

---

[19]    In any event, the Court is skeptical whether the representations made by New GM regarding the safety of its vehicles would be actionable under Michigan law, even if the Michigan Plaintiffs could prove that they made direct inquiries of New GM.  *See, e.g.*, *Ram Int'l Inc v. ADT Sec. Servs., Inc.*, No. 11-CV-10259, 2011 WL 5244936, at *6 (E.D. Mich. Nov. 3, 2011) (holding that promises of efficiency and reliability "cannot form the basis of a fraud claim"), *aff'd*, 555 Fed App'x 493 (6th Cir. 2014); *Van Tassel v. McDonald Corp.*, 407 N.W.2d 6, 8 (Mich. 1987) ("An action for fraud may not be predicated upon the expression of an opinion or salesmen's talk in promoting a sale, referred to as puffing."); *cf. First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*, No. 07-13132, 2010 WL 419972, at *3-4 (E.D. Mich. Feb. 1, 2010) (dismissing a fraudulent concealment claim where there was "no allegation that [the plaintiff] specifically inquired into [the defendant's] financial condition," and holding that the defendant's statement that business had been "very good" did not give rise to a duty to disclose as the plaintiff did not "seek specific clarification").

Article 2 [of the UCC], a sale of goods is accompanied by the implied warranties of merchantability and fitness . . . . Thus, under the code, the purchaser of defective goods may recover for the benefit of the bargain (the difference between the value of the goods as delivered and the value the goods would have had they complied with the warranty)." (footnotes omitted)). The Court agrees with that logic and conclusion. Thus, New GM's motion to dismiss must be and is denied.

### d. Unjust Enrichment

Finally, the Court turns to the Michigan Plaintiffs' unjust enrichment claims. (*See* FACC ¶¶ 3967-3977). To state a claim for unjust enrichment under Michigan law, a plaintiff must show "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Lipov v. Louisiana-Pac. Corp.*, No. 12-CV-439, 2013 WL 3805673, at *5 (W.D. Mich. July 22, 2013) (citing *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991)). "If this is established, the law will imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract governing the same subject matter." *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 478 (Mich. Ct. App. 2003) (citation omitted); *accord Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 506 (6th Cir. 1995); *Romeo Inv. Ltd. v. Michigan Consol. Gas Co.*, No. 260320, 2007 WL 1264008, at *7-8 (Mich. Ct. App. May 1, 2007). Michigan courts have occasionally allowed plaintiffs to plead alternative claims for breach of contract and equitable relief, but such cases have involved disputes regarding the validity of the underlying contracts. *See, e.g.*, *Glaske v. Indep. Bank Corp.*, No. 323167, 2016 WL 298986, at *10 (Mich. Ct. App. Jan. 21, 2016). Moreover, "[t]hese rules, allowing simultaneous and alternative claims for breach of contract and unjust enrichment, no longer appear to be good law

when both claims are asserted against the *same* defendant, with whom the plaintiff has an express contractual relationship." *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 906 (Mich. Ct. App. 2006). Under those circumstances, "Michigan courts now hold that the existence of the express contract bars the [equitable] claim." *Id.* Here, Michigan Plaintiffs Marks, Semrau, and Wloch all purchased their vehicles while still under warranty (FACC ¶¶ 163, 165, 169), and Plaintiffs do not challenge the validity of those warranties. Their unjust enrichment claims must be and are dismissed on that basis alone.

For an independent reason, however, all of the Michigan Plaintiffs' unjust enrichment claims are subject to dismissal. That is because Michigan courts "only employ the doctrine of unjust enrichment in cases where the defendant directly receives a benefit from the plaintiff." *Smith v. Glenmark Generics, Inc., USA*, No. 315898, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014); *accord Belle Isle Grill Corp.*, 256 666 N.W.2d at 666; *Storey Attends Healthcare Prod., Inc.*, No. 15-CV-13577, 2016 WL 3125210, at *12 (E.D. Mich. June 3, 2016). Applying that requirement, courts have consistently dismissed unjust enrichment claims under Michigan law where the benefit to the defendant was conferred by a third party. *See, e.g.*, *Lipov*, 2013 WL 3805673, at *6 (dismissing a claim where the defendant sold the product at issue "through distributors and wholesalers to builders, subcontractors, and/or agents, who then installed the [product] on [the p]laintiff's residence," holding that "these indirect transactions do not state a claim that [p]laintiff conferred a direct benefit on [d]efendant"); *W.C. Ducomb Co., Inc. v. Ann Arbor Mach. Co.*, 2012 WL 516089, at *3 (Mich. Ct. App. Feb. 16, 2012) ("Assuming that retaining the money from Chrysler was a benefit, it is undisputed that those funds came from Chrysler, not from plaintiff. Accordingly, plaintiff cannot establish the first element of unjust enrichment."); *A & M Supply Co. v. Microsoft Corp.*, No. 274164, 2008 WL

540883, at *2 (Mich. Ct. App. Feb. 28, 2008) (concluding that "the unjust enrichment doctrine does not apply under the facts alleged by plaintiff here" because the plaintiff could neither point to "direct contact between Microsoft and the indirect purchasers" nor "show that Microsoft received any direct payment or other benefit from those purchasers").

Admittedly, Plaintiffs' argument to the contrary finds some support in a handful of federal cases. *See, e.g. In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836864-865 (E.D. Mich. 2014) ("Michigan law does not require a benefit to be conferred directly by plaintiff to a defendant."); *accord Miller v. MSX-IBS Holding, Inc.*, No. 16-CV-10596, 2016 WL 4138238, at *7 (E.D. Mich. Aug. 4, 2016); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.Supp. 2d 896 (N.D. Cal. 2010); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 438 (E.D. Pa. 2010). But those cases do not withstand close scrutiny. All rely on the same three Michigan precedents — *Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools,* 504 N.W.2d 635, 640-41 (Mich. 1993); *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904-05 (Mich. Ct. App. 2006); and *In re Cardizem CD Antitrust Litig.*, 105 F Supp. 2d 618, 670-71 (E.D. Mich. 2000) — and, as other courts (including the Michigan Court of Appeals) have explained, those precedents do not bear the weight that the outlier cases have put on them. *See, e.g.*, *Fenerjian v. Nonshim Co., Ltd.*, 72 F. Supp. 3d 1058, 1087-88 (N.D. Cal. 2014) (concluding that *Kammer* and *Morris Pumps* are "less instructive because they involved situations where the parties' contacts or transactions with each other were direct" and that "*Cardizem* is not instructive because [it] did not cite any Michigan state authority involving indirect purchasers or transactions"); *see also, e.g.*, *Smith*, 2014 WL 4087968, at *1; *W.C. Ducomb Co.*, 2012 WL 516089, at *4 (similar); *A & M Supply Co.*, 2008 WL 540883, at *2 (similar). At most, "Michigan courts have in some instances

allowed a plaintiff to recover for an indirect conferral of benefit where the plaintiff is a subcontractor and the defendant is the party that hired the general contractor. This doctrine only applies where the defendant and the plaintiff had some sort of direct *interaction*, however." *Storey*, 2016 WL 3125210, at *12. The doctrine does not apply to cases "involving consumer plaintiffs and a remote manufacturer." *Id.; accord Schechner*, 2017 WL 588460, at *10. This case is indisputably of the consumer-remote manufacturer variety, as all of the Michigan Plaintiffs purchased their vehicles from third parties rather than directly from New GM. That is fatal to their unjust enrichment claims. Accordingly, New GM's motion to dismiss the Michigan Plaintiffs' unjust enrichment claims is granted.

### 5. New York

The remaining New York Plaintiffs for purpose of this motion are Renate Glyttov, Nicole Mason, Donna Quagliana, and Bedford Auto Sales, Inc. Glyttov owned a 2009 Chevrolet HHR that she purchased as a certified pre-owned vehicle under warranty from a Chevrolet dealer on March 28, 2012, which had a Delta Ignition Switch defect and was also subject to the Power Steering recall. (FACC ¶ 213). Mason owns a 2010 Chevrolet Cobalt that she purchased new with an extended warranty from a dealership on May 17, 2010, which was subject to the Delta Ignition Switch and Power Steering recalls. (*Id.* ¶ 215). Quagliana owns a 2005 Chevrolet Cobalt that she purchased used and unwarranted from a dealership in 2013, which was subject to the Delta Ignition Switch recall. (*Id.* ¶ 216). Finally, Bedford Auto Sales, Inc. is a car dealership with its principal place of business in Bedford, Ohio, which purchased two vehicles from New York dealers — a 2010 Chevy Cobalt subject to the Delta Ignition Switch and Power Steering recalls and a 2009 Chevrolet Cobalt subject to the Delta Ignition Switch recall,

purchased in December 2013 and January 2013 respectively — both of which it ultimately sold at a loss. (*See id.* ¶ 212).

Glyttov's car shut off spontaneously on several occasions, including while she was driving on the highway; the car would also shut off when she was driving on bumpy roads or hit a pothole. (*Id.* ¶ 213). Also, on several occasions, the key would not turn and would become stuck in the ignition. (*Id.*). In May 2012, her ignition lock cylinder was replaced during a routine oil change. (*Id.*). Two years later, on June 11, 2014, her ignition keys and switch were replaced. (*Id.*). She received notification of the Power Steering recall in June 2014, but the notice indicated the parts were not then available; her power steering was finally serviced on December 10, 2014, and she ultimately traded in the car in 2015. (*See id.*). Mason's car spontaneously shut off on at least three occasions, including when her daughter was driving the vehicle home from a test to get her driver's license; twice the vehicle had to be towed because it would not restart. (*Id.* ¶ 215). Her car's ignition switch was replaced in June 2014 under the recall, and she believes her power steering was serviced under the recall in or shortly after November 2014. (*Id.*). Quigliana's car turned off on two occasions while her daughter was driving to school; she attempted to have the vehicle fixed without success until she was told about the ignition switch recalls. (*See id.*). In 2015, after the ignition switch was repaired, the car was totaled in an accident. (*Id.*). Finally, Bedford Auto Sales, Inc. does not allege that either car it purchased manifested a defect. (*Id.* ¶ 212). After the recalls were announced, Bedford sought to get the cars repaired, but it was consistently informed that the ignition switch replacement parts were not available. (*Id.* ¶ 216). The dealership ultimately sold both cars at a loss in February and April 2015.

Together, the New York Plaintiffs bring claims against New GM under New York's consumer protection law for deceptive acts and practices, N.Y. Gen. Bus. Law ("GBL") §§ 349-350 (FACC ¶¶ 5161-5183); for common law fraudulent concealment (*id.* ¶¶ 5184-5197); for breach of implied warranty of merchantability, N.Y. U.C.C. § 2-314 (*id.* ¶¶ 5198-5207); for violations of the False Advertising Act, N.Y. Gen. Bus. Law § 350 (*id.* ¶¶ 5208-5216); and for unjust enrichment (*id.* ¶¶ 5239-5249). The Court will address each of these claims in turn.

### a. GBL Section 349

New York consumer protection statute, General Business Law Section 349(a) ("Section 349"), prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." To prove a claim under Section 349(a), a plaintiff must show, "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). Conduct is materially misleading if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995). Notably, however, "reliance is not an element of a [S]ection 349 claim." *Stutman*, 731 N.E.2d at 612. Finally, as the parties' briefing makes clear (*compare* GM Mem. 34 n.17 *with* Pls.' Opp'n 36 & n.30), federal courts are divided over whether claims under Section 349 are subject to the heightened pleading standards of Rule 9(b). In a case that is presumably binding on this Court, the Second Circuit held in *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511-12 (2d Cir. 2005), that the more relaxed standards of Rule 8(a) apply because Section 349 extends "well beyond common-law fraud to cover a broad range of deceptive practices." But other courts have declined to follow *Pelman* when it comes to

Section 349 claims sounding in fraud. *See, e.g.*, *Keegan v. Am. Honda Motor Co., Inc.*, 838 F. Supp. 2d 929, 957-58 (C.D. Cal. 2012).

The Court need not resolve the question of whether Rule 9(b) applies to the New York Plaintiffs' Section 349 claims because it would make no difference to the Court's analysis or conclusions. First, all of Bedford Auto's Section 349 claims are subject to dismissal because New York law requires a manifested defect for a plaintiff to recover on any claim and its vehicles did not manifest any of the alleged defects. (*See* FACC ¶¶ 209-212). Unlike in Michigan, there is no shortage in New York of case law on this point. Most relevant here is *Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9 (N.Y. App. Div. 2002), in which a putative class of plaintiffs brought claims for economic loss arising under Section 349 (as well common law fraud and breach of implied warranty claims), alleging a defect in the front seat backrests of certain vehicles that made the seats prone to collapse in the event of a rear-end collision. *See id.* at 11-12. The *Frank* Court found the plaintiffs' claims had been properly dismissed because "plaintiffs must plead actual injuries or damages, resulting from defendants' conduct, as an essential element of each" of their causes of action." *Id.* at 12. In reaching that conclusion, the Court undertook an extensive review of existing case law in this District — which unanimously provided that "[p]urchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." *Hubbard v. General Motors Corp.*, No. 95-CV-4362, 1996 WL 274018, at *3 (S.D.N.Y. May 22, 1996); *see also id.* ("[A] Suburban that performs satisfactorily and never exhibits the alleged braking system defect is fit for the purposes intended and does not give rise to a breach of warranty claim or other."); *In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) ("[P]roof of malfunction is a prerequisite to any of plaintiffs' claims [including under Section 349], and yet they do not

meaningfully contest that the class they seek to certify likely consists in overwhelming measure of owners of cameras that did not malfunction at all."); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y. 1997) ("Where, as here, a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies.").

The *Frank* Court also found support for its conclusion in precedents from other jurisdictions that had adopted the manifest defect requirement. *See Frank*, 741 N.Y.S.2d at 14-15; *see also, e.g.*, *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) (dismissing claims regarding allegedly defective brakes where the plaintiffs "[had] not alleged that their ABS brakes [had] malfunctioned or failed" because, "[u]nder each of the theories" invoked by the plaintiffs, "damages constitutes an essential element of the cause of action"); *Yost v. Gen. Motors Corp.*, 651 F. Supp. 656, 657 (D.N.J. 1986) (holding that a complaint alleging a design defect that was likely to cause damage and create safety hazards was insufficient to state a cause of action). Finally, the Court reasoned that "[p]ublic policy concerns" favored a manifest defect requirement — in particular, that "it would be manifestly unfair to require a manufacturer to become, in essence, an indemnifier for a loss that may never occur." *Frank*, 741 N.Y.S.2d at 16. Faced with a relative glut of adverse case law, the New York Plaintiffs insist that the *Frank* Court would have come out the other way had the plaintiffs in the case alleged (as Bedford Auto does here (*see* FACC ¶ 212)) that they had sold their cars at a financial loss because of the defect. (*See* Pls.' Opp'n 13-14). Some loose language in *Frank* aside, *see* 741 N.Y.S.2d at 17 (observing that the plaintiffs had not alleged injury in part because they did not allege that they had "attempted to sell, or sold an automobile at a financial loss because of the defect"), however, Plaintiffs conspicuously fail to cite any case departing from *Frank* on this ground. Moreover, such a distinction would do little or nothing to alleviate the public policy concerns raised in

*Frank*.  Plaintiffs try instead to rely on *BMW Group LLC v. Castle Oil Corp.*, 29 N.Y.S.3d 253

(N.Y. App. Div. 2016), in which the court found allegations that the defendant delivered

"inferior, adulterated heating oil" rather than the higher-quality oil contracted for sufficient to

sustain a claim for breach of express warranty.  *See id.* at 254.  But the *BMW* Court itself

described "'no injury' latent defect" cases like *Frank* as inapposite because those cases involved

the production or sale of "a defective product" or the failure "to warn of the product's danger,"

rather than a "basic contract law" claim that the defendant "fail[ed] to uphold its end of the[]

bargain and to deliver what was promised."  *Id.* at 256.  *BMW Group* is thus less persuasive in

this context than the multitude of cases cited by New GM.  Accordingly, New GM's motion to

dismiss is granted with respect to Bedford Auto's Section 349 claims.[20]

By contrast, the Section 349 claims of the remaining New York Plaintiffs — all of whom

allege manifestation of their defects — largely survive New GM's motion.  First, New GM does

not (and obviously cannot) dispute that its challenged acts were consumer-oriented.  Second,

given the seriousness of the alleged defects, New GM's alleged misrepresentations (in the form

of consumer-directed advertisements and reports) and omissions can be described as "materially

---

[20]    Relying on *Frank*, New GM argues that Bedford Auto cannot make out any claims —
statutory or otherwise — absent a manifested defect.  (*See* GM Mem. 12).  The Court need not
address the argument with respect to unjust enrichment because (as discussed below), the New
York Plaintiffs' claims must be dismissed for other reasons.  With respect to Bedford Auto's
claims for fraudulent concealment and breach of implied warranty, however, the Court agrees
with New GM.  *See, e.g.*, *Weaver*, 172 F.R.D. at 99 ("Plaintiff's allegation of possible economic
loss fails to plead adequately the required damages element for fraud . . . and breach of
warranty."); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 603 (S.D.N.Y. 1982)
("Tires which lived full, productive lives were, by demonstration and definition, 'fit for the
ordinary purposes' for which they were used; hence they were 'merchantable' under [the UCC],
and no cause of action for breach of an implied warranty can arise."); *Canon Cameras*, 237
F.R.D. at 360 (dismissing claims under Section 349 because "satisfaction of [its] elements would
. . . require proof of malfunction").  Accordingly, Bedford Auto's claims are dismissed in full.

misleading." Third, the New York Plaintiffs all allege sufficient injury, as they assert that they would not have purchased, or paid as much for, their vehicles had they known about the alleged defects. Finally, to the extent the remaining New York Plaintiffs' claims relate to the Delta Ignition Switch recall (Glyttov, Mason, and Quagliana), they satisfy Rule 9(b) for the reasons discussed above in connection with Alabama and Illinois. Mason's vehicle — a 2010 Chevy Cobalt that she purchased in May 2010 — was also subject to the Power Steering recall. (*See* FACC ¶ 215). Notably, New GM contends that, like Illinois Plaintiff Painter, Mason's car may have been part of the 2010 power steering recall (defeating any claim of concealment), but Mason has not alleged when in 2010 relative to her purchase that recall took place. Neither party disputes, however, that Glyttov's car — also subject to the Power Steering recall at issue here — was not part of the earlier 2010 recall so that argument is not applicable to her claim. Glytovv purchased her vehicle in March 2012 (*id.* ¶ 213); two years prior, in 2010, GM Canada had issued a recall for power steering defects in that model, and NHTSA had begun investigating the same issue with respect to New GM. (*Id.* ¶ 757). These allegations are sufficient to establish that New GM had knowledge of the alleged defect prior to Glytovv's purchase. Accordingly, New GM's motion to dismiss is granted solely as Bedford Auto's and Mason's claims (in the latter case, only to the extent they are premised on the Power Steering recall), but Mason (like Painter) is also granted leave to amend to allege when in 2010 the recall of her vehicle took place.

### b. Fraudulent Concealment

The Court turns next to the New York Plaintiffs' common law fraudulent concealment claims. (FACC ¶¶ 5184-5197). Notably, New GM's sole argument for dismissal of those claims is that they are barred by New York's economic loss doctrine. (*See* GM Mem. 58-59; GM Reply

29-30). That rule generally "restricts plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargain. If the damages suffered are of the type remedial in contract, a plaintiff may not recover in tort." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 277 (S.D.N.Y. 2004) (internal quotation marks omitted) (citing, *inter alia*, *Schiavone Constr. Co. v. Elgood Mayo Corp.*, 436 N.E.2d 1322, 1323 (N.Y. 1982)). The rule indisputably applies to claims sounding in negligence or strict liability. *See, e.g.*, *Computech Intern., Inc., v. Compaq Computer Corp.*, No. 02-CV-2628 (RWS), 2004 WL 1126320, at *10 (S.D.N.Y. May 21, 2004) (citing cases). Whether fraud claims are barred, however, is a closer question. As this Court has observed before, most courts in this Circuit have declined to apply the economic loss rule to intentional torts, citing the absence of any New York authority to the contrary. *See Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 297-98 (S.D.N.Y. 2015); *accord EED Holdings*, 387 F. Supp. 2d at 278; *Computech Int'l*, 2004 WL 1126320, at *10.

That approach is bolstered by the fact that New York courts have long "routinely permitted" fraud claims for pure economic loss to proceed. *EED Holdings*, 387 F. Supp. 2d at 278; *see, e.g., First Bank of Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21-22 (N.Y. App. Div. 1999) (allowing fraud claims to advance despite alleging only economic damages with no mention of the economic loss doctrine); *Strasser v. Prudential Sec., Inc.*, 630 N.Y.S.2d 80, 81-82 (N.Y. App. Div. 1995) (affirming a jury verdict on a cause of action for fraud); *Stevenson Equipment, Inc. v. Chemig Construction Corp.*, 585 N.Y.S.2d 318, 319-20 (N.Y. App. Div. 1991) (upholding a jury verdict awarding the plaintiff economic recovery based on a claim of fraudulent concealment); *Deerfield Comm. Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. App. Div. 1986) (affirming a lower court's denial of a motion to dismiss the

plaintiff's fraudulent concealment counterclaim where another counterclaim sounded in contract and the only alleged damages were purely economic). It is also consistent with the approach taken by many — if not most — other jurisdictions. *See, e.g.*, *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 287 (S.D.N.Y. 2002) (New Jersey law); *Orlando v. Novurania of America, Inc.*, 162 F. Supp. 2d 220, 226 n.2 (S.D.N.Y. 2001) (Connecticut law).

Some courts in the Circuit, however, have applied the economic loss rule to fraud claims under New York law. *See, e.g.*, *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 416-17 (S.D.N.Y 2013); *GMA Accessories, Inc v. ePartners Inc.*, No. 07-CV-8414 (LAK), 2008 WL 781188, at *1 (S.D.N.Y. Mar. 19, 2008). But those courts have relied solely on *Orlando*, which, in turn, cited no authority for its conclusion, leading this Court and others to find it unpersuasive. *See Weisblum*, 88 F. Supp. 2d at 298; *EED Holdings*, 387 F. Supp. 2d at 278. And while New GM invites the Court to revisit the issue on the basis of two New York Appellate Division cases not cited by the defendants in *Weisblum* (*see* GM Mem. 58-59 & n.28 (citing *Weiss v. Polymer Plastic Corp.*, 802 N.Y.S.2d 174 (N.Y. App. Div. 2005), and *New York Methodist Hospital v. Carrier Corporation*, 892 N.Y.S.2d 110 (N.Y. App. Div. 2009)), the Court declines the invitation. Assuming for the sake of argument that two intermediate appellate court decisions clearly on point would warrant reconsideration, the two decisions are not quite as clearly on point as New GM would have them. In *Weiss*, for example, the Court referenced only "strict products liability and negligence" in its discussion of the economic loss rule and addressed the plaintiffs' fraud claim separately. *See* 802 N.Y.S.2d 175-76. And *New York Methodist* involved claims for "negligent design and manufacture and breach of contract"; fraud is mentioned, but only in the context of a "cross motion" by the plaintiff (which was denied below) that sought "leave to replead so as to assert causes of action sounding in, among other

things, fraud." 892 N.Y.S.2d at 111. Notably, every subsequent decision citing these cases with respect to the economic loss doctrine has done so for the uncontroversial (and, for present purposes, irrelevant) proposition that the doctrine bars strict products liability and negligence claims. *See, e.g.*, *126 Newton St., LLC v. Allbrand Commercial Windows & Doors, Inc.*, 993 N.Y.S.2d 558, 560-61 (N.Y. App. Div. 2014) (citing both cases). New GM does not cite — and this Court has not found — a single decision that relies on either case for the proposition that the economic loss doctrine applies to intentional torts under New York law.

The Court thus adheres to the view that claims for intentional torts are not precluded by New York's economic loss doctrine. Accordingly, New GM's motion to dismiss the New York Plaintiffs' fraudulent concealment claim on the ground that the doctrine does apply is denied (except with respect to Bedford Auto, as discussed above).

### c. Unjust Enrichment

Finally, the New York Plaintiffs bring claims of unjust enrichment. To prevail on an unjust enrichment claim under New York law, a plaintiff must show that "(1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff." *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014) (alteration omitted). As this Court has repeatedly held, however, "[i]t is one of the 'well-settled principles of New York law' that 'the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" *Downey v. Adloox Inc.*, — F. Supp. 3d —, No. 16-CV-1689 (JMF), 2017 WL 816141, at *7 (S.D.N.Y. Feb. 28, 2017) (quoting *Superintendent of Ins. v. Ochs*, 377 F.3d 209, 213 (2d Cir. 2004)); *accord Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, No. 14-CV-9839 (JMF), 2015 WL 1809001, at

*5 (S.D.N.Y. Apr. 20, 2015). "Unjust enrichment may be pleaded in the alternative, but *only* where there is 'a bona fide dispute as to whether a relevant contract exists or covers the disputed issue.'" *Downey*, 2017 WL 816141, at *7 (emphasis added) (quoting *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014)).[21] Here, two New York Plaintiffs — Glyttov and Mason — purchased their cars subject to express warranties (*see* FACC ¶¶ 213, 215), and neither disputes the validity of those warranties. That dooms their claims.

In any event, all of the New York Plaintiffs' unjust enrichment claims fail for a separate reason: Because they have adequate remedies at law. The Second Circuit has repeatedly reaffirmed that unjust enrichment under New York law "is an equitable claim that is unavailable where an adequate remedy at law exists." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) (summary order); *accord Norris v. Grosvenor Mktg.*, 803 F.3d 1281, 1287 (2d Cir. 1986); *Samiento v. World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008). Once again, Plaintiffs' only retort is that unjust enrichment may be pleaded in the alternative at this stage of the litigation. (*See* Pls.' Opp'n 31-32). But this Court has previously rejected that argument in light of *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177 (N.Y. 2012), in which the New York Court of Appeals held that "an unjust enrichment claim 'is not available where it simply duplicates, or replaces, a conventional contract or *tort* claim." *Weisblum*, 88 F. Supp. 2d at 297 (quoting *Corsello*, 968 N.E.2d at 740). Other courts in this Circuit agree: "[T]he accusations surrounding the plaintiff's unjust enrichment claim overlap with her fraud,

---

[21]     As Plaintiffs note (Pls.' Opp'n 30), there is some authority for the proposition that a plaintiff may plead contract claims and unjust enrichment claims under New York law in the alternative pursuant to Rule 8. See, e.g., *Barth Packaging, Inc. v. Excelsior Packaging Grp., Inc.*, No. 11-CV-2563 (VB), 2011 WL 3628858, at *1 (S.D.N.Y. Aug. 16, 2011). That is not, however, the prevailing view or the view that this Court has taken. *See, e.g.*, *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) (collecting cases).

fraudulent concealment, express warranty, and [Section] 349 claims, all of which may proceed. She therefore may not bring an unjust enrichment claim as a catch-all cause of action where she adequate pleads that the defendants committed the recognized tort of fraud and breached an express warranty." *Mahoney v. Endo Health Sols., Inc.*, No. 15-CV-9841 (DLC), 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016). In light of these precedents, and Plaintiffs' failure to point to any post-*Corsello* case law to the contrary, all of the New York Plaintiffs' unjust enrichment claims fail. Accordingly, New GM's motion to dismiss on this count is granted.

### 6. Pennsylvania

The remaining Pennsylvania Plaintiffs for purposes of this action are Janice Bagley, Raymond Berg, Paul Pollastro, and David Schumacher. Bagley owns a 2007 Chevrolet Cobalt that she purchased used under a thirty-day warranty from a private seller in 2013, which was subject to the Delta Ignition Switch recall. (FACC ¶ 243). Berg owns a 2012 Chevrolet Traverse that he purchased used from a dealership in October 2013 along with an additional warranty; the car was ultimately subject to the Side Airbag recall. (*Id.* ¶ 244). Pollastro owns a 2007 Chevrolet Cobalt that he purchased as a certified pre-owned vehicle under limited warranty from a dealership on November 22, 2010, which was subject to the Delta Ignition Switch recall. (*Id.* ¶ 248). And finally, Schumacher owns a 2008 Buick Enclave that he purchased used from a dealership along with an extended warranty on May 30, 2014, which was subject to the Side Airbag defect recall. (*Id.* ¶ 249).

Berg does not allege that his car ever manifested any defect; nor did he receive a recall notice for the side airbag defect — although he has had the car serviced and other recall repairs. (*Id.* ¶ 244). Bagley's car experienced two stalling events within the first month of ownership — and a third event only a few weeks later. (*Id.* ¶ 243). In February 2014, she was in an accident

after a deer ran in front of her car, but the airbags did not deploy. (*Id.*). Bagley had the ignition switch replaced in June or July 2014, presumably pursuant to the recall. (*See id.*). In Pollastro's case, the key began to stick in the ignition switch shortly after his purchase of the car in the summer of 2011; he took the vehicle to a dealership, which identified the issue as a problem with the floor shifter. (*Id.* ¶ 248). He had the ignition switch replaced on July 24, 2014, after the recall was announced, but the first replacement switch failed, requiring a two-day repair period. (*Id.*). Additionally, Pollastro had to return to the dealership afterward because the new key did not properly match the new ignition switch. (*Id.*). Finally, the power steering in Schumacher's car went out within the first day of ownership while he was turning through a major intersection, nearly causing an accident. (*Id.* ¶ 249). He has also experienced other defects with the car, including issues with the power hatch, but he does not allege that the side airbag defect has manifested itself and he never had the car repaired. (*See id.*).

The Pennsylvania Plaintiffs bring claims against New GM under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 *et seq.* (FACC ¶¶ 5937-5959); for common law fraudulent concealment (*id.* ¶¶ 5960-5973); for breach of the implied warranty of merchantability, 13 PA. Const. Stat. Ann. § 2314 (*id.* ¶¶ 5974-5983); and for unjust enrichment (*id.* ¶¶ 6006-6016). The Court will address each of these claims in turn. Before doing so, however, the Court briefly addresses two threshold issues raised by New GM: whether Pennsylvania's economic loss doctrine bars all of Plaintiffs' UTPCPL and common law claims and whether Berg's and Schumacher's claims are subject to dismissal because the defects that they allege did not manifest in their vehicles. (*See, e.g.*, GM Mem. 16-17, 47, 56-57).

### a. Economic Loss Doctrine

In *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002), the Third Circuit held, based on its prediction at the time of how the Pennsylvania Supreme Court would rule on the issue, that the economic loss doctrine applies not only to claims of negligence, but also to claims under the UTPCPL and to intentional torts. *See id.* at 674-82. As other courts have explained, however, there are many reasons to doubt the soundness of *Werwinski*'s prediction, particularly with the passage of time. *See, e.g.*, *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 411-415 (E.D. Pa. 2016); *DeFebo v. Andersen Windows, Inc.*, 654 F. Supp. 2d 285, 293-94 (E.D. Pa. 2009); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 276 (E.D. Pa. 2003); *Smith v. Reinhart Ford*, 68 Pa. D. & C. 4th 432, 437-38 (C.P. Lanc. 2002); *Zwiercan v. General Motors Corp.*, 58 D. & C. 4th 251, 266-70 (C. P. Phila. 2002). In fact, citing intervening decisions by the lower Pennsylvania courts, several district courts within the Third Circuit itself have gone so far as to decline to follow *Werwinski*. *See, e.g.*, *Landau*, 2016 WL 6995038, at *6-10 (citing cases). The Third Circuit's decision, of course, is not even arguably binding on this Court. But in any event, the Court concludes, substantially for the reasons provided by the *Landau* Court, that the more recent cases have the better of the argument — at least with respect to claims under the UTPCPL. *See id.* After all, the economic loss rule is a common law doctrine, while the UTPCPL is "a statute in derogation of common law." *Id.* (internal quotation marks omitted). A "judicially created limitation cannot simply be engrafted onto a statute." *Id.*

Whether the economic loss doctrine bars Plaintiffs' fraudulent concealment claims is a closer question, however, as the more recent case law has focused predominantly on the UTPCPL. *See, e.g.*, *id.; see also DeFabo,* 654 F. Supp. 2d at 293-94. Moreover, at least two federal courts have followed *Werwinski* to dismiss fraudulent concealment claims in similar

cases.  *See In re Takata*, 193 F. Supp. 3d at 1341-42; *Martin v. Ford Motor Co.*, 765 F. Supp. 2d

673, 684 (E.D. Pa. 2011).  But again, this Court is not bound by *Werwinski* (as the *Martin* Court

was).  And there are good reasons to predict that, if confronted with the question, the

Pennsylvania Supreme Court would hold that the economic loss doctrine does not apply to

intentional torts.  As the Court in *O'Keefe* noted, "before the *Werwinski* panel's decision,

Pennsylvania's Common Pleas Courts were apparently unanimous in refusing to apply the

economic loss doctrine even in common law intentional fraud claims."  214 F.R.D. at 276 (citing

cases).  And there are strong public policy reasons to "leav[e] the possibility of an intentional tort

suit hanging over the head of a party considering outright fraud."  *Air Prods. Chems., Inc. v.*

*Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 336 (E.D. Pa. 2003).  That is, "the economic loss

doctrine is premised on the notion that parties to a contract may protect themselves from

negligence or defective products by negotiating the liability terms of the contract. . . .  [I]n both

theory and practice, it is impracticable, if not impossible, for parties to negotiate terms regarding

what happens if one of them is intentionally deceiving the other."  *Id.*; *see also O'Keefe*, 214

F.R.D. at 278.  Thus, the Court concludes that the economic loss doctrine does not call for

dismissal of the Pennsylvania Plaintiffs' common law fraud claims either.

### b.  Manifestation

Next, the Court turns to the question of whether Pennsylvania law allows a plaintiff to

sue for economic loss in the absence of a manifested defect.[22]  The Court begins with Plaintiffs'

---

[22]     New GM identifies Pennsylvania Plaintiffs Berg, Pollastro, and Schumacher as having
failed to allege a manifested defect.  (*See* GM Mem. 17 & n.10).  Pollastro, a proposed Delta
Ignition Switch Plaintiff, alleges that, on one occasion "[s]hortly after purchase, the key became
stuck in the ignition switch" — an incident that prompted him to take his vehicle to a dealership
for inspection.  (FACC ¶ 248).  New GM submits that these allegations are insufficient because
he did not allege that his vehicle ever shut off.  (GM Mem. 17 n.10).  As with Michigan Plaintiff

claims under the UTPCPL.  New GM's argument that those claims are barred rests almost

exclusively on the holding of the Third Circuit in *Argus v. Shiley, Inc.*, 989 F.2d 142 (3d Cir.

1993).  There, the plaintiff brought claims for intentional infliction of emotional distress

("IIED"), negligent infliction of emotional distress, and punitive damages against the

manufacturer of her heart valve, alleging that the valves were prone to malfunction — and,

crucially, that this knowledge caused her (and other recipients) "harm" in the form of "severe

mental anguish, anxiety, fear," and the like.  *See id.* at 143-44.  In predicting how the Supreme

Court of Pennsylvania would rule, the Third Circuit concluded:

> It seems to us that the Supreme Court of Pennsylvania would find no relief may
> be granted on the allegations of the complaint here for two independent reasons,
> either of which would bar this action.  First, . . . Angus has not alleged that the
> valve implanted in her is defective, a prerequisite to liability in a products
> liability action. . . .  Second, Angus has not suffered a compensable injury as the
> direct impact from the manufacture, sale, and implanting of the valve was on her
> emotional state and the allegations of this case will not support a recovery for
> emotional injuries.

*Id.* at 147 (citations omitted).  On its face, then, *Argus* is distinguishable from this case because

Plaintiffs here do allege that their vehicles were defective (even if the defect had not yet

manifested), and because Plaintiffs allege injuries outside of the emotional realm.  Additionally,

much of the *Argus* Court's reasoning was specific to IIED claims.  *See id.* at 148 ("If the

Supreme Court of Pennsylvania recognized a cause of action for intentional infliction of

---

Anderson, the Court concludes that Pollastro's allegations suffice for present purposes.
Schumacher — a proposed Side Airbag defect Plaintiff — alleges several defects with respect to
his car, including that his "power steering went out" while he was driving on the interstate.
(FACC ¶ 249).  New GM argues that these defects are irrelevant because he fails to allege any
side-airbag related defect (GM Mem. 17 n.10), and Plaintiffs apparently concede the point.  (*See*
Pls.' Opp'n 17 (arguing that Schumacher has a "viable" claim "notwithstanding the absence of
malfunction")).  Neither party disputes that Berg's vehicle has never manifested a defect.

emotional distress on the allegations of Argus's complaint, it effectively would sanction a large, if not vast, number of lawsuits by consumers who obtained properly functioning valves."); *see also id.* at 147 ("[B]ased on the cases involving the infliction of emotional distress, we are convinced that the district court correctly found that no basis for relief was stated in Angus's complaint.").  But the elements necessary to prevail on an IIED claim differ materially from the elements of a UTPCPL claim.  *Compare Hoy v. Angelone*, 691 A.2d 476, 482, *as aff'd* 720 A.2d 745 (1998), *with Hunt*, 538 F.3d at 223.  New GM is correct that other courts have cited *Argus* as evidence that the Pennsylvania Supreme Court would require a manifest defect in the UTPCPL context — but every one of those courts has done so in a string cite and without grappling with the distinction between IIED and consumer fraud claims.  *See, e.g.*, *Bridgestone/Firestone*, 288 F.3d at 1017; *Ziegelmann v. DaimlerChrysler Corp.*, 649 N.W.2d 556, 561 (N.D. 2002) (parenthetical quoting *Angus*'s holding with respect to "a cause of action for [IIED]"); *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 240 (Wis. 2004) (same).  The Court thus agrees with Plaintiffs that *Argus* is neither controlling nor particularly helpful here.

That conclusion is reinforced by recent pronouncements from Pennsylvania courts about the sorts of damages that amount to "ascertainable harm" under the UTPCPL.  The statute itself provides that "[a]ny person who purchases or leases goods or services . . . and thereby suffers *any ascertainable loss of money or property*, real or personal . . . may bring a private action."  73 Pa. Stat. Ann. § 201.92 (emphasis added); *see also Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001) ("The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action." (emphasis omitted)).  And while the "Pennsylvania Supreme Court has not definitively addressed what constitutes ascertainable loss under the statute," *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 180 (3d Cir.

2015), Pennsylvania courts have found that benefit-of-the-bargain damages can be sufficient, *see, e.g.*, *Dibish v. Ameriprise Fin., Inc.*, 134 A.3d 1079, 1087-88, *appeal denied*, 141 A.3d 481 (Pa. 2016) (considering a UTPCPL claim and "conclud[ing] that the record did not support the trial court's determination that the plaintiffs had presented no evidence of an ascertainable loss" where, "[a]t a minimum, the plaintiffs had lost the benefit of their bargain[] because the insurance policy issued was more expensive than the policy promised them").

Moreover, as Plaintiffs note, several lower Pennsylvania courts have found benefit-of-the-bargain damages sufficient under the UTPCPL. For instance, in *Zwiercan v. Gen. Motors Corp.*, No. 3235, 2002 WL 1472335 (Pa. Com. Pl. May 22, 2002), the "crux" of the dispute between the parties was "over the term 'ascertainable loss,' as it is used in the UTPCPL." *Id.* at *2. The *Zweircan* Court distinguished *Angus* as a case based on speculative, emotional damages; by contrast, the plaintiff in *Zweircan* alleged that the seats of her vehicle were defective and required repair — rendering "the fact that she had not suffered a manifestation of the defect in her [v]ehicle of no import." *Id.* at *3; *see also Solarz v. DaimlerChrysler Corp.*, No. 2033, 2002 WL 452218, at *13 (Pa. Com. Pl. Mar. 13, 2002) (finding "the plaintiffs allege[d] ascertainable loss to support a claim under [the UTPCPL]" where they alleged a "difference in value between minivans with the park-brake interlock device and those without it"); *Grant v. Bridgestone Firestone Inc.*, 57 Pa. D. & C 4th 72 (Com. Pl. 2002) (concluding, based in part on the reasoning of the district court in *Bridgestone/Firestone*, 155 F. Supp. 2d at 1096-99, that "[w]henever a consumer has received something other than what he bargained for, he has suffered a loss of money or property" (internal quotation marks omitted)). In light of these precedents, the Court rejects New GM's argument that Berg's and Schumacher's UTPCPL claims should be dismissed because their vehicles never manifested any defects.

The Court reaches a different conclusion, however, with respect to Berg's and Schumacher's common law claims. Notably, all the Pennsylvania cases cited by Plaintiffs discuss only the UTPCPL and implied breach of warranty claims — two contexts in which "harm" (or "injury") is defined outside the common law. *See Zweircan*, 2002 WL 1472335, at *1 (UTPCPL and warranty claims); *Solarz*, 2002 WL 452218, at *1 (UTPCPL, breach of warranty, and breach of contract claims); *Grant*, 2002 WL 372941, at *1 (UTPCPL and warranty claims). While the UTPCPL requires only "ascertainable loss," a common law fraud claim requires a showing of "injury" that was proximately caused by reliance on the defendant's fraudulent acts. *See Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1072 (Pa. Super. Ct. 2003). Plaintiffs do not cite, and the Court has not found, any Pennsylvania cases allowing fraud or unjust enrichment claims to proceed in the absence of a manifest defect. In fact, the case law suggests that a plaintiff may not even have standing to bring those claims in the absence of a manifested defect. *See, e.g.*, *Holster v. Jeld-Wen, Inc.*, 10-CV-3966, 2011 WL 4528378, at *1 (E.D. Pa. Sept. 30, 2011) (dismissing claims for "common law fraud by omission, breach of implied warranty of merchantability, and in the alternative, unjust enrichment" for lack of standing where the proposed class was composed of consumers of a certain brand of windows allegedly containing undisclosed inherent defects). Plaintiffs cite a single case that purportedly supports their position in the common law context (Pls.' Opp'n 18), but that case falls flat, both because that court was reviewing an award of damages under the UTPCPL and because the plaintiffs there alleged an already-suffered economic injury. *See Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308, 320-30 (Pa. Sup. Ct. 2015). The *Boehm* Court analyzed "ascertainable loss" under the UTPCPL, *see id.* at 328-30, but certainly did not endorse benefit-of-the-bargain damages in the common law fraud context (as Plaintiffs contend (*see* Pls.' Opp'n 18)), let alone

state that the loss of one's benefit of the bargain suffices as an injury for purposes of the common law. *See Boehm*, 117 A.3d at 325-30; *see also Dibish*, 134 A.3d at 1089 (analyzing "ascertainable loss" under the UTPCPL while making no mention of common law fraud, although the plaintiff had prevailed on both theories below).

In the absence of Pennsylvania case law to the contrary, the Court is persuaded by the ample precedent holding that injury (and, relatedly, actual damages) for common law purposes requires the manifestation of a defect. *See, e.g.*, *Tietsworth*, 677 N.W.2d at 240 ("The amended complaint alleges only that the motorcycles have diminished value . . . because [they] have demonstrated a 'propensity' for premature engine failure and/or will fail as a result of the cam bearing defect. This is insufficient to state a legally cognizable injury for purposes of a fraud claim."); *Jarman v. United Indus. Corp.*, 98 F. Supp. 2d 757, 768 (S.D. Miss. 2000) (dismissing claims for common law fraud and unjust enrichment, among others, because "unless there is actually a failure in product performance, there is not basis at all for claiming that the plaintiff has been damaged in any way" since "[m]ere suspicion of a lost bargain . . . will not support an award of damages"); *In re Air Bag Prod. Liab. Litig.*, 7 F. Supp. 2d 792, 805 (E.D. La. 1998) (dismissing common law claims because the "plaintiffs [had] failed to advance any allegation of manifest injury or defect, both central tenets of their tort and implied warranty claims"). Accordingly, Berg and Schumacher's common law claims — for fraudulent concealment and unjust enrichment — are dismissed. (As discussed below, Schumacher's unjust enrichment claim is subject to dismissal on an additional basis).

Finally, the Court reaches the same conclusion with respect to Berg's and Schumacher's claims for breach of the implied warranty of merchantability pursuant to Section 2314 of Title 13

of the Pennsylvania Commercial Statutes Code. (*See* FACC ¶¶ 5974-5983).[23] "The

Pennsylvania Commercial Code provides that an implied warranty of merchantability requires

that the product be 'fit for the ordinary purposes for which goods are used.'" *Petrucelli v.*

*Bohringer & Ratzinger*, 46 F.3d 1298, 1309 (3d Cir. 1995) (citing Pa. Cons. Stat. Ann.

§ 2314(b)(3)). A claim for breach of implied warranty requires a plaintiff to make out four

elements: the existence of an implied warranty, a breach of that warranty, "a causal connection

between the defendant's breach and the plaintiff's injury," and "the extent of loss proximately

caused by the defendant's breach." *Byrd v. Essex Silverline Corp.*, No. 04-CV-4827, 2008 WL

81887, at *3 (E.D. Pa. Jan. 8, 2008); *see also* 13 Pa. Const. Stat. § 2314 cmt. 13. To make out

the last two elements, a plaintiff necessarily "must show that the productive was defective." *Id.*;

*see also Epler v. Jansport Subsidiary of VF Corp.*, No. 00-CV-154, 2001 WL 179862, at *7

(E.D. Pa. Feb. 22, 2001) ("In the absence of a defect, [the p]laintiff's claim for breach of implied

warranty fails."); *Thomas v. Carter-Wallace, Inc.*, 27 Pa. D & C. 4th 146, 149 (C.P. 1994)

(observing that Pennsylvania law consistently holds that a merchant is "only liable for harm

caused by a defect in their product" and citing cases); *Altronics of Bethlem, Inc. v. Repco, Inc.*,

957 F.2d 1102, 1105 (3d Cir. 1992) (requiring a plaintiff to establish, *inter alia*, "that the product

malfunctioned"). *But see Weiler v. SmithKline Beecham Corp.*, 53 Pa. D. & C. 4th (Pa. Ct.

Comm. Pl. 2001) (allowing implied warranty claims to proceed where the plaintiff repeatedly

alleged that certain drugs were "defective" and that she had suffered economic loss because

those drugs did not effectively treat her symptoms). Thus, even if the sale of a defective vehicle

---

[23]    New GM does not challenge the implied warranty claims of the other Pennsylvania
Plaintiffs.

violates the implied warranty of merchantability, the *real* question, as the *Zwiercan* court

observed, is "whether a manifestation of the breaching defect is required for a claim to accrue."

2002 WL 1472335, at *3. That court concluded it is, noting that "Pennsylvania is hardly alone in

requiring a manifestation of a defect before a breach of warranty claim can be permitted." *Id.* at

*4 & n.7 (collecting cases); *see also Solarz*, 2002 WL 452218, at *5 (dismissing implied

warranty claims of plaintiffs who had not alleged any manifested defect); *Grant*, 2002 WL

372941, at *5 (same). In light of the foregoing precedent, the Court agrees that, under

Pennsylvania law, a manifested defect is required to make out a claim for implied warranty as

well.[24] Accordingly, Berg and Schumacher's implied warranty claims must be dismissed.

### c. The UTPCPL

The Court turns, then, to the substance of the Pennsylvania Plaintiffs' claims under the

UTPCPL. (*See* FACC ¶¶ 5937-5959). That statute "makes it unlawful for individuals or

businesses to engage in unfair or deceptive acts or practices." *Baker v. Family Credit*

*Counseling Corp.*, 440 F. Supp. 2d 392, 411 (E.D. Pa. 2006). To the extent relevant here, it

prohibits, *inter alia*, representing that goods or services have characteristics, benefits, or qualities

that they do not have; representing that goods or services are of a particular standard, quality, or

grade if they are of another; advertising goods or services with the intent not to sell them as

advertised; and engaging in any other fraudulent or deceptive conduct that creates a likelihood of

---

[24]    The Court found one federal case, not cited by the parties, that reaches a different
conclusion from the precedent discussed above: *In re Ford Motor Co. E-350 Van Prod. Liab.*
*Litig. (No. II)*, No. 03-CV-4558, 2010 WL 2813788, at *41-42 (D.N.J. July 9, 2010). There, the
court considered whether the Pennsylvania Supreme Court would permit implied warranty
claims for purely economic injury, absent a manifested defect. *See id.* The Court premised its
decision in large part on the lack of "caselaw from lower courts in Pennsylvania suggesting any
trend in that direction," but — as the above discussion makes clear — that premise is
questionable.

confusion or misunderstanding. *See* 73 P.S. § 201-2(4)(v), (vii), (ix), (xxi). (FACC ¶ 5941).

Complicating matters somewhat, "[w]hat a plaintiff must include in a complaint in order to allege a violation of the UTPCPL depends on which section of the UTPCPL a defendant allegedly violated." *Baker*, 440 F. Supp. 2d at 412. Under the false advertising sections (such as sections (v) and (vii)), for example, a plaintiff must allege "that the advertisement was false, that it actually deceives or has a tendency to deceive a substantial segment of its audience, and that the false advertising is likely to make a difference in the purchasing decision." *Id.* (quoting *DiLucido v. Terminix Int'l, Inc.*, 676 A.2d 1237, 1240-41 (Pa. Super. Ct. 1996). "Puffery is not actionable as false advertising." *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.2d 203, 215 (Pa. Commw. Ct. 2017) (distinguishing between material representations and puffery).

With respect to claims under the UTPCPL's "catch-all" provision (section (xxi)), however, Pennsylvania courts are split on whether a plaintiff must allege the elements of common law fraud. *See Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 468 (E.D. Pa. 2009) (collecting cases on both sides). A prior version of the provision prohibited only "fraudulent" conduct, but the Pennsylvania legislature amended it in 1996 to add a prohibition on "deceptive" conduct as well. *See Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 360 (E.D. Pa. 2015). Neither the Pennsylvania Supreme Court nor the Third Circuit has addressed the effect of this change. *See id.*; *see also Kemezis v. Matthews*, 394 F. App'x 956, 958-59 (3d Cir. 2010) (summary order) (declining to resolve the issue). In the face of that vacuum, most federal courts have predicted that "the Pennsylvania Supreme Court would follow the intermediate appellate courts' interpretation that . . . [p]laintiffs need *not* plead the elements of common law fraud to state a claim under the catch-all provision of the UTPCPL." *Walkup*, 147

F. Supp. 3d at 361 (emphasis added); *see also Seldon*, 647 F. Supp. 2d at 469 ("[I]f a plaintiff alleges deceptive conduct, a plaintiff need not allege the elements of common law fraud, but, conversely, must do so if a plaintiff alleges fraudulent conduct."). Accordingly, a plaintiff's allegations need only meet the heightened pleading standards of Rule 9(b) to the extent his or her UTPCPL claim is premised on fraudulent conduct, as opposed to deceptive conduct. *See, e.g.*, *Christopher v. First Mut. Corp.*, No. 05-CV-1149, 2006 WL 166566, at *3 (E.D. Pa. Jan. 20, 2006); *Seldon*, 647 F. Supp. 2d at 469-70. Finally, to allege a violation under any provision of the UTPCPL, "a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result." *Hunt v. United States Tobacco Co.*, 538 F.3d 217, 223 (3d Cir. 2008) (internal quotation marks omitted).

As New GM tacitly concedes, Plaintiffs' allegations concerning New GM's advertising and marketing are plainly sufficient to support the Pennsylvania Plaintiffs' false advertising-based UTPCPL claims under subsections (v), (vii), and (ix), as those claims are not subject to any heightened pleading standard. (*See* FACC ¶¶ 336-472). Plaintiffs' UTPCPL claims under the "catch-all" provision present a closer question, however, if only because there is a colorable argument that they sound in fraud and thus implicate Rule 9(b). Substantially for the reasons discussed in connection with the other states above, however, the claims of the remaining Pennsylvania Plaintiffs (Bagley and Pollastro) concerning the Delta Ignition Switch defect satisfy the Rule's heightened pleading standards. That leaves Berg and Schumacher, who purchased vehicles affected by the Side Airbag defect (also referred to as the "Wiring Harness" or "Side-Impact Airbag Wiring Harness" defect). (*Id.* ¶¶ 243, 249; Recall Chart 5-6).[25] New

---

[25]    The particulars of the Side Airbag Defect are not especially relevant here. Briefly explained, corrosion or loose crimps in the side impact airbag wiring harness could lead to an

GM challenges their claims on the ground that the FACC fails to allege that the company was aware of the defect prior to their vehicle purchases. (*See* GM Mem. 40-41). But that is not the case. First, the year before Berg purchased his 2012 Chevy Traverse, New GM had issued Customer Service Bulletins about replacing the front seat-mounted side-impact airbag connectors in that model after experiencing a high volume of warranty claims relating to that issue. (FACC ¶¶ 244, 743). Similarly, three years before Schumacher purchased his 2008 Buick Enclave, New GM had issued a similar bulletin for that make and model. (*See id.* ¶¶ 249, 740-742). Thus, the Pennsylvania Plaintiffs' UTPCPL claims survive.

### d. Fraudulent Concealment

Next, the Court turns to the claims for common law fraudulent concealment, also called "non-disclosure" under Pennsylvania law, for the Pennsylvania Plaintiffs other than Berg and Schumacher. (*See* FACC. ¶¶ 5960-5973). To make out a fraud claim, a plaintiff must show "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Presbyterian Med. Ctr.*, 832 A.2d at 1072. "The tort of intentional non-disclosure has the same elements as intentional misrepresentation, except in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999). "Absent a duty to speak or disclose," however, "the concealment

---

increase in resistance, which the airbag sensing system interpreted as a fault — causing a "service air bag" message to display. (FACC ¶ 732). That increased resistance could, in turn, result in the side airbags failing to deploy during a crash. (*Id.* ¶ 733).

of certain facts cannot constitute fraud." *Protica, Inc. v. iSatori Tech., LLC*, No. 11-CV-1105, 2012 WL 1071223, at *5 (E.D. Pa. Mar. 30, 2012). Like most jurisdictions, Pennsylvania recognizes that "a duty to disclose exists because of a fiduciary or similar relationship of trust and confidence between the parties." *Gibbs v. Ernst*, 647 A.2d 882, 893 (Pa. 1994) (internal quotation marks omitted). In general, such a relationship exists "whenever the relative positions of the parties is such that the one has power and means to take advantage of, or exercise undue influence over the other." *Matter of Estate of Evasew*, 584 A.2d 910, 913 (Pa. 1990) (internal quotation marks omitted); *see also id.* (listing examples of such relationships, including those "between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent"). Given the arm's-length nature of the relationship between New GM and Plaintiffs, it is pretty clear that Plaintiffs cannot make out a duty to disclose on that basis.

But the Pennsylvania Plaintiffs have another avenue available to them, as "Pennsylvania law recognizes a difference between active concealment and mere silence in the context of common law fraud." *Gnagey Gas & Oil Co., Inc. v. Pa. Underground Storage Tank Indem. Fund*, 82 A.3d 485, 501 (Pa. Commw. Ct. 2013); *accord Am. Planned Cmtys., Inc.*, 28 F. Supp. 2d 964, 968 (E.D. Pa. 1998) ("Concealment alone may create a sufficient basis for finding that a party engaged in fraud so long as the other elements of fraud are present."). As the *Gnagey Gas* Court concluded after an exhaustive analysis of the issue: "[A]t common law, no fiduciary relationship, no statute, no other independent legal duty to disclose is necessary to make active concealment actionable fraud — simple 'good faith' imposes an obligation not to purposefully conceal material facts with intent to deceive." 82 A.3d at 502; *see also Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, No. 11-CV-5676, 2015 WL 4597970, at *11 (E.D. Pa. July 31, 2015) ("[W]here a party is accused of purposefully concealing information material to a

transaction, no confidential or fiduciary relationship between the parties need exist for liability to be imposed. Pennsylvania has adopted the Restatement (Second) of Torts § 550, which imposes liability for intentional concealment of material information regardless of a duty to disclose." (citing *Youndt v. First Nat'l Bank of Port. Allegany*, 868 A.2d 539, 549 (Pa. Super. Ct. 2005)).[26] This theory of fraudulent concealment "is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." *Gnagey Gas*, 82 A.3d at 500. In a similar vein, "a defendant's incomplete disclosure can result in misleading 'half-truths,' where a material fact is not disclosed to the plaintiff," permitting the plaintiff to recover under a theory of nondisclosure. *Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC* ("*Boardakan II*"), No. 11-CV-5676, 2016 WL 6213035, at *12 (E.D. Pa. Oct. 24, 2016); *accord In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, No. 03-CV-3924, 2006 WL 2822261, at *49-50 (E.D. Pa. Sept. 29, 2006).

Applying these principles, Pennsylvania courts have upheld active concealment claims in many cases despite the lack of any fiduciary or special relationship. *See, e.g.*, *Gnagey Gas*, 82 A.3d at 503-04 (upholding a claim for "active concealment" where the defendant knew about eight underground storage tanks on a property that was sold and "active[ly] concealed their existence"); *Nat'l Bldg. Leasing, Inc. v. Byler*, 381 A.2d 963, 966 (Pa. Super. Ct. 1977) (holding that sellers fraudulently concealed material information when they demolished several buildings,

---

[26] For reference, Section 550 of the Restatement (Second) of Torts, titled "Liability for Fraudulent Concealment," states: "One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." Pennsylvania has also adopted Section 551, which imposes liability for fraudulent nondisclosure in those situations where there is an affirmative duty to disclose, such as in a fiduciary or confidential relationship. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 611-12 (3d Cir. 1995).

deposited the debris in a large hole located on the property, filled the hole with soil, and told the buyers that the debris had been removed from the property); *Aetna, Inc. v. Health Diagnostic Lab Inc.*, No. 15-CV-1868, 2015 WL 9460072, at *5 (E.D. Pa. Dec. 28, 2015) (observing that "Plaintiff would not need to prove an affirmative duty to disclose as Bluewave Defendants argue because that only arises when a party cannot prove active concealment and must rely on a non-disclosure theory" and concluding that "Plaintiff has pleaded sufficient facts that it may be entitled to relief under an active concealment theory" because it alleged that the defendants had engaged in a fraudulent billing scheme that they hid from the plaintiff insurance provider).

New GM's arguments to the contrary fall short.  For one, the cases New GM cites were all limited to the question of whether a fiduciary or confidential relationship existed, and did not address the active-concealment doctrine.  *See, e.g.*, *Jeter v. Brown & Williamson Tobacco Corp.*, 113 Fed App'x 465, 469 (3d Cir. 2004); *Brown v. Johnson & Johnson*, 64 F. Supp. 3d 717, 725 (E.D. Pa. 2014); *Slippery Rock Area Sch. Dist. v. Tremco, Inc.*, No. 15-CV-1020, 2016 WL 3198122, at *10-13 (W.D. Pa. June 9, 2016).  New GM does cite one case, *Arndt v. Johnson & Johnson*, 67 F. Supp. 3d 673 (E.D. Pa. 2014), in which the plaintiff alleged that the defendant had covered up manufacturing defects in one of its drugs (which led to the death of the plaintiff's son).  *See id.* at 678-70.  But that allegation was made in service of the plaintiff's argument that the company's fraudulent concealment tolled the statute of limitations — a fundamentally different issue from the one presented here.  Accordingly, the Court declined to consider several acts allegedly committed by the defendant on the ground that they occurred prior to the plaintiff's son's death, *see id.* at 679, and held that even if the plaintiff "had adequately alleged affirmative acts of concealment," he was ineligible for tolling because he did not undertake "*any*

investigation" before the statute of limitations period ended, *see id.* at 680.  *Ardnt* and the other cases cited by New GM are therefore not particularly apt guides in this context.

Here, Pennsylvania Plaintiffs expressly plead that New GM "concealed and suppressed material facts concerning safety defects."  (FACC ¶ 5962).  Together with the other allegations in the FACC, discussed above, that is sufficient to plead a claim for active concealment under Pennsylvania law.  Still, to prevail on this claim, each of the Pennsylvania Plaintiffs must also show that New GM "intended for the plaintiff to be induced to act," "that the plaintiff justifiably relied on the defendant's misrepresentation," and "that the plaintiff suffered damages as the proximate result of that reliance."  *Boardakan II*, 2016 WL 6213035, at *13 (citing *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3d Cir. 1991).  In other words, a plaintiff must show that the defendant had "knowledge of the untrue character of his representation," *Ira G. Steffy & Son, Inc. v. Citizens Bank of PA*, 7 A.3d 278, 290 (Pa. Super. Ct. 2010), and that "the means of obtaining the information in question were not equal," *Fort Washington Res., Inc. v. Tannen*, 858 F. Supp. 455, 460 (E.D. Pa. 1994).  The FACC satisfies those requirements, however, as Plaintiffs allege, among other things, that "to conceal and suppress the defects," New GM "went so far as to instruct its employees not to use terms that could notify NHTSA or the public as to the existence of a safety issue" (FACC ¶ 5964); that New GM did so "in whole or in part to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money" (*id.* ¶ 5968); that "New GM had superior knowledge and access to the facts regarding the defects" that Plaintiffs could not have discovered on their own (*id.* ¶ 5967); and, in terms of damages, that Plaintiffs would have "paid less for their vehicles or would not have purchased or leased them at all" had they known of the defects.  (*Id.* ¶ 5971).  Accordingly, New GM's motion to dismiss the remaining Pennsylvania Plaintiffs' fraudulent concealment claims is denied.

### e. Unjust Enrichment

Finally, the Pennsylvania Plaintiffs assert claims of unjust enrichment. (*See* FACC ¶¶ 6006-6016). To prevail on such a claim under Pennsylvania law, a plaintiff must show that (1) the "plaintiff conferred a benefit on the defendant"; (2) "the defendant appreciated the benefit"; and (3) "acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit." *Glob. Ground Support, LLC v. Glazer Enters., Inc.*, 581 F. Supp. 2d 669, 675 (E.D. Pa. 2008); *see also Mitchell v. Moore*, 729 A.2d 1200, 1203-04 (Pa. 1999). As with many of the states discussed above, Pennsylvania holds that "where the subject matter of the claim is governed by a contract, a plaintiff cannot pursue (and a court cannot grant relief) based on unjust enrichment theory." *Andrichyn v. TD Bank, N.A.*, 93 F. Supp. 3d 375, 389 (E.D. Pa. 2015) (collecting cases); *accord Gurdkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 169-70 (3d Cir. 2014). Courts applying Pennsylvania law are divided, however, on the question of whether a plaintiff may plead contract claims and unjust enrichment claims together. *Compare, e.g.*, *Fish Net, Inc. v. ProfitCenter Software*, No. 09-CV-5466, 2011 WL 1235204, at *10 (E.D. Pa. Mar. 31, 2011) (no alternative pleading), *and Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, No. 08-CV-453, 2008 WL 2758029, at *4 (E.D. Pa. July 15, 2008) (same), *with Spuhler v. Mass. Mut. Life Ins. Co.*, No. 14-MDA-911, 2015 WL 5970490, at *5 (Pa. Super. Ct. Oct. 1, 2015) (allowing alternative pleading). But the weight of authority, particularly recent authority, seems to hold that, as a matter of substantive state law, a plaintiff can assert an unjust enrichment claim even where he or she asserts the existence of an express contract. *See Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. Ct. 2009); *accord Bonomo v. Nova Fin. Holdings, Inc.*, No. 11-CV-4762, 2012 WL 2196305, at *13 (E.D. Pa. June 15, 2012); *Kane v. Platinum Healthcare,*

*LLC*, No. 10-CV-4390, 2011 WL 248494, at *6 (E.D. Pa. Jan. 25, 2011); *Rollinson v. Clarke-DeMarco*, No. 2004-2993, 2007 WL 4593471 (Pa. Comm. Pl. Jan. 22, 2007); *DTK Ventures, L.P. v Russo*, No. 05-EQ-4059, 2006 WL 2988463 (Pa. Comm. Pl. Aug. 21, 2006). Accordingly, the Court will not dismiss the remaining Pennsylvania Plaintiffs' claims on that basis, even though all of them purchased their vehicles pursuant to some form of warranty.

New GM's last challenge to the Pennsylvania Plaintiffs' unjust enrichment claims — namely, that Pennsylvania law requires the conferral of a *direct* benefit to allow recovery under this theory (*see* GM Mem. 32) — has more weight, at least with respect to some Plaintiffs. Regrettably, the case law on point is once again somewhat muddled. *Compare In re Takata*, 193 F. Supp. 3d at 1343 (dismissing a claim on the ground that the plaintiff had purchased his car from a third party), *and Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712, 722 (E.D. Pa. 2013) (similar), *with Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 310 F.R.D. 166, 176-77 (E.D. Pa. 2015) ("Plaintiffs need not have purchased the vaccine lots at issue directly from [d]efendants to have conferred benefits on the defendant." (internal quotation marks omitted)). Whether or not proof of a direct *benefit* is required, however, Pennsylvania courts have regularly held that a plaintiff "need not have *dealt* directly with each defendant in order to allege a claim of unjust enrichment against them." *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006) (collecting cases); *see also Com. ex rel. Pappert v. TAP Pharm. Prod., Inc.*, 885 A.2d 1127, 1137 (Pa. Commw. Ct. 2005) ("The [d]efendants assert that the Commonwealth has failed to state a cause of action for unjust enrichment because they have not pleaded facts showing that the Commonwealth conferred any *direct* benefit on the [d]efendants. . . . However, . . . we can infer [that it did confer a benefit on the defendant] from the pleading.").

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, No. 03-CV-4558 (GEB), 2011 WL 601279, at *10 (D.N.J. Feb. 16, 2011), which involved unjust enrichment claims under circumstances similar to those here, is particularly instructive.  There, the Court concluded that, under "Pennsylvania's law of restitution, benefit refers to 'any form of advantage,' and the plaintiff need not directly make payment to defendants in order to raise a claim for unjust enrichment.  Thus, although the direct benefits — *i.e.*, payment for vehicle delivery — took place upstream, the Court cannot say that [the plaintiffs] have conveyed no benefit on Ford."  *Id.* at *6.  The Court expressed skepticism that "purchase of a used vehicle — which the Court presumes was acquired by the dealership from a downstream consumer — has any effect on the manufacturer," but found that the plaintiffs who purchased *new* vehicles had "indirectly conferred a benefit upon Ford, because their new vehicle purchase factored into the calculus whereby their dealership and Ford made orders for replacement vehicles."  *Id.*

Applying those principles here, and giving Plaintiffs the benefit of the doubt, the Court concludes that Pollastro — who purchased his vehicle as a certified pre-owned car from a Chevrolet (*i.e.*, GM) dealer (*see* FACC ¶ 248) — may proceed with his claim.  His purchase may have "factored into the calculus whereby their dealership and [New GM] made orders for replacement vehicles," *Ford Motor Co. E-350 Van Products Liab. Litig.*, 2011 WL 601279, at *6, thereby conferring a benefit, albeit indirectly, on New GM.  By contrast, there are no allegations in the FACC from which the Court could infer that Bagley — who purchased her vehicle from a private seller (or, for that matter, Schumacher who purchased his car from a non-GM dealership) — conferred a benefit, whether direct or indirect, on New GM.  Accordingly, Bagley's unjust enrichment claim must be and are dismissed.  (Schumacher's claim was previously dismissed failing to allege a manifested defect.)

### 7.  Texas

The remaining Texas Plaintiffs for purposes of this motion are Gareebah Al-ghamdi, Dawn Bacon, Michael Graciano, Keisha Hunter, Tajah Liddy, Lisa McClellan, and Cindy Wilson.  Al-ghamdi owns a 2004 Chevrolet Impala that she purchased used and unwarranted at an auto expo on September 7, 2009, which was subject to the Low Torque Ignition Switch recall. (FACC ¶ 266).  Bacon owns a 2006 Cadillac CTS that she purchased used and unwarranted from a private seller in September 2012, which was subject to the Low Torque Ignition Switch recall. (*Id.* ¶ 267).  Graciano owns at 2007 Chevrolet Cobalt that he purchased used along with a warranty from a dealership on October 17, 2011, which was subject to the Delta Ignition Switch recall.  (*Id.* ¶ 270).  Hunter owned a 2006 Chevrolet Cobalt which she purchased used from a dealership on March 22, 2013, which was subject to the Delta Ignition Switch defect.  (*Id.* ¶ 272).  Liddy owns a 2011 GMC Acadia that she purchased used along with an extended warranty from a dealership on May 22, 2011, which was subject to the Side Airbag recall.  (*Id.* ¶ 274).  McClellan owned a 2005 Malibu Maxx that she purchased used under a ninety-day warranty from a dealership on November 22, 2010, which was subject to the Low Torque Ignition Switch and Power Steering recalls.  (*Id.* ¶ 275).  Finally, Wilson owns a 2008 Saturn Aura XR that she purchased used along with an extended warranty from a dealership in 2012, which was subject to the Power Steering recall.  (*Id.* ¶ 279).

Hunter does not allege that her vehicle ever manifested any defect, but the vehicle was repaired pursuant to the recall in early 2015.  (*Id.* ¶ 272).  After experiencing post-repair mechanical problems, Hunter returned the car to the dealership, defaulting on her loan.  (*See id.*).  Wilson similarly does not allege any issues with her car; she did not receive a recall notice for the power steering issue, although she did have her car repaired pursuant to a recall notice

regarding a defective wave plate in March 2015. (*Id.* ¶ 279). By contrast, Al-ghamdi's car experienced frequent shut downs while she was driving, including on the highway; initial diagnostic testing failed to show why her vehicle was shutting off while in motion. (*Id.* ¶ 266). She received a recall notice for the Low Torque ignition switch defect in 2015, but as of the filing of the FACC had not yet had her vehicle repaired because the dealership did not have the parts available. (*See id.*). Similarly, Bacon's car has stopped without warning while driving on the interstate at least eight times — nearly causing several serious accidents. (*Id.* ¶ 267). She also experienced trouble with the ignition switch, requiring her to turn the ignition key may times before her car will start. (*Id.*). She has yet to receive a recall notice for the ignition switch defect, so her car remains unrepaired. (*Id.*). Although Bacon attempted to trade her car in several times, the dealerships have declined to accept it because they cannot sell her model until the ignition problem is fixed. (*See id.*). Graciano has also had recurring issues with his vehicle, as it has experienced stalling and corresponding loss of power steering on numerous occasions. (*Id.* ¶ 270). In March 2014, Graciano received a recall notice, although it took several months before his family received a loaner vehicle while waiting for delivery of the parts necessary to repair his car. (*Id.*). Liddy's car experienced issues with the timing change sensor and an oil pan leak (*id.* ¶ 274); she has also been told that her engine needs to be replaced. (*Id.*). Although Liddy's car was subject to the Side Airbag recall (as well as recalls for the hatchback motors and seatbelts), she does not allege that she experienced any issues with the airbags or that her car has been repaired pursuant to the recall. (*Id.*). McClellan had significant issues with her car, which shut off while she was driving at least fifty to sixty times in the first year and a half that she owned it. (*Id.* ¶ 275). Her car was repaired many times, but she does not remember receiving

any recall notices.  (*See id.*).  She eventually returned the car to the dealership due to its many problems.  (*Id.*).

The Texas Plaintiffs bring claims against New GM under the Texas Deceptive Trade Practices Act ("Texas DPTA"), Tex. Bus. & Com. Code §§ 17.41 *et seq.* (FACC ¶¶ 6551-6581); for common law fraudulent concealment (*id.* ¶¶ 6582-6595); for breach of the implied warranty of merchantability, Tex. Bus. & Com. Code § 2.314 (*id.* ¶¶ 6596-6605); and for unjust enrichment (*id.* ¶¶ 6628-6638).  The Court will address each of these claims in turn.

### a.  The Texas DPTA

The Texas Plaintiffs first bring claims under the Texas DPTA.  (*See* FACC ¶¶ 6551-6581).  Before addressing the substance of those claims, however, the Court addresses a threshold challenge raised by New GM — namely, that Texas law bars recovery for purely economic losses under the Texas DPTA where the parties' transaction is covered by a contract. (GM Mem. 46).  Generally speaking, New GM is correct that Texas law "precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract."  *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2008).  Whether, however, that rule is a product of the "economic loss doctrine" (as New GM characterizes it) or application of the "independent injury" requirement — pursuant to which a plaintiff cannot make out a cause of action in tort without alleging conduct actionable outside of a governing contract, *see Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) — is not entirely clear, as the line between the two doctrines is, to put it mildly, blurred.  *See Eastman Chem. Co. v. Niro*, 80 F. Supp. 2d 712, 716 n.2 (S.D. Tex. 2000); *see also, e.g.*, *Arlington Home, Inc. v. Peak Envt'l Consultants, Inc.*, 361 S.W.3d 773, 779 (Tex. App. 2012) (noting "that there is not one 'economic loss rule,' but several rules governing recovery of economic losses in various

areas of the law"). Functionally, however, there is not much daylight between the two rules: To determine whether an independent injury occurred, "as with the economic loss rule, the inquiry is whether the alleged unconscionable conduct could have resulted in the absence of a contract between the parties." *Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 295 (5th Cir. 2016) (internal quotation marks omitted).

In light of that principle, courts applying Texas law have routinely dismissed tort-style claims under the DPTA where the claims amounted to "nothing more than [] breach of contract claim[s]." *Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 178 (Tex. App. 2000); *see, e.g.*, *Shakeri*, 816 F.3d at 295 (dismissing an unconscionable conduct claim under the DTPA because it "ultimately rest[ed] on the allegation that [the defendant] falsely advertised that its alarm system would be of high quality and would work, when the alarm system, in fact, did not work as it was supposed to under the contract"). At the same time, Texas courts have repeatedly held that "the fact that the heart of [a] dispute involves the interpretation of a contract does not automatically preclude a DPTA claim." *Garza v. CTX Mortg. Co., LLC*, 285 S.W.3d 919, 928 (Tex. App. 2009). As the Fifth Circuit recently observed:

> While . . . a breach of contract does not itself constitute a DTPA violation, the Texas Supreme Court has never held that *underlying conduct* that breaches an agreement cannot violate the DTPA merely because it also breaches an existing contractual obligation. Put differently, if a particular duty is defined both in a contract and in a statutory provision, and a party violates the duty enumerated in both sources, the economic loss rule does not apply.

*McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 475 (5th Cir. 2015). Thus, for example, Texas courts have allowed DTPA claims by consumers where they are premised, not on breach of the contract to provide goods or services *per se*, but rather on "advertis[ing] goods or services with the intent not to sell them as advertised" or on failing to disclose material

information "at the time of the transaction." *Conquest Drilling Fluids, Inc. v. Tri-Flo Int'l, Inc.*, 137 S.W.3d 299, 309 (Tex. App. 2004); *accord Tony Gullo Motors LLP v. Chapa*, 212 S.W.3d 299, 304-05 (Tex. 2006); *Balay v. Gamble*, 2011 WL 2435929, at *5 (Tex. App. Ct. June 16, 2011). "A duty to not act illegally to procure a contract," these courts have reasoned, "is separate and independent from the duties established by the contract itself." *Conquest Drilling Fluids*, 137 S.W.3d at 310.

Relatedly, Texas court have permitted DPTA claims to proceed, notwithstanding contracts governing the parties' transactions, where plaintiffs have alleged "unconscionable actions" on the part of defendants. *See, e.g.*, *SCS Builders, Inc. v. Searcy*, 390 S.W.3d 534, 541 (Tex. App. 2012) ("Under the record in this case, we hold that the duty breached by [the defendants]: to refrain from engaging in or using deceptive trade practices as set out in Section 17.50(a)(3) — unconscionable actions or courses of action — was one that . . . arose outside, and existed independently of, the contract."). Finally, Texas courts have observed that a party who prevails on a statutory fraud claim is entitled to statutory damages — that is, to damages beyond the subject matter of the contract. *See id.* at 541-42 (observing that the "nature of the remedy" for a DTPA violation differs from the remedy in a contract action because Section 17.50(b)(1) of the Act entitles the prevailing party to economic damages, attorney's fees, costs, and potentially other additional damages); *cf. Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998) ("When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."); *Breitling v. LNV Corp.*, 15-CV-0703, 2015 WL 5896131, at *4 (N.D. Tex. Oct. 5, 2015) ("[A] party who succeeds in an action under this section of the [another Texas statute] is entitled to statutory damages . . . . The economic loss rule is thus inapplicable to a claim under [that statute].").

In light of the foregoing authorities, the Court concludes that the Texas Plaintiffs' DPTA claims are not barred by the economic loss doctrine (or its close cousin, the independent injury requirement). It may well be that New GM's conduct violated contracts with (at least some of) the Texas Plaintiffs. But the gravamen of the Texas Plaintiffs' DPTA claims is not that New GM violated duties that arose under contracts. Instead, it is that New GM violated duties that arose under the DPTA: not to misrepresent the quality and safety of is cars and not to conceal defects prior to Plaintiffs' purchases of their allegedly defective cars. (*See* FACC ¶¶ 6555, 6557). And Texas law provides that "[a] statutory offender will not be shielded from liability simply by showing its violation also violated a contract." *McCaig*, 788 F.3d at 475. Thus, the real issue is whether the Texas Plaintiffs state claims under the DPTA. To the extent they do, their claims arise independent of contract and are not barred by the economic loss rule. To the extent they do not — which was the case in the authorities upon which New GM relies, *see, e.g.*, *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (finding no actionable misrepresentation under the DTPA because the defendant's statements were "nothing more than representations that the defendants would fulfill their contractual duty to publish, and the breach of the duty sounds only in contract") — the economic loss rule would apply (but would also be superfluous). *See, e.g.*, *McCaig*, 788 F.3d at 475 (noting the "inapt[ness]" of certain cases in which "Texas courts have applied the economic loss rule to the DTPA" because, "in each of them, the Texas Supreme Court concluded that there was no statutory violation to begin with" (citing cases)).

The remaining Texas Plaintiffs do state claims under the DPTA. To prove a violation of the Act, a plaintiff must show that "(1) [he or she] is a consumer, (2) the defendant engaged in false, misleading or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex.

1995) (citing Tex. Bus. & Com. Code § 17.50(a)(1)). For DTPA claims that sound in fraud, a plaintiff must also meet the heightened pleading standards of Rule 9(b). *See, e.g.*, *Omni USA, Inc. v. Parker-Hannifan Corp.*, 798 F. Supp. 2d 831, 850-51 (S.D. Tex. 2011). In this case, the Texas Plaintiffs (who plainly qualify as consumers under the law), allege that New GM engaged in false, misleading or deceptive acts in several ways, but the Court need address only one: that New GM undertook an "unconscionable action or course of action." (FACC ¶ 6554). That phrase is defined under the statute as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com Code § 17.45(5). When assessing the "unconscionability" of an action, courts look to "what the consumer could have or would have done if he had known about the information," as well as the consumer's relative "knowledge, ability, experience, or capacity." *Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. App. Ct. 2000). Courts "determine whether the consumer was taken advantage of to a grossly unfair degree by looking at the entire transaction, not just whether a defendant actually intended to take advantage of the consumer." *SCS Builders,* 390 S.W.3d at 541. "To prove an unconscionable action or course of action, a plaintiff must show that the defendant took advantage of his lack of knowledge and the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Washburn v. Ford*, No. 14-CV-0459, 2017 WL 2258253, at *5 (Tex. App. May 23, 2017); *see also Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995) ("[U]nconscionability requires that the seller take advantage of special skills and training at the time of the sale.").

Applying those standards here, the Court concludes that the FACC sufficiently alleges that New GM's practice of promoting its vehicles as safe and reliable, despite its knowledge of numerous alleged defects, "took advantage of [the plaintiffs'] lack of knowledge" such that "the

resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." Tex. Bus. & Com Code § 17.45(5); *see Washburn*, 2017 WL 2258253, at *5. First, as noted, in evaluating whether the defendant's actions were unconscionable, courts look to "what the consumer could have or would have done if he had known about the information." *Peltier Enters.,* 51 S.W.3d at 623. Here, the Texas Plaintiffs expressly allege that, had they known about the defects, they would have altered their purchasing behavior. (*See, e.g.*, FACC ¶¶ 266, 267). The FACC also alleges that Plaintiffs lacked any sophisticated knowledge or experience in the realm of car manufacturing and that New GM was uniquely positioned to take advantage of that disparity. *Cf. Peltier Enters.,* 51 S.W.3d at 624 ("A plaintiff with knowledge about indirect lending or with years of experience in the car-selling business would not have been able to show that [the defendant] did anything that was 'unconscionable.'"). And finally, New GM's purportedly unconscionable actions were a "producing cause" of Plaintiffs' injury, thus satisfying the third prong of the DPTA analysis, because — but for the company's deception — Plaintiffs allegedly would not have purchased or paid as much for their vehicles. *See, e.g.*, *Mercedes-Benz of N. Am., Inc v. Dickenson*, 720 S.W.3d 844, 855 (Tex. App. Ct. 1986) (upholding a DTPA unconscionability claim where Mercedes had failed to provide proper repair parts despite "the repeated appearance of numerous defects in the car" because "it resulted in a gross disparity between the value [the plaintiff] gave in consideration for the car and the value of the car he received"). Accordingly, the Texas Plaintiffs provide sufficient allegations to sustain their claims under the DTPA.

The Court has already addressed New GM's general arguments to the contrary with respect to the Delta Ignition Switch Plaintiffs (as to misrepresentations) and the non-Delta Ignition Switch Plaintiffs (as to concealment of a defective process), and will not repeat those

discussions here.  New GM's additional arguments focus on the FACC's allegations concerning the company's knowledge of other defects alleged by the Texas Plaintiffs — specifically, the Power Steering defect (Wilson and McClellan) and the Side Airbag defect (Liddy) — and the relationship in time between any such knowledge and those Plaintiffs' vehicle purchases.  (*See* GM Mem. 43-44; FACC ¶¶ 274-275, 279).  With respect to the former, however, the FACC plausibly alleges New GM's knowledge prior to the relevant purchase dates (and, notably, New GM does not argue otherwise).  For example, New GM knew before McClellan purchased her 2005 Chevy Malibu Maxx in November 2010 that, in response to a preliminary investigation concerning that particular car model, Old GM had extended warranty coverage to replace the steering column assembly.  (*Id.* ¶¶ 275, 754).  Additionally, in June 2010, New GM itself initiated a special coverage program for the 2005 Chevy Malibu Maxx.  (*Id.* ¶ 756).  Similarly, two years before Wilson purchased her 2008 Saturn Aura XR, New GM had issued a service bulletin regarding "special coverage to replace the power steering motor" for that very car.  (*Id.* ¶ 756).  The case for New GM's knowledge of the Side Airbag defect prior to Liddy's vehicle purchase in May 2011 is a much closer call.  But she alleges that, from its inception, New GM knew about problems in the wiring harness and other components of the airbag wiring dating back to 2008, in other vehicles and the 2009 model of the Saturn Aura XR, her vehicle.  (FACC ¶¶ 734, 736-745).  "Although that barely alleges knowledge of a potential defect that was not disclosed" to Liddy herself, it is — as the Court previously found with respect to similar allegations in the TACC — "just enough to cross the Rule 9(b) line."  *In re Gen. Motors*, 2016 WL 3920353, at *26 (upholding a claim concerning the wiring harness defect under Florida's consumer protection statute).

In the alternative, New GM contends that the DPTA claims of Hunter, Liddy, and Wilson must be dismissed because their vehicles never manifested the defects at issue. (*See* GM Mem. 10-12 & n.7).[27] New GM relies heavily on *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844 (Tex. App. 2005), for this proposition. In *Everett*, the plaintiffs sued several manufacturers under the DTPA (among other causes of action) for the production and sale of defective seatbelts that were "susceptible to partial engagement, leaving the seat belt user essentially unrestrained"). *Id.* at 849. Plaintiffs alleged that their economic injury — namely, the "loss of the benefit of their bargain" and "prospective cost of replacing the defective buckles" — constituted an "injury in fact" for purposes standing, even though their seatbelts had never malfunctioned. *See id.* at 851. The Texas Court disagreed, beginning its analysis by expressly "drawing a distinction between manifested product defects and unmanifested product defects," *id.* at 852, and concluding that the plaintiffs had "not plead[ed] facts demonstrating the type of injury that is compensable under the DPTA," *id.* at 858. In particular, the Court found that, "[s]o far," according to the pleadings, the plaintiffs had "received the benefit of their bargain; they were promised and they received seat belt buckles that latched and provided sufficient restraint." *Id.* Moreover, they had not "pleaded characteristics or benefits that the seat belts were represented to have but did not have," although "allegedly defective." *Id.* The *Everett* Court did, however, place a temporal limitation on its holding: "[a]t some point, potential loss-of-benefit-of-the-bargain injuries . . . from a defect that has not manifested itself simply become too remote in time to constitute an 'injury' for

---

[27]    Liddy does allege that, "[i]n addition to the airbag recall and sensor issue, [her] vehicle had problems with the timing change sensor and an oil pan leak" and that she "has been told that the engine needs to be replaced." (FACC ¶ 274). But she is a proposed Side Airbag defect Plaintiff and does not allege that that defect manifested itself. Accordingly, Plaintiffs appear to concede that a manifestation requirement would bar her claim. (*See* Pls.' Opp'n 10).

statutory standing purposes under the DPTA." *Id.*; *see also id.* at 859 n.14 ("We do not hold that a consumer may never possess standing to bring suit under the DTPA for benefit-of-the-bargain damages based on an unmanifested product defect.").

Arguably, then, *Everett* leaves open the possibility of standing for Plaintiffs here (or, at least, some Plaintiffs depending on how long they have or had used their vehicles absent any defect). *See, e.g.*, *Doyle v. Chrysler Grp., LLC*, No. 13-CV-0620 (JVS), 2014 WL 1910628, at *10 (C.D. Cal. Jan. 29, 2014) (declining to rely on *Everett* as, there, the "allegedly defective seat belt had functioned as promised for over ten years" whereas the likelihood of manifestation in the instant case was not so remote); *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 301, 304 (Tex. 2008) (observing that "[a] person who buys a defective product can sue for economic damages, but the law is not well developed on the degree to which the defect must actually manifest itself before it is actionable," and holding that the plaintiff class lacked standing as the "fear of possible injury from an accidental release of a seatbelt [was] so remote" (footnote omitted)).  But the great weight of Texas authority suggests that manifestation is necessary, at least in the context of frequently used products like cars, for a plaintiff to bring an action for solely economic losses.  *See, e.g.*, *Rosa v. Am. Water Heater Co.*, 177 F. Supp. 3d 1028, 1051, 1053 (S.D. Tex. 2016) ("A water heater, like a tire or car, has a limited usable life. . . . Given the extensive body of case law indicating that Texas does not permit plaintiffs to recover unless they have experienced some injury to a product with a limited useable life, the court is not persuaded by [the p]laintiff's arguments."); *Gen. Motors Corp. v. Garza*, 179 S.W.3d 76, 83 (Tex. App. 2005) ("[T]he purchasers of Malibus could drive their cars with no problem until the pulsation manifested, if it ever did.  For purchasers who never experienced a problem during the time they owned the car, they got what they paid for — a vehicle that provided transportation with a brake

system that safely stopped the car."); *Martin v. Ford Motor Co.*, 914 F. Supp. 1449, 1455 (S.D. Tex. 1996) ("Plaintiffs cannot succeed on any of their claims without demonstrating that they have in fact been injury." (collecting Texas cases)); *Polaris Indus. v. McDonald*, 119 S.W.3d 331, 338 (Tex. App. 2003) (finding no standing where the alleged design defect had not caused an injury); *see also Compaq Computer Corp. v. LaPray*, 79 S.W.3d 779, 792 (Tex. App. 2002) ("Tires and cars have a distinctly limited usable life. At the end of the product's life, the product and whatever defect it may have had pass away. If a defect does not manifest itself in that time span, the buyer has gotten what he bargained for."), *rev'd on other grounds*, 135 S.W.3d 657 (Tex. 2004). Federal courts applying Texas law have almost uniformly concluded the same. *See, e.g.*, *In re Gen. Motors Type III Door Latch Litig.*, No. 98-CV-5836, 2001 WL 103434, at *3 (N.D. Ill. Jan. 31, 2001) ("Courts interpreting Texas law have generally opposed the idea that consumers should be able to recover damages for an allegedly defective product which has not yet malfunctioned or caused injury," and the two Texas courts that have "allowed uninjured plaintiffs to proceed . . . have specifically distinguished cases in which owners of automobiles sued for defects which never materialized."); *In re Air Bag Prods. Liab. Litig.*, 7 F. Supp. 2d at 806 (concluding that, under Texas law, the "plaintiffs' failure to demonstrate or, even allege, manifest injury or defect shatters an essential element of all their tort and implied warranty claims").

Faced with a veritable "wealth of contrary case law," Plaintiffs' inability to provide a single Texas precedent reaching a different outcome in the context of cars is beyond telling. *In re Air Bag Prod. Liab. Litig.*, 7 F. Supp. 2d at 805. The cases that Plaintiffs do cite were expressly distinguished by the *Everett* Court as "not controlling" because they all involved manifested defects. 178 S.W.3d at 852 (listing cases). (*See* Pls.' Opp'n 12 n.9 (listing the

same)).  Plaintiffs' attempts to distinguish New GM's cases are also unavailing: They claim the

cases did not involve alleged misrepresentations or product recalls, but none of those differences

undermines the central point of the cases — namely, that a manifest defect is a necessary

element of a DPTA claim.  Accordingly, New GM's motion to dismiss the remaining Texas

Plaintiffs' DPTA claims is granted as to Hunter, Liddy, and Wilson, but otherwise denied.[28]

### b. Fraudulent Concealment

Next, the Texas Plaintiffs bring common law claims of fraudulent concealment.  (*See*

FACC ¶¶ 6582-6595).  To prevail on an action for fraud under Texas law, a plaintiff must prove

that "(1) a material representation was made, (2) the representation was false, (3) when the

speaker made the representation, he knew it was false or made it recklessly without knowledge

of the truth as a positive assertion, (4) the speaker made it with the intention that it should be

acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered

injury."  *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385

(Tex. App. 2007); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,

---

[28]     New GM contends that the lack of a manifest defect also defeats the implied warranty,
fraudulent concealment, and unjust enrichment claims of Hunter, Liddy, and Wilson.  (GM
Mem. 12).  As the above cited case law makes clear, under Texas law, implied warranty claims
are also foreclosed absent a manifest defect.  *See, e.g.*, *Everett*, 178 S.W.3d at 853-55 ("[F]or a
defect to cause redressable damages in a breach of the implied warranty of merchantability
action, it must cause the product not to function adequately in the performance of its ordinary
function for the plaintiff."); *Polaris Indus.*, 119 S.W.3d at 340-41 (dismissing breach of implied
warranty claim where jet ski could and did perform adequately such that the plaintiffs sought
only benefit-of-the-bargain damages); *Garza*, 179 S.W.3d at 81 ("A product that performs its
ordinary function adequately does not breach the implied warranty of merchantability merely
because it does not function as well as the buyer would like, or even as well as it could.").
Accordingly, the implied warranty claims of Hunter, Liddy, and Wilson must be dismissed.  As
to these Plaintiffs' fraudulent concealment and unjust enrichment claims, the Court is inclined to
agree with New GM that they are also foreclosed, but it need not reach the issue because (for
reasons discussed below) those claims fail for different reasons.

960 S.W.2d 41, 47 (Tex. 1998). Fraud by omission or fraudulent concealment "is a subcategory of fraud because an omission or non-disclosure may be as misleading as a positive misrepresentation of fact when a party has a duty to disclose." *Solutioneers*, 237 S.W.2d at 385. Thus, to state a claim of fraudulent concealment under Texas law, a plaintiff must allege facts from which a court can plausibly find that the defendant had a "duty to disclose."

Texas precedent is, to put it mildly, a tad inconsistent with respect to what circumstances give rise to a duty to disclose. On the one hand, courts have pronounced that such a duty "may arise in four situations":

> (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression.

*Vial v. Gas Sol., Ltd.*, 187 S.W.3d 220, 230 (Tex. App. 2006). On the other hand, some (although not all) courts applying Texas law have held that a "confidential" or special trust relationship is necessary for a duty to disclose to arise in *any* of these four situations. *See, e.g.*, *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565 (5th Cir. 2005) ("[N]o duty to disclose exists in Texas absent a fiduciary or confidential relationship." (collecting cases)); *see also, e.g.*, *Bradford v. Ventor,* 48 S.W.3d 749, 755-56 (Tex. 2001) (holding that, "[a]s a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information" and noting "we have never adopted section 551" of the Restatement (Second) of Torts, which recognizes a duty of disclosure in non-fiduciary interactions where, for example, disclosure is necessary to correct a misleading partial statement). *But see, e.g.*, *Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747, 763 (N.D. Tex. 2012) ("This district has held that even without a special relationship giving rise to a

duty of care, there is always a duty to correct one's own prior false or misleading statement.");

*Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 213 (Tex. App. 2001) ("The existence of a confidential relationship is but one of the bases for imposing a duty to disclose."). In light of the Texas Supreme Court's decision in *Bradford* and the Fifth Circuit's pronouncement in *United Teacher Associations*, the Court is inclined to agree with New GM that Plaintiffs' fraudulent concealment claims cannot proceed absent fiduciary or confidential relationships.

That conclusion is bolstered by several cases involving circumstances analogous to those here, in which courts have held that the connection between a plaintiff-purchaser and a defendant-manufacturer is too attenuated to sustain a fraud claim under Texas law where the plaintiff-purchaser had acquired her vehicle from a third party. In *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337 (N.D. Ga. 2015), for instance, the district court found "no evidence of any disclosure of information or the making of a representation by [the defendant car distributor] directly to [the plaintiff] concerning the vehicle" before purchase. *Id.* at 1353-54. The Court reasoned that, even if *Bradford* left open the possibility of a duty to disclose absent a confidential or fiduciary relationship, the Texas Supreme Court decision still involved "*arm's length business transactions* between the parties in which affirmative representations were made but other material information was not disclosed. On the other hand, there was no arms length transaction between [the plaintiff] and [defendant distributor]" because the plaintiff "purchased his car from a third-party seller." *Id.* at 1354; *see also Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 235 (S.D.N.Y. 2015) (dismissing Texas fraudulent concealment claims as Chrysler had no duty to disclose under the circumstances); *Nissan Motors Co. v. Armstrong*, 145 S.W.3d 131, 149 (Tex. 2004) (holding that the trial court did not err in dismissing the plaintiff's fraud claims where she had "obtained her car from her parents six years after they bought it from Nissan" and

"Nissan had no involvement or pecuniary interest in the transaction," meaning Nissan had "no duty to disclose" any defect). At a minimum, therefore, Texas law requires proof of a transaction between the parties of *some sort* (even arm's length) before a duty to disclose will arise. Because none of the Texas Plaintiffs interacted with New GM directly, New GM's motion to dismiss their fraudulent concealment claims must be and is granted.[29]

### c. Unjust Enrichment

Finally, the Court turns to the Texas Plaintiffs' unjust enrichment claims. (FACC ¶¶ 6628-6638). As other courts have observed, the precise characterization of unjust enrichment under Texas law — whether it is "an independent cause of action" or a "quasi-contractual theory of recovery" — is "not completely clear." *Perales v. Bank of America, N.A.*, No. 14-CV-1791, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014) (collecting cases on both sides); *see also Ford Motor Co. E-350 Van Products Liab. Litig.*, 2011 WL 601279, at *10 ("Texas courts have provided limited guidance regarding the doctrine of unjust enrichment."). Regardless, the elements of unjust enrichment are well-defined: Recovery is allowed "when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W2d 39, 41 (Tex. 1992). The remedy is a narrow one, however, as the Texas Supreme Court has cautioned that it is not rendered proper "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss . . . or because the benefits to the person sought to be charged amount to a

---

[29]     New GM also contends that the economic loss doctrine bars the Texas Plaintiffs' fraudulent concealment claims. (*See* GM Mem. 57-58). In light of the Court's conclusion that the Texas Plaintiffs fail to state fraudulent concealment claims on other grounds, the Court need not address New GM's contention — or the question of whether the economic loss doctrine applies differently with respect to the DPTA (as discussed above) and common law fraud claims.

windfall." *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998) (internal quotation marks omitted). As in most states, "when a valid, express contract covers the subject of the parties' dispute, there can be no recovery under a quasi-contract theory." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); *accord Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001); *Patterson v. Long Beach Mortg. Co.*, No. 07-CV-1602, 2009 WL 4884151, at *8 (N.D. Tex. Dec. 15, 2009). Significantly, however, "whether a plaintiff has a meritorious claim for breach of contract does not govern whether that remedy precludes a claim for unjust enrichment; rather, the mere existence of [a] potential contract claim bars the unjust enrichment remedy." *Anderson v. CitiMortgage, Inc.*, No. 10-CV398, 2011 WL 1113494, at *6 (E.D. Tex. Mar. 24, 2011) (internal quotation marks omitted). Here, most of the remaining Texas Plaintiffs — namely Graciano, Liddy, McClellan, and Wilson — purchased their vehicles under warranty, and Plaintiffs do not dispute the validity of those contracts. Accordingly, these Plaintiffs' claims fail as a matter of law. *See, e.g., In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 879 (S.D. Ohio 2012) ("Texas Plaintiffs' vehicles are subject to the terms of the Warranties. The Warranties define PCNA's obligation to reimburse consumers for the cost of repairing and replacing parts that are defective in material. Allowing Texas Plaintiffs to recover the damages that they seek from PCNA under a theory of unjust enrichment would improperly expand the duration and scope of these Warranties.").

In any event, the unjust enrichment claims of all the Texas Plaintiffs fall short because they have an adequate remedy at law. Unjust enrichment is an equitable claim and, "[l]ike other equitable claims, an adequate legal remedy may render equitable claims of unjust enrichment . . . unavailable." *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005); *accord Texas Carpenters Health Ben. Fund v. Philip Morris, Inc.*, 21 F. Supp. 2d 664, 678 (E.D. Tex. 1998).

In fact, even when Texas courts refer to unjust enrichment as a "claim," they "do not . . . characterize [it] as a separate cause of action from money had and received; they consider it to be a general theory of recovery for an equitable action seeking restitution." *Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009) (citation omitted), *aff'd sub nom. Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699 (5th Cir. 2011); *see also, e.g.*, *Walker v. Cotter Prop., Inc.*, 181 S.W.3d 895, 900 (Tex. App. 2006) ("Unjust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."). To the extent the Texas Plaintiffs state an independent cause of action for unjust enrichment, therefore, the claim is duplicative of their other claims and must be dismissed. *See, e.g.*, *In re Clorox Consumer Litig.*, No. 12-CV-280, 2013 WL 3967334, at *12 (N.D. Cal. July 31, 2013); *Vigo v. Reed*, No. 11-CV-2044, 2013 WL 786925, at *4 (N.D. Tex. Mar. 4, 2013). Thus, New GM's motion to dismiss the Texas Plaintiffs' unjust enrichment claims is granted in full.

### 8. Wisconsin

Last but not least, the remaining Wisconsin Plaintiffs for purposes of this motion are Nancy Bellow, Dion Jones, Scott Schultz, and Christy Smith. Bellow owns a 2007 Chevrolet Cobalt that she purchased used and not under warranty from a Buick dealership on March 31, 2012, which was subject to the Delta Ignition Switch defect recall. (FACC ¶ 286). Jones owns a 2007 Chevrolet Impala that he purchased from a private seller in May 2013, which was subject to the Low Torque Ignition Switch recall. (*Id.* ¶ 287). Schultz owns a 2006 Saturn Ion that he purchased used and not under warranty from a dealership in 2011, which was subject to the Delta Ignition Switch defect and Power Steering recalls. (*Id.* ¶ 289). Finally, Smith owns a 2008

Buick Enclave, which she purchased used along with an extended warranty from a car dealership on December 20, 2012, which was subject to the Side Airbag recall. (*Id.* ¶ 290).

Bellow does not allege that her car ever experienced any issues, although she was fearful of driving it after learning about the ignition switch recall. (*Id.* ¶ 286). Her car's ignition switch was repaired, as part of the recall, on September 18, 2014. (*Id.*). Jones alleges that he experienced "a few problems" with the ignition switch of his car, finding it too unreliable to be used to drive for hire with Uber. (*See id.* ¶ 287). Smith experienced an issue with the airbag light in her car coming on almost immediately after she purchased it in December 2012; she returned to the dealership, which replaced the airbag. (*Id.* ¶ 290). Schultz, however, experienced several issues with his ignition switch. His car shut off approximately ten times while he was driving it; during one incident, "he had to maneuver to avoid an oncoming vehicle and a ditch." (*Id.* ¶ 289). When the car would turn off, the power steering and brakes would also be disabled. (*See id.*). Finally, his car also shut off while driving on gravel roads and railroad tracks; it is possible that his knee hit the ignition switch on some of those occasions. (*Id.*). Smith did not have his car repaired pursuant to the recall, because he traded it in around August 2014 after experiencing so many problems and being unable to sell the vehicle privately. (*See id.*).

The Wisconsin Plaintiffs bring claims against New GM under the Wisconsin Deceptive Trade Practices Act ("WDTPA"), Wis. Stat. § 100.18 (FACC ¶¶ 7277-7300); for common law fraudulent concealment (*id.* ¶¶ 7301-7314); and for unjust enrichment (*id.* ¶¶ 7337-7347). The Court will address each of these claims in turn.

**a. The WDTPA**

The Wisconsin Plaintiffs first bring claims under the WDTPA, which "generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or

sales announcements." *Tietsworth*, 677 N.W.2d at 244; *see also* Wis. Stat. § 100.18(1). To state

a claim under the statute, then, a plaintiff must prove three elements: "(1) the defendant made a

representation to 'the public' with the intent to induce an obligation, (2) the representation was

'untrue, deceptive or misleading,' and (3) the representation materially caused a pecuniary loss

to the plaintiff." *Spacesaver Corp. v. Marvel Grp., Inc.*, 621 F. Supp. 2d 659, 662 (W.D. Wis.

2009). Significantly, in contrast to the consumer protection laws of the other states at issue in

this motion, "[s]ilence — an omission to speak — is insufficient to support a claim" under the

WDTPA. *Tietsworth,* 677 N.W.2d at 245. That is because the Act "does not purport to impose a

duty to disclose, but, rather, prohibits only affirmative assertions, representations, or statements

of fact." *Id.* Relatedly, mere "puffery" — defined as "the exaggerations reasonably to be

expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot

be precisely determined," *State v. Am. TV & Appliance of Madison, Inc.*, 430 N.W.2d 709, 712

(Wis. 1998) — is also "legally insufficient" to support a DTPA claim. *Tietsworth,* 677 N.W.2d

at 245-46. Finally, "[b]ecause a claim under the DTPA sounds in fraud, it must be pleaded with

particularity" under Rule 9(b). *Miller v. Vonage Am., Inc.*, No. 14-CV-379, 2015 WL 59361, at

*5 (E.D. Wis. Jan. 5, 2015).

Applying those standards here, the Wisconsin Plaintiffs' WDTPA claims largely pass

muster. New GM does not dispute that the Wisconsin Plaintiffs are members of "the public"

within the meaning of the Act. *See K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732

N.W.2d 792, 799 (Wis. 2007) (noting that the WDTPA does not define the phrase but

concluding a plaintiff ceases to be a member of "the public" only where there is "some particular

relationship between the parties," such as a pre-existing contract). Nor does it contest that, if

there are actionable misrepresentations, they are alleged to have "materially caused a pecuniary

loss" to the Wisconsin Plaintiffs. *Spacesaver Corp.*, 621 F. Supp. 2d at 662. (*See* FACC ¶¶ 287, 289). Instead, New GM challenges their claims on the ground that the claims actually rest on the concealment of defects — rather than any active misrepresentation — and thus fall outside the scope of the WDTPA. (*See* GM Mem. 48-49; GM Reply 24). It is certainly true that the FACC contains a host of concealment-related allegations, as discussed above. But that does not mean that allegations of concealment are irrelevant to the analysis, let alone that Plaintiffs are precluded from also bringing misrepresentation-based claims. *See Murillo v. Kohl's Corp.*, 197 F. Supp. 3d 1119, 1127 (E.D. Wis. 2016) (rejecting an argument that the plaintiffs could not make out a WDTPA claims because their complaint, "at least in part, tie[d] Kohls' liability to certain price-related omissions," noting that, "for every deceptive misstatement of fact, there will often be corresponding omission of truth"); *see also Christense v. TDS Metrocom LLC*, 763 N.W.2d 248 n.4 (Wis. Ct. App. 2008) (Table) ("[A] nondisclosure of facts, *combined with* an affirmative representation that is undermined by the non-disclosed facts, may result in liability under [the WDTPA]. In such situations, the existence of the undisclosed facts may show that the affirmative representation is untrue, deceptive, or misleading."). And Plaintiffs certainly plead their fair share of misrepresentations: for example, that New GM "intentionally and knowingly misrepresented material facts" regarding the safety of its vehicles (FACC ¶ 7288), "made material statements about the safety and reliability of" defective vehicles (*id.* ¶ 7290), and "made incomplete representations about the safety and reliability" of those vehicles. (*Id.* ¶ 7291).

New GM's alternative argument — that, to the extent Plaintiffs plead active misrepresentations, those misrepresentations are not sufficient under the WDTPA (*see* GM Mem. 48) — is a closer call, if only because the line between "puffery" and actionable statements of fact can be difficult to draw. *See, e.g.*, *United Concrete & Const., Inc. v. Red-D-*

*Mix Concrete, Inc.*, 836 N.W.2d 807, 817 (Wis. 2013) (distinguishing between an "abstract, highly *generalized* pitch" and "a *specific,* factual statement"). As a general matter, however, whether an assertion amounts to puffery or not turns on whether it is "a statement of fact which can be proven false." *Am. TV*, 430 N.W.2d at 712; *see also United Concrete*, 836 N.W.2d at 816 ("Exaggerations of this sort do not subject the speaker to liability under [the WDTPA] because they convey only the seller's opinion and are not capable of being substantiated or refuted." (internal quotation marks omitted)). And here, Plaintiffs identify a host of statements made by New GM to the public that, when viewed in context, could be objectively measured. For example, Plaintiffs point to advertisements by New GM discussing its vehicles' "world class engineering" and "advanced safety and security features," not to mention the company's "quality processes in the plant that prevent any defects from getting out." (FACC ¶¶ 365-424). New GM also advertised to the public that it made "some of the safest vehicles on earth"; that "passenger safety is a primary consideration throughout the engineering process"; that the company had an "above-and-beyond commitment to provide continuous occupant protection before, during and after a crash"; and that it employed "the world's most sophisticated safety technology," with safety as the company's "top priority." (*See id.*).

To be sure, if "[v]iewed in isolation," some of these statements — about making "some of the safest vehicles on earth" and the like — "may indeed constitute 'puffery.'" *Murillo*, 197 F. Supp. 3d at 1128. But when viewed in conjunction with other allegations in the FACC — particularly those tending to show that New GM was aware of the various alleged defects at the same time that it was touting, for example, its "quality processes . . . that prevent any defects from getting out" (FACC ¶¶ 365-424) — many of these statements cross the line from mere puffery to active misrepresentations. *Compare United Concrete*, 836 N.W.2d at 817 (dismissing

statements that a "product is the 'best' or the like" as "not representing a fact at all, let alone misrepresenting one"), *with Radford v. J.J.B. Enters., Ltd.*, 472 N.W.2d 790, 794 (Wis. Ct. App. 1991) (finding "credible evidence" of a material misrepresentation where the defendants "spoke to the condition of the boat as it existed" prior to the plaintiff's purchase, claiming it had "a sound hull" — when the boat leaked from the time the plaintiff purchased it). *See generally In re Toyota Motor Corp.*, No. 10-MDL-2151 (JVS), 2012 WL 12929769, at *17 (C.D. Cal. May 4, 2012) ("Advertising a car as safe and reliable when it actually has a safety-related defect that may render it unable to stop is not within the tolerable range of commercial puffery" (internal quotation marks omitted)).

Thus, the Court concludes that the Wisconsin Plaintiffs adequately allege at least some misrepresentations that are actionable under the WDTPA, and their claims may not be dismissed on this basis. With respect to specific non-Delta Ignition Switch Plaintiffs: Schultz is a proposed Power Steering (and Delta Ignition Switch) Defect Plaintiff. (FACC ¶ 289). He purchased his 2006 Saturn Ion in 2011; the prior year, in June 2010, New GM approved a special coverage plan for that vehicle model, extending warranty coverage to ten years or 100,000 miles and instructing dealers to replace the power steering motors in the cars of customers who complained. (*See id.* ¶ 756). Moreover, in December 2010, New GM Canada issued a recall of 2006 Saturn Ions (among other vehicles) — but New GM still did not recall those same models in the United States. (*See id.* ¶ 757). These allegations are sufficient to demonstrate that New GM had knowledge of the defect prior to Schultz's purchase in 2011. Finally, Smith is a Proposed Side Airbag Defect Plaintiff (*id.* ¶ 290). She purchased her 2008 Buick on December 20, 2012 (*id.*); since its inception, New GM knew that Old GM had issued a technical service bulletin in November 2008 regarding the 2008 Buick's issue with increased resistance in its

airbag wiring (*see id.* at ¶ 740). New GM was also aware of a host of similar issues in other models, including later Buick models — prompting New GM to circulate an internal bulletin recommending that dealers replace the wiring connectors in, among other things, 2011 and 2012 Buick Enclaves. (*Id.* ¶ 743; *see generally id.* ¶¶ 731-747). Taken together, these allegations are sufficient at this stage to allege that New GM had knowledge of the Side Airbag defect when Smith purchased her car in 2012. Accordingly, New GM's motion to dismiss all the Wisconsin Plaintiffs' WDTPA claims is denied.

Before moving on, the Court must briefly address two alternative arguments raised by New GM for dismissing Wisconsin Plaintiff Bellow's WDTPA claim. First, New GM asserts that Bellow's claims are barred by the WDTPA's three-year statute of repose. *See* Wis. Stat. § 100.18(11)(b). (GM Mem. 49). That assertion, however, appears to be premised on an error. New GM alleges that Bellow purchased her vehicle in 2007, more than three years before this action was commence (an assertion that, inexplicably, Plaintiffs adopt). (GM Mem. 49; Pls.' Opp'n 50). The FACC alleges, however, that Bellow purchased her vehicle in March *2012*. (FACC ¶ 286; Recall Chart 8). Second, New GM claims that Bellow cannot allege a cause of action under the WDTPA (or otherwise) because her car never manifested any defect. (GM Mem. 9-10).[30] In making this argument, New GM relies heavily on the Wisconsin Supreme

---

[30]    New GM makes the same argument with respect to Wisconsin Plaintiffs Jones and Smith. (*See* GM Mem. 10 n.5; GM Reply 4 n.3). Jones is a proposed Low Torque Ignition Switch Plaintiff who alleges that he "experienced a few problems with the ignition switch" of his car. (FACC ¶ 287). Although somewhat threadbare, that allegation suffices for now to take Jones out of the no-manifestation category. Smith is a proposed Side Airbag defect Plaintiff; she alleges that the "airbag light came on" in her car "almost immediately after purchasing it." (*Id.* ¶ 290). That too suffices for now. The airbag light coming on is precisely how the defect would manifest itself short of the airbags not deploying in an accident. (*See* Pls.' Opp'n 8; FACC ¶ 732 (noting that increased resistance in the side airbag wiring harness "will illuminate the airbag readiness light on the instrument cluster" and may, over time, "reach a level where the [airbags]

Court's analysis in *Tietsworth*. *See* 677 N.W.2d at 239-42. In *Tietsworth*, a class of plaintiffs (namely, owners of certain Harley-Davidson motorcycles) brought claims for common law fraud and WDTPA violations against the company alleging that "their motorcycles [were] diminished in value because [a] defect create[d] a 'propensity' for premature engine failure." *Id.* at 236. Notably, none of these plaintiffs "alleged any personal injury or property damage caused by the defective engines"; nor did they allege "that their motorcycle engines [had] actually failed or malfunctioned in any way." *Id.*

In a section titled "Common-Law Fraud Claim," the Court observed that, "[i]n the context of deciding when a claim accrues for purposes of the statute of limitations, we have generally held that a *tort claim* is not capable of present enforcement (and therefore does not accrue) unless the plaintiff has suffered actual damage." *Id.* at 239 (emphasis added). Because the injury alleged was "diminution in value only" — that is, "the plaintiffs allege[d] that their motorcycles [were] worth less than they paid for them" — the Court concluded that the plaintiffs' allegations standing alone were "insufficient to state a legally cognizable injury for purposes of a fraud claim." *Id.* at 240 (noting that "[d]iminished value premised upon a mere possibility of future product failure is too speculative and uncertain to support a fraud claim"). Having resolved the plaintiffs' *common law* fraud claims on that basis, the Court then analyzed their WDTPA claims in a separate section titled "DTPA Claim." *Id.* at 244. As the Court noted, to prevail on a *statutory* fraud claim in Wisconsin, a plaintiff need only show that he or she "suffer[ed] a pecuniary loss" to have alleged a legally cognizable injury. *Id.*; *see also* Wis. Stat.

---

will not deploy in a crash")). And it would be perverse to require Smith to be involved in an accident to prove that her car manifested the defect. *See In re Takata*, 193 F. Supp. 3d at 1335 ("If Takata had installed grenades in its airbags that may or may not explode on impact, a court would not require an explosion to demonstrate manifestation of a defect.").

§ 100.18(11)(b) ("Any person suffering pecuniary loss because of a violation of this section [may recover]."). The Court thus dismissed the plaintiffs' WDTPA claims on a wholly separate ground from their common law claims: that they were premised mainly on nondisclosure and "the only affirmative assertions alleged in the [] complaint [were] mere puffery," neither of which are actionable under the WDTPA. *See* 677 N.W.2d at 245-46.

New GM argues that the *Tietsworth* Court intended its holding regarding the need for a manifested defect in the common law fraud context to extend to statutory fraud claims. (*See* GM Mem 9-10; GM Reply 3). But the Court is not convinced. The Wisconsin Supreme Court explicitly distinguished between its two holdings, both structurally (by dividing the discussions into two sections) and legally. *See, e.g.*, 677 N.W.2d at 237 (summarizing that "diminished value" is "insufficient to state damages in a tort claim for fraud" and, in the next paragraph, that "plaintiffs have *also* failed to state a claim for deceptive trade practices" because those claims were premised on "non-disclosure" and "classic advertising puffery" (emphasis added)). In support of its argument, New GM points to a lengthy string cite in *Tietsworth*'s common law fraud section that includes (without comment) two out-of-state decisions dismissing, for lack of a manifested defect, "various statutory claims" and "deceptive trade practices" claims in addition to common law claims. *See id.* at 240-41. But the *Tietsworth* Court itself characterized these cases as "federal and state court decisions that have affirmed the dismissal of claims brought under *fraud, strict products liability, and other tort theories* where the allegedly defective product has not actually malfunctioned." *Id.* at 240 (emphasis added). Had the Court believed that manifestation of a defect was required to state a legally cognizable claim under the WDTPA, it could have dismissed those claims on that same ground (and, presumably, in the same section of its opinion). It did not.

The Court's conclusion that *Tietsworth* does not control here is bolstered by other Wisconsin decisions. First, since *Tietsworth*, Wisconsin courts have dismissed common law fraud claims absent a manifested defect, while allowing WDTPA claims to proceed. *See, e.g.*, *Martin v. LG Elecs. USA, Inc.*, No. 14-CV-83 (JDP), 2015 WL 1486517, at *8 (W.D. Wis. Mar. 31, 2015) (citing *Tietsworth* to foreclose a plaintiff's common law fraud claims while allowing his WDTPA claim to proceed because he alleged "that he suffered a pecuniary loss *in the diminution of the player's value*" (emphasis added)). Notably, New GM does not cite, and the Court has not found, any case law applying *Tietsworth*'s manifestation holding to bar a WDTPA claim. Second, Wisconsin courts have interpreted "pecuniary loss" in the WDTPA broadly "to encompass any *monetary* loss," including the loss of a plaintiff's benefit of the bargain. *Mueller v. Harry Kaufmann Motorcars, Inc.*, 859 N.W.2d 451, 458-59 (Wis. App. Ct. 2014). In *Mueller*, for instance, the Wisconsin Appellate Court reversed a trial court's holding that "pecuniary loss" included "only benefit-of-the-bargain damages" because it found that "nothing in the words of the statute [] limits 'pecuniary loss' to benefit-of-the-bargain damages," meaning a full refund of the purchase price might also suffice for damages. *See id.*; *see also K & S Tool*, 732 N.W.2d at 803 (affirming a jury's verdict that the plaintiff had suffered pecuniary loss where it had alleged that it "would not have purchased" the product at all but for the seller's misrepresentations because it did not receive the product it bargained for). "In sum, based upon [the statute's] plain language and particularly the deterrent purpose of the statute," the Wisconsin Appellate Court has concluded "that a 'pecuniary loss' can include monetary remedies like the cost of repair or *diminution in value*." *Mueller*, 859 N.W.2d at 460 (emphasis added). In light of this authority, diminished value (or benefit-of-the-bargain damages) can fulfill the WDTPA's "pecuniary loss"

requirement, whether or not a defect has manifested.  Accordingly, New GM's motion to dismiss Bellow's WDTPA claim is denied.[31]

### b.  Fraudulent Concealment

Next, New GM challenges the Wisconsin Plaintiffs' fraudulent concealment claims on the ground that they are barred under Wisconsin law by the economic loss rule.  (GM Mem. 55). Plaintiffs concede this point.  (*See* Pls.' Opp'n 56; GM Reply 28 n.19).  Accordingly, New GM's motion to dismiss the Wisconsin Plaintiffs' fraudulent concealment claims is granted.

### c. Unjust Enrichment

Finally, the Court turns to the Wisconsin Plaintiffs' claims for unjust enrichment.  To state a claim for unjust enrichment under Wisconsin law, "a plaintiff must show that: (1) plaintiff conferred a benefit on the defendant, (2) the defendant appreciated or knew of the benefit, and (3) the defendant accepted or retained the benefit under circumstances making retention of the benefit inequitable without payment."  *Martin*, 2015 WL 1486517, at *7; *see also Puttkammer v. Minth*, 266 N.W.2d 361, 363 (1978) (same).  New GM argues that the unjust enrichment claims of all the Wisconsin Plaintiffs should be dismissed because they have adequate remedies at law. (*See* GM Mem. 26-27, 29; GM Reply 14-16).  But conspicuously, New GM's sole authority in support of that argument is a case from 1956 concerning an injunction, in which the Court stated that "one who invokes the aid of equity must ordinarily" show "they were without an adequate remedy at law."  *Klump v. Cybulski*, 81 N.W.2d 42, 46 (Wis. 1957).  New GM's failure to cite — and the Court's failure to find — a more recent authority on point, let alone a single authority

---

[31]      New GM also challenges Bellow's unjust enrichment claim on manifestation grounds. (GM Mem. 10).  Because, as discussed below, the Wisconsin Plaintiffs cannot maintain their unjust enrichment claims for other reasons, the Court need not resolve that issue.

with respect to unjust enrichment is telling, especially given the ample applicable precedent from other jurisdictions. Accordingly, the Court declines to dismiss the Wisconsin Plaintiffs' unjust enrichment claims on this ground at this stage of the proceedings.

New GM's second argument — which applies only to Smith — is that, as a matter of Wisconsin law, a plaintiff may bring an unjust enrichment claim only in the absence of an enforceable contract. (GM Mem. 26-27). As in other jurisdictions, there are authorities on both sides of that issue. *Compare, e.g.*, *Diamond Ctr., Inc v. Leslie's Jewelry Mfg. Corp.*, 562 F. Supp. 2d 1009, 1016-17 (W.D. Wis. 2008) (allowing pleading in the alternative), *with Harley Marine Servs., Inc. v. Manitowoc Marine Grp., LLC*, 759 F. Supp. 2d 1059, 1062-63 (E.D. Wis. 2010) (dismissing an unjust enrichment claim where the plaintiff also alleged breach of contract). Nevertheless, the weight of authority supports New GM's position, at least where the plaintiff alleges the existence of a contract in her complaint (and there is no suggestion that the contract is invalid). *See, e.g.*, *Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir. 2011) ("In Wisconsin, the quasi-contractual theories of quantum meruit and unjust enrichment are legal causes of action grounded in equitable principles and can be invoked only in the absence of an enforceable contract."). That is, where a plaintiff herself alleges the existence of a contract, "the plaintiff is precluded from pleading in the alternative claims that are legally incompatible with the contract claim. This is but an application of the rule that '[a] plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits . . . .'" *Harley Marine Servs.*, 759 F. Supp. 2d at 1063 (quoting *Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7th Cir. 2008)). Here, Smith does not bring a contract *claim* per se, but she does allege the existence of a contract. (FACC ¶ 290 ("She purchased an extended warranty for the car.")). In light of that allegation, her unjust enrichment claim is "is a dud on its face" and must be

dismissed.  *Harley Marine Servs.*, 759 F. Supp. 2d at 1061.  Accordingly, New GM's motion to dismiss Smith's unjust enrichment claim under Wisconsin law is granted.

## CONCLUSION

In sum, many claims asserted by the named Plaintiffs in this motion survive, but the Court yet again rejects Plaintiffs' novel theory of damages — the brand devaluation theory — as impermissibly repleading claims previously dismissed with prejudice and, in any event, as insufficient as a matter of law.  The economic loss claims of a large swath of named Plaintiffs are also foreclosed because those individuals either purchased their vehicles prior to New GM's creation on July 10, 2009 (meaning their time-of-sale economic injury cannot be attributed to New GM) or disposed of their vehicles prior to New GM's announcement of the recalls in 2014 (meaning they did not suffer economic damages from reselling or trading in vehicles not yet known to be defective).  To the extent that the named Plaintiffs who disposed of their vehicles prior to the recall announcements can plead and prove out-of-pocket expenses or lost time damages stemming from a defect (for instance, payment of defect-related repairs during ownership), however, Plaintiffs are granted leave to amend.  Relatedly, the Court rejects New GM's categorical challenge to Plaintiffs' claims for "lost time" damages, as some states recognize this as a valid theory of consequential damages.

Turning to the state law claims of the remaining Plaintiffs, the statutory consumer fraud claims of most (and, in many states, all) Plaintiffs survive — although the claims of the New York and Texas Plaintiffs whose vehicles never manifested a defect are dismissed.  Further, Illinois Plaintiff Painter and New York Plaintiff Mason are granted leave to amend to their consumer fraud claims to the extent that the 2010 power steering recall was initiated after they purchased their vehicles (which were subject to the 2014 Power Steering recall at issue here).

Illinois Plaintiff Redmon is also granted leave to amend his consumer fraud claim to the extent that he can allege that he purchased his car after the May 2010 NHSTA complaints regarding the Knee-to-Key defect.  Plaintiffs' fraudulent concealment claims also survive in most states, although they are barred under the laws of Michigan, Texas, and Wisconsin.   Moreover, the fraudulent concealment claims of the New York and Pennsylvania Plaintiffs whose vehicles never manifested a defect are dismissed.  Similarly, to the extent Plaintiffs brought implied warranty claims (which the Alabama, Illinois, and Wisconsin Plaintiffs did not), those claims generally survive, except again for those of the New York, Pennsylvania, and Texas Plaintiffs whose cars never manifested any defect.  Finally, the bulk of Plaintiffs' unjust enrichment claims are dismissed — except for the claims of the Illinois Plaintiffs, Pennsylvania Plaintiff Pollastro (who purchased his car from a GM-brand dealership), and the Wisconsin Plaintiffs other than Smith (whose car was purchased under warranty), which all survive.

As the Court indicated in the last round of motion practice, although this ruling addresses only some of the claims in the operative complaint, it should inform the parties with respect to the viability of other claims and, more generally, bear upon the further progress of the MDL. Pursuant to Order No. 114 (Docket No. 3431), no later than **three weeks** from the date of this Opinion and Order, the parties shall meet and confer and advise the Court of their views with respect to whether and how the Court's rulings apply to the thirty-five jurisdictions that have not been the subject of full briefing (the Court's sincere hope being that it will not have to repeat this exercise with respect to each and every one of the remaining jurisdictions).  Any submissions should address a briefing schedule and process if either side believes that briefing or motion practice is appropriate.  Further, to the extent the parties find it helpful, they should confer and submit a chart (or proposed order) summarizing the rulings in this Opinion and Order with

respect to the named Plaintiffs' claims, to be so ordered by the Court. In those submissions, Plaintiffs should also indicate to the Court whether they intend to amend the FACC (as to any of the claims that were dismissed with leave to amend) and, if so, provide an outline of the proposed amendments and a proposed schedule.

The Clerk of Court is directed to terminate Docket No. 3577.

SO ORDERED.

Dated: June 30, 2017
      New York, New York



JESSE M. FURMAN
United States District Judge